No. 21-1478

In The

# United States Court of Appeals
# For the Fourth Circuit

WILLIAM PARKER GAREY, et al, *Plaintiffs-Appellants*

v.

JAMES S. FARRIN, P.C., et al., *Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA AT WINSTON-SALEM
(The Honorable Loretta Biggs)

---

**JOINT APPENDIX – VOLUME IX**

---

J. David Stradley
Robert P. Holmes, IV
WHITE & STRADLEY, PLLC
3105 Charles B. Root Wynd
Raleigh, North Carolina 27612
Telephone: (919) 844-0400
Facsimile: (919) 845-9745
*stradley@whiteandstradley.com*
*rob@whiteandstradley.com*

*Counsel for Plaintiffs-Appellants*

Bradley M. Risinger
Matthew Nis Leerberg
Jeffrey R. Whitley
Troy D. Shelton
Fox Rothschild, LLP
P.O. Box 27525
Raleigh, North Carolina 27611
Telephone: (919) 755-8700
Facsimile: (919) 755-8800
*brisinger@foxrothschild.com*
*mleerberg@foxrothschild.com*
*jwhitley@foxrothschild.com*
*tshelton@foxrothschild.com*

*Counsel for Defendants-Appellees*
*(continued on inside cover)*

Christopher Patrick Raab
Harold Craig Spears
Casey F. Cogburn
Caudle & Spears, P.A.
121 W. Trade St., Suite 2600
Charlotte, North Carolina 28202-5399
Telephone: (704) 377-1200
Facsimile: (704) 338-5858
*craab@caudlespears.com*
*hspears@caudlespears.com*
*ccogburn@caudlespears.com*

Reid Calwell Adams, Jr.
Jonathan Reid Reich
Womble Bond Dickinson, LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Telephone: (336) 721-3674
Facsimile: (336) 733-8333
*Cal.adams@wbd-us.com*
*Jonathan.reich@wbd-us.com*

*Counsel for Defendants-Appellees*

Brian M. Boynton
    Acting Assistant Attorney General
Mark B. Stern
Amanda L. Mundell
Attorneys, Appellate Staff
Civil Division, Room 7236
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 514-3469

*Counsel for Intervenor United States*

# TABLE OF CONTENTS

<u>**Volume I**</u>

Docket Report .................................................................................JA1

Complaint (ECF 1)........................................................................JA84

First Amended Complaint (ECF 32) ..............................................JA104

    Exhibit 1:  Law Offices of James Scott Farrin Marketing Materials to the Garey Family (ECF 32-1) .............................JA141

    Exhibit 2:  Marcari Russotto Spencer & Balaban, P.C. Marketing Materials to William Garey (ECF 32-2) .................................JA153

    Exhibit 3:  Riddle & Brantley, LLP Marketing Materials to William Garey (ECF 32-3) ......................................................................JA165

    Exhibit 4:  Wallace Pierce Law Marketing Materials to William Garey (ECF 32-4) ......................................................................JA174

    Exhibit 5:  Bradley Law Group Marketing Materials to William Garey (ECF 32-5) ......................................................................JA184

    Exhibit 6:  Crumley Roberts Marketing Materials to William Garey (ECF 32-6) ......................................................................JA199

    Exhibit 7:  Ted A. Greve Marketing Materials to William Garey (ECF 32-7) ......................................................................JA206

    Exhibit 8:  Hardee & Hardee Marketing Materials to William Garey (ECF 32-8) ......................................................................JA212

    Exhibit 9:  Lanier Law Group, P.A. Marketing Materials to Aaron Cruthis (ECF 32-9) ......................................................................JA224

    Exhibit 10:  Crumley Roberts Marketing Materials to Aaron Cruthis (ECF 32-10).....................................................................JA232

    Exhibit 11:  Hardison & Cochran Marketing Materials to Aaron Cruthis (ECF 32-11).....................................................................JA239

    Exhibit 12:  Hardee & Hardee Marketing Materials to Aaron Cruthis (ECF 32-12).....................................................................JA245

Exhibit 13: Law Offices of Michael A. DeMayo, LLP Marketing Materials to Amanda Reilly (ECF 32-13) ...............................JA252

Exhibit 14: Lanier Law Group, P.A. Marketing Materials to Adilah McNeil (ECF 32-14) ....................................................JA296

Exhibit 15: Law Offices of James Scott Farrin Marketing Materials to the McNeil Family (ECF 32-15) ...........................JA303

Exhibit 16: Marcari Russotto Spencer Balaban, P.C. Marketing Materials to Adilah McNeil (ECF 32-16)................................JA351

Exhibit 17: Riddle & Brantley, LLP Marketing Materials to Adilah McNeil (ECF 32-17) ....................................................JA363

Exhibit 18: Bradley Law Group Marketing Materials to Adilah McNeil (ECF 32-18) ..........................................................JA371

Exhibit 19: Crumley Roberts Marketing Materials to Adilah McNeil (ECF 32-19) ..........................................................JA381

Exhibit 20: Ted A. Greve & Associates Marketing Materials to Adilah McNeil (ECF 32-20) ....................................JA398

Exhibit 21: Law Offices of James Scott Farrin to the Clevenger Family (ECF 32-21).......................................................JA404

## Volume II

Exhibit 22: Marcari Russotto Spencer Balaban, P.C. Marketing Materials to Charlotte Clevenger (ECF 32-22) ......................JA452

Exhibit 23: Bradley Law Group Marketing Materials to Charlotte Clevenger (ECF 32-23).................................................JA463

Exhibit 24: Crumley Roberts Marketing Materials to Charlotte Clevenger (ECF 32-24).................................................JA473

Exhibit 25: Ted A. Greve & Associates Marketing Materials to Charlotte Clevenger (ECF 32-25).............................JA490

Exhibit 26: Riddle & Brantley, LLP Marketing Materials to Justin Blakeslee (ECF 32-26).................................................JA496

Exhibit 27: Marcari Russotto Spencer Balaban, P.C. Marketing Materials to Justin Blakeslee (ECF 32-27) ............................JA506

Exhibit 28: Lanier Law Group, P.A., Marketing Materials to Justin Blakeslee (ECF 32-28)................................................JA517

Exhibit 29: Bradley Law Group Marketing Materials to Justin Blakeslee (ECF 32-29)....................................................JA525

Exhibit 30: Crumley Roberts Marketing Materials to Justin Blakeslee (ECF 32-30)....................................................JA536

Exhibit 31: Law Offices of Michael A. DeMayo, LLP Marketing Materials to Justin Blakeslee (ECF 32-31) ...........................JA552

Exhibit 32: Ted A. Greve & Associates Marketing Materials to ustin Blakeslee (ECF 32-32)...................................JA555

Memorandum of *Amici Curiae* in Support of Defendants' Motion to Dismiss (ECF 59)................................................................JA561

Motion to Dismiss First Amended Complaint (ECF 60) .....................................JA573

Brief in Support of Motion to Dismiss First Amended Complaint (ECF 61) .........................................................................................JA577

Motion to Dismiss Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (ECF 62).........................................................................JA623

Plaintiff's Brief in Response to Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint and Brief of *Amici Curiae* (ECF 67) .........................................................................................JA627

Memorandum Opinion and Order (ECF 93)........................................................JA683

Motion to Certify Order for Interlocutory Appeal (ECF 94) ...............................JA707

Brief in Support of Motion to Certify Order for Interlocutory Appeal (ECF 95).........................................................................................JA712

Answer of Defendants Michael A. DeMayo; Law Offices of Michael A. DeMayo, LLP; Hardison & Cochran, PLLC; Benjamin T. Cochran; Ted A. Greve & Associates, P.A.; and Ted A. Greve (ECF 96).........................................................................JA720

Answering Defendants' Answer to Plaintiffs' First Amended Complaint (ECF 97).........................................................................JA755

Memorandum Opinion and Order (ECF 131).......................................................JA790

North Carolina Special Warranty Deed (ECF 133-1) .........................................JA807

North Carolina Speical Warranty Deed (ECF 133-2) .........................................JA810

North Carolina Special Warranty Deed (ECF 133-3) .........................................JA812

North Carolina Special Warranty Deed (ECF 133-4) .........................................JA816

North Carolina Special Warranty Deed (ECF 133-5) .........................................JA818

North Carolina Special Warranty Deed (ECF 133-6) .........................................JA820

North Carolina Special Warranty Deed (ECF 133-7) .........................................JA822

Answer of Defendant Katherine E. Andrews-Lanier to Plaintiffs' First Supplemental Complaint (ECF 141)...........................................................JA824

Memorandum Opinion and Order (ECF 142).....................................................JA831

Plaintiffs' Motion for Leave to File and Serve Second Amended and Supplemental Complaint and to Add and Drop Parties (ECF 176)..................................................................................................................JA842

Response to Plaintiff' Motion for Leave to File Second Amended Complaint (ECF 179)................................................................................................JA846

Second Amended and Supplemental Complaint (ECF 180) ..............................JA915

    Exhibit 1:  James Scott Farrin Marketing Materials to Belinda Steinmetz (ECF 180-1)...............................................................JA916

## Volume III

    Exhibit 2:  Bradley Law Group Marketing Materials to Belinda Steinmetz (ECF 180-2).................................................................JA926

    Exhibit 3:  Wallace Pierce Law Marketing Materials to Belinda Steinmetz (ECF 180-3).................................................................JA937

    Exhibit 4:  Lanier Law Group, P.A. Marketing Materials to Belinda Steinmetz (ECF 180-4)............................................................JA942

    Exhibit 5:  Crumley Roberts Marketing Materials to Belinda Steinmetz (ECF 180-5).................................................................JA949

    Exhibit 6:  Ted A. Greve & Associates Marketing Materials to Belinda Steinmetz (ECF 180-6)............................................JA956

Memorandum in Support of Defendants' Consent Motion for a
Protective Order Governing the Production and Use of
Confidential Material (DOC 182)..........................................................JA962

Motion for Class Certification (ECF 184) ..........................................JA969

Plaintiff Justin Brent Blakeslee's Declaration in Support of
Class Certification (ECF 185-1) ............................................................JA980

Plaintiff Aaron Kent Cruthis's Declaration in Support of Class
Certification (ECF 185-2) ......................................................................JA991

Plaintiff Charlotte Clevenger's Declaration in Support of Class
Certification (ECF 185-3) ....................................................................JA1002

Plaintiff Belinda Lee Steinmetz's Declaration in Support of
Class Certification (ECF 185-4) ..........................................................JA1013

Plaintiff William Parker Garey's Declaration in Support of Class
Certification (ECF 185-5) ....................................................................JA1017

Plaintiff Adilah McNeil's Declaration in Support of Class
Certification (ECF 185-6) ....................................................................JA1028

Affidavit of Steve Kulig (ECF 185-7) ................................................JA1039

Declaration of Police Officer A.D. Reed (ECF 185-8) ........................JA1044

Declaration of Christa Boswell (ECF 185-9) ....................................JA1050

Affidavit of Eric S. Schaberg (ECF 185-10) ......................................JA1055

Affidavit of Sergeant John Maultsby (ECF 185-11)..........................JA1064

Declaration of J. David Stradley in Support of Request for
Appointment of Class Counsel (ECF 185-12) ....................................JA1072

Fox Defendants' Motion to Dismiss the Second Amended and
Supplemental Complaint (ECF 188)..................................................JA1075

Brief in Support of Fox Defendants' Motion to Dismiss the
Second Amended and Supplemental Complaint (ECF 189) ..............JA1079

Defendants' Memorandum in Opposition to Plaintiff's Motion for
Class Certification (ECF 201 at p 5) ..................................................JA1187

Fox Defendants' Brief in Opposition to Plaintiffs' Motion for
Class Certification (ECF 206) ............................................................JA1189

    Exhibit 1: Index of Exhibits for the Fox Defendants' Brief
    in Opposition to Plaintiffs' Motion for Class Certification
    (ECF 206-1) ...........................................................................JA1237

    Exhibit 4: Declaration of Sergeant John Maultsby (ECF
    206-4) ......................................................................................JA1239

    Exhibit 6: Accident Report for Justin Brent Blakeslee
    (ECF 206-6) ...........................................................................JA1243

    Exhibit 7: Accident Report for Meghan Elizabeth
    Schneider (ECF 206-7).............................................................JA1248

    Exhibit 8: Accident Report for Adilah Haneefah-Khadi
    McNeil (ECF 206-8) ...............................................................JA1271

    Exhibit 10: Affidavit of Cierra Blakey (ECF 206-10) ...........JA1276

    Exhibit 11: Declaration of Robert Andre Fleury, Jr. (ECF
    206-11) ....................................................................................JA1294

    Exhibit 16: Deposition exhibit identifying class definition
    (ECF 206-16) .........................................................................JA1298

    Exhibit 17: Table of Individual DPPA Actions Filed in
    Federal Court (ECF 206-17) ....................................................JA1300

    Exhibit 18: Declaration of Charles R. Hardee (ECF 206-
    18) ..........................................................................................JA1309

Response to Fox Defendants' Motion to Dismiss (ECF 213)............................JA1382

**Volume IV**

Memorandum Opinion and Order (ECF 216)......................................JA1393

Plaintiffs' Reply in Support of Motion for Class Certification
(ECF 220) ....................................................................................JA1400

    Videotaped Deposition of Eric Sanchez, 30(b)(6) for James
    S. Farrin ,P.C. taken October 28, 2019 (ECF 220-1 pp 1, 5-
    7, 10-14, 43-44) ......................................................................JA1475

Videotaped Deposition of Jared Pierce taken October 165,
2019 (ECF 220-4 pp 1, 6-7) ......................................................JA1486

Deposition of Theodore Allen Greve taken July 11, 2019
(ECF 220-6 pp 1, 6) ...................................................................JA1489

Videotaped Deposition of Lisa Lanier, 30(b)(6) for Lanier
Law Group taken October 25, 2019 (ECF 220-7 pp 1, 6, 8-
11) ..............................................................................................JA1491

Rule 30(b)(6) Deposition of Law Offices of Michael A.
DeMayo, LLP taken October 1, 2019 (ECF 220-10, pp 1, 8-
9, 11-13, 47-49, 61) ...................................................................JA1497

Rule 30(b)(6) Deposition of Charlotte-Mecklenburg Police
Department taken August 5, 2019 (ECF 220-12 pp 1-3, 6,
9, 35-36, 94-96, 100-103, 134-135)............................................JA1507

Redacted Declaration of Kevin Creech (ECF 220-16)............JA1523

Supplemental Declaration of William Parker Garey in
Support of Class Certification (ECF 220-18) ...........................JA1528

Supplemental Declaration of Adilah McNeil in Support of
Class Certification (ECF 220-19)..............................................JA1541

Supplemental Declaration of Aaron Kent Cruthis in
Support of Class Certification (ECF 220-20) ...........................JA1554

Supplemental Declaration of Charlotte Clevenger in
Support of Class Certification (ECF 220-21) ...........................JA1567

Supplemental Declaration of Justin Brent Blakeslee in
Support of Class Certification (ECF 220-22) ...........................JA1580

Plaintiff Belinda Lee Steinmetz's Delcaration in Support
of Class Certification (ECF 220-23)..........................................JA1593

Reply in Support of Fox Defendants' Motion to Dismiss the
Second Amended and Supplemental Complaint (ECF 221) .............JA1603

Plaintiffs' Motion for Summary Judgment on Claim for Violation
of the Driver's Privacy Protection Act (ECF 262)................................JA1619

Declaration of William Parker Garey in Support of
Plaintiffs' Motion for Summary Judgment (ECF 262-1) .........JA1625

Declaration of Charlotte Moffat Clevenger in Support of
Plaintiffs' Motion for Summary Judgment (ECF 262-2) .........................JA1629

Declaration of Adilah McNeil in Support of Plaintiffs'
Motion for Summary Judgment (ECF 262-3) ..........................................JA1633

Declaration of Belinda Lee Steinmetz in Support of
Plaintiffs' Motion for Summary Judgment (ECF 262-4) .........................JA1637

Declaration of Aaron Kent Cruthis in Support of
Plaintiffs' Motion for Summary Judgment (ECF 262-5) .........................JA1642

Declaration of Justin Brent Blakeslee in Support of
Plaintiffs' Motion for Summary Judgment (ECF 262-6) .........................JA1646

Defendant James S. Farrin, P.C., d/b/a Law Offices of
James Scott Farrin Supplemental Response to Plaintiff
Andrew Clevenger's First Request for Admissions (ECF
262-7) ...............................................................................................................JA1650

Defendant Marcari, Russotto, Spencer & Balaban, P.C.'s
Supplemental Response to Plaintiff Andrew Christopher
Clevenger's First Request for Admissions (ECF 262-8) .........................JA1653

Defendant Riddle & Brantley, L.L.P.'s Supplemental
Response to Plaintiff James Weaver Garey's First Request
for Admissions (ECF 262-9)......................................................................JA1656

Defendant Wallace Pierce Law, PLLC Supplemental
Response to Plaintiff James Weaver Garey's First Request
for Admissions (ECF 262-10).....................................................................JA1659

Defendant Van Laningham & Associates, PLLC, d/b/a
Bradley Law Group's Supplemental Response to Plaintiff
Andrew Christopher Clevenger's First Request for
Admissions (ECF 262-11) ..........................................................................JA1662

Defendant Lanier Law Group, P.A.'s Supplemental
Response to Plaintiff Justin Blakeslee's First Request for
Admissions (ECF 262-12) ..........................................................................JA1665

Defendant Crumley Roberts, LLP's Supplemental
Response to Plaintiff Andrew Christopher Clevenger's
First Request for Admissions (262-13).....................................................JA1668

Defendant Hardison & Cochran, PLLC's Responses to Plaintiff Aaron Kent Cruthis's First Request for Admissions (ECF 262-14) ........................................................JA1671

Defendant Ted A. Greve & Assocaites, P.A.'s Responses to Plaintiff Andrew Christopher Clevenger's First Request for Admissions (ECF 262-15)....................................................JA1675

Defendant Law Offices of Michael A. DeMayo, L.L.P.'s Responses to Plaintiff Amanda Davis Reilly's First Request for Admissions (ECF 262-16) ......................................JA1679

Defendant Hardee & Hardee, LLP's Supplemental Response to Plaintiff James Weaver Garey's First Request for Admissions (ECF 262-17)....................................................JA1684

Defendant James S. Farrin, P.C., d/b/a Law Offices of James Scott Farrin's Resposnes to Plaintiff Andrew Clevenger's First Interrogatories and Request for Production (ECF 262-29) ........................................................JA1687

Defendant Marcari, Russotto, Spencer & Balaban, P.C. Responses to Plaintiff Andrew Christopher Clevenger's First Set of Interrogatories and Request for Production (ECF 262-30) ............................................................JA1717

Defendant Riddle & Brantley, L.L.P.'s Responses to Plaintiff James Weaver Garey's First Set of Interrogatories and Request for Production (ECF 262-31) ....................JA1739

Defendant Wallace Pierce Law, PLLC's Responses to Plaintiff James Weaver Garey's First Set of Interrogatories and Request for Production (ECF 262-32) ....................JA1760

Defendant Van Laningham & Associates, PLLC d/b/a Bradley Law Group's Responses to Plaintiff Andrew Christopher Clevenger's First Set of Interrogatories and Request for Production (ECF 262-33) ......................................JA1781

Defendant Lanier Law Group, P.A.'s Responses to Plaintiff Justin Brent Blakeslee's First Set of Interrogatories and Request for Production (ECF 262-34) ....................JA1803

Defendant Crumley Roberts, LLP's Responses to Plaintiff Andrew Christopher Clevenger's First Set of Interrogatories and Request for Production (ECF 262-35) ....................JA1847

Defendant Hardison & Cochran, PLLC's Responses to Plaintiff Aaron Kent Cruthis's First Set of Interrogatories and Request for Production (ECF 262-36) ...............................................JA1874

Defendant Ted A. Greve & Associates, P.A.'s Responses to Plaintiff Andrew Christopher Clevenger's First Set of Interrogatories and Request for Production (ECF 262-37) ....................JA1891

## Volume V

Defendant Law Offices of Michael A. DeMayo, L.L.P.'s Resposnes to Plaintiff Amanda Davis Reilly's First Set of Interrogatories and Request for Production (ECF 262-38) ....................JA1908

Defendant Hardee & Hardee LLP's Responses to Plaintiff James Weaver Garey's First Set of Interrogatories and Request for Production (ECF 262-39) ......................................JA1925

North Carolina Department of Transportation DMV-349 Instructional Manual (ECF 262-40).........................................JA1946

Declaration of J. David Stradley (ECF 262-41) ......................................JA2072

Deposition of Benjamin Todd Cochran (ECF 262-43)..............................JA2085

Brief in Support of Plaintiffs' Motion for Summary Judgment (ECF 263) ...................................................................................JA2095

Andrews-Lanier Defendants' Motion for Summary Judgment (ECF 264) ...................................................................................JA2141

Exhibit 1: Declaration of Lisa Andrews-Lanier (ECF 264-1) .........................................................................................JA2143

Exhibit 2: Marriage Register 2014 (ECF 264-2) ....................................JA2149

Exhibit 3: State of North Carolina Certificate of Marriage (ECF 264-3) ..............................................................................JA2151

Exhibit 4: Declaration of Katherine Elaine Andrews-Lanier (ECF 264-4) ...........................................................JA2152

Exhibit 5: Declaration of Ronald P. Johnson (ECF 264-5) ....................JA2156

Exhibit 6: Letter dated August 17, 2016 from Ronald P. Johnson to Lisa Andrews-Lanier regarding preparation of deeds for real estate parcels (ECF 264-6) .................................................JA2162

Exhibit 7:  Letter dated January 17, 2017 from White & Stradley, PLLC to McGuire Woods regarding transfer of property (ECF 264-7) .............................................................................JA2163

Fox Defendants' Motion to File Documents Partially Under Seal (ECF 266) ...........................................................................................JA2166

Defendants' Joint Appendix of Exhibits in Support of Motions for Summary Judgment (ECF 269).......................................................JA2173

Exhibit 1:  Driver's Privacy Protection Act, Legislative History Composite (ECF 269-1).............................................JA2180

Exhibit 2:  Accident Report of Justin Brent Blakeslee (ECF 269-2) ...............................................................................JA2264

Exhibit 3:  Accident Report of Charlotte Moffat Clevenger (ECF 269-3) ...............................................................................JA2269

Exhibit 4:  Accident Report of Aaron Kent Cruthis (ECF 269-4) ...........................................................................................JA2272

Exhibit 5:  Accident Report of William Parker Garey (ECF 269-5) ...........................................................................................JA2275

Exhibit 6:  Accident Report of Adilah McNeil (ECF 269-6).....................JA2278

Exhibit 7:  Accident Report of Belinda Lee Steinmetz (ECF 269-7) ...............................................................................JA2281

Exhibit 8:  Declaration of Sean A.B. Cole (ECF 269-8) ..........................JA2284

Exhibit 9:  Affidavit of Kevin Creech (ECF 269-09) ...............................JA2288

Exhibit 10:  Supplemental Declaration of Kevin Creech (ECF 269-10) .............................................................................JA2294

Exhibit 11:  Supplemental Affidavit of Kevin Creech (ECF 269-11)...........................................................................JA2298

Exhibit 12:  Declaration of Robert Andre Fleury, Jr. (ECF 269-12)...........................................................................JA2302

## Volume VI

Exhibit 13:  Declaration of Rhonda Harper, MBA (ECF 269-13)...........................................................................JA2418

Exhibit 14:  Declaration of Victoria F. Nourse (ECF 269-14) ...............................................................................JA2519

Exhibit 15:  Declaration of Steven B. Vinick (ECF 269-15) ....................JA2569

Exhibit 16:   Affidavit of Sergeant John Maultsby (ECF 269-16) .................................................................................JA2586

Exhibit 17:  Declaration of Sergeant John Maultsby (ECF 269-17) ................................................................................JA2595

Exhibit 18:  Declaration of Police Officer A.D. Reed (ECF 269-18) ................................................................................JA2599

Exhibit 19:  Affidavit of Eric S. Schaberg (ECF 269-19) .........................JA2606

Exhibit 20:  Declaration of James P. Moran (ECF 269-20) .....................JA2625

Exhibit 21:  Affidavit of Cierra Blakey (ECF 269-21) ............................JA2677

Exhibit 22:   Rule 30(b)(6) Deposition of Charlotte-Mecklenburg Police Department taken August 5, 2019 (ECF 269-22, 206-2) ...........................................................JA2695

## Volume VII

Exhibit 23:  Deposition of Justin Blakeslee taken October 18, 2019 (ECF 269-23, 206-5) ...................................................JA2887

Exhibit 24:   Deposition of Charlotte Clevenger taken October 21, 2019 (ECF 269-24, 206-14) ...................................JA3067

## Volume VIII

Exhibit 25:  Deposition of Aaron Cruthis taken October 16, 2019 (ECF 269-25, 206-15) .................................................JA3238

Exhibit 26:  Deposition of William Garey taken October 25, 2019 (ECF 269-26, 206-14) .................................................JA3464

## Volume IX

Exhibit 27:  Deposition of Adilah McNeil taken October 23, 2019 (ECF 269-27, 206-9) ...................................................JA3620

Exhibit 28:   Deposition of Belinda Steinmetz taken November 4, 2019 (ECF 269-28, 206-12) ................................JA3847

Exhibit 29: Videotaped Deposition of Ronald Bradley Balaban 30(b)(6) for Marcari, Russotto, Spencer and Balaban P.C. taken October 18, 2019 (ECF 269-29) ...............................JA4062

Exhibit 30: Videotaped Deposition of Mary Bibb 30(b)(6) for Hardee & Hardee, LLP taken October 28, 2019 (ECF 269-30) ...................................................................................................JA4068

Exhibit 31: Deposition of Justin B. Blakeslee taken October 18, 2019 (ECF 269-31)....................................................JA4071

Exhibit 32: Videotaped Deposition of Chad Clark 30(b)(6) for Van Laningham & Associates, PLLC taken October 25, 2019 (ECF 269-32) ...............................................JA4075

Exhibit 33: Videotaped Deposition of Robert Andrew Fleury, Jr. 30(b)(6) for Crumley Roberts, LLP taken October 23, 2019 (ECF 269-33)....................................................JA4079

Exhibit 34: Videotaped Deposition of Duwayne Joseph Gilchrist, Jr. 30(b)(6) for Riddle & Brantley taken October 22, 2019 (ECF 269-34) ...............................................JA4083

Exhibit 35: Videotaped Deposition of Lisa Lanier 30(b)(6) for Lanier Law Group taken October 25, 2019 (ECF 269-35) ..................................................................................................JA4087

Exhibit 36: Rule 30(b)(6) Deposition of Hardison & Cochran, PLLC taken October 2, 2019 (ECF 269-36)............................JA4090

Exhibit 37: Rule 30(b)(6) Deposition of Ted A. Greve & Associates, PA taken September 24, 2019 (ECF 269-37) ......................JA4095

Exhibit 38: Rule 30(b)(6) Deposition of Law Offices of Michael A. DeMayo, LLP taken October 1, 2019 (ECF 269-38) ...................................................................................................JA4109

Exhibit 39: Deposition of Benjamin Todd Cochran taken July 10, 2019 (ECF 269-39) .....................................................JA4114

## Volume X

Exhibit 40: Deposition of Theodore Allen Greve taken July 11, 2019 (ECF 269-40) ......................................................JA4121

Exhibit 41: Deposition of Michael A. DeMayo taken July 9, 2019 (ECF 269-41) ...........................................................JA4136

Exhibit 42: Rule 30(b)(6) Deposition of Davis & Gelshenen, LLP (Daniel Scott Davis) taken October 3, 2019 (ECF 269-42) .................................................................JA4146

Exhibit 43: Rule 30(b)(6) Deposition of Estwanik & May, PLLC (Stephanie Michelle Dicer) taken October 17, 2019 (ECF 269-43) ...........................................................JA4152

Exhibit 44: Deposition Christopher May taken June 26, 2019 (ECF 269-44) ...........................................................JA4157

Exhibit 45: Rule 30(b)(6) Deposition of Law Offices of Jason E. Taylor, PC (Lawrence Brian Serbin) taken October 4, 2019 (ECF 269-45).....................................JA4165

Exhibit 46: Deposition of Jason Edward Taylor taken July 9, 2019 (ECF 269-46) .......................................JA4174

Exhibit 47: Rule 30(b)(6) Deposition of Nagle & Associates, PA (Carl Bryon Nagle) taken October 3, 2019 (ECF 269-47) ...........................................................JA4189

Exhibit 48: Videotaped Deposition of Jared Pierce taken October 16, 2019 (ECF 269-48)......................................JA4193

Exhibit 49: Deposition of Carl Brian Nagle taken July 18, 2019 (ECF 269-49) ...........................................................JA4198

Exhibit 50: Videotaped Deposition of Eric Sanchez 30(b)(6) for James S. Farrin, P.C. taken October 28, 2019 (ECF 269-50) .........................................................JA4213

Exhibit 51: Legal Opinion of Chief Deputy Attorney General Grayson G. Kelley dated February 9, 2005 regarding DPPA (ECF 269-51) .....................................JA4217

Exhibit 52: North Carolina Department of Justice Memorandum regarding DPPA dated May 7, 2013 (ECF 269-52) .........................................................JA4221

Exhibit 53: Plaintiffs' Supplemental Responses to Fox Defendants First Set of Interrogatories (ECF 269-53)............................JA4224

Exhibit 54: Undated Memorandum of the State of South Carolina regarding online availability of collision reports (ECF 269-54) .........................................................JA4236

Exhibit 55: Deposition of Mark I. Farbman dated July 19, 2019 (ECF 269-55) ...................................................JA4238

Exhibit 56: Accident Report of Mark Francis Dvorsky (ECF 269-56) ......................................................JA4341

Exhibit 57: Accident Report of Kelly Deward Eppeson (ECF 269-57) ......................................................JA4344

Exhibit 58: Accident Report of Johnathan Robert Hatch (ECF 269-58) ......................................................JA4346

Exhibit 59: Deposition of Mark Dvorsky taken July 22, 2019 (ECF 269-59) ...................................................JA4349

Exhibit 60: Deposition of Kelly Epeprson taken October 28, 2019 (ECF 269-60) ............................................JA4493

## Volume XI

Exhibit 61: Deposition of Johnathan Hatch taken July 23, 2019 (ECF 269-61) ............................................JA4673

Exhibit 62: Declaration of Christa Boswell (ECF 269-62) ....................JA4887

Exhibit 63: Declaration of Mark I. Farbman (ECF 269-63) ..................JA4893

Exhibit 64: Declaration of G. Wayne Hardee (ECF 269-64) .........................................................................JA4897

Exhibit 65: Declaration of Charles Hardee (ECF 269-65).....................JA4901

Exhibit 66: Declaration of R. Bradley Van Laningham (ECF 269-66) ......................................................JA4905

Exhibit 67: Declaration of Christopher H. Roberts (ECF 269-67) .............................................................JA4909

Exhibit 68: Declaration of Jared Wallace Pierce (ECF 269-68) .............................................................JA4913

Exhibit 69: Declaration of James S. Farrin (ECF 269-69) ....................JA4917

Exhibit 70: Declaration of Gene A. Riddle (ECF 269-70) ......................JA4922

Exhibit 71: Declaration of Duwayne J. Gilchrist, Jr. (ECF 269-71) .............................................................JA4925

Exhibit 72: Declaration of Lisa Andrews-Lanier (ECF 269-72) ................................................................................JA4929

Exhibit 73: Declaration of Donald Marcari (ECF 269-73) .....................JA4933

Exhibit 74: Declaration of Michelle Eissele (ECF 269-74) ....................JA4937

Exhibit 75: Declaration of Cliff Adel (ECF 269-75) ...............................JA4948

Exhibit 76: Declaration of Robby Hobbs (ECF 269-76) .........................JA4978

Fox Defendants' Motion for Summary Judgment (ECF 270) ...........................JA4992

Fox Defendants' Brief in Support of Motion for Summary Judgment (ECF 271) .....................................................................................JA4995

Womble Defendants' Motion for Summary Judgment (ECF 272) ....................JA5051

Memorandum in Support of Summary Judgment F.R.C.P. 56 (ECF 273) ................................................................................................JA5054

Fox Defendants' Corrected Motion to File Documents Partially Under Seal (ECF 274) ...............................................................................JA5105

Joint Status Report (ECF 276) ....................................................................JA5113

Order (ECF 282) ..........................................................................................JA5119

Order (ECF 283) ..........................................................................................JA5121

**Volume XII**

Memorandum Opinion and Order (ECF 284) .....................................................JA5124

Answer of Defendants Michael A. DeMayo, Law Offics of Michael A. DeMayo, LLP, Hardison & Cochran, PLLC, Benjamin T. Cochran, Ted A. Greve & Associates, P.A. and Ted A. Greve (ECF 285) .............................................................................JA5149

Fox Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment (ECF 293) .........................................................JA5178

Declaration of James S. Farrin (ECF 293-2) ...........................JA5233

Rule 26 Disclosure Statement of Rhonda Harper (ECF 301-1) .........................JA5271

Fox Defendants' Filing of Corrected Documents (ECF 305) .............................JA5280

Exhibit 1: Deposition of Charles Hardee Volume 1 taken
May 7, 2020 (ECF 305-1) ..........................................................JA5282

Exhibit 2: Additional Materials Related to ECF No. 252-4
(ECF 305-2) ...............................................................................JA5399

United States' Memorandum of Law in Support of the
Constitutionality of the Driver's Privacy Protection Act (ECF
312)............................................................................................JA5406

Memorandum Opinion and Order (ECF 313)....................................JA5427

Fox Defendants Answer to Plaintiffs' Second Amended and
Supplemental Complaint (ECF 317)..................................................JA5445

Answer of Defendant Katherine E. Andrews-Lanier to Plaintiffs'
Second Amended and Supplemental Complaint (ECF 318) ..............JA5490

Plaintiffs' Motion to Amend Order Denying Class Certification
(ECF 328) ........................................................................................JA5497

Brief in Support of Plaintiffs' Motion to Amend Order on Class
Certification (ECF 329) ...................................................................JA5500

Memorandum Opinion and Order (ECF 331)....................................JA5526

Motion to Extend Time for Appeal (ECF 332)...................................JA5546

Plaintiff's Motion to Revise Order on Summary Judgment
Motions (ECF 333).............................................................................JA5549

Plaintiffs' Brief in Support of Motion to Revise Order on
Summary Judgment Motions (ECF 334)...........................................JA5552

Memorandum Opinion and Order (ECF 338)....................................JA5568

Order (ECF 339) ...............................................................................JA5575

Judgment (ECF 340)..........................................................................JA5576

Plaintiffs' Notice of Appeal to United States Court of Appeals for
the Fourth Circuit (ECF 341)...........................................................JA5578

## Volume XIII–Sealed

Declaration of Charles R. Hardee (ECF 208-1) ................................JA5583

Affidavit of Kevin Creech (DOC 218)...............................................................JA5656

Deposition of Charles Hardee taken May 7, 2020 (ECF 247-1 pp
1, 6-8)...............................................................................................................JA5661

Deposition of James S. Farrin taken May 7, 2020 (ECF 247-2 pp
1, 6-7, 18-19)...................................................................................................JA5665

Declaration of Michelle Eissele (ECF 266-1) ...................................................JA5670

Declaration of Cliff Adel (ECF 266-2) ...............................................................JA5681

Declaration of Rhonda Harper (ECF 266-3) ....................................................JA5705

**<u>Volume XIV–Sealed</u>**

Deposition of Gary Wayne Hardee taken May 14, 2020 (ECF
268-1).................................................................................................................JA5918

Deposition of Christopher H. Roberts taken May 14, 2020 (ECF
268-2).................................................................................................................JA6025

Deposition of Lisa Lanier taken May 13, 2020 (ECF 268-3)............................JA6140

Deposition of Gene Riddle taken May 12, 2020 (ECF 268-4)...........................JA6194

Deposition of Robert Bradley Van Laningham taken May 13,
2020 (ECF 268-5) .............................................................................................JA6265

**<u>Volume XV–Sealed</u>**

Fox Defendants' Sealed Exhibits to Corrected Motion to File
Documents Partially Under Seal (ECF 277) .....................................................JA6408

    Exhibit 1:  Declaration of Kevin Creech (ECF 277-1)............................JA6409

    Exhibit 2:  Supplemental Declaration of Kevin Creech
    (ECF 277-2) .............................................................................................JA6415

    Exhibit 3:  Declaration of Michelle Eissele (ECF 277-3) ........................JA6420

    Exhibit 4:  Declaration of Cliff Adel (ECF 277-4) ...................................JA6432

    Exhibit 5:  Declaration of Rhonda Harper (ECF 277-5) .........................JA6457

Certificate of Service..........................................................................................JA6671

**In the Matter Of:**

GAREY, ET AL. vs FARRIN, ET AL.

---

**ADILAH MCNEIL**

*October 23, 2019*

---



Info@NCDepo.com    1-919-557-4640

DEPOSI-TIONS, Inc.

www.NCDepo.com

1000 N. Main St., Suite 215, Fuquay Varina, NC 27526

JA3620

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2                    1:16-CV-00542

3
   ------------------------------------
4  JAMES WEAVER GAREY, et al., on     :
   behalf of themselves and others    :
5  similarly situated,                :
                                      :
6      Plaintiffs,                    :
                                      :
7  vs.                               :
                                      :
8  JAMES S. FARRIN, P.C., et al.,     :
                                      :
9      Defendants.                    :
   ------------------------------------
10

11

12

13

14                 DEPOSITION OF

15          ADILAH HANEEFAH-KHADI McNEIL

16

17

18              Taken by Defendants
               Raleigh, North Carolina
19              October 23, 2019

20

21

22

23

24  Reported by:  Eileen M. Dunne,
                  Court Reporter and
25                Notary Public

www.NCDepo.com              *Depositions, Inc.*
info@NCDepo.com        *Serving all of North Carolina*        (919) 557-4640
                    **JA3621**

```
 1                      APPEARANCES

 2   On behalf of the Plaintiffs:

 3            ROBERT P. HOLMES, ESQ.
             White & Stradley
 4           3105 Charles B. Root Wynd
             Raleigh, North Carolina 27612
 5           (919) 845-9745
             rob@whiteandstradley.com
 6
     On behalf of the Defendants James S. Farrin, PC d/b/a
 7   Law Offices of James Scott Farrin; James S. Farrin;
     Marcari, Russotto, Spencer & Balaban, PC; Donald W.
 8   Marcari; Riddle & Brantley, LLP; Sean A. Cole;
     Wallace Pierce Law, PLLC; Jared Pierce; Van Laningham
 9   & Associates, PLLC d/b/a/ Bradley Law Group;
     R. Bradley Van Laningham; Lanier Law Group, PA;
10   Lisa Lanier; Crumley Roberts, LLP; Chris Roberts;
     Hardee & Hardee, LLP; Charles Hardee; and G. Wayne
11   Hardee:
             TROY D. SHELTON, ESQ.
12           Fox Rothschild, LLP
             434 Fayetteville Street, Suite 2800
13           Raleigh, North Carolina 27601
             (919) 755-8700
14           tshelton@foxrothschild.com

15   On behalf of Defendants Hardison & Cochran, PLLC;
     Benjamin T. Cochran; Ted A. Greve & Associates, PA;
16   Ted A. Greve; Law Offices of Michael A. Demayo, LLP;
     Michael A. Demayo:
17
             JONATHAN. REICH, ESQ.
18           Womble Bond Dickinson
             One West Fourth Street
19           Winston-Salem, North Carolina 27101
             (336) 721-3600
20           jonathan.reich@wbd-us.com

21        Deposition of ADILAH HANEEFAH-KHADI McNEIL,

22   taken by the Defendants, at White & Stradley, 3105

23   Charles B. Root Wynd, Raleigh, North Carolina, on the

24   23rd day of October, 2019, at 9:58 A.M., before

25   Eileen M. Dunne, Court Reporter and Notary Public.
```

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*            *(919) 557-4640*
                              **JA3622**

1                              INDEX

2    DEPONENT                                              PAGE

3    Called by the Defendants:

4           ADILAH HANEEFAH-KHADI McNEIL

5
          Examination by Mr. Reich                         5
6
         Examination by Mr. Shelton                      173
7
         Examination by Mr. Holmes                       197
8

9
                           EXHIBITS
10
      NUMBER          DESCRIPTION                         PAGE
11
       Exhibit 331    Original Verification for Fox        8
12                    Defendants' First Set of
                      Interrogatories dated 10/23/19
13
       Exhibit 332    Accident report                     18
14
       Exhibit 333    Lanier Law Group mailer             48
15
       Exhibit 334    Ted A. Greve mailer                 50
16
       Exhibit 335    Marcari Russotto mailer             52
17
       Exhibit 336    Plaintiffs' First Supplemental      53
18                    Responses to Fox Defendants'
                      First Request for Production
19
       Exhibit 337    Voter Search information            96
20
       Exhibit 338    First Amended Complaint            101
21
       Exhibit 339    First page of First Amended        117
22                    Complaint with highlighting
                      and handwritten numbers
23
       Exhibit 340    Plaintiff Adilah McNeil's          124
24                    Responses to Fox Defendants
                      First Set of Interrogatories
25

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            Serving all of North Carolina        *(919) 557-4640*
                              **JA3623**

1                          EXHIBITS

2    NUMBER                 DESCRIPTION                    PAGE

3    Exhibit 341            Plaintiffs' Amended Responses  125
                            to Interrogatory No. 6 of the
4                           Fox Defendants' First
                            Interrogatories
5
     Exhibit 342            Second Amended and             132
6                           Supplemental Complaint

7    Exhibit 343            Complaint in Summary Ejectment 135
                            and related documents
8
     Exhibit 344            Complaint in Summary Ejectment 137
9                           and related documents

10   Exhibit 345            Complaint in Summary Ejectment 139
                            and related documents
11
     Exhibit 346            Complaint in Summary Ejectment 141
12                          and related documents

13   Exhibit 347            Complaint in Summary Ejectment 143
                            and related documents
14
     Exhibit 348            Complaint in Summary Ejectment 145
15                          documents

16   Exhibit 349            Complaint in Summary Ejectment 149
                            documents
17
     Exhibit 350            Complaint in Summary Ejectment 151
18                          and related documents

19   Exhibit 351            Complaint in Summary Ejectment 153
                            and related documents
20
     Exhibit 352            North Carolina Criminal        157
21                          Records search

22   Exhibit 353            Copies of deponent's Facebook   179
                            pages
23
     Exhibit 354            Raleigh Police Department       187
24                          Crash Reports Database

25   Exhibit 355            Printout related to deponent's  191
                            automobile accident

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina      (919) 557-4640
                                  **JA3624**

1              P R O C E E D I N G S

2                    * * * * *

3            ADILAH HANEEFAH-KHADI McNEIL,

4    being duly sworn to tell the truth, the whole truth

5    and nothing but the truth, was examined and testified

6    as follows:

7            THE DEPONENT:  I do.

8                        EXAMINATION

9    BY MR. REICH:

10       Q.   Please state your name for the record.

11       A.   Adilah McNeil.

12       Q.   And, Ms. McNeil, what is your -- where do

13   you currently live at; what's your address?

14       A.   4717 Dansey Drive, Apartment J, and that's

15   Raleigh, 27616.

16       Q.   Have you ever been deposed before?

17       A.   No.

18       Q.   Okay.  So I'll ask a series of questions,

19   and I'll ask them one at a time.  And it's important

20   that we don't talk over each other --

21       A.   Okay.

22       Q.   -- so the court reporter here can make a

23   good, clear transcript.

24       A.   Okay.

25       Q.   It's important that we both -- that I ask

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                          **JA3625**

1   my questions with words and that you answer with

2   words and not just uh-huh, unh-unh or head nods.

3       A.   Okay.

4       Q.   I may ask -- if you're pointing at

5   something, I may ask a follow-up question to nail

6   down like what corner of the document you're pointing

7   at or something like that so it's clear on her

8   deposition transcript.

9       A.   Okay.

10      Q.   Have you ever given testimony in court

11  before?

12      A.   No.

13      Q.   Okay.  I may ask some questions that you

14  don't understand, and if I do ask you a question that

15  you don't understand, please stop me or ask me to

16  rephrase it or explain a word to you; otherwise, I'll

17  just assume or guess that you understood the question

18  that I asked and the words I used and the way I asked

19  the question.

20      A.   Okay.

21      Q.   You may hear your attorney object at

22  certain points, and in that case, you'll probably

23  stop your testimony and we may discuss the objection

24  or we may ask you to continue with an answer.

25      A.   Okay.

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*          (919) 557-4640
**JA3626**

1          MR. HOLMES:  Mr. Reich, can I serve the

2     verification for the Fox Defendants'

3     interrogatories at this time?

4          MR. REICH:  Certainly.

5          MR. HOLMES:  Okay.  I'm going to hand to

6     Mr. Shelton the original copy of the verification

7     of Ms. McNeil's verification of the Fox

8     Defendants' First Set of Interrogatories.

9          Mr. Shelton, do you acknowledge receiving

10    that verification?

11         MR. SHELTON:  Yes, sir.

12         MR. HOLMES:  I will.  And, Mr. Reich, I'm

13    going to hand you a photocopy of that.

14         MR. REICH:  Okay.

15         MR. HOLMES:  Do you acknowledge receiving

16    that photocopy?

17         MR. REICH:  I do acknowledge that.

18         MR. HOLMES:  Okay.  I appreciate it.  And

19    so I just wanted to get that done as a matter of

20    record before we --

21         MR. REICH:  Okay.

22         MR. HOLMES:  -- got moving.

23  BY MR. REICH:

24    Q.   And, Ms. McNeil, did you sign this document

25  today?

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                          JA3627

1      A.    I did.

2            (A discussion was held off the record.)

3            MR. REICH:  Okay.  We'll mark this.

4            THE COURT REPORTER:  And you're starting

5      with 331?

6            MR. REICH:  331.

7            (Exhibit 331 is marked for identification.)

8            MR. HOLMES:  So the original verification

9      is now an exhibit to the deposition?

10           MR. REICH:  It will be shortly, yeah.

11           MR. HOLMES:  Okay.

12   BY MR. REICH:

13     Q.    And, Ms. McNeil, I'm handing you something

14   that's been marked as Exhibit No. 331.  Have you seen

15   this document before?

16     A.    No.

17     Q.    Okay.  You've never seen this document

18   before?

19     A.    When I signed it.

20     Q.    Okay.  So did you sign this document

21   earlier today?

22     A.    Yes.

23     Q.    Okay.  And that's a -- it's titled

24   "Verification" at the top center of the page?

25     A.    Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3628

1          Q.    And that's the document that Mr. Holmes

2    just referred to and just gave to Mr. Shelton --

3          A.    Yes.

4          Q.    -- earlier?  Okay.  Perfect.  And you can

5    just set that in the middle or set it to the side.

6                Have you lived in Raleigh your whole life?

7          A.    No.

8          Q.    Where did you grow up at?

9          A.    Mostly Raleigh.  I was born in North New

10   Jersey.

11         Q.    Okay.  And did you go to high school in

12   Raleigh?

13         A.    Yes.

14         Q.    What school did you go to?

15         A.    Sanderson.  Jesse O. Sanderson.

16         Q.    And since that age, have you lived the rest

17   of your life in Raleigh --

18         A.    Yes.

19         Q.    -- until now?  Okay.  Did you have any

20   education after high school?

21         A.    Some college.

22         Q.    Okay.  And where was that at?

23         A.    Wake Tech.

24         Q.    And what did you study at Wake Tech?

25         A.    Nursing.

www.NCDepo.com                  *Depositions, Inc.*
info@NCDepo.com          *Serving all of North Carolina*        (919) 557-4640
**JA3629**

1      Q.   Did you ever become employed in the nursing

2  field?

3      A.   Yes.  Well, not as a nurse.

4      Q.   Okay.

5      A.   But I am working in the medical field.

6      Q.   So where do you currently work at?

7      A.   Wake Medical.

8      Q.   And what do you do there?

9      A.   Check-out at Wake Urology.

10     Q.   Okay.  And so that's one of the clinics

11  that --

12     A.   Yes.

13     Q.   -- Wake Medical operates?

14     A.   Yes.

15     Q.   Okay.  And how long have you worked there?

16     A.   Seven years.

17     Q.   Okay.  And so before working at Wake

18  Medical Urology Clinic, where did you work at?

19     A.   Blue Cross/Blue Shield of North Carolina.

20     Q.   And was that locally here in Raleigh or was

21  that at, sort of, the big --

22     A.   Durham.

23     Q.   -- campus -- the big campus --

24     A.   In Durham.

25     Q.   -- in Durham?

www.NCDepo.com                      Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                   JA3630

 1      A.    Yes.

 2      Q.    Okay.  And what did you do there?

 3      A.    Customer service rep.

 4      Q.    Okay.  And prior to working at Blue

 5  Cross/Blue Shield in Durham, where did you work at?

 6      A.    Time Warner Cable.

 7      Q.    And was that in Raleigh or Durham?

 8      A.    That was Morrisville.

 9      Q.    Okay.  And that's spelled

10  M-o-r-r-i-s-v-i-l-l --

11      A.    Correct.

12      Q.    -- v-i-l-l-e?

13      A.    Correct.

14      Q.    Okay.  When you worked at Blue Cross/Blue

15  Shield, how long did you work there?

16      A.    Four years.

17      Q.    Were you living in Raleigh then or did you

18  move to Durham?

19      A.    I lived in Raleigh.

20      Q.    And so before Time Warner, where did you

21  work at?

22      A.    White & Stradley.

23      Q.    Okay.  And what did you do -- is that the

24  White & Stradley law firm?

25      A.    Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3631

1      Q.   And what did you do at White & Stradley?

2      A.   Legal assistant.

3      Q.   How long did you work at White & Stradley?

4      A.   I want to say about six, seven years.

5      Q.   Six to seven years, okay.  And I didn't ask

6  you how long you worked at Time Warner, but the six

7  or seven years you worked at White & Stradley, do you

8  remember roughly what years those were?  Was it like

9  2000 to 2006 or 2006 to 2012?

10     A.   I can't recall.

11     Q.   Okay.  Well, before working at White &

12 Stradley, do you remember where you worked at?

13     A.   I did security briefly.

14     Q.   Okay.  So like onsite security guard?

15     A.   Yeah.

16     Q.   And was that at different locations in

17 Raleigh or were you always working at one place?

18     A.   I did it at the Marbles Museum.

19     Q.   And that is in downtown Raleigh?

20     A.   Yes.

21     Q.   That's the children's museum in downtown?

22     A.   Yes.

23     Q.   I think it's on --

24     A.   Hargett, I think.

25     Q.   -- Blount Street or Hargett Street?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3632

1        A.    Um-hmm.

2        Q.    Okay.  So how long have you lived at the

3    Dansey Drive address?

4        A.    Six years.

5        Q.    Okay.  So since before this lawsuit was

6    filed?

7        A.    Yes.

8        Q.    Who lives with you in the Dansey Drive

9    address?

10       A.    My daughter and my husband.

11       Q.    And how old is your daughter?

12       A.    Just turned 19.

13       Q.    So in 2016 when this lawsuit, kind of,

14   started, was there anyone else living with you there

15   other than your daughter and your husband?

16       A.    No.

17             MR. HOLMES:  Well -- can I ask her a

18        question?

19             MR. REICH:  Sure.

20             (Sotto voce discussion had.)

21             MR. HOLMES:  Can she --

22             MR. REICH:  I can ask the question again

23        or --

24             MR. HOLMES:  Or she can, I think, provide

25        some information I think --

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3633

1          MR. REICH:  Okay.

2          MR. HOLMES:  -- to clarify.

3          MR. REICH:  Okay.

4          THE DEPONENT:  So I was not married in

5     2016.

6   BY MR. REICH:

7      Q.  Okay.  So the gentleman who became your

8   husband --

9      A.  Um-hmm.

10     Q.  -- was living with you in 2016?

11     A.  Yes.

12     Q.  Okay.  And that was at Dansey Drive?

13     A.  Yes.

14     Q.  Okay.  And so have you ever gone by a

15  different name other than Adilah McNeil?

16     A.  No.  Adilah McNeil.

17     Q.  Adilah.  I'm sorry.  So after you were

18  married, did you change your name?

19     A.  I am going to.  We just got married in the

20  end of August, so we haven't received our certificate

21  yet.

22     Q.  Oh, okay.  And what's your husband's name?

23     A.  Major Carmon.

24     Q.  And how is the last name spelled?

25     A.  C-a-r-m-o-n.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3634

1      Q.    Okay.  And so you might be planning to

2    change your last name to Carmon?

3      A.    Yes.

4      Q.    So going back to 2016 when you were living

5    at Dansey Drive with your daughter and Major Carmon,

6    who was able to get the mail?

7      A.    I was.

8      Q.    Did your daughter ever go get the mail?

9      A.    No.

10     Q.    Did Mr. Carmon ever go get the mail?

11     A.    No.

12     Q.    Okay.  And so how -- I'm trying to picture,

13   like, where the mailbox is or -- is there a mail slot

14   on the door or is it like a --

15     A.    Well, we're in an apartment complex, so

16   it's a -- a little -- it's not actually a building,

17   but it's an area where just the mailboxes are.

18     Q.    So it's like a little hut or a little --

19     A.    Yeah.

20     Q.    -- kiosk?

21     A.    Yeah.

22     Q.    Okay.  And does it have, like, little

23   square metal doors?

24     A.    Yes.

25     Q.    Okay.  And so those are the individual

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com          *Serving all of North Carolina*      *(919) 557-4640*
                              **JA3635**

1   mailboxes?

2        A.   Yes.

3        Q.   And you have to have a key to open them?

4        A.   To get in, yes.

5        Q.   So were you the only one with a key to open

6   the --

7        A.   Yes, sir.

8        Q.   Okay.  So on a given day in 2016 when you'd

9   go get the mail -- well, I take that back.  How often

10  would you get your mail?

11       A.   Every day.

12       Q.   So you'd stop by the little hut and pick

13  the mail up every day?

14       A.   Yes.

15       Q.   And then so you'd bring it back to your

16  apartment.  What would you do with it then?

17       A.   I'd go through it.

18       Q.   Okay.  Did you, like, sort it out by

19  recipient or did you put it in a big pile and let

20  people just come figure out what mail they got or --

21       A.   Just went through it.  Most of it was

22  addressed to me.  I don't recall anybody else getting

23  anything.  So I just opened the mail.

24       Q.   Okay.  Did you always do that at one

25  specific place in your apartment?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3636

1        A.    No.

2        Q.    So sometimes you would maybe be at the

3   counter, sometimes on the couch, sometimes in the

4   bedroom?

5        A.    Yes.

6        Q.    Okay.  So if you were standing there in

7   2016 opening your mail and you saw a piece of mail

8   from a company you didn't recognize and you thought

9   it was junk mail, would you just throw it away or did

10  you always open it?

11       A.    I always opened it.

12       Q.    Okay.  And then if you concluded that this

13  is like some sort of junk mail, what did you do then?

14       A.    If I felt like it was junk mail, I probably

15  trashed it.

16       Q.    Okay.  But you weren't literally standing

17  on top of the trash can and just throwing it right

18  down in the trash?

19       A.    No.

20       Q.    So you'd, like, put it in a pile and later

21  throw it away?

22       A.    Yes.

23       Q.    Okay.  Did you ever shred pieces of mail or

24  did you always just throw them away?

25       A.    I'd rip it and throw it away.

www.NCDepo.com              *Depositions, Inc.*
info@NCDepo.com         *Serving all of North Carolina*      (919) 557-4640
                          **JA3637**

1      Q.    Okay.  So rip it in half --

2      A.    Yes.

3      Q.    -- and throw it away?  So --

4            (Exhibit 332 is marked for identification.)

5   BY MR. REICH:

6      Q.    So I'm going to hand you something that's

7   been marked as Exhibit 332 --

8      A.    Okay.

9      Q.    -- and ask have you ever seen that document

10  before?

11     A.    Yes.

12     Q.    Okay.  What is this?

13     A.    Accident report.

14     Q.    Okay.  And is it from an automobile

15  accident you were involved in?

16     A.    Yes.

17     Q.    Okay.  And what -- this is 332.  I'm going

18  to ask you some more questions about this later, but

19  prior to this accident on July 1st, 2016, had you

20  ever had any other car accidents?

21     A.    Yes.

22     Q.    Okay.  How many?

23     A.    I can't recall.

24     Q.    Okay.  Is it more than five?

25     A.    No.

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3638

1      Q.    Okay.  And when I say prior car accidents

2   before 2016, I mean accidents where some sort of law

3   enforcement showed up and, you know, there was some

4   property damage of more than a couple hundred

5   dollars.  So do you remember the locations of some of

6   the car accidents you've had?

7      A.    I do not.

8      Q.    Is it more than -- have you had any other

9   car accidents other than the July 2016 car accident?

10     A.    Yes.

11     Q.    And were they before or after July 2016?

12     A.    Before.

13     Q.    So it's more than one but less than five?

14     A.    Correct.

15     Q.    Do you remember if any of them were on the

16  interstate?

17     A.    No.

18     Q.    No, they were not on the interstate or no,

19  you don't remember?

20     A.    No, they were not on the interstate.

21     Q.    Okay.  In any of the other automobile

22  accidents which you've been involved in before

23  July 2016, were you ever considered the at-fault

24  driver?

25     A.    Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3639

1      Q.   In all of them or some of them?

2      A.   One of them.

3      Q.   Were there some before 2016 where you were

4  found to be not at fault?

5      A.   Yes.

6      Q.   Okay.  And so in those accidents, did you

7  file a lawsuit in any of those?

8      A.   No.

9      Q.   And in the accident where you were found at

10  fault, did the other driver sue you?

11      A.   No.

12      Q.   Okay.  Have you ever had a speeding ticket?

13      A.   Yes.

14      Q.   How many?

15      A.   One.

16      Q.   One.  Do you remember if after your

17  speeding ticket, you got letters from lawyers wanting

18  to represent you in that?

19      A.   I can't recall.  I don't think so.

20      Q.   Have you ever filed for bankruptcy?

21      A.   No.

22      Q.   And going back to your employment history,

23  your job at WakeMed, is that a full-time job?

24      A.   Yes.

25      Q.   Okay.  Do you get mail at that job

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3640

1  addressed to you?

2      A.   No.

3      Q.   Okay.  So looking at Exhibit No. 332, do

4  you remember this car accident happening?

5      A.   Yes.

6      Q.   Okay.  Where were you when it happened?

7      A.   Atlantic Avenue, and I'm not sure of the

8  side street, but I was coming down Atlantic.

9      Q.   And what does Atlantic -- what is the major

10  road Atlantic runs -- well, where were you driving

11  to?

12      A.   I was going towards Walmart, which is on

13  New Hope Church Road.

14      Q.   Okay.  And just in your own words, how

15  would you describe the car accident that's explained

16  on Exhibit 332?

17      A.   How would I explain it?

18      Q.   Yeah.

19      A.   Scary, fast, shocking.

20      Q.   Jarring?

21      A.   Jarring.

22      Q.   After the impact, did your car -- did the

23  impact of the other motorist into your car move your

24  car?

25      A.   Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
JA3641

1      Q.   And so what direction -- you know, were you

2   rear ended or t-boned or how was your car hit?

3      A.   I was hit from the front, front driver's

4   side.  So she was turning out to the left and hit me

5   front driver.

6      Q.   Okay.  So she pulled out in front of you --

7      A.   Yes.

8      Q.   -- basically?  Okay.  And when we say

9   "she," if you look on the left side of the first page

10  of 332, there's someone's name called Francis Desire

11  Portales-Rios.  Do you see that?

12     A.   I do.

13     Q.   Is that who you're talking about when you

14  say she pulled out in front of you?

15     A.   I don't know if that was her name or not,

16  but ...

17     Q.   Okay.  So was anybody else in the car with

18  you when you got hit?

19     A.   With me, no.

20     Q.   Do you remember if anyone else was in her

21  car?

22     A.   Yes.

23     Q.   How many other people were in it?

24     A.   I think there were about two or three.

25     Q.   Okay.  In the immediate instant after the

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                          JA3642

1    wreck happens and your car stops moving, what

2    happened next?  Did you jump out of the car or did

3    you immediately call somebody or --

4         A.   I sat there just trying to take in what --

5    what just happened.

6         Q.   Okay.  So you just kind of --

7         A.   Dazed almost.

8         Q.   -- collected yourself?

9         A.   Yeah.

10        Q.   Okay.  Do you remember if you got yourself

11   out of your car or if someone else came and opened

12   the door and helped you get out?

13        A.   I can't recall.

14        Q.   Did you call 911 or did somebody else call

15   911?

16        A.   I did.

17        Q.   Do you remember if you were sitting in your

18   car when you did it or had you already gotten out?

19        A.   I'm not sure.  I think I had already gotten

20   out.

21        Q.   Okay.  Did you take any pictures of your

22   car with your -- did you have a cell phone at the

23   time that you could take pictures with?

24        A.   I did.

25        Q.   And did you get out of your car and take

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              **JA3643**

1  pictures of it?

2      A.  Not immediately.

3      Q.  Eventually, did you take pictures of it?

4      A.  Yes.

5      Q.  Okay.  So you get hit.  You sit in the car

6  for a moment and collect yourself.  You eventually

7  get yourself out of the car.  And you probably called

8  911 at roughly that time.  And then what happened

9  after that?

10     A.  I was standing off to the side.  The police

11 officer showed up and started investigating the

12 accident.

13     Q.  And if you turn to the second page of

14 Exhibit No. 332, there's like a drawing in the

15 middle.  Do you see that?

16     A.  I do.

17     Q.  And when you're describing getting out of

18 the car and standing to the side, was your vehicle

19 still, like, in the middle of Atlantic Avenue?

20     A.  Yes.

21     Q.  Okay.  And so there's -- presumably there's

22 still traffic --

23     A.  Yes.

24     Q.  -- kind of driving around?

25     A.  Yes.

www.NCDepo.com                     Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                    JA3644

1       Q.    So when you said you went to stand to the

2    side, did you just stand to the side of your car or

3    did you actually get off of the highway and stand on

4    the shoulder of the road?

5       A.    I got off the highway and stood on the

6    shoulder.

7       Q.    Okay.  And do you remember how many law

8    enforcement officers arrived?

9       A.    There was one initially, and then I think a

10   second came.

11      Q.    Okay.  Do you remember what either

12   officer's name was?

13      A.    I don't.

14      Q.    So the law enforcement arrives, and you

15   said they started their investigation.

16      A.    Um-hmm.

17      Q.    Before they arrived, did you ever go talk

18   to the other motorist?

19      A.    No.

20      Q.    Did they try to talk to you?

21      A.    No.

22      Q.    Did they shout anything at you?

23      A.    No.

24      Q.    Okay.  Or anybody else that was in their

25   car; did you talk to anybody?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3645

1        A.    No.

2        Q.    Okay.  So do you -- do you remember where

3    they were standing after they got out of the car?

4        A.    On a side -- on the opposite side of the

5    street.

6        Q.    So you kind of went one way and they kind

7    of went the other way?

8        A.    Yeah.

9        Q.    Officer shows up.  Who does the officer

10   talk to first?

11       A.    I can't recall.

12       Q.    Do you remember -- did the officer ever

13   come speak with you directly?

14       A.    Yes.

15       Q.    What did the officer -- do you remember

16   what the officer said to you?

17       A.    No, not -- asked what happened in the

18   accident, and I described the accident to her.

19       Q.    Okay.  So it was a female officer?

20       A.    Yes.

21       Q.    Was she taking any notes?

22       A.    No, not that I can remember.

23       Q.    Did you see her ever talk to the other

24   motorist?

25       A.    Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3646

1      Q.   And did you see if she was taking any notes
2  when she talked to that person?
3      A.   I can't remember.
4      Q.   Did the officer ever hand you a piece of
5  paper and ask you to draw a picture of what happened?
6      A.   No.
7      Q.   Did she ever hand you a piece of paper and
8  ask you to fill out, like, your name and address or
9  driver's license number?
10     A.   No.
11     Q.   Did she ask for your driver's license?
12     A.   She did, yes.
13     Q.   Did you have it on you?
14     A.   I got it out of the car.
15     Q.   Okay.  And then you gave it to her?
16     A.   Yes.
17     Q.   Did she ask for your registration?
18     A.   She did.
19     Q.   Did you have that as well?
20     A.   I did.
21     Q.   And you gave it to her, I guess?
22     A.   Yes.
23     Q.   Did an ambulance ever show up?
24     A.   No.
25     Q.   How badly damaged was your car?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3647

1        A.    It was totaled.

2        Q.    So did a wrecker show up?

3        A.    Yes.

4        Q.    Did you call the wrecker or how did the

5   wrecker know to come there?

6        A.    I didn't call.  I don't know.

7        Q.    Okay.  So no ambulance.  How long do you

8   think the officer was there before leaving the scene

9   of the accident?

10       A.    I don't know.

11       Q.    Prior to being hit in this wreck, were you

12  leaving work or was it on a weekend or --

13       A.    I was leaving work.

14       Q.    Okay.  And so you were going to run an

15  errand to Walmart and then, I guess, go do something

16  else?

17       A.    Correct.

18       Q.    So did this make you get -- did this make

19  you late getting home from work?

20       A.    Yes.

21       Q.    Do you think you were there for more than

22  15 minutes?

23       A.    Yes.

24       Q.    How did you -- since your car was totaled,

25  how were you able to leave the intersection of Ingram

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3648

1    Drive and Atlantic Avenue?

2        A.    My then-fiance picked me up.

3        Q.    And did you call him?

4        A.    I did.

5        Q.    Okay.  And what did you tell him?

6        A.    That I had been in an accident.

7        Q.    So when you were speaking with the officer

8    on July 1st, 2016, did they tell you they were making

9    a report or tell you they were making an accident

10   report?

11       A.    She didn't say.

12       Q.    Did she ever tell you how you would be able

13   to get a copy of your accident report?

14       A.    No.

15       Q.    Did she ever show you like a draft of

16   Exhibit 332 and say, Does this look right?

17       A.    No.

18       Q.    Okay.  And so did she ever -- did she ask

19   you if the information on your driver's license was

20   correct?

21       A.    Yes.

22       Q.    And what did you tell her?

23       A.    Yes.

24       Q.    And other than that, did she ever ask you

25   to confirm if any other information was correct?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina          (919) 557-4640
                                  JA3649

1        A.    No.

2        Q.    So after your accident, did you ever get a

3   copy of Exhibit 332 prior to today at your

4   deposition?

5        A.    Yes.

6        Q.    And how -- the first time you got a copy of

7   it, how did you get it?

8        A.    In a mailing from a lawyer.

9        Q.    Okay.  So did the police ever give you a

10  copy of it?

11       A.    No.

12       Q.    And you didn't go to the Raleigh Police

13  Department website and get a copy yourself?

14       A.    No.

15       Q.    Do you remember which law firm sent you a

16  copy of the accident report?

17       A.    I don't.

18       Q.    When you received it from a lawyer -- let

19  me take a step back.

20             Did you get it in the mail from a lawyer?

21       A.    Yes.

22       Q.    Okay.  And was it a lawyer you already knew

23  or somebody you didn't know?

24       A.    No, a -- a lawyer I didn't know.

25       Q.    Okay.  So you get this piece of mail

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina      (919) 557-4640
                              JA3650

 1  delivered to your house from a lawyer you don't know,

 2  and it has the accident report in it?

 3       A.   Right.

 4       Q.   Did it have other stuff in there?

 5       A.   Yeah.

 6       Q.   It was like an advertisement, right?

 7       A.   Right.

 8       Q.   Okay.  Did you look at the accident report

 9  when you got it?

10       A.   I did.

11       Q.   Do you remember how long you spent looking

12  at it?

13       A.   No.

14       Q.   Did anything jump out at you as being

15  incorrect on it?

16       A.   No.

17       Q.   How fast do you think you were going when

18  the wreck happened?

19       A.   I was probably going about 30, 35 because

20  it was a -- it's like a -- a slope, so I had -- I was

21  already on the brakes going down the hill.

22       Q.   Okay.  So you were -- so Atlantic Avenue

23  there is kind of -- is going downhill?

24       A.   Um-hmm.

25       Q.   And you were already, kind of, on the

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3651

1   brakes to, you know, slow yourself or not exceed the

2   speed limit?

3        A.   Yes.

4        Q.   And then this other driver pulls out in

5   front of you?

6        A.   Right.

7        Q.   And when you see her pulling out in front

8   of you, what did you do?

9        A.   Just grabbed tight.

10       Q.   Okay.  Did you slam on the brakes even

11  harder?

12       A.   I believe so.

13       Q.   And so when -- I think you testified when

14  her car hit you, it also physically moved your car?

15       A.   Yes.

16       Q.   Do you know how fast she was going?

17       A.   I don't.

18       Q.   If you look on the second page of

19  Exhibit 332, kind of in the top middle, you'll see a

20  bunch of boxes.  Do you see those?

21       A.   Yes.

22       Q.   And these boxes each have a small number on

23  the left side of them.  And so in the top box in the

24  middle, it says, No. 60 Authorized Speed Limit.  Do

25  you see that?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3652

1          A.    Yes.

2          Q.    And it says 35 miles per hour?

3          A.    Yes.

4          Q.    And does that seem like that's the speed

5    limit on Atlantic Avenue in that section?

6          A.    Yes.

7          Q.    Okay.  And below that estimate -- Box 61

8    Estimate of Original Traveling Speed.  For both

9    vehicles, it has 35 miles per hour listed.  Do you

10   see that?

11         A.    Yes.

12         Q.    And do you think that's roughly correct?

13         A.    Yes.

14         Q.    Okay.  Now, you see there -- there's two

15   columns here, Vehicle 1 and Vehicle 2, right?

16         A.    Um-hmm.

17         Q.    Do you know which one you are?  Do you know

18   which one Vehicle -- whether you were Vehicle 1 or

19   Vehicle 2?

20         A.    No.

21         Q.    Okay.

22         A.    Can I look at the front?

23         Q.    Sure.  Yeah, yeah.

24         A.    I am listed as Vehicle 2.

25         Q.    Okay.  And if you jump down to Box No. 85

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3653

 1    below the drawing where it says narrative --

 2         A.   Um-hmm.

 3         Q.   -- 85 Narrative, it says, Vehicle 2 was

 4    traveling straight.  Vehicle 1 was making a left-hand

 5    turn and collided with Vehicle 2.  Do you see that?

 6         A.   I do.

 7         Q.   Okay.  And so that is consistent with you

 8    being Vehicle 2, right?

 9         A.   Yes.

10         Q.   So if we look at -- go back to the top

11    middle of the page.  Box No. 64 says Distance

12    Traveled After Impact.  Do you see that?

13         A.   I do.

14         Q.   And then underneath Vehicle 2, it has a

15    zero.

16         A.   Okay.

17         Q.   Do you see that?

18         A.   I do.

19         Q.   So the officer has it listed here that you

20    traveled zero feet after being hit by the other car.

21         A.   Okay.

22         Q.   But that's not consistent with what you

23    testified to earlier, right?

24         A.   Yeah.

25         Q.   Because her car actually moved yours?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3654

1        A.    Yes.

2        Q.    Okay.  So that Box 64 where it says you

3   moved zero feet is not correct, right?

4        A.    Correct.

5        Q.    Because you remember a jarring impact that

6   moved you?

7        A.    Yes.

8        Q.    Okay.  Are there any other boxes on this

9   document that the officer may have filled in wrong?

10        A.    I don't know.

11        Q.    Okay.  When you first got this -- I'll take

12   a step back.

13             When you received that letter at your house

14   with a copy of your accident report in it, do you

15   remember how many days that was after the car wreck?

16        A.    I don't.

17        Q.    Does it seem like it was months later or

18   pretty quick after the wreck?

19        A.    It seemed like it was pretty quick.

20        Q.    Okay.  So you have a wreck on July 1st, and

21   pretty quickly you get a copy of this accident

22   report.  Did you know that some information on here

23   might not have been accurate?

24        A.    No.

25        Q.    Did you know how to read the different

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3655

1    codes on the first page?

2         A.    I did not.

3         Q.    Okay.  So even though you worked at a law

4    firm as a legal assistant --

5         A.    Um-hmm.

6         Q.    -- the first time you saw this, you weren't

7    an expert on the document?

8         A.    Right.

9         Q.    Okay.  When you worked at White & Stradley,

10   did you ever see documents that looked kind of like

11   Exhibit 332, accident reports?

12        A.    Yes.

13        Q.    Okay.  So you had -- you knew what an

14   accident report was?

15        A.    Yes.

16        Q.    I want to go back to July 1st.  So

17   Mr. Carmon picks you up.  And does he take you home

18   or take you to the hospital?

19        A.    Took me --

20        Q.    Or urgent care or something?

21        A.    I think we went home.

22        Q.    Did you ever end up going to the urgent

23   care or the doctor or the hospital?

24        A.    I did.

25        Q.    Okay.  And when was that?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3656

1        A.    I can't recall when.

2        Q.    Do you think it was that same night or like

3    a couple days later?

4        A.    Probably a few days later.

5        Q.    Okay.  So you go home, sleep in your own

6    bed that night, and then eventually within the next

7    couple of days, what caused you to seek medical care?

8        A.    Hurt.

9        Q.    Okay.  Pain?

10       A.    Um-hmm.

11       Q.    Where was the pain at; was it like in your

12   legs or back or neck or --

13       A.    It was in my legs, back, the majority of

14   the pain was my right knee.

15       Q.    Okay.  So physical pain.  Let me -- most of

16   it was the right knee?

17       A.    Uh-huh.

18       Q.    And so looking at Exhibit 332, it looks

19   like your car was hit to begin with from the right

20   side.  Is that correct?

21       A.    Correct.

22       Q.    Mostly from the front, but the impact was

23   from the right?

24       A.    Right.

25       Q.    Did you have headaches after the accident?

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina        (919) 557-4640
                              JA3657

1      A.   Not that I can recall.

2      Q.   Do you ever remember if you lost

3  consciousness?

4      A.   I can't remember.

5      Q.   So you had this pain.  Before going to seek

6  medical treatment for it, did you try, like, taking

7  aspirin or Tylenol or ibuprofen?

8      A.   I did.

9      Q.   And was that just not strong enough?

10     A.   Not doing it, yes.

11     Q.   Okay.  Not doing it.  Do you remember where

12  you went to for your -- to the emergency room or was

13  it urgent care?

14     A.   Initially, I think I went to Wake Medical.

15     Q.   And what did they do; did they run X-rays

16  or --

17     A.   Yeah, just made sure nothing was broken.

18     Q.   Okay.  So you came in there, you complained

19  of knee pain and maybe some other pain?

20     A.   Um-hmm.

21     Q.   Did they find any broken bones?

22     A.   No.

23     Q.   Did they eventually refer you to some

24  further medical treatment?

25     A.   Yes.

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*        *(919) 557-4640*
**JA3658**

1       Q.   And so who did they send you to?

2       A.   Where did I go?  Wake Orthopaedic.

3       Q.   Did they ever do surgery?

4       A.   Yes.

5       Q.   And what part of your body did they do

6   surgery on?

7       A.   My right knee.

8       Q.   Right knee, okay.  What did they do surgery

9   to repair?

10      A.   My meniscus.

11      Q.   Okay.  So it was like a torn meniscus or

12  something --

13      A.   Um-hmm.

14      Q.   -- like that?  And that's a yes?

15      A.   Yes.

16      Q.   Okay.  How did that surgery turn out?

17      A.   It turned out good.  I recovered.

18      Q.   Successful?

19      A.   Yeah.

20      Q.   Okay, good.  Do you remember how long the

21  surgery was after the July 1st accident?

22      A.   I don't.

23      Q.   But probably several months later?

24      A.   Yes.

25      Q.   And so the surgery was probably several

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                  JA3659

1    years ago?

2          A.    Yes.

3          Q.    Have you had any follow-up surgery on your

4    knee since then?

5          A.    No.

6          Q.    So after the accident happened, did you

7    post on social media about it?

8          A.    No.

9          Q.    So the pictures you took on your phone, you

10   didn't go put them on Facebook or Instagram or

11   anything?

12         A.    No.

13         Q.    Did you tell -- well, Mr. Carmon knew

14   about, clearly?

15         A.    Correct.

16         Q.    Did he post about it on social media?

17         A.    No.

18         Q.    Did your daughter post about it?

19         A.    No.

20         Q.    Did you tell any of your friends or

21   neighbors about your car wreck?

22         A.    I did.

23         Q.    How many of them do you think you told?

24         A.    I'm not sure.

25         Q.    More than 20?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                            JA3660

1      A.    I don't know.

2      Q.    Did you tell your coworkers about it?

3      A.    Yes.

4      Q.    Did you tell anybody at church about it or

5  any other places?

6      A.    I don't know.

7      Q.    Okay.  Let's see.  So you went -- did you

8  ever see a chiropractor after your accident?

9      A.    No.

10      Q.    And you said your car was totaled in the

11  accident?

12      A.    Correct.

13      Q.    Do you ever remember talking to any

14  insurance companies about the accident?

15      A.    I do.  I did.

16      Q.    And was it Nationwide Insurance that you

17  talked to?

18      A.    Yes.

19      Q.    Okay.  Did you call Nationwide or did they

20  call you or --

21      A.    She -- the adjuster called me.

22      Q.    Okay.  And do you remember when she called

23  you?

24      A.    I don't.  I think it was the next day.

25      Q.    Okay.  So pretty soon --

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                        JA3661

1          A.    Yes.

2          Q.    -- after the accident happened?

3          A.    Yes.

4          Q.    And did she call -- do you have just a cell

5    phone or do you also have a home phone number?

6          A.    Just a cell.

7          Q.    Okay.  And so she called your cell phone?

8          A.    Correct.

9          Q.    How did she get your cell phone number?

10         A.    I'm not sure.

11         Q.    Okay.  But you hadn't gone on Nationwide's

12   website and given them your phone number, had you?

13         A.    No.

14         Q.    Okay.  And you don't think your daughter or

15   Mr. Carmon or anybody had given Nationwide your phone

16   number?

17         A.    No.

18         Q.    Okay.  In looking at the first page of

19   Exhibit 332, in the box marked Unit 2, which has your

20   name in it --

21         A.    Um-hmm.

22         Q.    -- there is a section which says Driver's

23   Phone Numbers, and it says (919) 637-3382?

24         A.    Correct.

25         Q.    Was that your cell phone back in 2016?

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*        *(919) 557-4640*
**JA3662**

1       A.    Correct.

2       Q.    Okay.  So maybe the next day after the

3   accident, Nationwide calls up, and what did they want

4   to talk to you about?

5       A.    About damages to my vehicle.

6       Q.    And what did they tell you?

7       A.    They were just offering to pay to get it

8   fixed or -- yeah, I can't recall.

9       Q.    Well, so you said that it eventually got

10  totaled.

11      A.    Yeah.

12      Q.    So did it seem like they started out

13  saying, Yeah, it's clear our driver caused this

14  really bad wreck and we're going to total out your

15  car or were they just going to try to sort of patch

16  it up?

17      A.    To me, it felt like they were just trying

18  to patch it up.

19      Q.    Did they ask you to send them the

20  photographs of your car which you had taken with your

21  phone?

22      A.    No.

23      Q.    Did they ask you to download an app on your

24  phone and use their app to take the photographs?

25      A.    No.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3663

1          Q.    Could you tell by talking to the Nationwide

2     person if they had already seen photographs somehow?

3          A.    I can't recall.

4          Q.    Okay.  Did the Nationwide person try to

5     talk to you about any of your physical injuries, your

6     body injuries?

7          A.    No.

8          Q.    Okay.  So she was just focused on the car

9     accident stuff?

10         A.    Yes.

11         Q.    Did the Nationwide adjuster ever try to

12    take a recorded statement from you?

13         A.    Yes.

14         Q.    Okay.  And did you let her do that or did

15    you say, Nah, I don't really feel like doing a

16    recorded statement right now?

17         A.    I think I did.

18         Q.    Okay.  And did they ever play that -- like

19    give you a copy of the audio file or play that back

20    for you?

21         A.    No.

22         Q.    And so in your recorded statement, what did

23    you tell her?

24         A.    I can't remember.

25         Q.    Probably just an explanation of how the

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3664

1    accident happened?

2         A.   Yes.

3         Q.   Did you ever file a lawsuit against Francis

4    Desire Portales-Rios?

5         A.   No.

6         Q.   Did you file a lawsuit against Miguel

7    Ochoa?

8         A.   No.

9         Q.   Okay.  So regarding your pain and your knee

10   operation, did you ever miss any days from work

11   because of that?

12        A.   Yes.

13        Q.   Do you remember how many?

14        A.   Just from the pain, I'm not sure, but I

15   missed like two weeks after the operation.

16        Q.   Okay.  Do you remember if you worked the

17   next day after the accident?

18        A.   I don't remember.

19        Q.   Okay.  But so at least after the surgery,

20   which was caused by the accident, you missed at least

21   two weeks of work?

22        A.   Correct.

23        Q.   Okay.  Did you ever hire a lawyer for your

24   personal injury claim arising from this car wreck on

25   July 1st, 2016?

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com           *Serving all of North Carolina*        *(919) 557-4640*
**JA3665**

1        A.    Yes.

2        Q.    And without getting into a lot of detail,

3   can you tell me the name of that lawyer?

4        A.    White & Stradley.

5        Q.    Okay.  And did they send you any

6   unsolicited mail?

7        A.    No.

8        Q.    Specifically regarding the accident on

9   7/1/2016, did you go talk to any other personal

10  injury lawyers before White & Stradley?

11       A.    No.

12       Q.    Okay.  And you knew the firm because you'd

13  already worked here?

14       A.    Right.

15       Q.    So after the accident on July 1st, you said

16  you got a copy of Exhibit 332 from a lawyer that you

17  didn't know?

18       A.    Correct.

19       Q.    And you got other mail from other lawyers

20  you didn't know, right?

21       A.    Correct.

22       Q.    Did you get any mail from any

23  chiropractors?

24       A.    I can't remember.

25       Q.    Do you remember if you got any mail from

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3666

1  any, like, auto collision or auto body shops?

2       A.   No.

3       Q.   Okay.  On the first day that you got a copy

4  of -- or I take that back.

5            After the accident, for how many days do

6  you think you got letters from lawyers?

7       A.   I'm not sure.

8       Q.   Okay.  Did they all come on one day?

9       A.   No.

10       Q.   Do you think it lasted for more than two

11  weeks?

12       A.   I don't remember.

13       Q.   Do you remember how many letters total you

14  got from law firms?

15       A.   I don't.

16       Q.   Okay.  Do you think you got them all in the

17  first week after the accident?  Let me --

18       A.   Not sure.

19       Q.   -- take that back.  I think you said

20  earlier it was a couple days after the accident that

21  you first got a letter from a lawyer?

22       A.   Um-hmm.

23       Q.   So then starting several days after

24  July 1st, in the next seven -- do you think you got

25  most of the letters in the next seven days?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3667

1        A.    I can't remember.

2        Q.    Okay.

3              (Exhibit 333 is marked for identification.)

4        A.    Are you done with this?

5        Q.    For now.  You can set it aside.

6              And so I'm handing you something that's

7    been marked as Exhibit 333.

8        A.    Okay.

9        Q.    If you could take a moment and just look

10   through that and let me know when you're done.

11       A.    Okay.

12       Q.    Have you ever seen Document 333 before?

13       A.    Yes.

14       Q.    Or anything that looked like Document 333?

15       A.    Yes.

16       Q.    And what do you think Document 333

17   represents?  And when I say that, I mean all seven

18   pages of the document.

19       A.    An advertisement.

20       Q.    So on the first page, that's your name in

21   the middle of the page?

22       A.    That's correct.

23       Q.    And that was your home address at the time

24   of the accident?

25       A.    That is correct.

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com              Serving all of North Carolina      (919) 557-4640
**JA3668**

1      Q.    So on this first page of 333, does that
2   look like the outside of a mailing envelope to you?
3      A.    It does.
4      Q.    Okay.  And turning to the second page, does
5   that look like the reverse or the back side of an
6   envelope?
7      A.    It does.
8      Q.    Do you remember getting a letter from Lisa
9   Lanier or the Lanier Law Group?
10     A.    Yes.
11     Q.    And do you remember going through this
12  letter or opening this envelope and going through
13  this letter?
14     A.    Yes.
15     Q.    And the last two pages are a redacted copy
16  of your accident report, right?
17     A.    Correct.
18     Q.    So the Lisa Lanier mailer, which is
19  represented as Exhibit 333, could have been the one
20  where you got a copy of your accident report from,
21  right?
22     A.    The first or, I mean --
23     Q.    Well -- so, earlier, you testified that the
24  first time you saw a copy of your accident report,
25  you got it from a lawyer.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3669

1        A.    Right.

2        Q.    And it's from a lawyer that sent you an

3   advertisement and somebody --

4        A.    Correct.

5        Q.    -- you didn't know?  And so it appears that

6   Lisa Lanier was at least one of the lawyers who sent

7   you a copy of your accident report?

8        A.    Correct.

9        Q.    So it could have been her that's the one

10  that gave it to you for the first time, right?

11       A.    Could have been.

12       Q.    Okay.  Now, you also got mail from lawyers

13  that didn't send you the accident report, right?

14       A.    Correct.

15       Q.    And you're claiming in this lawsuit that

16  receiving these letters harmed you, right?

17       A.    Correct.

18       Q.    So do you think that getting a copy of your

19  accident report made the harm worse or not as bad or

20  they're both equally -- you were equally harmed?

21       A.    In getting the accident report?

22       Q.    Um-hmm, yeah.

23       A.    Equally.

24             (Exhibit 334 is marked for identification.)

25  BY MR. REICH:

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3670

1        Q.    Okay.  Let's see.  Now I'm handing you 334.

2    If you can take a look and let me know when you

3    finish.

4        A.    Okay.

5        Q.    Have you ever seen the documents that are

6    represented here in 334 before?

7        A.    Yes, when I received them.

8        Q.    So the first page, again, looks like the

9    outside of a mailing envelope, right?

10       A.    Correct.

11       Q.    And it says "THIS IS AN ADVERTISEMENT FOR

12   LEGAL SERVICES" really big at the bottom?

13       A.    Correct.

14       Q.    And then the second page, does that look

15   like the back of a mailing envelope?

16       A.    It does.

17       Q.    Okay.  And then you remember receiving the

18   other pages as being stuff inside the envelope?

19       A.    Correct.

20       Q.    And so this letter from Ted A. Greve &

21   Associates, it doesn't have a copy of your accident

22   report with it, does it?

23       A.    No.

24       Q.    Okay.  But, you know, looking at 333 and

25   334 and using your memory, you think you were, sort

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3671

1    of, equally harmed by both?

2        A.   Yes.

3        Q.   Okay.

4             (Exhibit 335 is marked for identification.)

5    BY MR. REICH:

6        Q.   And I'll hand you 335, and I'll confess

7    it's not in color.  Just let me know when you finish

8    looking through 335.

9        A.   Okay.

10       Q.   And have you ever seen Document 335 before?

11       A.   When I received it.

12       Q.   Okay.  And so this was another mailer you

13   received at 4717 Dansey Drive?

14       A.   Correct.

15       Q.   And this one from the Marcari Russotto firm

16   also has a copy of the accident report in the back,

17   correct?

18       A.   Correct.

19       Q.   And you also remember getting other

20   mailers, too, other than just these three, right?

21       A.   Correct.

22       Q.   So, you know, earlier, we went over some of

23   the, sort of, ground rules for depositions, and if

24   you need to take a break at any time, just let us

25   know or let your attorney know.

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3672

1     A.   Okay.

2     Q.   We'll be happy to stop and take a five- or

3   15-minute break, however much time you need.

4          MR. HOLMES:  If we could do that sometime

5       like in about 10 minutes maybe.

6          MR. REICH:  I was going to do it in about

7       one minute.

8          MR. HOLMES:  Oh, good.  Less time works.

9   BY MR. REICH:

10    Q.   And so, you know, for any reason -- and if

11  you're taking any medications that you need to take

12  at a certain time schedule, just let us know.

13    A.   Okay.

14    Q.   If you need water, we have that.  If you're

15  taking any medications that affect your ability to

16  recall, memory, or you're still taking frequent for

17  your knee, just let us know.

18    A.   Okay.

19    Q.   But if now is a good time for everybody, I

20  think we should just probably take a break.

21    A.   Okay.

22         MR. HOLMES:  Okay.  All right.

23         (A break was had.)

24         (Exhibit 336 is marked for identification.)

25  BY MR. REICH:

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3673

1      Q.   Ms. McNeil, I'm handing you a document

2   that's been marked as Exhibit No. 336.

3      A.   Okay.

4      Q.   And I'll represent to you that this was

5   prepared by your attorneys at White & Stradley on

6   behalf of all of their clients in this case.

7      A.   Okay.

8      Q.   So we're going to skip around a little bit

9   in the document.  So if you turn to Page 4 -- and the

10  pages are numbered, the first several pages are

11  numbered -- do you see your name in the middle of

12  Page 4?

13     A.   Correct.

14     Q.   Okay.  And so underneath that, on behalf of

15  our clients we asked a question:  Produce every

16  mailing that you received from any law firm, not

17  identified in this action as a Defendant, from the

18  relevant date of your accident to the present.

19          Do you see that written question?

20     A.   I do.

21     Q.   And below that, it says to basically see

22  Exhibit 2.  Do you see that?

23     A.   Yes.

24     Q.   Okay.  Your copy may have a paper clip that

25  goes to -- oh, no, Rob's copy has the paper clip.

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                          JA3674

1        MR. HOLMES:  Do you want to take that and

2    give me -- let's see.  I'm sorry.  Has yours been

3    marked with a --

4        MR. REICH:  Hers has been marked, yeah.

5        MR. HOLMES:  Yeah, you hold on --

6        MR. SHELTON:  Yeah.

7        MR. HOLMES:  You hold onto the marked one.

8    I'm sorry.

9  BY MR. REICH:

10      Q.  So if you flip towards the -- to the back

11  of this document, Exhibit 336, you'll see copies of

12  different mailers that all different named Plaintiffs

13  got.

14      A.  Okay.

15      Q.  And --

16        MR. HOLMES:  They're numbered down here,

17    Ms. McNeil, in this corner.

18        THE DEPONENT:  Okay.

19  BY MR. REICH:

20      Q.  They're probably five or six pages from

21  where you are, and you'll see your name.

22      A.  Okay.

23      Q.  Okay.  And so if you'd turn to Exhibit 2 of

24  Exhibit 336.

25      A.  All right.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3675

1      Q.   Okay.  And does this look like the outside
2   of a mailing envelope to you?
3      A.   It does.
4      Q.   Okay.  And that's your name, and 4717
5   Dansey Drive is the address, right?
6      A.   That is correct.
7      Q.   Okay.  And it's from the Howard, Stallings,
8   From, Hutson, Atkins, Angell & Davis law firm; is
9   that correct?
10      A.   That is correct.
11      Q.   And it says on the front "THIS IS AN
12   ADVERTISEMENT FOR LEGAL SERVICES," right?
13      A.   Yes.
14      Q.   Okay.  And if you turn to the next page,
15   there is an exterior of another envelope, correct?
16      A.   Correct.
17      Q.   And that one is also addressed to you,
18   right?
19      A.   That is correct.
20      Q.   And it says "Jordan Legal Services, PLLC"?
21      A.   That's correct.
22      Q.   And then if you turn to the third page of
23   Exhibit No. 2 to Exhibit 336, it appears to be a
24   different size or type of mailing envelope?
25      A.   Correct.

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                            JA3676

1        Q.   But it's also addressed to you, correct?

2        A.   That's correct.

3        Q.   And it's from Nagle & Associates, right?

4        A.   Correct.

5        Q.   Okay.  And it says it's from 7780 Brier

6    Creek Parkway, Suite 210, Raleigh, North Carolina,

7    right?

8        A.   Correct.

9        Q.   Okay.  So these three envelopes that are

10   represented in Exhibit 2 from the Howard Stallings

11   law firm and the Jordan Legal Services law firm and

12   Nagle & Associates, do you remember getting those at

13   your house?

14       A.   Yes.

15       Q.   Do you remember if you opened those?

16       A.   Yes.

17       Q.   But you didn't sue these three law firms,

18   right?

19       A.   No.

20       Q.   How many law firms did you sue in this

21   lawsuit?

22       A.   I'm not sure.

23       Q.   Okay.  Well, did you ever work at Nagle &

24   Associates?

25       A.   No.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3677

1       Q.    Did you ever work at Jordan Legal Services

2   or the Howard Stallings law firm?

3       A.    No.

4       Q.    Have you ever heard of these three law

5   firms?

6       A.    No.

7       Q.    So why didn't you sue these three law

8   firms?

9       A.    That was my lawyer's decision.

10      Q.    Okay.  But it's not because, like, you knew

11  Ms. Jordan or you go to church with someone at Howard

12  Stallings?

13      A.    No.

14      Q.    And just to kind of clarify the record, all

15  of the pieces of attorney mail that you received at

16  your house in July of 2016, did you open all of it or

17  did, after you opened like four or five of these

18  letters, you just quit opening them?

19      A.    I opened them all.

20      Q.    Okay.  And did you ever think you might

21  hire one of these law firms that was sending you

22  unsolicited mail?

23      A.    Never thought about it.

24      Q.    So why did you keep opening the mail from

25  law firms that you knew was an advertisement if you

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina      (919) 557-4640
                              JA3678

1   didn't plan to hire any of them?

2       A.   I open all my mail.

3       Q.   Okay.  Let's see.  And when you -- even

4   after you opened four or five of these unsolicited

5   advertisements from the Defendant law firms and you

6   kept opening the other ones, did you also read

7   through all of them?

8       A.   I did.

9       Q.   Okay.  About how much time would you spend

10  reading through one of these mailers?

11      A.   Individually or --

12      Q.   Um-hmm, yeah, just one?

13      A.   Maybe two or three minutes --

14      Q.   Okay.

15      A.   -- depending on what was inside.

16      Q.   Okay.  So it was more than like 10 seconds;

17  you didn't just, like, rip the envelope open, glance

18  at it real quick --

19      A.   Right.

20      Q.   -- and throw it away?

21      A.   Right.

22      Q.   Okay.  You actually, like, took two or

23  three minutes and read through line by line, it

24  sounds like?

25      A.   Pretty much.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3679

1      Q.    Okay.  So after your accident on 7/1/2016,

2    without going into any specifics of conversations

3    with White & Stradley, how soon did you think you

4    might hire White & Stradley to represent you in the

5    car wreck?

6      A.    I don't know.  I think after I found out I

7    had to have surgery.

8      Q.    Okay.  So that would have been days or

9    weeks later?

10     A.    Yes.

11     Q.    So do you think that was before or after

12   you received all of the unsolicited mail from, like,

13   Marcari Russotto, Ted Greve, Lisa Lanier, and these

14   lawyers you didn't know?

15     A.    After.

16     Q.    But while you were in your house receiving

17   this unsolicited mail, did you already think, Well,

18   if something bad happens, I would probably hire

19   White & Stradley?

20     A.    I don't remember.

21     Q.    Okay.  But you never thought you were going

22   to hire Ted Greve, right, and you'd never heard of

23   him?

24     A.    Right.  I never thought about it.

25     Q.    And you never thought you were going to

www.NCDepo.com                     Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3680

1    hire Lisa Lanier?

2         A.    Right.

3         Q.    Okay.  Did you know who she was?

4         A.    No.

5         Q.    Okay.  So -- I mean, let me rephrase that.

6               Had you ever seen television ads for any of

7    these law firms that sent you mail?

8         A.    Yeah.

9         Q.    Okay.  So -- or maybe heard radio ads for

10   them?

11        A.    Right.

12        Q.    You didn't personally know any of them?

13        A.    Right.

14        Q.    Let's see.  You can put that document to

15   the side now.  When you were reading the unsolicited

16   mail that you got, did you think any of the

17   information in it was helpful to you?

18        A.    I don't know.  It was all pretty much

19   standard.

20        Q.    Okay.  Stuff that you already knew because

21   you had worked at a personal injury law firm before?

22        A.    Yes.

23        Q.    Okay.  Do you think it could be helpful to

24   other people who don't have that sort of legal

25   background?

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*        *(919) 557-4640*
**JA3681**

1        A.    I don't know.

2        Q.    Was it helpful to get a copy of your

3   accident report?

4        A.    I don't know.

5        Q.    Do you think some people might find that

6   helpful?

7        A.    Maybe.

8        Q.    Okay.  So although you don't know if it was

9   helpful and maybe some other people think it's

10  helpful, is there any way to know whether somebody

11  thinks it's helpful other than asking them?

12       A.    There is no way to know.

13       Q.    So after you had this accident and you're

14  talking to the person from Nationwide, did you know

15  that you didn't have to talk to them?

16       A.    Yes.

17       Q.    Okay.  And it's because you had worked at

18  White & Stradley before?

19       A.    Yes.

20       Q.    Do you think everybody knows that?

21       A.    I'm not sure.

22       Q.    Okay.  Do you think the car insurance

23  company for the driver that hit you was looking out

24  for your best interests?

25       A.    Could you say that again?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3682

1      Q.    Yeah.  Do you think the car insurance
2  company for the driver that hit you in this accident
3  was looking out for your best interests?
4      A.    No.
5      Q.    Okay.  So -- and maybe to make that a
6  little more specific, you don't think Francis Desire
7  Portales-Rios's insurance company, Nationwide, was
8  looking out for your best interests?
9      A.    No.
10     Q.    And they were probably looking out --
11 they're trying to save money, right?
12     A.    That's the way I felt.
13     Q.    Right.  And so when they weren't just
14 automatically totaling your car and you felt like
15 they're just trying to patch it up --
16     A.    Right.
17     Q.    -- it's because they're trying to keep more
18 money in Nationwide's pocket?
19     A.    Right.
20     Q.    Do you think most motorists understand that
21 the other insurance company is not looking out for
22 them?
23     A.    I don't know.
24     Q.    Did anybody from Nationwide ever try to
25 come to your house?

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina      (919) 557-4640
                              JA3683

1          A.    No.

2          Q.    Had you ever heard of insurance companies

3    actually, like, knocking on the door and coming to

4    people's houses to try to get them to settle cases

5    cheap?

6          A.    I don't know.   No.

7          Q.    Okay.   So in kind of the week or two weeks

8    after your July 1st accident when you're getting

9    unsolicited mail from the Defendant law firms and

10   other law firms, did you show these letters to

11   anybody else?

12         A.    No.

13         Q.    Did you tell anybody that you were getting

14   a bunch of unsolicited mail from law firms?

15         A.    No.

16         Q.    Did you talk to Mr. Carmon about them?

17         A.    No.

18         Q.    How did it make you feel to get these

19   letters?

20         A.    Overwhelmed.

21         Q.    How else?

22         A.    Confused, I guess.   Overwhelmed.

23         Q.    And did you have any other emotions or

24   feelings kind of running through your head when you

25   were getting these?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3684

1       A.    Frustrated.

2       Q.    Okay.

3       A.    Angry.

4       Q.    Okay.

5       A.    Confused.

6       Q.    And so just -- I'm just going to go back to

7    some of those.  So you don't remember missing any

8    work immediately after the car wreck, right?

9       A.    I can't recall.

10      Q.    So if you were working do you -- in 2016,

11   at the time of the accident, were you typically

12   working like eight hours a day or were they longer

13   shifts or what was your --

14      A.    Eight -- actually, I was working a full

15   time and part time.

16      Q.    Okay.

17      A.    So, yeah, I did miss some from part time.

18   I can't recall about full time.

19      Q.    Where were you working part time?

20      A.    Macy's.

21      Q.    Okay.  So you had a pretty busy work

22   schedule, it sounds like.

23      A.    Yes.

24      Q.    And you would get home.  And you were

25   collecting the mail every day, right?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3685

1      A.   Yes.

2      Q.   And you'd go back to your mail kiosk or

3  little hut where the mailboxes are --

4      A.   (Nods head up and down).

5      Q.   -- and I'm guessing it would be stuffed

6  full of mail from lawyers that you had never had a

7  relationship with, right?

8      A.   I won't say stuffed full, but yeah.

9      Q.   Okay.  There would be --

10      A.   Mailings in there.

11      Q.   -- a couple pieces a day of unsolicited

12  mail, right?

13      A.   Right.

14      Q.   Okay.  And so is that what made you feel

15  overwhelmed or was it once you got back to the

16  apartment and you were reading through them that made

17  you feel overwhelmed?  Or when did you feel

18  overwhelmed?

19      A.   To receive them initially was just

20  overwhelming.

21      Q.   Okay.

22      A.   Didn't have time to really deal with the

23  accident itself, but then I'm getting a lot of

24  advertisements.

25      Q.   And so you also mentioned you were feeling

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com        *Serving all of North Carolina*        *(919) 557-4640*
**JA3686**

1  confused?

2       A.   Um-hmm.

3       Q.   What about these unsolicited pieces of mail

4  made you feel confused?

5       A.   Why was I getting them, how did I start

6  getting them, where did they get my information, how

7  did they know I was in an accident.

8       Q.   Did you ever call any of these attorneys up

9  or email them and ask them, How did you get my

10  information, or, Why are you sending me this mail?

11       A.   No.

12       Q.   Okay.  When Nationwide reached out to you

13  and you talked to the Nationwide adjuster, did you

14  ask them, How did you get my cell phone number?

15       A.   No.

16       Q.   And you also said frustrated was one of the

17  feelings or --

18       A.   Um-hmm.

19       Q.   -- emotions that you had?  Is that a yes?

20       A.   Yes.

21       Q.   What made you frustrated about getting

22  these pieces of unsolicited mail?

23       A.   They just kept coming.

24       Q.   And so it's not like -- it's not like you

25  just went on one day and you got a couple of pieces

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3687

1   of mail and it was over; it was just day after day

2   after day?

3        A.   Right.

4        Q.   And then you also said angry.  What about

5   these made you angry?

6        A.   Because I didn't have time to process what

7   was going on in my own accident.  Then I had to take

8   time and, you know, sit through and go through each.

9        Q.   And you said that was probably two or three

10  minutes per piece, right?

11       A.   Right.

12       Q.   So on the first day when you first got one,

13  were you angry or did the anger only kick in a couple

14  -- after you kind of got them for multiple days?

15       A.   I can't recall.  Probably after a multiple

16  of days.

17       Q.   So the frustration kind of built up over

18  time; the anger kind of --

19       A.   Correct.

20       Q.   -- built up over time?  Okay.  After the

21  accident, have you ever met Francis Desire

22  Portales-Rios or Miguel Ochoa?

23       A.   No.

24       Q.   Okay.  So they never, like, came to your

25  house or --

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3688

1         A.    No.

2         Q.    -- came -- did they ever call you on your

3    cell phone or threaten you or --

4         A.    No.

5         Q.    -- talk to you or anything?  Okay.

6               Did Nationwide Insurance ever ask you to

7    sign anything?

8         A.    No.

9         Q.    So they took a recorded statement from you,

10   but they didn't ask you to sign anything?

11        A.    Right.

12        Q.    Do you ever receive any other unsolicited

13   mail at your house?

14        A.    Ever?  Yeah.

15        Q.    Okay.  Junk mail?

16        A.    Yes.

17        Q.    What type of companies send you junk mail?

18        A.    More like coupons.  Like there's a -- I

19   guess it's called Midweek or something like that.

20   They send a variety of coupons.

21        Q.    Okay.

22        A.    And I get voter -- like election time, I'll

23   get different advertisements for that.

24        Q.    So like political --

25        A.    Mail.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3689

1     Q.    -- candidates are sending --

2     A.    Correct.

3     Q.    -- sending you stuff?

4           Do you ever get mail asking you to -- or

5     from credit card companies?

6     A.    Not unless I have -- not unless I applied

7     for one or something.

8     Q.    Okay.  Do you ever get mail trying to do --

9     offering you debt consolidation?

10    A.    No.

11    Q.    Or offering you -- let us help fix your

12    credit or anything like that?

13    A.    No.

14    Q.    Do you get stuff from the grocery store,

15    like coupons from the grocery store?

16    A.    Yes.

17    Q.    Do you get flyers from Best Buy or Kohl's

18    or big box stores?

19    A.    Yes.

20    Q.    Do you get stuff from the stores at the

21    mall like Macy's or --

22    A.    Yes.

23    Q.    -- Sears before it went bankrupt?

24          Did you ever think the insurance company

25    was trying to trick you into settling your case for

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3690

1   less than it was worth?

2        A.   I won't say trying to trick me, but maybe

3   pressure.

4        Q.   Okay.  Kind of like high pressure, you

5   know, catch you the day after the accident when you

6   were --

7        A.   Right.

8        Q.   -- when your head wasn't really clear?

9        A.   Right.

10       Q.   Okay.  So going back to Exhibit 335, which

11   is the Marcari Russotto --

12       A.   Okay.

13       Q.   -- flyer, if you'll turn to Page 7.  And

14   there are page numbers at the bottom, but it's right

15   in that footer so they're kind of hard to read.

16       A.   Okay.

17       Q.   And you look on the left side of the Page

18   7, I'm going to read a paragraph to you.  The flyer

19   says:

20            The adjuster works for the insurance

21       company.  His responsibility is to save the

22       insurance company money.  He has absolutely no

23       obligation to you.  Insurance adjusters are

24       trained to earn your trust.  Their guidance is to

25       tell claimants they don't need an attorney.  Keep

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3691

1        in mind an adjuster settles hundreds of claims a

2        year.  You may only settle two or three claims in

3        a lifetime.

4            Did I read that correctly?

5        A.   Yup.

6        Q.   Is that kind of the way that you already

7   felt or that you felt when you were talking to

8   Nationwide?

9        A.   Yes.

10       Q.   Do you think other people feel the same way

11  or other people have that knowledge?

12       A.   I'm not sure.

13       Q.   Okay.  You'd have to ask them, right?

14       A.   Right.

15       Q.   The next paragraph says:

16           Adjusters may tell you "the lawyer will get

17       all the money and the case will take forever to

18       be resolved."  That's not true.

19           Do you think that's -- did I read that

20  correctly?

21       A.   You did.

22       Q.   Do you agree with that statement?

23       A.   Do I agree that the adjusters would tell me

24  that?

25       Q.   Yeah, they might tell you something like

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com          *Serving all of North Carolina*          *(919) 557-4640*
**JA3692**

1   that?

2       A.   Yeah.

3       Q.   Okay.  So the adjusters are not looking out

4   for your best interests?

5       A.   Correct.

6       Q.   And then if you look on the right column or

7   the right side of Page 7, and I'm going to read a

8   sentence or a couple sentences from the second

9   paragraph.

10      A.   Okay.

11      Q.   It starts off saying:

12           If you accept a quick settlement, you are

13           doing yourself a disservice.  You may find months

14           later that you need further medical treatment or

15           have permanent injuries that were not noticeable

16           after the accident.

17                Did I read those two sentences

18   correctly?

19      A.   You did.

20      Q.   And do you agree with those?

21      A.   I do.

22      Q.   That's pretty much what happened to you,

23   right?

24      A.   Right.

25      Q.   Because, like, immediately after the

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3693

1    accident -- well, like the day after your accident,

2    was your knee already hurting then?

3         A.   It had started to, yeah.

4         Q.   Okay.  But you didn't actually seek medical

5    treatment for a couple of days later?

6         A.   Right.

7         Q.   Right.  And it wasn't for weeks or months

8    when you actually had surgery?

9         A.   Correct.

10        Q.   So do you think that information on Page 7

11   here is good for people to know who have been injured

12   in car wrecks?

13        A.   I guess it could be.

14        Q.   Okay.  But you'd have to ask them, right?

15        A.   Right.

16        Q.   And then the next -- the third paragraph

17   there on Page 7 says:

18             The real reason adjusters don't want you to

19        seek legal advice is because claimants who hire

20        lawyers generally receive two to four times more

21        money than claimants who settle directly with the

22        insurance company.

23             Did I read that correctly?

24        A.   You did.

25        Q.   Do you think people that hire lawyers

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                                JA3694

1   sometimes receive more money than the people who try

2   deal directly with the insurance company?

3        A.   Sometimes.

4        Q.   And you went out and got a lawyer after

5   this accident, right?

6        A.   Right.

7        Q.   The medical bills you incurred after the

8   July 1st, 2016 accident, you didn't get those medical

9   bills until months after the accident?

10       A.   Correct.

11       Q.   And so you didn't know how many there would

12  be or how big the bills would be when you first

13  talked to the insurance adjuster, did you?

14       A.   Correct.

15       Q.   In fact, you -- at the time you first

16  started talking to the insurance company, you had not

17  missed any days of work yet, had you?

18       A.   I can't recall.

19       Q.   Okay.  But you -- well, but you first

20  talked to them like the day after the accident,

21  right?

22       A.   Somewhere, yeah.

23       Q.   And you eventually missed two weeks of work

24  after your surgery?

25       A.   Right.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3695

1      Q.    And that was months later?

2      A.    Right.

3      Q.    Yeah.  Okay.  So you couldn't have known

4    when you were first talking to the insurance company

5    after the accident how many days of work you would

6    have ultimately missed?

7      A.    Correct.

8      Q.    Okay.  Have you ever seen a chiropractor

9    before for anything?

10     A.    No.

11     Q.    So turning to Exhibit 334, which is the

12   full colored Ted Greve exhibit, if you would turn to

13   Page 6 of that -- and before I ask you about Page 6,

14   when the accident happened back in July 2016, did you

15   know that some personal injury law firms give free

16   consultations?

17     A.    Yes.

18     Q.    And that's because you had worked at one,

19   right?

20     A.    Right.

21     Q.    And so you knew that if somebody has a

22   wreck, they don't have to pay $500 just to talk to

23   somebody for a half hour?

24     A.    Correct.

25     Q.    Because they can get a free consultation,

www.NCDepo.com                      Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                    JA3696

1  right?

2       A.    Correct.

3       Q.    And did you know when the accident happened

4  in July of 2016 that some personal injury lawyers in

5  North Carolina take cases on a contingency fee?

6       A.    Yes.

7       Q.    And so that means that the client doesn't

8  have to pay any money up front and if there is a

9  recovery, the attorney gets some percentage usually,

10  right?

11       A.    Correct.

12       Q.    Okay.  And so on Page 6 of Ted Greve's

13  letter, which is Exhibit 334, he's got a paragraph

14  there.  I'm going to read it into the record.

15       A.    Okay.

16       Q.    What will it cost?  There is never a charge

17  to discuss your case with us.

18            Did I read those first two sentences

19  correctly?

20       A.    You did.

21       Q.    Okay.  And so you already knew before you

22  got this letter that there were people who would talk

23  to personal injury victims for free, right?

24       A.    Correct.

25       Q.    Okay.  And then the last sentence says --

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3697

1  of that same paragraph:

2          If we accept your case and you wish us to

3       represent you, there are no attorney's fees until

4       we are successful in obtaining a settlement or

5       win a suit for you.

6          Did I read that correctly?

7       A.   You did.

8       Q.   And is that generally how you understand a

9  contingency fee to work?

10      A.   Yes.

11      Q.   Do you think other people who get involved

12  in car wrecks know about contingency fees?

13      A.   I'm not sure.

14      Q.   If they didn't already know how a

15  contingency fee worked, do you think it'd be helpful

16  for them to get a letter that explained it to them?

17      A.   Probably.

18      Q.   Okay.  But you'd have to ask them, right?

19      A.   Right.

20      Q.   When you receive other types of unsolicited

21  mail at your apartment that's not sent by lawyers, do

22  you also feel frustrated, angry and overwhelmed?

23      A.   I don't know.

24      Q.   Well, when you -- on a normal day, like

25  today, and you go home and you have some mail in your

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3698

1   mailbox that you didn't expect from a company you've

2   never done business with, based on your testimony, I

3   understand you would probably take that letter into

4   the house --

5           A.   Um-hmm.

6           Q.   -- or into the apartment, and then you'd

7   open it, right?

8           A.   Correct.

9           Q.   And you'd read it because you read all of

10  your mail?

11          A.   Correct.

12          Q.   And do you think it would make you feel

13  angry to get it?

14          A.   It could, yeah.

15          Q.   Does it always make you feel angry to get

16  unwanted mail?

17          A.   Not always.

18          Q.   Okay.  Does it always make you feel -- do

19  you ever wonder how they got your address?

20          A.   Sometimes.  For the most part, if it's like

21  department stores, I know it's because I've filled

22  out information with them.

23          Q.   So the feeling of confusion that you had

24  when you got these law firm letters --

25          A.   Um-hmm.

www.NCDepo.com                     Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                 JA3699

1      Q.    -- you don't have that confusion feeling

2   when you're getting stuff from like a department

3   store?

4      A.    No.

5      Q.    Okay.  Do you ever get other mail and

6   you're confused of why you're getting it?

7      A.    No.

8      Q.    Okay.  Do you ever have insurance companies

9   that you don't have insurance from send you mail and

10  say, Hey, you should switch your car insurance to us?

11     A.    Yes.

12     Q.    Do you feel confused when you get that kind

13  of mail?

14     A.    No.

15     Q.    Do you feel like you're injured when you

16  get that kind of mail?

17     A.    Yes.

18     Q.    Have you ever called them up and said, Stop

19  sending me these letters; I like my car insurance?

20     A.    No.

21     Q.    Looking at Exhibit 332, it said you had

22  Discovery Insurance Company at the time of the

23  accident?

24     A.    Yes.

25     Q.    Do you still have -- is that still your car

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                **JA3700**

1    insurance company?

2        A.    No.

3        Q.    Who do you have your car insurance with

4    now?

5        A.    Dairyland.

6        Q.    Okay, Dairyland.  And that's like -- like

7    milk dairy, D-a-i-r-y?

8        A.    Correct.

9        Q.    So after you received the unsolicited mail

10   for the car wreck, did you go to research any of

11   these law firms?

12       A.    No.

13       Q.    So you didn't go to Ted Greve's website or

14   Lisa Lanier's website?

15       A.    No.

16       Q.    Okay.  Why did you keep copies of the mail

17   that they sent you?

18       A.    I don't know.  I just held on to them

19   because they were for an accident, so I didn't know

20   if I would need them.

21       Q.    Okay.  Because normally when you get mail

22   from some insurance company you don't do business

23   with or something, you throw it away, right?

24       A.    Right.

25       Q.    But you saved the mail from -- the

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3701

1  unsolicited mail from the law firms.

2          Did getting these pieces of mail cause you

3  to lose any money?

4      A.   Not lose any, no.

5      Q.   Have you ever heard of something called

6  under insured motorist insurance?

7      A.   I -- I have, yes.

8      Q.   And uninsured motorist insurance?

9      A.   Yes.

10     Q.   Okay.  And have you ever heard it called UM

11 or UIM?

12     A.   Yeah.

13     Q.   And did you become -- did you first hear

14 about those terms or become acquainted with them when

15 you worked at White & Stradley?

16     A.   No.

17     Q.   Okay.  But you already knew about them on

18 July 1st, 2016 when you had your wreck, right?

19     A.   Yes.

20     Q.   Okay.  Do you think other drivers know that

21 if they have a wreck with an underinsured motorist

22 that they can then file a lawsuit against their own

23 insurance company?

24     A.   I don't know.

25     Q.   Okay.  You'd have to ask them, right?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3702

1       A.    Right.

2       Q.    But at the time of your wreck and

3    immediately after your wreck, you knew that -- you

4    knew about the concepts of pain and suffering, right?

5       A.    Yes.

6       Q.    And that people can file lawsuits and

7    receive money for pain and suffering?

8       A.    Correct.

9       Q.    In addition to just the physical damage to

10   their car, right?

11      A.    Correct.

12      Q.    And you knew that if you missed work

13   because of an accident, you could potentially file a

14   lawsuit and receive money for lost wages or lost days

15   of work?

16      A.    Correct.

17      Q.    So after the July 1st, 2017 -- 2016

18   accident, did you eventually get a replacement

19   vehicle?

20      A.    I did.

21      Q.    And about how -- because you said your car

22   was totaled, right?

23      A.    Right.

24      Q.    So about how much later was it until you

25   got your replacement car?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3703

1     A.   I can't tell the time frame.  A few weeks.

2     Q.   Okay.  So like way less than a year, right?

3     A.   Yes.

4     Q.   A couple weeks or a month?

5     A.   Yes.

6     Q.   What did you get?

7     A.   I got a Chrysler 200.

8     Q.   And was that new or used?

9     A.   It was used.

10     Q.   Okay.  And so, I guess, did you buy it from

11 a private party or from like a car dealership?

12     A.   A car dealership.

13     Q.   So they did like the tax and license tag

14 and that sort of registration stuff there at the

15 spot?

16     A.   Correct.

17     Q.   And they probably mailed you some paperwork

18 that was related to that, right?

19     A.   Correct.

20     Q.   So after you got your new car with your new

21 license plate on it and your new registration, do you

22 remember if you got any mail solicitations from

23 companies that you had never done business with?

24     A.   I can't remember.

25     Q.   Do you remember if you got any people

www.NCDepo.com          Depositions, Inc.
info@NCDepo.com     Serving all of North Carolina     (919) 557-4640
JA3704

1  trying to sell you like extended warranties, car

2  warranties?

3      A.   I can't recall.  I think I have.  I can't

4  recall.

5      Q.   So you think you may have gotten them

6  sometime; you just don't know if it was right then?

7      A.   Right.

8      Q.   Do you remember how many car warranty

9  solicitations you got?

10     A.   No.

11     Q.   Do you remember if they ever called you on

12  the phone?

13     A.   No.

14     Q.   Okay.  Did you sign up and say, I'd like to

15  learn more about extended car warranties?

16     A.   No.

17     Q.   So it was like unwanted solicitations,

18  right?

19     A.   Yes.

20     Q.   Do you remember ever getting one of those

21  extended warranty pieces of mail and they would have

22  the model year of your car in that piece of mail and

23  you think, How do they know I own a Chrysler 200?

24     A.   Yes.

25     Q.   Okay.  So you've seen that kind of really

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3705

1    direct or personalized mail, right?

2         A.   Correct.

3         Q.   Did you ever purchase one of those extended

4    car warranties?

5         A.   No.

6         Q.   No.  I never have either.

7              So whether it was when you got your

8    Chrysler 200 or a different car, when you got one of

9    those very personalized extended car warranty pieces

10   of mail, did you ever feel like that invaded your

11   privacy?

12        A.   I did.

13        Q.   Did you ever sue any of those companies?

14        A.   No.

15        Q.   Did you ever call them up and complain?

16        A.   No.

17        Q.   Okay.  So in a given week, how much

18   unsolicited mail do you think you get at your

19   apartment?

20        A.   I don't get much.  In a week -- some weeks,

21   I may not get any.

22        Q.   How often do you yourself send mail?

23        A.   Send mail?

24        Q.   Um-hmm.

25        A.   Not often.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3706

1      Q.   Okay.  So you usually pay your bills

2   electronically or somehow?

3      A.   Correct.

4      Q.   Have you ever talked to somebody and -- let

5   me rephrase that.

6           Have you ever sent mail to somebody and

7   then they told you they didn't get it?

8      A.   Yes.

9      Q.   So it got lost in the mail or stolen or

10  something?

11     A.   (Nods head up and down).

12     Q.   Have you ever mailed something and it came

13  back to you Return to Sender?

14     A.   Yes.

15     Q.   When you get, say, flyers from, like, big

16  box stores or stores at the mall, do you ever then go

17  into those stores because you saw something that was

18  on sale?

19     A.   No.

20     Q.   If you have gotten -- do you get those

21  things from the grocery store?

22     A.   Yes.

23     Q.   And do you ever go into the grocery store

24  and take the coupon that you got in the mail and

25  redeem the coupon?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                  JA3707

1      A.    No.

2      Q.    When you get things from the grocery store

3  or from other stores, do you feel like your privacy

4  is violated?

5      A.    No.

6      Q.    So what makes getting those flyers from

7  like a grocery store different than getting these

8  letters from lawyers?

9      A.    Because I actually sign up for those

10  mailers.

11      Q.    So you have like a --

12      A.    A rewards card or something like that, yes.

13      Q.    Like the Food Lion MVP card or --

14      A.    Correct.

15      Q.    Okay.  So what is your goal with this

16  lawsuit?

17      A.    My goal?  Hopefully that the letters -- the

18  unsolicited letters would stop.  Maybe a small

19  settlement, but definitely so someone who is going

20  through an accident can have time to process and do

21  their own homework and not be harassed.

22      Q.    When you say "do their own homework," like

23  to find a lawyer themselves?

24      A.    Yes.

25      Q.    Is that what you're saying?  Okay.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3708

1          So if somebody doesn't, you know, didn't

2     used to work at a personal injury law firm or didn't

3     go to school with people who became lawyers, doesn't

4     have a lawyer in their family, how should they do

5     their homework and go find a lawyer?

6          A.   On websites.

7          Q.   Okay.

8          A.   Internet.

9          Q.   Did you ever -- so after the accident

10    happened, did you ever call up the bar association or

11    the state bar and complain about the letters that you

12    received?

13         A.   No.

14         Q.   Okay.  Did you ever complain to the

15    attorney general or any of the local bar associations

16    about them?

17         A.   No.

18         Q.   Have you ever driven on a toll road in

19    North Carolina?

20         A.   Yes.

21         Q.   And was it the one here in Wake County, the

22    Southern Wake Expressway?

23         A.   Yes.

24         Q.   Did they send you a bill through the

25    mail --

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3709

1       A.    Yes.

2       Q.    -- for the toll?  Okay.  And you said maybe

3  a small settlement.  How do you calculate your

4  damages in this case?

5       A.    How do I calculate them?

6       Q.    Um-hmm.

7       A.    I don't know that I could, you know, just

8  outside of my feelings, but I don't know that I could

9  calculate them all.

10      Q.    It would be hard for you to put a dollar

11  amount on that?

12      A.    Yeah.

13      Q.    So do you know that there could be a jury

14  trial in this case?

15      A.    Yes.

16      Q.    And so if you're on the stand and there's

17  six or twelve people in the jury box, you're not

18  really sure what dollar amount you could put on your

19  frustration and your anger; is that what you're

20  saying?

21      A.    Yes.

22      Q.    So I just want to kind of talk generally

23  about privacy.  Do you consider yourself a private

24  person?

25      A.    I -- yeah.  Kind of.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3710

1    Q.   So what do you do to further that or
2  maintain your privacy?
3    A.   I'm not sure.  I mean, I just don't put my
4  information -- disclose it to anybody, you know.
5    Q.   Okay.  Do you use Facebook?
6    A.   I do.
7    Q.   Okay.  And how many friends do you have on
8  Facebook?
9    A.   Quite a few.
10   Q.   Okay.
11   A.   Over a thousand.
12   Q.   Okay.  Do you know what your privacy
13 settings on Facebook are?
14   A.   No.
15   Q.   How often do you log into Facebook?
16   A.   Not often.
17   Q.   Do you have the --
18   A.   It's --
19   Q.   -- Facebook phone --
20   A.   -- an app.
21   Q.   -- on your app [sic]?
22   A.   Yes.
23   Q.   How often do you use the app?
24   A.   I'm not sure.  I might -- I -- I don't go
25 on it often.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3711

1     Q.   Okay.  Once a day?

2     A.   No, not even.

3     Q.   Okay.  A couple of times a week then?

4     A.   Yeah.

5     Q.   Less than seven times a week?

6     A.   Yeah.

7     Q.   So when you go onto the Facebook app and

8  you're scrolling through the news feed, do you ever

9  see advertisements on the news feed?

10    A.   Yes.

11    Q.   Do you ever see an ad on the news feed and

12 you think to yourself, Wow, I was just talking about

13 that product a couple days ago?

14    A.   Yes.

15    Q.   Do you ever wonder how it pops up on there?

16    A.   No.

17    Q.   Okay.  Or have you ever sort of went to a

18 website one day and a couple days later you see that

19 website pop up on your Facebook news feed?

20    A.   Yes.

21    Q.   Do you ever wonder why that website you

22 were just at is now on your news feed?

23    A.   No.

24    Q.   Do you ever use Uber?

25    A.   I have, yes.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                            JA3712

1      Q.   Has Uber ever picked you up at your Dansey

2  Drive apartment?

3      A.   Yes.

4      Q.   And have they ever dropped you off there?

5      A.   Yes.

6      Q.   Have you ever used Google Maps?

7      A.   Yes.

8      Q.   And have you ever typed in your Dansey

9  Drive address into Google Maps?

10     A.   Yes.

11     Q.   Is your daughter still in high school?

12     A.   She is, yes.

13     Q.   Over the last several years while she's

14  been in high school, did you ever get stuff from the

15  school mailed to your house?

16     A.   Yes.

17     Q.   Did they ever send like a newsletter or

18  kind of a bulletin?

19     A.   Yes.

20     Q.   Do you get any information from a church or

21  any churches mailed to your house?

22     A.   No.

23     Q.   When you started using Facebook, did you

24  read the terms of service?

25     A.   I skimmed over it, yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3713

1        Q.    Okay.  And did you, like, click "accept" or

2   whatever?

3        A.    Yes.

4        Q.    When you downloaded the app, did you read

5   the terms of service?

6        A.    Same as --

7        Q.    When you say "skimmed," how much time do

8   you think you spent reading it?

9        A.    I'm not sure.

10        Q.    Okay.  Have you ever had a yard sale at

11   your home?

12        A.    No.

13        Q.    Have you ever bought or sold things on

14   Craig's List or Facebook Marketplace?

15        A.    No.

16        Q.    Do you ever use Amazon.com?

17        A.    Yes.

18        Q.    Do you have an Amazon Prime membership?

19        A.    I do not.

20        Q.    Okay.  But you use -- when I say do you use

21   Amazon, do you look at products on there and then buy

22   them and have them delivered to your house?

23        A.    Yes.

24        Q.    Do you know that Amazon is collecting

25   information about your shopping habits and buying

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina       (919) 557-4640
                              JA3714

1    habits?

2         A.    Yes.

3         Q.    Does that bother you?

4         A.    No.

5         Q.    Are you registered to vote?

6         A.    Yes.

7         Q.    And have you voted in the last couple of

8    elections?

9         A.    Yes.

10        Q.    Now, earlier, I think you said you

11   originally grew up -- or you were maybe born and

12   raised in New Jersey, right?

13        A.    About half my life, yeah.

14        Q.    Were you ever registered to vote in New

15   Jersey?

16        A.    No.

17        Q.    Okay.  So you've only been registered to

18   vote in North Carolina?

19        A.    Correct.

20        Q.    Do you remember where you went to get

21   registered to vote?

22        A.    I don't remember.  I want to say it was

23   maybe DMV.  I can't remember.

24        Q.    Okay.  Let's see.  Have you ever looked at

25   your voter's registration online?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                               JA3715

1      A.    No.

2            (Exhibit 337 is marked for identification.)

3  BY MR. REICH:

4      Q.    So I'm going to hand you something marked

5  as Exhibit 337.

6      A.    Okay.

7      Q.    If you'd take a moment and look at that and

8  let me know when you're finished reading it.

9      A.    Okay.

10           Okay.

11     Q.    Have you ever seen this document before?

12     A.    Yes.  When I go to the voting booth and you

13  have to look through the book, yeah.

14     Q.    Okay.  So you've seen information about

15  your voting records when you go vote?

16     A.    Correct.

17     Q.    Have you ever been to the North Carolina

18  Board of Elections website yourself and looked it up?

19     A.    No.

20     Q.    And I'll tell you that that's where this

21  was printed out from.  And that if you go to this

22  address on the bottom left corner, you can get to

23  this page or one close to it.

24     A.    Okay.

25     Q.    So on the top of Page 337, that is your

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3716

1  correct name and address, right?

2      A.   That is, yes.

3      Q.   And you live in Wake County, correct?

4      A.   Correct.

5      Q.   And are you registered as a Democrat?

6      A.   Yes.

7      Q.   And your race is black, or African

8  American; that's correct?

9      A.   Correct.

10     Q.   Okay.  And gender is female, correct?

11     A.   Correct.

12     Q.   And sometimes you vote in person at the

13 polling station, right?

14     A.   Correct.

15     Q.   And do you vote at the Saint Matthew

16 Baptist Church?

17     A.   Yes.

18     Q.   So they have the polling place on here

19 correctly?

20     A.   Yes.

21     Q.   So turning to the second page, in the

22 middle of the page, it has the history of the

23 elections that you voted on going back to 2004.  Do

24 you see that?

25     A.   I do.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                  JA3717

1      Q.   And it says you voted in various primary

2  elections and general elections.

3      A.   Uh-huh.

4      Q.   And that sometimes you vote either absentee

5  or one-stop voting and -- but most of the time you

6  vote in person.  Do you see that?

7      A.   Correct.  Um-hmm.

8      Q.   Did you know all of this information was

9  publicly posted online?

10     A.   No.

11     Q.   How does that make you feel?

12     A.   No way.

13     Q.   Okay.  So it doesn't make you feel angry or

14  frustrated?

15     A.   No.

16     Q.   Or confused as to why it's online?

17     A.   No.

18     Q.   So going back to Exhibit 332, which is the

19  accident report, did you know that the Wake County

20  Sheriff's Department or Raleigh Police Department

21  also post these online?

22     A.   I didn't know.

23     Q.   Okay.  So when you first got this from a

24  lawyer, you didn't know that these were posted

25  online?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                   JA3718

1        A.    No, I did not.

2        Q.    Have you eventually -- before today, did

3    you know that accident reports like No. 332 are

4    posted by local law enforcement online?

5        A.    I didn't.

6        Q.    And so when you were at your house in

7    July 2016 receiving this mail from lawyers that you

8    made you angry and frustrated and confused and

9    overwhelmed, you didn't know that these accident

10   reports were posted online?

11       A.    Right.

12       Q.    So if you could put back in front of you

13   maybe Exhibit 334.  If you look in the top right

14   corner of the first page --

15       A.    Um-hmm.

16       Q.    -- there is like a reddish color stamping

17   for the mailing because they don't use an actual

18   stamp that you lick, right?

19       A.    Right.

20       Q.    And underneath the mailed from zip code

21   part, it says 07062016.  Do you see that?

22       A.    I do.

23       Q.    And then immediately to the left of this,

24   sort of, electronic stamp, there is a black stamp

25   which also has some information including 06 July 16.

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com        *Serving all of North Carolina*        *(919) 557-4640*
**JA3719**

1  Do you see that?

2       A.   I do.

3       Q.   So looking at your accident report, which

4  is Exhibit 332, it looks like your accident was on

5  July 1st and it looks like this letter was mailed on

6  July 6th.  Would you agree with that?

7       A.   I agree.

8       Q.   Okay.  And so then if we look at

9  Exhibit 333, which is the Lanier Law Group mailer,

10 again, on the first page looking at the electronic

11 stamp, it also looks like it was mailed on July 7,

12 2016?

13      A.   Correct.

14      Q.   And then looking at the Marcari Russotto

15 mailer, which is Exhibit 335, they use a Hasler

16 stamp, but it looks like it's marked July 7, 2016,

17 right?

18      A.   Correct.

19      Q.   Okay.  So it seems like at least these

20 three pieces of mail came -- or were put into the

21 mail six or seven days after your wreck?

22      A.   Correct.

23      Q.   Okay.  So how soon after getting these

24 pieces of mail did you decide to sue these law firms?

25      A.   I don't know.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3720

1      Q.   Okay.  So as you're standing there in your

2  apartment on -- about a week after the accident

3  happened, and you're getting this mail and you feel

4  frustrated and overwhelmed, angry and confused, were

5  you thinking, I'm going to find a lawyer and sue

6  these guys right now?

7      A.   No.

8      Q.   Okay.  So it wasn't -- it wasn't on

9  July 8th?

10     A.   Right.

11     Q.   Okay.  Did you ever hear -- did you ever

12  see any billboards related to this lawsuit?

13     A.   No.

14     Q.   Did you ever hear any radio ads about it?

15     A.   No.

16     Q.   I'm going to try to find a copy of the

17  lawsuit and hand it to you.

18          (Exhibit 338 is marked for identification.)

19  BY MR. REICH:

20     Q.   So I'm handing you Document 338.

21     A.   Okay.

22     Q.   And just a take a moment and look over

23  that, and let me know when you've finished looking at

24  it.

25          MR. HOLMES:  Do you want her to read all

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3721

1      37 pages?

2           THE DEPONENT:  Yeah.

3           MR. REICH:  I'd just like her to become

4      familiar enough with the document so that I can

5      ask her some questions about it.

6           MR. HOLMES:  Will she be able to refer to

7      the document --

8           MR. REICH:  Yeah.

9           MR. HOLMES:  -- while you're asking her

10     questions?

11          MR. REICH:  Oh, yeah.  Yeah.

12          MR. HOLMES:  And you'll direct her to where

13     you are?

14          MR. REICH:  Yes, sir.

15          THE DEPONENT:  All right.

16 BY MR. REICH:

17     Q.   Okay.  Well, if you turn to the first page

18 of 337.  It is 337, correct?  No, 338.  My apologies.

19 The first page, sort of, on the top of the page,

20 that's got your name on it, right?

21     A.   Correct.

22     Q.   Okay.  When was the -- do you remember the

23 first time you saw -- have you ever seen Document 338

24 before?

25     A.   I can't recall.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3722

1      Q.   Do you know what Document 338 is?

2      A.   Yes.

3      Q.   Okay.  What is it?

4      A.   This is the lawsuit.

5      Q.   And it's got your name on it, right?

6      A.   Correct.

7      Q.   Do you know when it was filed?

8      A.   The year?

9      Q.   We can start with that.

10     A.   2016, I believe.

11     Q.   Do you know actually what day of 2016 it

12  was filed?

13     A.   No.

14     Q.   So if you look at the very bottom of the

15  first page on Document No. 338, it says filed

16  08/22/16.  Do you see that?

17     A.   I do.

18     Q.   And so I'll tell you that it's my belief or

19  understanding that this document was first filed on

20  August 22nd, 2016.  Did you ever see this before

21  August 22nd, 2016?

22     A.   No.

23     Q.   Okay.  So I'm going to skip around a little

24  bit in it.  Have you ever been involved in -- have

25  you ever been a party in a class action lawsuit

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                               JA3723

1   before?

2        A.   I have.

3        Q.   Okay.  And did you receive some sort of

4   settlement or monetary payment for that?

5        A.   I have.

6        Q.   From a class action, right?

7        A.   Yes.

8        Q.   And that's in some questions that you

9   answered somewhere, and we'll look at those later.

10            When you had received the unsolicited mail

11  from the Defendants in this lawsuit, why did you

12  choose to bring a class action?

13       A.   Because my rights were violated.

14       Q.   Did you ever think of bringing an action

15  just on behalf of yourself and not on behalf of other

16  class members?

17       A.   No.

18       Q.   Did you know that's possible for you to

19  file a lawsuit just on your own behalf and not

20  represent other class members?

21       A.   Yes.

22       Q.   Okay.  So turning to Page 14, Paragraph 52

23  says:

24            On 1 July 2016, Plaintiff, and then it says

25       your name, was operating a motor vehicle and

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                                  JA3724

1          involved in an accident which this lawsuit will

2          call the McNeil Accident.

3               Did I read that close to correctly?

4     A.   Yes.

5     Q.   Okay.  So then turn to the next page, Page

6  15.  In Paragraph 60, it says:

7               Each investigating officer obtained the

8          Plaintiff-Driver's name, address, date of birth,

9          and driver's license number either by copying the

10         information from the license itself into a

11         DMV-349; (b) by typing the license number into a

12         computer which then automatically populated the

13         Plaintiff-Driver's name and address into a

14         standard DMV-349; or (c) by scanning the code on

15         the back of the driver's license into the

16         computer which then automatically populated the

17         name, address, and driver's license number of the

18         Plaintiff-Driver into a DMV-349.

19              Did I read that correctly?

20    A.   You did.

21    Q.   Okay.  So going back to the scene of the

22  accident, July 1st, 2016, you know, when the officer

23  asked you for your driver's license --

24    A.   Uh-huh.

25    Q.   -- did you see what they did with it?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                          JA3725

1        A.    I didn't.  He walked up -- she walked over

2    to the -- her patrol car.

3        Q.    Oh, okay.  So she takes your license and

4    walks away with it?

5        A.    Yes.

6        Q.    And so did you ever see her scan any code

7    on the back of it?

8        A.    I didn't see.

9        Q.    Okay.  Did you see whether she typed -- did

10   you see her typing on a laptop at all?

11       A.    I couldn't tell.

12       Q.    Okay.  Did she ask you if the information

13   on your driver's license was correct?

14       A.    She did.

15       Q.    And what did you tell her?

16       A.    Yes.

17       Q.    Okay.  Do you have any restrictions on your

18   driver's license?

19       A.    No.

20       Q.    Okay.  Do you have to wear glasses to

21   drive?

22       A.    No.

23       Q.    Are the glasses you're wearing now reading

24   glasses or --

25       A.    Yeah.

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                          JA3726

1          MR. REICH:  Take another break?

2          MR. HOLMES:  Sure.

3          MR. REICH:  Okay.

4          (A break was had.)

5  BY MR. REICH:

6      Q.   Ms. McNeil, taking a look back at Exhibit

7  332, which is the crash report, you said earlier that

8  when you were receiving these in the mail, you didn't

9  realize that they had been posted on a public

10  website, right?

11      A.   Right.

12      Q.   Do you think it violates your privacy that

13  the local law enforcement puts these up on websites

14  that just anyone can look at?

15      A.   No.

16      Q.   So once they put it on a public website, do

17  you think it's still a private record?

18      A.   Not private if it's on a public website.

19      Q.   Did you ever send a letter or make a phone

20  call to the police department and say, Hey, I want

21  you to take my accident report down?

22      A.   No.

23      Q.   So I'm going to ask you a series of

24  questions probably very quickly.

25      A.   Okay.

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3727

1      Q.   And it will probably help if you pull out

2   Exhibit 336 again and look at it.

3      Okay. So Exhibit 336 -- or, no, I told you

4   the wrong one. Look at Exhibit 338.

5      MR. SHELTON: Is that the complaint?

6      MR. REICH: The complaint, First Amended

7     Complaint.

8   BY MR. REICH:

9      Q.   And so the top two-thirds of the page, the

10   first page of Exhibit 338, we usually call that the

11   caption.

12      A.   Okay.

13      Q.   Have you ever heard of it referred to as

14   that?

15      A.   Yes.

16      Q.   Okay. And so the people whose names are

17   grouped around your name at the top, do you know any

18   of those people personally?

19      A.   No.

20      Q.   Have you ever met any of them?

21      A.   No.

22      Q.   Okay. So James Weaver Garey, William

23   Parker Garey, Aaron Kent Cruthis, Amanda Davis

24   Reilly, Charlotte Moffat Clevenger, Andrew

25   Christopher Clevenger, and Justin Brent Blakeslee,

www.NCDepo.com       *Depositions, Inc.*
info@NCDepo.com     *Serving all of North Carolina*     (919) 557-4640
**JA3728**

1   have you ever met any of those people?

2        A.   No.

3        Q.   Do you know if you've ever talked to any of

4   them on the phone?

5        A.   No.

6        Q.   Have you ever sent emails directly to any

7   of those people?

8        A.   No.

9        Q.   Have you ever gotten an email from any of

10  those people?

11       A.   No.

12       Q.   And so, similarly, do you know a man named

13  Jonathan Hatch?

14       A.   No.

15       Q.   Do you know a woman named Shaterika

16  Nicholson?

17       A.   No.

18       Q.   Do you know a man named Mark Dvorsky?

19       A.   No.

20       Q.   Do you know a man named Kelly Epperson?

21       A.   No.

22       Q.   Are you aware that there is another similar

23  class action lawsuit filed in North Carolina against

24  some of these same law firms?

25       A.   No.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina          (919) 557-4640
                              JA3729

1      Q.   Have you ever heard someone talk about the

2   Hatch Lawsuit?

3      A.   No.

4      Q.   And in your lawsuit, which is

5   Exhibit 338 --

6      A.   Um-hmm.

7      Q.   -- do you know any other people that might

8   be in the class other than the people listed on the

9   top of page -- the top of the first page of

10   Exhibit 338?

11      A.   No.

12      Q.   So you, you know, haven't talked to people

13   at work and they said, Oh, yeah, I've got a bunch of

14   those mailers, too?

15      A.   No.

16      Q.   So we talked about your car accident and

17   how it caused physical bodily injuries which required

18   surgery, right?

19      A.   Um-hmm.

20      Q.   That's a yes?

21      A.   Yes.

22      Q.   And caused physical pain to you, right?

23      A.   Yes.

24      Q.   So the receipt of the letters, just talking

25   about receiving these letters after the accident, did

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3730

1  they harm you in any physical way?

2      A.   Not physical.

3      Q.   Okay.  So like the weight of carrying all

4  of the letters didn't cause you to hurt your back?

5      A.   Right.

6      Q.   All right.  And you didn't, like, slip and

7  fall while going to go get the letters?

8      A.   Right.

9      Q.   Do you think they caused you any mental

10  harm or psychological distress?

11      A.   No.

12      Q.   Okay.  So no emotional distress?

13      A.   No.

14      Q.   And you didn't feel like these lawyers were

15  stalking you, did you?

16      A.   In a sense, I guess, maybe.

17      Q.   Okay.  Were you afraid that they were going

18  to start calling you up and pestering you on the

19  phone?

20      A.   No.

21      Q.   Did you lose sleep at night over getting

22  these letters?

23      A.   No.

24      Q.   So you never sought any counseling or

25  anything like that?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                                JA3731

1      A.    No.

2      Q.    So when you decided to initiate this

3  lawsuit, you knew it would be a class action lawsuit,

4  right?

5      A.    Yes.

6      Q.    And so what do you understand a class

7  action lawsuit to be?

8      A.    That there are several people that have the

9  same complaint and bring forth that lawsuit.

10     Q.    Okay.  So multiple people have the same

11  complaint and they join together to bring a lawsuit?

12     A.    Um-hmm.

13     Q.    Do you know how many people might be in the

14  class that you plan to represent?

15     A.    I don't.

16     Q.    Do you have any idea?

17     A.    No.

18     Q.    Do you think it's more than just the names

19  of the people on the front page of Exhibit 338?

20     A.    I'm not sure.

21     Q.    So without getting into specifically what

22  you talked about with anybody at White & Stradley or

23  any other law firm, after your accident on July 1st,

24  2016, you eventually spoke with someone at White &

25  Stradley, right?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                  JA3732

1      A.    Correct.

2      Q.    And so I'm trying to understand what

3  happened next or what was the first step.  Did you

4  reach out to White & Stradley because of the physical

5  bodily injuries and car property damage arising from

6  your car wreck or did you reach out to White &

7  Stradley about getting the letters from the lawyers?

8      A.    It was for the car wreck.

9      Q.    Did you eventually come in and meet with

10 them in person about the car wreck?

11     A.    Yes.

12     Q.    Did Mr. Carmon come with you?

13     A.    No.

14     Q.    Just you yourself?

15     A.    Yes.

16     Q.    When you first came and talked with White &

17 Stradley, do you remember signing an engagement

18 letter or any type of contract for them to be your

19 lawyers?

20     A.    Yes.

21     Q.    Do you remember if you later signed a

22 different contract or engagement letter related to

23 the lawsuit for the unsolicited letters from law

24 firms?

25     A.    I believe I did.  I'm not sure.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina           (919) 557-4640
                               JA3733

1      Q.    So regarding your lawsuit against the law

2    firms, which we have Exhibit 338, how many classes

3    are in that lawsuit?

4      A.    Count each individual party or --

5      Q.    Well, in the class action, how many

6    classes?

7      A.    How --

8            MR. HOLMES:  Just --

9      A.    I don't know what you're asking.  I'm

10   sorry.

11     Q.    Okay.  So if you'd turn to Page 30,

12   Paragraph 132 begins:

13           As to Defendants Farrin Firm, Marcari

14        Russotto, Riddle & Brantley, Wallace Pierce, Van

15        Laningham and Lanier Law Group, Plaintiffs bring

16        this action on behalf of a class defined as

17        follows, and there's like five subparts below

18        that.

19           Do you see that?

20     A.    I do.

21     Q.    So that's like the one class that is

22   defined here, right?

23     A.    Okay.

24     Q.    And then there's five subparts that give

25   more detail.  Are you a member of the class described

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina       (919) 557-4640
                              JA3734

1    in Paragraph 132?

2         A.    Yes.

3         Q.    What makes you a member of that class?

4         A.    What makes me a member of this class?

5         Q.    Um-hmm.  Yeah.

6         A.    Because I'm all natural persons.

7         Q.    Is there anything else --

8         A.    I received letters from these firms.

9         Q.    Okay.  Did you get a letter from all of the

10   firms identified in Paragraph 132?

11        A.    I believe so.

12        Q.    Okay.  So moving down to Paragraph 133,

13   that first sentence says:

14              As to Defendants Farrin, Marcari, Cole,

15        Pierce, Van Laningham & Associates, PLLC, the

16        Crumley Roberts Defendants, the Hardison &

17        Cochran Defendants, and Greve Defendants, the

18        DeMayo Defendants and the Hardee Defendants,

19        Plaintiffs bring this action on behalf of the

20        class as follows, and then, again, there are five

21        separate subparts listed at the bottom of Page 30

22        and over to Page 31.

23              Do you see those?

24        A.    I do.

25        Q.    So are you a member of the class defined in

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3735

1    Paragraph 133, as well?

2              THE DEPONENT:  I can't look at this?

3              MR. HOLMES:  Um --

4              THE DEPONENT:  Or --

5              MR. HOLMES:  If that would -- I mean, if

6         that -- if that helps refresh your memory, then

7         it depends on whether Mr. Reich wants to allow

8         you to look at that.

9              MR. REICH:  Yeah, yeah.  She can look at

10        that.

11             MR. HOLMES:  Do you want to mark it?

12             MR. REICH:  We can mark it before or after

13        she looks at it; either one.  It doesn't matter

14        to me.

15             THE DEPONENT:  No.

16             MR. HOLMES:  So look at the class

17        definition and -- or were you talking about 133?

18             MR. REICH:  133 now, yeah.

19             MR. HOLMES:  Was that the question?

20             MR. REICH:  Yeah.

21             THE DEPONENT:  No.

22             MR. REICH:  Okay.  And if we could mark

23        that as Exhibit 130 --

24             THE COURT REPORTER:  339.

25             MR. REICH:  -- 339.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3736

1              (Exhibit 339 is marked for identification.)

2   BY MR. REICH:

3       Q.   So Exhibit 339 appears to be the front page

4   of the First Amended Complaint, and it has some

5   highlighting and numbers that have been written on

6   it.

7              Did I describe that correctly?

8       A.   Yes.

9       Q.   And it has your name on there, too, right?

10      A.   Yes.

11      Q.   Is that your handwriting on the first page?

12      A.   No.

13      Q.   Do you know whose handwriting that is?

14      A.   No.

15      Q.   Okay.  Did you write those numbers on the

16  case caption?

17      A.   No.

18      Q.   Okay.  But this was handed to you by your

19  attorney after I asked you a question about Paragraph

20  133 of the complaint, right?

21      A.   Yes.

22      Q.   Okay.  And so that is a -- it appears to

23  be, Exhibit 339, sort of a sheet to just inform you

24  or describe to you which Defendants you sued; is that

25  fair?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3737

1       A.    Yes.

2       Q.    Okay.  So did you sue all of the Defendants

3   in the lawsuit that I've handed you a copy of, 338,

4   or only some of them?

5       A.    I think that they're all part of the suit.

6       Q.    Okay.  But are your claims against all of

7   them or only some of them?

8       A.    Some of them.

9       Q.    Okay.  Do you expect to spend any of your

10  own money on this case?

11      A.    No.

12      Q.    Did you know that it's possible you could

13  be liable for some of the costs in this case?

14      A.    No.

15      Q.    Okay.  What is your understanding of who

16  will pay for the costs in this case?

17      A.    White & Stradley.

18      Q.    So you're joined with one, two, three,

19  four, five, six -- seven other named Plaintiffs,

20  right?

21      A.    Yes.

22      Q.    Would it bother you if some of them ended

23  up receiving more money than you at the end of this

24  lawsuit than you receive?

25      A.    No.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                               JA3738

1      Q.   Okay.  And there may be other members of

2   the class, right?

3      A.   Right.

4      Q.   Do you think there will be any other

5   members other than these seven?

6      A.   I don't know.

7      Q.   If anybody else received more money than

8   you, would that bother you?

9      A.   No.

10     Q.   How much time have you spent working on

11  this case?

12     A.   I'm not sure.  A couple of hours.  I'm not

13  sure in -- in total.

14     Q.   Have you been keeping a log or any written

15  records of how much time you have spent over the last

16  several years on this case?

17     A.   I have not.

18     Q.   When you say a couple hours, is that two or

19  three hours?

20     A.   No.  It's been more than that.

21     Q.   Okay.

22     A.   But I -- I'm not sure.

23     Q.   Okay.  How much more than two or three?

24     A.   I'm not sure.

25     Q.   Has it been -- is it more than five?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3739

1    A.   I'm not sure.

2    Q.   So it could be less than five?

3    A.   I'm not sure.  It could be.

4    Q.   Okay.  So since 2016 --

5    A.   Um-hmm.

6    Q.   -- and without getting into the details of

7  any conversations with any attorney, have you ever

8  met with a lawyer from White & Stradley and in the

9  same meeting talked about your personal injury

10  lawsuit arising from the bodily injuries of the car

11  wreck and also talked about this class action?

12    A.   No.

13    Q.   So anytime you've talked about the class

14  action, it's been in a separate conversation or a

15  separate meeting?

16    A.   Yes.

17    Q.   How much time do you think you'll have to

18  spend on this case between now and when it's over?

19    A.   I'm not sure.

20    Q.   If there's going to be a trial in this

21  case, do you plan to come to the trial?

22    A.   Yes.

23    Q.   And you know that it could take one or

24  two weeks?

25    A.   Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                          JA3740

1        Q.    What do you think your role is in directing

2   the lawsuit?

3        A.    I'm not sure I understand.

4        Q.    Well, what is your -- do you think you have

5   any sort of obligation to oversee your lawyers in

6   this case?

7        A.    Yes.

8        Q.    What is that?

9        A.    I don't know exactly until something comes

10  up.

11       Q.    Has anything ever come up where you think

12  you've had to supervise them?

13       A.    No.

14       Q.    So do you do your own nails or do you go to

15  like a salon and have them done?

16       A.    I go have them done.

17       Q.    Okay.  And so when you sit down at the

18  salon, do you just say, Do my nails and make them

19  look good or do you actually tell the person working

20  there like what you want them to look like and what

21  color and how you want them shaped?

22       A.    For the most part, I let her.

23       Q.    Use her --

24       A.    Um-hmm.

25       Q.    -- judgment?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3741

1       A.    Yes.

2       Q.    And do you go to a salon to have your hair

3   done?

4       A.    No.

5       Q.    Do you do it yourself or a family member?

6       A.    I do.

7       Q.    Okay.  So you know exactly what you're

8   doing when you're doing your own hair, right?

9       A.    Yes.

10      Q.    But you, kind of, defer to the person who

11  works on your nails, right, and let them use their

12  own judgment?

13      A.    Yes.

14      Q.    Okay.  So what did you do to prepare for

15  this deposition today?

16      A.    I reviewed my interrogatories and watched

17  some videos.  I spoke with Rob a few times.

18      Q.    When you spoke with Rob, was it in person

19  or on the phone?

20      A.    On the phone.

21      Q.    Okay.  Was it on speakerphone?

22      A.    No.

23      Q.    So nobody else in the room you were in

24  could hear you?

25      A.    No.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina          (919) 557-4640
                              JA3742

1     Q.   What were the videos about that you
2   watched?
3     A.   Just --
4          MR. HOLMES:  I want to make sure that --
5     because it's work product, and so I want to make
6     sure the work product isn't revealed.  But I
7     don't mind her giving some general --
8          MR. REICH:  Okay, yeah.
9          MR. HOLMES:  -- information about it.
10         MR. REICH:  Yeah.
11         MR. HOLMES:  Can I find out what she's
12    getting ready to say?
13         MR. REICH:  Sure.  Yeah, yeah.
14         MR. HOLMES:  Can we step outside?
15         MR. REICH:  Yeah.  I mean, you can step
16    out.
17         MR. SHELTON:  Yeah, we'll just wait right
18    here.
19         MR. HOLMES:  Okay.  And your question was
20    what were the videos about?
21         MR. REICH:  Yeah.
22         (A break was had.)
23         MR. HOLMES:  You can answer Mr. Reich's
24    question without saying in detail anything that
25    was in the videos.

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina      (919) 557-4640
                        JA3743

1          THE DEPONENT:  Okay.  Just to make sure I

2       understood what this was about.  He went over the

3       DPPA, and just to make sure I'm answering, you

4       know, the question the best that I could remember

5       and truthfully.

6  BY MR. REICH:

7       Q.   Okay.  Do you remember if you came to the

8  office here and watched them in person or if they

9  were like emailed to you or mailed to you or

10  something?

11      A.   Emailed.

12      Q.   Do you remember if you looked at a copy of

13  your crash report, Exhibit 332?

14      A.   While I was looking at that?

15          MR. HOLMES:  Are you talking about --

16  BY MR. REICH:

17      Q.   Before -- well, preparing for your

18  deposition?

19      A.   No.

20      Q.   Okay.  So I think you said one of the

21  documents you looked at in preparation for your

22  deposition is a copy or your interrogatory responses?

23      A.   Um-hmm.

24          MR. REICH:  And if we could mark those.

25          (Exhibit 340 is marked for identification.)

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                 JA3744

1    BY MR. REICH:

2        Q.   So I'm going to hand you Document No. 340,

3    or Exhibit No. 340, rather.  Have you ever seen that

4    document?  And take your time and look through that

5    and let me know when you've finished.

6        A.   Okay.

7        Q.   Does this appear to be similar to one of

8    the documents you looked at in preparation for your

9    deposition?

10       A.   Yes.

11       Q.   These are your interrogatory responses,

12   correct?

13       A.   Yes.

14       Q.   And so I'm going to hand you Document

15   No. 341, as well.

16            (Exhibit 341 is marked for identification.)

17            MR. REICH:  And, Rob, I've given you a copy

18       of that.

19            MR. HOLMES:  Yes.

20   BY MR. REICH:

21       Q.   And in preparation for your deposition, did

22   you also look at Document 341, which is the Amended

23   Response to Interrogatory No. 6?

24       A.   Yes.

25       Q.   Okay.  And so the very first thing in this

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*        (919) 557-4640
                              **JA3745**

1    deposition today was Exhibit 331, right?

2         A.   Um-hmm.

3         Q.   And that was the verification of your

4    interrogatories, which you signed today, right?

5         A.   Um-hmm.

6         Q.   Okay.  And so the verification applies to

7    both 340 and 341 --

8         A.   Okay.

9         Q.   -- right?

10        A.   Yeah.

11        Q.   And you had read through these before

12   signing that, right?

13        A.   Yes.

14        Q.   And I think earlier, we mentioned that you

15   had been involved in a different class action --

16        A.   Yes.

17        Q.   -- at some point, right?

18             And so if you'll turn to Exhibit No. 340 --

19        A.   Okay.

20        Q.   -- Page 9, No. 6, this is a written

21   question that was sent to you by the Fox Defendants,

22   as they have been described in the case.  And

23   Question No. 6 says:

24             Describe in detail any litigation, other

25        than this one, in which you have been involved as

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3746

1           either a plaintiff or defendant, including

2           without limitation the caption of the litigation

3           and the courts in which the litigation proceeded.

4                Did I read that correctly?

5      A.    Yes.

6      Q.    And there is some -- there's an objection

7  underneath that, right?

8      A.    Yes.

9      Q.    And then if you'd look at Document 341, on

10 Page 3, this is your amended response to that

11 question, right?

12     A.    Correct.

13     Q.    Okay.  And, again, this was the Fox

14 Defendants' Interrogatory No. 6, and your answer is:

15          Her recollection is that several years ago,

16          possibly around 2014, she was notified that she

17          qualified to receive money as a result of a class

18          action against either a company called

19          "Homecomings" or Chase Bank, or both, as a result

20          of alleged improprieties involving mortgages.

21               Did I read that correctly?

22     A.    That is correct.

23     Q.    So you weren't like actually -- you weren't

24 deposed in that case?

25     A.    No.

www.NCDepo.com                        Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina            (919) 557-4640
                                   JA3747

1      Q.   And you never went to court personally in

2   that case?

3      A.   No.

4      Q.   So you were a member of a class action, it

5   sounds like, and received a notice that you were

6   entitled to some compensation?

7      A.   Correct.

8      Q.   And the next sentence says:

9           Ms. McNeil was not highly involved with the

10      lawsuit.

11          And so that goes to you weren't deposed.

12   Do you remember if you ever had to answer written

13   questions, interrogatories, like you did in this

14   case?

15      A.   No.

16      Q.   Probably not.  And then the next sentence:

17          She believes that the amount of money she

18      received could have been around $1,400.

19          Does that still seem accurate?

20      A.   Correct.

21      Q.   Okay.  And then finally:

22          She does not recall being involved in any

23      other civil litigation as a plaintiff or

24      defendant.

25      A.   Correct.

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                          JA3748

1      Q.   Did I read that correctly?

2      A.   Yes.

3      Q.   And so you don't remember any other

4  lawsuits that you've been a party to?

5      A.   No.

6      Q.   Okay.  And we talked about being deposed

7  earlier or being in trial or testifying at trial or

8  anything like that.  Have you ever testified in

9  someone else's criminal case --

10     A.   No.

11     Q.   -- as a witness?

12     A.   No.

13     Q.   Have you ever testified in like a child

14  custody case or any other court proceeding?

15     A.   No.

16     Q.   Have you ever been to court for anything

17  else?

18     A.   Yes.

19     Q.   Okay.  What type of case was that?

20     A.   Child support.

21     Q.   And was that someone that was trying to get

22  you to pay child support or you were trying to get

23  somebody else to pay child support?

24     A.   I was trying to get someone else to pay.

25     Q.   Okay.  And any other times you've been to

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3749

1  court?

2       A.   No.

3       Q.   So earlier today before the deposition

4  started, you were asked to show a copy of your

5  driver's license to the court reporter.

6       A.   Correct.

7       Q.   What other instances do you show your

8  driver's license in your daily life?

9       A.   In my daily life?

10      Q.   Um-hmm.  I mean yes.

11      A.   None that I can recall in my daily -- if I

12 go get some wine, maybe I'm carded but ...

13      Q.   Okay.  So sometimes you purchase alcohol?

14      A.   Yes.

15      Q.   And sometimes they ask for your driver's

16 license?

17      A.   Yes.

18      Q.   Do you smoke cigarettes?

19      A.   No.

20      Q.   Do you use chewing tobacco or snuff?

21      A.   No.

22      Q.   Okay.  When you bought the Chrysler 200 to

23 replace the car which was totaled as a result of your

24 car accident with Ms. Portales-Rios, do you remember

25 if the car dealership asked you for your driver's

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3750

1   license during the financing?

2        A.   They did.

3        Q.   Do you remember if you test drove any cars

4   before you bought that one?

5        A.   I did.

6        Q.   Do you remember if they asked you for your

7   driver's license before you did the test drive?

8        A.   He actually did not.

9        Q.   Oh, okay.  Since this car wreck, have you

10  test drove any other cars other than the --

11       A.   No.

12       Q.   Have you ever taken a test drive in a car

13  and they asked you for your driver's license first?

14       A.   No.

15       Q.   Do you remember the last time you stayed in

16  a hotel room?

17       A.   Yes.

18       Q.   Was it within the last six years?

19       A.   Yes.

20       Q.   And do you remember if they -- when you

21  checked into the hotel, if they asked for your

22  driver's license?

23       A.   They did.

24       Q.   And so you showed your driver's license to

25  them?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3751

1          A.    Yes.

2          Q.    Have you ever bought a gun?

3          A.    No.

4          Q.    Have you flown in an airplane in the last

5     10 years?

6          A.    Yes.

7          Q.    Do you remember if you had to show your

8     driver's license to go through the TSA or to get on

9     the airplane?

10         A.    No.

11         Q.    You don't remember or you didn't have to?

12         A.    I didn't have to.

13         Q.    And regarding your accident which is

14    reflected on Exhibit 332, is your personal injury

15    dispute still ongoing or have you settled that?

16         A.    That's settled.

17         Q.    Okay.  That's been settled.  Do you

18    remember how long ago it was settled?

19         A.    About two years.

20         Q.    Okay.  So it's been, kind of, a while?

21         A.    Yeah.

22               (Exhibit 342 is marked for identification.)

23    BY MR. REICH:

24         Q.    And have you ever seen this document

25    before?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina      (919) 557-4640
                                JA3752

1      A.    I can't recall.  No.

2      Q.    So if you also get out Exhibit 338 and kind

3   of put them side by side -- I think it's right there.

4   So earlier I asked you a lot of questions about

5   Exhibit 338, which is the First Amended Complaint --

6      A.    Um-hmm.

7      Q.    -- in the case.  And I'll represent to you

8   that Document Exhibit 342 has not been accepted by

9   the Court as the operative lawsuit, but it's a

10  proposed amendment to the lawsuit.

11     A.    Okay.

12     Q.    Did you know that Document Exhibit 342 had

13  been submitted to the Court?

14     A.    I think we did discuss it.

15     Q.    So, earlier, I asked you the names of all

16  the people on the front of 338.

17     A.    Um-hmm.

18     Q.    And, as you can see, 342 has the name

19  Belinda Lee Steinmetz on it.  Do you see that?

20     A.    I do.

21     Q.    Do you know Ms. Steinmetz?

22     A.    No.

23     Q.    Okay.  Have you ever gotten an email from

24  her or sent her an email?

25     A.    No.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3753

1        Q.    Okay.  So turning to Page -- I take that
2    back.
3             Do you remember I asked you questions about
4    how the different classes on Exhibit 338 worked?
5        A.    Um-hmm.
6        Q.    Okay.  So if you'd turn to page 40 of 342,
7    and you see Paragraph 132 says "General Class
8    Definition."  Do you see that?
9        A.    I do.
10       Q.    Okay.  And then Paragraphs 133 -- so
11   Paragraph 133 says Farrin Subclass.  Do you see that?
12       A.    I do.
13       Q.    And then below that, there's two
14   Sub-Subclasses?
15       A.    I see it.
16       Q.    And that's 133 a. and b., right?
17       A.    Correct.
18       Q.    Do you understand why there are these
19   subclasses?
20       A.    I do not.
21       Q.    Okay.  Do you know if you're in either of
22   those subclasses?
23       A.    I do not.
24       Q.    And so then, you know, skipping over to
25   Page 43, the bottom, Paragraph 136 --

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                         JA3754

1        A.    Okay.

2        Q.    -- there is a Van Laningham/Greve Subclass.

3   Do you see that?

4        A.    I do.

5        Q.    On the next page, Page 44, there is what

6   would be Paragraph 136 a. and b., there are two

7   Sub-Subclasses.  Do you see those?

8        A.    I do.

9        Q.    Do you know if you're in either of those

10  Subclasses?

11       A.    I don't know.

12       Q.    Do you understand how the Subclasses that

13  are on pages 141 through 140 -- that are on pages 41

14  through 46 work?

15       A.    Not really, no.

16       Q.    Okay.  I won't ask any more about that.

17            MR. REICH:  Could you mark that as the next

18       exhibit.

19            (Exhibit 343 is marked for identification.)

20  BY MR. REICH:

21       Q.    I'm handing you what has been marked as

22  Exhibit 343.  If you could take a moment and look at

23  that.

24            MR. REICH:  I don't think I have a copy for

25       you.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3755

1          MR. SHELTON:  Okay.  Can I look at yours?

2          MR. REICH:  Here.

3          THE DEPONENT:  Okay.

4    BY MR. REICH:

5          Q.   So this is a packet of documents, actually.

6    Have you ever seen the first page of Exhibit 343?

7          A.   No.

8          Q.   Do you ever recall living at 3143 Calvary

9    Drive?

10         A.   I do.

11         Q.   Okay.  And that was the North Timbers

12   Apartments?

13         A.   Um-hmm.

14         Q.   Okay.  Do you ever remember being behind on

15   your rent or failing to pay your water bill there?

16         A.   No.

17         Q.   Okay.  So turning to the third page, the

18   one that says Magistrate Summons, have you ever seen

19   this page before?

20         A.   No.

21         Q.   Okay.  And then if you turn two more pages

22   to the Notice of Voluntary Dismissal, have you ever

23   seen this before?

24         A.   Unh-unh.

25         Q.   Okay.  But that is your name under Name of

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina          (919) 557-4640
                                   JA3756

1    Defendant, correct?

2         A.   It is, yes.

3         Q.   And do you remember ever having a court

4    date on June 3rd of 2010?

5         A.   I don't.

6         Q.   Okay.

7              (Exhibit 344 is marked for identification.

8    BY MR. REICH:

9         Q.   All right.  I'm handing you what's been

10   marked as Exhibit 344.  And just take a moment to

11   look at that.

12        A.   Okay.

13        Q.   Okay.  And so starting at the next to the

14   last page, the one that says Complaint in Summary

15   Ejectment --

16        A.   Um-hmm.

17        Q.   -- do you see that?  Is that your name

18   Adilah McNeil and then 3143-H2 Calvary Drive?

19        A.   Correct.

20        Q.   Do you ever remember living at that

21   address?

22        A.   I do.

23        Q.   And were you living there in May of 2011?

24        A.   Yes.

25        Q.   Okay.  Do you remember your landlord filing

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina          (919) 557-4640
                          JA3757

1   this lawsuit against you?

2       A.   I do not.

3       Q.   Do you remember being behind on your rent

4   for $1,001?

5       A.   I was not.

6       Q.   Okay.  Do you remember when your landlord

7   accused you of being behind on your rent for a total

8   amount of $1,001?

9       A.   I don't.

10      Q.   Okay.

11      A.   And, actually, it wasn't because my rent

12  was behind.  They weren't renewing my lease, so I

13  could not continue to stay.  And they wouldn't renew

14  it because I had a -- a dog.

15      Q.   Oh, okay.  Do you remember them assessing

16  late fees against you?

17      A.   No.  Not for this, no.  I have -- I was

18  late before, but not for this.

19      Q.   Okay.  So you had been late at North

20  Timbers before May 1st, 2011?

21      A.   Yes.

22      Q.   Okay.  Do you remember them sending you a

23  copy of this Complaint in Summary Ejectment?

24      A.   I do not.

25      Q.   And then turning forward two pages to the

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                                JA3758

1    document titled Magistrate Summons of Exhibit 344 --

2         A.    Um-hmm.

3         Q.    -- have you ever seen that before?

4         A.    No.

5         Q.    Okay.  When you were living at North

6    Timbers Apartments, did you ever go back to your

7    apartment and see papers stuck into the door jamb of

8    your apartment door?

9         A.    At North Timbers or --

10        Q.    Um-hmm.

11        A.    No.

12        Q.    Did you ever get anything taped onto the

13   door there?

14        A.    No.

15        Q.    Okay.  When did you move out of North

16   Timbers Apartments?

17        A.    I want to say June of 2011.  It was the

18   summertime.  Um -- yeah, I think it was June.

19             (Exhibit 345 is marked for identification.)

20   BY MR. REICH:

21        Q.    I'm handing you what's been marked as 345.

22   And just flip through that and tell me if you've ever

23   seen that before.

24        A.    No.

25        Q.    So looking at just the first page of 345,

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3759

1  you've never seen a copy of this before?

2      A.   No.

3      Q.   Okay.  And this says the date rent was due

4  was January 1st, 2010, and February 1st, 2010.  Do

5  you see that?

6      A.   Yes.

7      Q.   Okay.  And, at this point, your lease -- it

8  says, Date Lease Ended:  August 31st, 2010.  Do you

9  see that?

10     A.   I do.

11     Q.   Okay.  Do you remember being behind on your

12 rent for January and February of 2010 at North

13 Timbers Apartments?

14     A.   I don't remember, but apparently.

15     Q.   Apparently you may have been?

16     A.   Um-hmm.

17     Q.   Okay.  And so turning two pages forward to

18 the page that says Magistrate Summons, did you ever

19 see this page?

20     A.   No.

21     Q.   Were you ever told by your landlord at

22 North Timbers that they had taken out papers against

23 you or taken out court process against you?

24     A.   They did tell me that they were going to

25 take out court papers if I hadn't paid the rent.

www.NCDepo.com               Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                             JA3760

1      Q.   Oh, okay.

2      A.   So once I paid the rent, it was cleared up.

3      Q.   Okay.  So for like Exhibits 343 and 344 and

4  345, even if you never actually saw these, somehow

5  the landlord told you, We're going to take court

6  papers out against you because you're behind on your

7  rent, and then you would make a catch-up payment or

8  payments, and then they would dismiss these --

9      A.   Right.

10     Q.   -- ejectment papers?

11     A.   Yes.

12     Q.   Okay.  Do you remember how many times that

13 happened?

14     A.   I don't.

15     Q.   Okay.  Was it multiple times?  I mean, more

16 than just these three?

17     A.   I'm not sure.

18     Q.   Okay.

19          (Exhibit 346 is marked for identification.)

20 BY MR. REICH:

21     Q.   I'm handing you what's been marked as

22 Document 346.  Have you ever seen these documents

23 before?

24     A.   No.

25     Q.   Okay.  And on the first page of 346, that's

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3761

1  your name as the Defendant, correct, Adilah McNeil,

2  correct?

3       A.   Correct.

4       Q.   And the date of this Notice of Voluntary

5  Dismissal towards the bottom left corner is

6  October 28, 2011, right?

7       A.   Correct.

8       Q.   Okay.  Do you remember ever getting a copy

9  of the voluntary dismissal?

10      A.   No.

11      Q.   Okay.  So turning to the next to the last

12  page of Exhibit 346 --

13      A.   Okay.

14      Q.   -- this is another Complaint in Summary

15  Ejectment, correct?

16      A.   Correct.

17      Q.   And this says that the rate of rent was

18  $693 per month, right?

19      A.   Correct.

20      Q.   And this is when you're staying at 3143-H2

21  Calvary Drive?

22      A.   Correct.

23      Q.   And it says the date the rent was due was

24  October 1st, 2011, right?

25      A.   Correct.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3762

1      Q.   Okay.  And then going down to No. 4 in the

2   same column, your landlord in this case has alleged,

3   The plaintiff has demanded possession of the premises

4   from the defendant, who has refused to surrender it,

5   and the plaintiff is entitled to immediate

6   possession.

7            Do you see that?

8      A.   I see that.

9      Q.   Were you still living at North Timbers

10  Apartments on October 17th, 2011?

11     A.   I believe so, yes.

12           (Exhibit 347 is marked for identification.)

13  BY MR. REICH:

14     Q.   I'm handing you what's been marked as 347.

15     A.   Okay.

16     Q.   So starting on the first page of Exhibit

17  No. 347, this is the Notice of Voluntary Dismissal of

18  the lawsuit, right?

19     A.   Correct.

20     Q.   And it looks like this is dated at the

21  bottom left corner March 28th, 2013?

22     A.   Correct.

23     Q.   The second page, did you ever see the

24  second page?

25     A.   No.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                            JA3763

1      Q.   And turning to the third page, have you

2  ever seen the third page before?

3      A.   No.

4      Q.   Do you know who Pam Jennings was?

5      A.   I do not.

6      Q.   So that name is not familiar to you?

7      A.   No.

8      Q.   Do you remember living on the second floor

9  of Building 3143 and your monthly rent being $742 per

10 month?

11     A.   Yes.

12     Q.   Okay.  So, again, was this a situation

13 where the landlord told you you were behind on your

14 rent and they were going to take out court papers and

15 then you paid the late fee or whatever --

16     A.   Yes.

17     Q.   -- and they dismissed it?

18     A.   Yes.

19     Q.   Okay.  And actually turn to the next to the

20 last page.  I'm guessing you also never saw this

21 document.  It's titled Magistrate Summons, Alias and

22 Pluries Summons?

23     A.   No.

24     Q.   And going to back the actual page that says

25 Complaint in Summary Ejectment --

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3764

1          A.    Um-hmm.

2          Q.    -- the landlord is saying your rent was

3    $742 a month and then there is a late free of $37.10.

4    Do you see the late fee on there?

5          A.    I do.

6          Q.    Okay.  So the total amount due over here on

7    the -- I guess you could say the top side or the far

8    right is $779.10.  Do you see that?

9          A.    I do.

10         Q.    Is that the amount that you ultimately paid

11   so that you wouldn't be ejected?

12         A.    I'm sure.  I can't remember the exact

13   amount.

14         Q.    Okay.  But it was something more than just

15   your regular monthly rent?

16         A.    Right.

17               (Exhibit 348 is marked for identification.)

18   BY MR. REICH:

19         Q.    I'm handing you what's been marked as

20   Exhibit 348.  If you could take a moment and look

21   through that.

22         A.    Okay.

23         Q.    Have you ever seen any of these documents

24   before that I've handed you in Exhibit 348?

25         A.    No.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3765

1      Q.   Okay.  In May 2013, were you still living

2    at North Timbers Apartments?

3      A.   I was.

4      Q.   And here your landlord has alleged you

5    failed to pay the May 2013 rent; is that correct?

6      A.   Correct.

7      Q.   So turning to the third page, did you ever

8    see a copy of the third page?

9      A.   No.

10     Q.   So it was never taped on your door or stuck

11   in the door jamb of your apartment?

12     A.   No.

13     Q.   Then if you turn two more pages forward

14   where it also says Magistrate Summons but this one

15   has a checkmark on it --

16     A.   Um-hmm.

17     Q.   -- have you ever seen -- had you ever seen

18   this page before?

19     A.   No.

20     Q.   So if you go to the next page -- yeah, that

21   one.

22     A.   Okay.

23     Q.   And look at towards the bottom where it

24   says "For Use In Summary Ejectment Cases Only;" do

25   you see that?

www.NCDepo.com              *Depositions, Inc.*
info@NCDepo.com        *Serving all of North Carolina*      *(919) 557-4640*
**JA3766**

1      A.   I do.

2      Q.   And Name of Defendant Served by Posting,

3  that's your name, correct --

4      A.   It is.

5      Q.   -- Adilah McNeil?  Okay.  And below that,

6  it says Signature Of Deputy Sheriff Making Return.

7  Do you see that line?

8      A.   I do.

9      Q.   And it looks like it says R. Foy 939?

10     A.   Correct.

11     Q.   Okay.  And then there's some sort of stamp

12  underneath that, Donnie Harrison, Sheriff.  Do you

13  see that?

14     A.   Correct.

15     Q.   Do you have any reason to think that the

16  sheriff's deputy didn't actually post this summons?

17     A.   I don't know.

18     Q.   Okay.  So if you'd turn to the next page --

19     A.   Okay.

20     Q.   -- have you ever seen this page before?

21     A.   No.

22     Q.   Was a copy of it ever sent to you or posted

23  on your door?

24     A.   Not that I -- I can remember.

25     Q.   Did you ever hear that North Timbers

www.NCDepo.com               Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3767

1  actually had a court date and took you to court?

2      A.   No.  I mean, they -- when they -- they --

3  they'll tell us that they'll file court papers.  It

4  wasn't necessary that we be there.  If we paid the

5  rent, they'll file for a dismissal or whatever.

6      Q.   Okay.  So looking on the right side of this

7  page, which is the last page of Exhibit 348 --

8      A.   Okay.

9      Q.   -- it says -- under the Findings heading,

10 it says, The Court finds that:  No. 1, the box next

11 to "a" is checked.  The plaintiff has proved the case

12 by the greater weight of the evidence.

13          Did I read that correctly?

14     A.   Yes.

15     Q.   And then jumping down to No. 2, The

16 defendant -- and they've checked the box "was not

17 present at trial."  Do you see that?

18     A.   I do.

19     Q.   And you don't remember ever going to the

20 trial?

21     A.   I didn't know about it.

22     Q.   Okay.  And the box next to that has a check

23 -- or has an "X" which says The defendant was served

24 by posting.  Do you see that?

25     A.   I do.

www.NCDepo.com                     Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3768

1      Q.   And then under Order -- so moving down on

2  the page a little bit under Order, the first box is

3  X'd, correct?

4      A.   Correct.

5      Q.   And it says, The defendant be removed from

6  and the plaintiff be put in possession of the

7  premises described in the complaint.

8           And did I read that correctly?

9      A.   You did.

10     Q.   Do you remember sometime after May 31st,

11 2013 North Timbers ejecting you from the apartment?

12     A.   No, they didn't eject me.

13     Q.   Okay.  Did you eventually pay the back

14 amount?

15     A.   No.  I moved in, like, June.  I think it

16 was June or July.

17     Q.   Okay.  Of 2013?

18     A.   Yes.

19          (Exhibit 349 is marked for identification.)

20 BY MR. REICH:

21     Q.   I'm handing you a document or Exhibit 349,

22 if you could take a look at that.

23     A.   Okay.

24     Q.   And all of the documents in the packet

25 rather.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3769

1        A.    Okay.

2        Q.    Have you ever heard of Mission Capital

3   Crossing?

4        A.    Yes.   That's where I live now.

5        Q.    Okay.   So that's the name of the apartment

6   complex?

7        A.    Um-hmm.

8        Q.    And that's your name and current address on

9   the first page of 349, right?

10       A.    Correct.

11       Q.    Okay.  And this is a -- have you ever seen

12   this document before?

13       A.    I have not.

14       Q.    Okay.  Do you remember in September of 2014

15   your landlord telling you you were behind on your

16   rent?

17       A.    I don't know the exact dates, but I've been

18   behind, yes.

19       Q.    Okay.  If you look on the first page of

20   349, at the very bottom under Name and Address of

21   Plaintiff's Attorney or Agent, it says:   Heather

22   MacDonald, Loebsack & Brownlee, PLLC.  Do you see

23   that?

24       A.    I see it.

25       Q.    Did you ever call up and talk to Heather

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3770

1  MacDonald?

2        A.   I didn't talk to her.

3        Q.   Did you ever talk to anybody at Loebsack &

4  Brownlee?

5        A.   No.

6        Q.   So if you were behind on your rent at

7  Mission Capital, did you just call the leasing office

8  people?

9        A.   Yes.

10        Q.   So turning to the fifth page, the ones that

11  says Magistrate Summons --

12        A.   Okay.

13        Q.   -- and it has some stamping on it, did you

14  ever see this page?

15        A.   No.

16        Q.   And then turn to next page, that one, had

17  you ever seen this page?

18        A.   No.

19        Q.   And was this another situation where you

20  just paid the --

21        A.   Yes.

22        Q.   -- rent back and they let you stay in the

23  apartment?

24        A.   Yes.

25             (Exhibit 350 is marked for identification.)

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3771

1   BY MR. REICH:

2       Q.   I'm handing you a document that's been

3   marked as Exhibit 350.

4       A.   Okay.

5       Q.   If you could take a look at that.

6       A.   Okay.

7       Q.   Have you ever seen the documents contained

8   in Exhibit 350 before?

9       A.   I have not.

10      Q.   But that's another instance where North

11  Timbers filed a Complaint in Summary Ejectment

12  against you?

13      A.   Correct.

14      Q.   And turning to, I think, the fourth page at

15  the Magistrate Summons, I take it you've never seen

16  that before either?

17      A.   I have not.

18      Q.   And then on the final page, the Notice of

19  Voluntary Dismissal, it said the landlord, the

20  Plaintiff, gives notice of voluntary dismissal in

21  this case there with a checkbox underneath your court

22  date.  Do you see that?

23      A.   That is correct.

24      Q.   And so this is probably another instance

25  where you-all negotiated some sort of resolution?

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina      (919) 557-4640
                           JA3772

1        A.    (Nods head up and down).

2        Q.    Is that a yes?

3        A.    Yes.

4              (Exhibit 351 is marked for identification.)

5    BY MR. REICH:

6        Q.    I'm handing you a document marked

7    Exhibit 351.

8        A.    Um-hmm.

9        Q.    If you could look through that and let me

10   know when you're finished.

11       A.    Okay.

12       Q.    So starting on the second page of 351, the

13   Complaint In Summary Ejectment, have you ever seen

14   that before?

15       A.    I have not.

16       Q.    And the date at the bottom of this page is

17   July 16th, 2013.

18       A.    Correct.

19             MR. HOLMES:  I'm sorry.  I'm not on the

20       same page.  You said the second page?

21             MR. REICH:  So it's the third page,

22       actually --

23             MR. HOLMES:  Okay.

24             MR. REICH:  -- of 351 --

25             MR. HOLMES:  Okay.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3773

 1              MR. REICH:   -- the Complaint In Summary

 2        Ejectment.

 3    BY MR. REICH:

 4        Q.   It was filed by North Timbers Apartments,

 5    LLC, against you, correct?

 6        A.   Correct.

 7        Q.   And if you turn over two more pages, you

 8    get to the Magistrate Summons.  Do you see that?

 9        A.   I do.

10        Q.   And have you ever seen that before?

11        A.   I have not.

12        Q.   And if you turn two more pages, I take it

13    you've never seen the stamped copy of the Magistrate

14    Summons?

15        A.   No.

16        Q.   Do you know if this ever went to trial?

17        A.   No, I don't.

18        Q.   So if you turn two more pages and you get

19    to what is called Judgment In Action For Summary

20    Ejectment --

21        A.   Okay.

22        Q.   -- under the Findings section, on No. 2, it

23    says the defendant was not present at trial.  Do you

24    see that?

25        A.   I do.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3774

1     Q.    Okay.  And then did you ever get a copy of

2   this judgment?

3     A.    I did not.

4     Q.    So if you turn to the next page, which

5   appears to be a typewritten document entitled

6   "Landlord Request To Sheriff For Locking of

7   Premises" --

8     A.    Okay.

9     Q.    -- have you ever seen that before?

10    A.    I have not.

11    Q.    Okay.  And then if you turn to the final

12  page, Writ of Possession for Real Property, had you

13  ever seen this -- have you ever seen this page

14  before?

15    A.    I did not.

16    Q.    Okay.  And I see underneath the date the

17  writ was issued, there is a signature and something

18  marked "Deputy CSC," and then somebody wrote, "No

19  appeal."  And so I take it you didn't try to appeal

20  any of this?

21    A.    I didn't know about it.

22    Q.    Okay.  So do you know if you have any liens

23  against you?

24    A.    As far -- no.  Student loans?  No.

25    Q.    Do you know if you've ever had any liens

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3775

1  against you?

2       A.   No.

3       Q.   Okay.  You mentioned earlier you had a

4  speeding ticket.  Do you know if you had any other

5  traffic court type infractions?

6       A.   No.

7       Q.   Do you know if you've been charged with any

8  other crimes?

9       A.   No.

10      Q.   Were you ever charged with simple affray?

11      A.   Yes.

12      Q.   Okay.  When was that?

13      A.   I don't -- I don't know the year.  I was

14  16.

15      Q.   And was that in North Carolina or New

16  Jersey?

17      A.   North Carolina.

18      Q.   Do you remember what happened with that;

19  did you get a lawyer to defend you?

20      A.   No.

21      Q.   Did you plead guilty?

22      A.   No.  I don't remember.  I was given a year

23  of unsupervised probation.

24      Q.   So you were given probation, but you don't

25  remember pleading guilty?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3776

1      A.    Yeah.  I was 16.  I don't remember.

2      Q.    Have you ever been cited for having no

3   driver's license, no operator's license?

4      A.    No.

5      Q.    Have you ever been cited or charged for

6   driving with no insurance?

7      A.    No.  Not that I can recall, no.

8            MR. REICH:  Can we take a break?

9            MR. HOLMES:  Sure.

10            THE WITNESS:  Yes.

11            (A break was had.)

12            (Exhibit 352 is marked for identification.)

13   BY MR. REICH:

14      Q.    Ms. McNeil, I'm handing you a document

15   that's been marked as Exhibit 352.

16      A.    Okay.

17      Q.    You can either flip through the pages and

18   become accustomed with it or we can just -- I can

19   just start on the first page, either way.

20            MR. HOLMES:  Do you mind if I go get some

21        clips for this?

22            MR. REICH:  You want this one?

23            MR. HOLMES:  Why don't I get some at a

24        little better size that we can -- oh, okay, yeah.

25        Thanks.  I don't know if you want to clip that at

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3777

1        some point, but this --

2    BY MR. REICH:

3        Q.    I have a large binder clip here if you'd

4    like that one as well.

5        A.    That's fine.

6              MR. HOLMES:  I'm sorry.  What was the

7        number for this one?

8              MR. REICH:  352, I think.

9        A.    Okay.  You can --

10       Q.    Okay.  So, Ms. McNeil, when you worked at

11   White & Stradley, did you ever run court search

12   reports on people?

13       A.    I believe I did.  I can't recall.

14       Q.    Did you ever look up people's driving

15   record?

16       A.    It's been a while.

17       Q.    Did you ever look up people's driving

18   record?

19       A.    No.

20       Q.    Okay.  And can you state your full name for

21   the record?

22       A.    My middle name, too?

23       Q.    Correct.

24       A.    Adilah Haneefah-Khadij McNeil.

25       Q.    Okay.  And so on the first page of 352,

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina      (919) 557-4640
                              JA3778

1  some of these entries say Adilah Kaneefah --

2        A.    Haneefah.

3        Q.    Haneefah.  But then the middle name is cut

4  off, right?

5        A.    Correct.

6        Q.    The Khadij is only K-h-a-d, right?  But

7  that's still you, correct?

8        A.    Yes.

9        Q.    Okay.  And so turning to the second page of

10 Exhibit 352, it says, kind of towards the top,

11 Address:  261 Newton Road.  Do you ever remember

12 living on Newton Road?

13       A.    Yes.

14       Q.    Okay.  And this was in 1995.  So does that

15 seem like you would have been about 16 years old or

16 so then?

17       A.    Somewhere around there.

18       Q.    Okay.  And that's the simple affray, right?

19       A.    Yes.

20       Q.    And in the first column here, it says,

21 Charged/Arraigned Offense:  Simple affray.  Do you

22 see that?

23       A.    I do.

24       Q.    Okay.  And you think you got some sort of

25 probation or something for that?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina         (919) 557-4640
                          JA3779

1      A.    Yes.

2      Q.    Okay.  And so in the middle column it says,

3  Plea, guilty.  Do you see that?

4      A.    Yes.

5      Q.    Okay.  So if you turn over two pages,

6  there's a record for when you lived at 3143 Calvary

7  Drive.  You remember living there, right?

8      A.    Yes.

9      Q.    Okay.  And so this was in, it looks like,

10  2011.  And it was one of the speeding tickets you

11  mentioned, right?

12     A.    Yes.

13     Q.    Okay.  If you turn three pages, okay, so

14  this page has your almost full name at the top,

15  correct?

16     A.    Correct.

17     Q.    And you were living at 3143 Cavalry Drive?

18     A.    Correct.

19     Q.    And here in the first column it says,

20  Citation No. 417790E.  Do you see that?

21     A.    I do.

22     Q.    And do you ever remember getting that

23  citation?

24     A.    I don't remember.

25     Q.    Okay.  Well, if you drop down three lines,

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3780

 1  it says, Charged/Arraigned Offense:  Operate vehicle,

 2  no insurance.  Do you see that?

 3      A.   I do.

 4      Q.   And this was -- if you look in the far

 5  right column, it says, County name:  Wake.  Do you

 6  see that?

 7      A.   I do.

 8      Q.   Okay.  But you don't have any memory of

 9  this ticket for operating a vehicle with no

10  insurance?

11      A.   I don't.

12      Q.   Okay.  So if you'd turn two more pages,

13  again, that's your full name at the top, correct?

14      A.   Correct.

15      Q.   And then your address, 3143 Calvary Drive,

16  right?

17      A.   Correct.

18      Q.   And then if you go down three lines, in the

19  far left column, it says Citation No. F835685.  Do

20  you see that?

21      A.   I do.

22      Q.   And if you go down three more, it says,

23  Charged/Arraigned Offense:  Operating vehicle, no

24  insurance.  Do you see that?

25      A.   I do.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3781

1      Q.   Do you have any recollection of when you

2  received this citation for driving with no insurance?

3      A.   I don't.

4      Q.   Okay.  So if you'd go forward three more

5  pages, and you'll again see your name at the top,

6  almost full name, and if you on the left column go

7  down to Citation No. --

8      A.   I see it.

9      Q.   -- F934120.  Do you see that?

10     A.   Yes.

11     Q.   Okay.  And if you go down three more lines,

12  it says, Charged/Arraigned Offense:  Operate vehicle,

13  no insurance.  Do you see that?

14     A.   I do.

15     Q.   And the line underneath that says, Served:

16  September 30th, 2012?

17     A.   Correct.

18     Q.   Do you remember in 2012 receiving a

19  citation for operating a vehicle with no insurance?

20     A.   I do not.

21     Q.   Okay.  So if you go forward five or six

22  pages until you get to another one with your almost

23  full name at the top --

24     A.   Okay.

25     Q.   -- and it's Citation No. C, like cat,

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3782

1    6910725.  Do you see that one?

2         A.   Yes.

3         Q.   Okay.  And if you go down three lines, it

4    says you were charged with having no operator's

5    license.  Do you see that?

6         A.   I do.

7         Q.   And that was in 1996.  Do you remember

8    that?

9         A.   I do not.  I'm sorry.

10         Q.   And so do you remember pleading guilty to

11   having no operator's license?

12         A.   I do not.

13         Q.   But you see in the middle column next to

14   plea where it says "guilty"?

15         A.   I do.

16         Q.   Okay.  And in the far right column under

17   Disposition Date, it says, Verdict, and it lists

18   "guilty."  Do you see that?

19         A.   Yes.

20         Q.   Okay.  So if you go forward four more

21   pages, you'll get to a page that looks completely

22   different than the ones we've been looking at.

23         A.   Okay.

24         Q.   And at the top it says, NC Driving Records

25   Search.  Do you see that?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                                JA3783

1          A.    I do.

2          Q.    Okay.  If you kind of start in the middle

3    of the page, there is something that says, Nature of

4    Record or Division Action.  Do you see where it says

5    that?

6          A.    Um-hmm.

7          Q.    Okay.  And so I want to go down about one,

8    two, three -- four lines.  There is an entry that is

9    dated 11/18/14.

10         A.    Okay.

11         Q.    And then to the immediate right of

12   11/18/14, it says, Failure to appear.  Do you see

13   that?

14         A.    I do.

15         Q.    Do you know what that is about?

16         A.    I really do not.

17         Q.    Do you know if you ever received a ticket

18   in New Jersey in 2014?

19         A.    No.

20         Q.    Do you know if you --

21         A.    I don't even know where this is.

22         Q.    Okay.  Have you ever heard of Wrightstown,

23   W-r-i-g-h-t-s-t-o-w-n?

24         A.    I have not.

25         Q.    Wrightstown, New Jersey?  Okay.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina          (919) 557-4640
                                  JA3784

1          Do you know of anyone else in New Jersey

2    that has your same name?

3          A.    No.

4          Q.    Did you ever receive any certified mail

5    from anyone in New Jersey in 2014?

6          A.    I did not.  I do remember.  This was an --

7    I got a ticket on a highway.

8          Q.    Oh, okay.

9          A.    I did.

10         Q.    So --

11         A.    But I paid.  I didn't -- they said I didn't

12   have to show up.

13         Q.    Okay.  Do you still have family in New

14   Jersey?

15         A.    I do.

16         Q.    And was this on, like, a trip back to

17   visit?

18         A.    Yes.

19         Q.    And if we look at just a couple of lines

20   down from right there, there is an entry marked

21   05-26-14, Chesterfield Township, Municipal Court, New

22   Jersey is what it looks like it says.

23         A.    Yes.

24         Q.    Does Chesterfield ring a bell?

25         A.    I think they're the same.  This was the

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3785

1  same incident.

2       Q.   Okay.  And you mentioned you think you may

3  have gotten a ticket.  Was it for like not having

4  your seat belt on?

5       A.   My cousin was in the back, and he didn't

6  have ID, so they charged the driver of the car, but I

7  had my seatbelt on.

8       Q.   Oh, okay.  Okay.  If you turn two more

9  pages, and I apologize it's kind of faint, although,

10  there are some -- some better quality printouts

11  behind this page, but the heading is North Carolina

12  Civil Search by Name.  Do you see that?

13       A.   I do.

14       Q.   Okay.  And it looks like about 10 of these

15  are either North Timbers Apartments or King

16  Properties, which it seems like we've already talked

17  about a lot of those.

18            Have you ever heard of Heatherbrook

19  Townhouse?

20       A.   I do.  I did.

21       Q.   Or Heatherbrook Recreation?

22       A.   I do.

23       Q.   What is Heatherbrook or who was that?

24       A.   It's a subdivision where I had a townhouse.

25       Q.   Okay.  And then have you ever heard of

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3786

1    Stone Creek Homeowners?

2         A.    I have not.

3         Q.    And who is Lucas James?

4         A.    That's my daughter's father.

5         Q.    And so a couple of hours ago, you talked

6    about a child support situation.  So that would

7    probably be related to Lucas James?

8         A.    Yes.

9         Q.    Okay.  And then it looks like in 1999,

10   there's something from Cameron Ridge.  Do you know

11   what Cameron Ridge is?

12        A.    It's an apartment complex.

13        Q.    Okay.  So if you turn to the next page, do

14   you know why Cameron Ridge may have filed a lawsuit

15   against you in 1999?

16        A.    Yes.  We didn't pay the rent.

17        Q.    Okay.  So like money owed?

18        A.    Yes.

19        Q.    Summary ejectment type thing?

20        A.    Yes.

21        Q.    Okay.  And do you remember what the

22   resolution of that was?

23        A.    We moved.  I moved and paid the balance

24   off.

25        Q.    Okay.  And if you turn two pages forward,

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina          (919) 557-4640
                                JA3787

1  this appears to be the child support record against

2  Lucas James?

3         A.    Correct.

4         Q.    Or one of the records, rather.  Okay.

5               So if you go forward about four pages, and

6  I'm looking at one of the pages titled "North

7  Carolina Civil Search by Case" and Heatherbrook

8  Recreation.

9         A.    Okay.

10        Q.    And it says, Case disposed by final

11  judgment, no trial.  Do you know if Heatherbrook got

12  a judgment against you?

13        A.    I don't know.

14              MR. HOLMES:  Mr. Reich, where are we now?

15        Using this frame of reference, this North

16        Carolina Civil Search by Name --

17              MR. REICH:  It would be immediately after

18        all of the child support matters.

19              MR. HOLMES:  Okay.  Hold on.

20              MR. REICH:  Immediately --

21              MR. HOLMES:  Hold on one second there.

22        Let's see.

23              MR. REICH:  So it's after Lucas -- or James

24        Lucas matters.  It's --

25              MR. HOLMES:  Is it -- are we talking

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3788

1       Heatherbrook Recreation; is that what we're

2       talking?

3              MR. REICH:  Correct.

4              MR. HOLMES:  Okay.  I think I'm at the same

5       place.  Thank you.

6              MR. REICH:  You're welcome.

7    BY MR. REICH:

8       Q.   If you'd turn forward about seven pages to

9    a record.  And the case number which is on the record

10   is 08SP 1711, Stone Creek Homeowners Association.

11      A.   Okay.

12      Q.   And do you see that record?

13      A.   I do.

14      Q.   And it says on here foreclosure.  Do you

15   see that?

16      A.   I do.

17      Q.   Who was the Stone Creek Homeowners

18   Association?

19      A.   I don't know.  I never paid anything to

20   them.  I've never heard of their name before, but

21   that was --

22      Q.   Do you ever remember being --

23      A.   -- when I was in Heather -- Heatherbrook.

24      Q.   Do you ever remember being involved in a

25   foreclosure case?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3789

1        A.    Yes.

2        Q.    Do you remember who brought the case

3   against you?

4        A.    That was -- I'm not exactly sure.

5        Q.    Was it like a bank or was it the --

6        A.    I was just --

7        Q.    -- Homeowners Association?

8        A.    I'm not sure.  I thought it was the bank.

9   I went to speak to a lawyer about bankruptcy.  That's

10  when I found out the house was actually in

11  foreclosure.  But I was never told who, so I just

12  assumed it was with Homecomings.

13       Q.    Did you -- I think I asked you earlier had

14  you ever filed for bankruptcy, though, right?

15       A.    Right.

16       Q.    And you've never filed for bankruptcy?

17       A.    No.

18       Q.    But you just consulted with somebody?

19       A.    Yes.

20       Q.    Okay.  Do you remember when you lived in

21  the townhouse if you had, like, neighborhood

22  association fees that you had to pay?

23       A.    Yes.

24       Q.    And were you ever behind on those?

25       A.    Not that I can recall.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3790

1      Q.   Okay.  Do you ever remember them putting

2  fines or penalties on you for not cutting your grass

3  or parking your car the wrong way or --

4      A.   No.

5      Q.   Painting the house the wrong color or

6  anything?

7      A.   No.

8      Q.   So sitting here, you don't recall why the

9  Heatherbrook Townhomes or Heatherbrook Recreation or

10  Stone Creek Homeowners Association may have

11  instituted a foreclosure against you?

12      A.   I don't know.  I don't even know who Stone

13  Creek is.

14      Q.   Have you ever heard of somebody named Grady

15  Ingle?

16      A.   No.

17      Q.   Okay.  So if you turn about four or five

18  pages further forward -- and this is Case No. 09

19  Special Proceeding -- or 09 SP 2660.

20          MR. HOLMES:  Give me a second.

21          MR. REICH:  I think she found it right

22      there.

23          THE DEPONENT:  This one?

24  BY MR. REICH:

25      Q.   There's a lot of entries on the page.  I

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3791

1    think it's that page.

2        A.   This one?

3            MR. HOLMES:   Is this the page you're

4        looking at, Mr. Reich?

5            MR. REICH:   Yes, sir.

6            MR. HOLMES:   And where is the reference?

7        You're talking about down toward the bottom?

8            MR. REICH:   As the plaintiff of the party,

9        Grady Ingle.

10   BY MR. REICH:

11       Q.   Ms. McNeil, do you see on this page where

12   it says underneath "By Party," Ingle, Grady, the

13   letter I, and then FID?

14       A.   I do.

15       Q.   Do you know who that is?

16       A.   I have no idea.

17       Q.   Okay.  And then that's your name

18   immediately to the right, Adilah McNeil, correct?

19       A.   Correct.

20           MR. HOLMES:   We're through with this

21       document for the moment?

22           MR. REICH:   We are through with this

23       document.  I don't have any further questions

24       right now.  Troy?

25           MR. SHELTON:   Why don't we take just a

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina      (919) 557-4640
                        JA3792

1      two-minute break.

2                  MR. HOLMES:  Sure.

3                  (A break was had.)

4                         EXAMINATION

5    BY MR. SHELTON:

6          Q.   Ms. McNeil, my name is Troy Shelton, as, I

7    think, Mr. Reich mentioned a few hours ago.

8          A.   Okay.

9          Q.   His firm represents several Defendants in

10   this case, and my law firm represents several other

11   Defendants in this case.

12         A.   Um-hmm.

13         Q.   Can you give me your date of birth?

14         A.   December 24th, 1978.

15         Q.   All right.  I should probably have said

16   this before I got started.  I'm going to, sort of, be

17   hopping around a lot.

18         A.   Okay.

19         Q.   So if you'll bear with me, and if I change

20   subjects too quickly, just let me know.  Okay?

21         A.   All right.

22         Q.   Why did you stop working at White &

23   Stradley?

24         A.   I was looking for a different job.

25         Q.   Why is that?

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              **JA3793**

1      A.    Just a change.

2      Q.    People normally want to change jobs for a

3  reason.

4      A.    I wanted a change.

5      Q.    And you went from White & Stradley to

6  where?

7      A.    Time Warner.

8      Q.    Time Warner.  Did you not want to be a

9  legal assistant anymore?

10      A.    I did not.

11      Q.    Who did you mostly work for when you were

12  at White & Stradley?

13      A.    Nancy White, I did some for David, and a

14  little with Rob.

15      Q.    Okay.  You were mostly Nancy White's --

16      A.    Yes.

17      Q.    -- assistant?  Okay.

18            Can you remind me of the address that you

19  currently live at?

20      A.    4717 Dansey Drive, Apartment J.

21      Q.    And you rent that; is that correct?

22      A.    That is correct.

23      Q.    Can you remind me when the complaint was

24  filed in this case, the original complaint?

25      A.    2016.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                            JA3794

1          Q.    And can you tell me what's happened in the

2     lawsuit since it was filed?

3          A.    There's been some interrogatories served

4     and this deposition.

5          Q.    Anything else?

6          A.    I'm not sure.

7          Q.    Have you made any effort to find out what

8     has happened in the past three years?

9          A.    I have not.

10          Q.    Do you know that the Drivers' Privacy and

11     Protection Act is?

12          A.    I do.

13          Q.    What is it?

14          A.    The DPPA?

15          Q.    Yes, ma'am.

16          A.    It is my right -- it's the act that says

17     when my information can be used or disclosed.

18          Q.    What information?

19          A.    My -- off my driver's license.

20          Q.    Okay.  And what have you done to

21     familiarize yourself with the DPPA?

22          A.    I read over the 14 rules or laws under that

23     act.

24          Q.    You read the DPPA itself?

25          A.    Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina          (919) 557-4640
                                  JA3795

1   Q. Do you know what a class representative is?

2   A. No.

3   Q. So do you know if you're trying to be a

4 class representative?

5   A. I'm not sure.

6   Q. Have you ever heard a radio ad about this

7 lawsuit?

8   A. I have not.

9   Q. Do you know if your husband is a member of

10 this class action?

11   A. He is not.

12   Q. How do you know that he is not?

13   A. Because we talk.

14   Q. Well, what's led you to believe that he's

15 not?

16   A. He hasn't told me.

17   Q. Well, it could be the case that he's a

18 member and he just hasn't told you; isn't that right?

19   A. That could be right.

20   Q. Do you know if your husband got into a

21 motor vehicle accident in August 2016?

22   A. 2016?  He has been in an accident, but

23 I'm not sure when it was.

24   Q. Okay.  Do you know if your husband has ever

25 gotten any mailers after getting into an automobile

www.NCDepo.com   Depositions, Inc.
info@NCDepo.com  Serving all of North Carolina  (919) 557-4640
JA3796

1  accident?

2      A.    I can't recall.

3      Q.    You may have said this earlier, but I have

4  a few questions about your own accident back from

5  July 2016.

6            Do you know if the other driver had been

7  drinking or was intoxicated?

8      A.    I don't know.

9      Q.    Would that have been helpful information to

10 know after the accident?

11     A.    I'm sure it could have been.

12     Q.    And can you remind me; was your car

13 drivable after the accident?

14     A.    It was not.

15     Q.    Was the other car drivable after the

16 accident?

17     A.    I'm not sure.

18     Q.    And did you try to brake to avoid the

19 accident?

20     A.    Yes.  I was already slightly on my brakes

21 from going down an incline, but I did press harder to

22 try not to, I guess, have a collision.  She pulled

23 out in front me, so I braked to embrace [sic], I

24 guess.

25     Q.    Okay.  And I think you testified earlier

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                            JA3797

1   that your car had been damaged; is that right?

2       A.   That is correct.

3       Q.   Can you estimate the damage?

4       A.   I can't remember what the damage was

5   estimated at.  I can't remember.

6       Q.   Okay.  Was the car totaled?

7       A.   It was totaled.

8       Q.   Do you have an idea about what the estimate

9   of the value of the car was at that time?

10      A.   I can't remember.

11      Q.   Do you know if it was $10,000?

12      A.   I can't remember.

13      Q.   Okay.  Was the other car damaged in the

14  accident?

15      A.   I believe so.

16      Q.   Could you give me an estimate of how much

17  damage you think there was to the other car?

18      A.   I don't know.

19      Q.   Okay.  Do you know if the other driver, the

20  one who pulled out in front of you, had her driver's

21  license with her that day?

22      A.   I'm not sure.

23      Q.   Okay.  I think you testified that you have

24  at least some social media accounts; is that right?

25      A.   That is correct.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina          (919) 557-4640
                                 JA3798

1      Q.   I think you testified that you have a

2   Facebook account; isn't that right?

3      A.   That is correct.

4      Q.   And do you know if that Facebook account is

5   public or private?

6      A.   It's private.

7      Q.   It's private?

8      A.   Yes.

9           MR. SHELTON:  Can someone remind me of what

10       exhibit number we're on?

11           THE COURT REPORTER:  The next one will be

12       353.

13           (Exhibit 353 is marked for identification.)

14   BY MR. SHELTON:

15      Q.   Ms. McNeil, I'm going to show you what

16   we've marked as 353.

17      A.   Okay.

18      Q.   Is this your Facebook page?

19      A.   It is.

20      Q.   Now, I'll represent to you that I looked up

21   your Facebook profile.  Have we ever met before?

22      A.   No.

23      Q.   We're not friends on Facebook, right?

24      A.   No, not that I know of.

25      Q.   Does this refresh your recollection as to

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                            JA3799

1    whether your Facebook is private or not?

2        A.   Yes.

3        Q.   It's not private, is it?

4        A.   I don't know.  I mean, I think you can get

5    this information when you look -- when you -- when

6    you put my name in a search engine --

7        Q.   So you think this --

8        A.   -- this comes up.

9        Q.   I'm sorry.  I didn't mean to talk over you.

10       A.   Go ahead.

11       Q.   So you think this information, what I've

12   provided to you, this part of your Facebook profile,

13   is not private?

14       A.   I'm not sure.

15       Q.   What makes you think that your Facebook

16   profile is private?

17       A.   I thought I set it to private.

18       Q.   Do you have any other social media accounts

19   besides Facebook?

20       A.   I have Instagram and old pages like Myspace

21   and BlackPlanet.

22       Q.   Okay.  Anything else?

23       A.   A website tag Marco Polo.  I can't

24   remember.

25       Q.   Do you know whether your Instagram profile

www.NCDepo.com            Depositions, Inc.
info@NCDepo.com      Serving all of North Carolina      (919) 557-4640
JA3800

1   is more private or less private than your Facebook

2   profile?

3        A.   I think it's more private.

4        Q.   Okay.

5        A.   I believe so.  I set it to private.

6        Q.   Do you know if your Myspace profile or

7   BlackPlanet profiles are more private or less private

8   than your Facebook account?

9        A.   I don't believe so.

10       Q.   You don't believe that they're more

11  private?

12       A.   No.

13       Q.   Okay.  Do you think that you have a public

14  YouTube account?

15       A.   I'm not sure.

16       Q.   Mr. Reich asked you some questions about

17  your understanding of car wrecks and what you knew

18  about how they worked back in 2016, and my

19  understanding was you know quite a bit about how car

20  wrecks work because you worked at a personal injury

21  firm like White & Stradley; is that right?

22       A.   Um-hmm.  Could be.

23       Q.   Did you learn it some other way?

24       A.   No.

25       Q.   Okay.  And I think I also heard you testify

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                   JA3801

1    that you have a 19-year-old daughter?

2         A.   I do.

3         Q.   Do you think she knows as much about car

4    wrecks as you do?

5         A.   No.

6         Q.   Is she a driver?

7         A.   No.

8         Q.   Has she ever ridden in a car?

9         A.   She has.

10        Q.   Okay.  Do you think that she knows that

11   other drivers might have to pay for her medical

12   treatment if she gets hurt in a wreck?

13        A.   She does.

14        Q.   Do you think that she knows that she could

15   recover lost wages if she had to be out of work?

16        A.   She doesn't know.

17        Q.   She doesn't know?

18        A.   No.

19        Q.   Do you think that she knows that she could

20   recover money for pain and suffering in addition to

21   medical bills and property damage if she got hurt in

22   a wreck?

23        A.   I don't think she does, no.

24        Q.   Do you think that she knows that attorneys

25   who have been -- strike that.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina          (919) 557-4640
                              JA3802

1          Do you think that your daughter knows that

2    there are attorneys out there that would be willing

3    to represent her on a contingency fee agreement if

4    she got hurt?

5          A.    I don't think she does.

6          Q.    Do you think your daughter knows that she

7    doesn't have to give a recorded interview to the

8    other driver's insurance adjuster?

9          A.    I don't think she does.

10         Q.    Do you think she understands about

11   uninsured and underinsured motorist coverage?

12         A.    I don't think she does.

13         Q.    Do you know if anyone has ever hired a

14   lawyer that sent them a letter like the ones that you

15   received in this case?

16         A.    Could you repeat that?

17         Q.    Do you know of anyone who has ever hired or

18   contacted a letter [sic] who received letters from

19   law firms like you did in this case?

20         A.    I don't know.

21         Q.    And I think I understood this correctly,

22   but I want to be clear.  When Nationwide, the other

23   driver's insurance carrier, called you the day after

24   your accident, had you seen your accident report yet

25   at that time?

www.NCDepo.com                     Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina          (919) 557-4640
                                  JA3803

1    A.    No.

2    Q.    It hadn't yet come in the mail?

3    A.    No.

4    Q.    Okay.  And did you end up signing a release

5  with Nationwide?

6    A.    I did not.

7    Q.    Did you settle your personal injury claim?

8    A.    Yes.

9    Q.    How so?

10    A.    With my attorney.

11    Q.    Did you file a lawsuit?

12    A.    No.

13    Q.    Well, what were in the settlement papers

14  then?

15    A.    Well, it didn't go to court.  That's what

16  my understanding is.  But it was settled between the

17  lawyer and the insurance company.

18    Q.    Okay.  And when you say the insurance

19  company, you mean Nationwide?

20    A.    Yes.

21    Q.    The other driver's insurance?

22    A.    Yes.

23    Q.    So I guess that's my question.  You did end

24  up signing some papers --

25    A.    Yes.

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com              *Serving all of North Carolina*        *(919) 557-4640*
                              **JA3804**

1     Q.    -- with Nationwide, right?

2     A.    Yes.

3     Q.    Okay.  After you hired White & Stradley?

4     A.    Correct.

5     Q.    And you said you hired White & Stradley

6   because you used to work here, right?

7     A.    Correct.

8     Q.    We're sitting in White & Stradley's office

9   right now, right?

10    A.    That's right.

11    Q.    Not obvious maybe if you're reading the

12  transcript, but --

13    A.    Right.

14    Q.    -- that's where we are?

15          Now, if you hadn't worked at White &

16  Stradley and you didn't know about the law firm of

17  White & Stradley, who would you have hired to handle

18  your personal injury claim against Nationwide?

19    A.    I don't know.

20    Q.    How would you have gone about finding a

21  lawyer?

22    A.    Probably looking on a website or talking to

23  family or friends.

24    Q.    But you received some --

25    A.    I'm saying a website, but the internet.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3805

1        Q.   Okay.  And you received some mailers about

2   some law firms?

3        A.   Right.

4        Q.   You might have looked up some of those law

5   firms' websites, right?

6        A.   I don't know.

7        Q.   Now, at the time of your accident in 2016,

8   my understanding was you testified that you didn't

9   know that the officer was going to create an accident

10  report; is that right?

11       A.   I don't know that I said that.

12       Q.   Okay.  And I didn't mean to -- I was just

13  trying to under -- well, let me just ask it to you

14  directly then.  At the time of your accident in 2016,

15  did you know whether the police officer was going to

16  create an accident report?

17       A.   I would assume she was.

18       Q.   Okay.  And did you know at that time, at

19  the time of your accident, how to get a copy of the

20  accident report?

21       A.   I did not.

22       Q.   Sitting here today, three years later, do

23  you know how to get a copy?

24       A.   I do not.

25       Q.   Would that have been helpful to know?

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3806

1        A.    I'm not sure.

2        Q.    Would it have been helpful if the police

3    department had just mailed you a copy?

4        A.    I'm not sure.

5        Q.    Is there any information in your accident

6    report that you consider private information?

7        A.    My address.

8        Q.    And I'm going to show you what we'll mark

9    as Exhibit 354.

10            (Exhibit 354 is marked for identification.)

11   BY MR. SHELTON:

12       Q.    I'll represent to you this is the website

13   where you go to find your accident report.

14       A.    Okay.

15       Q.    That's what I did.

16       A.    Thank you.

17       Q.    You see the first page, I typed in your

18   name.  Page 2, up pops the results.  Page 3 and

19   Page 4, that's your accident report.

20       A.    Okay.

21       Q.    So if we're looking at Page 3, the first

22   page of the accident report, is there any information

23   here that you consider to be private information?

24            MR. HOLMES:  I'm sorry.  Page 3, the first

25       page is what you said?

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3807

1           MR. SHELTON:  Yeah.  Page 3 of this

2       accident, which is the first page of the accident

3       report.

4           MR. HOLMES:  Okay.

5  BY MR. SHELTON:

6       Q.  I'll repeat the question for you,

7  Ms. McNeil.  Is there any information on Page 3 that

8  you consider to be private information?

9       A.  I guess not.

10       Q.  And that's because it's on the internet,

11  right?

12       A.  Correct.

13       Q.  Does it matter to you that your accident

14  report is available on the internet?

15       A.  I'm not sure.

16       Q.  Can you elaborate?

17       A.  Oh.  I said I'm not sure.

18       Q.  What are you not sure about?

19       A.  Like if I feel any type of way about it.

20       Q.  Indifferent to it being out there?

21       A.  I guess.

22       Q.  Do you know if this accident report says

23  that you were at fault?

24       A.  It does not.

25       Q.  It doesn't say one way or the other?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3808

1      A.    Right.

2      Q.    Do you think most people would want to know

3  if the police officer did assign fault to them in an

4  accident report?

5      A.    I'm not sure.

6      Q.    Do you think people wouldn't care whether

7  the police officer said that they were the ones to

8  blame?

9      A.    I don't know what people would care.

10     Q.    Okay.

11     A.    I don't know.

12     Q.    Do you know whether the other driver in

13 this accident, Ms. Francis Portales-Rios, do you know

14 if she was carrying a copy of her driver's license at

15 the time of the accident?

16     A.    I don't know.

17     Q.    Can you turn to the last page of this

18 exhibit?  If you look all the way to the bottom,

19 you'll see Francis Desire Portales-Rios, do you see

20 that?

21     A.    I do.

22     Q.    And it says Charges for Traffic Violations,

23 and it says:  No OL/Failed to yield right of way.

24          Do you see that?

25     A.    I do.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3809

1      Q.    Do you know what no OL means?

2      A.    No operator's license.

3      Q.    That is what I think it also means.  So

4    does that suggest that Ms. Portales-Rios did not have

5    her driver's license on her at the time of the

6    accident?

7      A.    That's what it says.

8      Q.    Okay.  And if you can flip back to the

9    previous page of the accident report and look at

10   where it says Unit 1 and it's got Ms. Portales-Rios's

11   information.  About in the middle of that box, do you

12   see something that says "Same Address on Driver's

13   License"?

14     A.    I do.

15     Q.    Do you see that that box is checked yes?

16     A.    I do.

17     Q.    That seems to indicate that the officer

18   looked at her driver's license but at the same time

19   cited her for not having a driver's license.  Does

20   that sound about right?

21     A.    I'm not sure.

22     Q.    I'm not really sure either.  Is there some

23   other way to read that though?

24     A.    I'm not sure how you could read it.  Yeah,

25   I guess.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3810

1      Q.   And if you can go back to the last page,

2   and go back down to where it says No OL --

3      A.   Okay.

4      Q.   -- do you see that there's some numbers

5   right before that?

6      A.   I do.

7      Q.   It says 565731F.  Do you see that?

8      A.   I do.

9      Q.   Okay.  I'm going to show you what we're

10   marking as the next exhibit --

11           (Exhibit 355 is marked for identification.)

12   BY MR. SHELTON:

13      Q.   -- which is 355.  And I'm not going to ask

14   you whether you've ever seen this before because I'm

15   certain you have not.  But I'll represent to you that

16   this is a printout related to your accident.  Do you

17   see towards the top left part, it says Portales-Rios,

18   Francis Desire; do you see that?

19      A.   I do.

20      Q.   Do you see a few lines below that, it says,

21   it looks like, Charge/Arrest offense:  No operator's

22   license?

23      A.   I do.

24      Q.   Do you --

25      A.   I do.

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                          JA3811

1          Q.    Okay.  And if you look in the middle of the

2    page -- I can circle it for you on my copy.  Do you

3    see that on your copy (indicating)?

4          A.    Yes.

5          Q.    And it starts 565; do you see that?

6          A.    Yes.

7          Q.    Does that look like the same traffic

8    citation number on the last page of the accident

9    report?

10         A.    Exhibit 354?

11         Q.    Yes.

12         A.    Yes.

13         Q.    This looks like the information about her

14   no operator's license citation that she got from your

15   accident, right?

16         A.    Yes.

17         Q.    Okay.  People file lawsuits because they

18   have been injured.  Would you agree with that

19   statement?

20         A.    I would.

21         Q.    And do you know what a defendant is?

22         A.    Yes.

23         Q.    What is a defendant?

24         A.    The opposing party or the at-fault party in

25   a lawsuit.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3812

1        Q.    The allegedly at-fault party maybe?

2        A.    Right.

3        Q.    And you're suing several law firms in this

4    case as defendants, right?

5        A.    Yes.

6        Q.    And how have you been injured by the law

7    firms that you've named as defendants?

8        A.    It caused me, you know, confusion, stress,

9    anger, different emotions when I was getting the

10   letters, different feelings.

11       Q.    And you got those feelings because you

12   received the letters; is that right?

13       A.    Yes.

14       Q.    Are there any other injuries that I should

15   be aware of?

16       A.    No, not that -- not like a bodily injury,

17   no.

18       Q.    Okay.  That's it?

19       A.    Yes.

20       Q.    Have any of the Defendants caused your

21   identity to be stolen?

22       A.    I don't know.

23       Q.    Do you have any reason to believe that any

24   of the Defendants have caused your identity to be

25   stolen?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3813

1        A.   I don't know.

2        Q.   You don't have any reason to believe it one

3   way or the other?

4        A.   No.

5        Q.   Have any of the Defendants caused you to be

6   stalked or harassed by someone else?

7        A.   I don't know.

8        Q.   You don't have any reason to believe that

9   they have, do you?

10       A.   No.

11       Q.   Okay.  Have any of Defendants caused you to

12  incur any medical bills?

13       A.   No.

14       Q.   Have any of the Defendants caused you to

15  lose wages?

16       A.   No.

17       Q.   Have they caused you to lose any money at

18  all?

19       A.   No.

20       Q.   Has there been any economic impact on your

21  life because of the Defendants' actions?

22       A.   No.

23       Q.   If you had to put a number on your injury,

24  what would it be?

25       A.   I don't know right now.  I can't put a

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3814

1   number on it.

2        Q.   So about a dollar?

3        A.   I don't know.

4        Q.   Is it more than $3,000?

5        A.   I don't know.

6        Q.   It could be?

7        A.   Could be.

8        Q.   I want you to assume you hadn't received a

9   letter in this case from any of the law firms.  Okay?

10       A.   Okay.

11       Q.   That the law firms had obtained your name

12  and address but then never used it.  They never sent

13  you a letter.  In that case, would you be injured?

14       A.   Repeat that.

15       Q.   No problem.  Now, in this case, you got a

16  letter from the Defendants that you've sued.  I want

17  you to assume you had never received a letter from

18  any of the Defendants.  Okay?

19       A.   Okay.

20       Q.   That the Defendants obtained your

21  information but then they never used it and they

22  never sent you a letter.  Okay?

23       A.   Okay.

24       Q.   In that scenario, would you have been

25  injured by the Defendants?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina           (919) 557-4640
                               JA3815

1       A.    Yes.

2       Q.    How so?

3       A.    Because my information was still taken.

4       Q.    Taken from whom?

5       A.    Where they got it from, from the website.

6       Q.    They took it from the public website?

7       A.    I'm not sure where they took it from, but

8    however they obtained it.

9       Q.    If they got the information from a public

10   website, would you have been injured?

11      A.    No.

12      Q.    Now, this case is a class action, so there

13   are lots of other people involved besides just the

14   people whose names are on the caption of the

15   complaint.  I'm entitled to understand how all of

16   those other people have been injured.  How do you

17   think I should go about finding out how those people

18   have been injured?

19      A.    That -- the ones that are involved in the

20   class action?

21      Q.    That's right, but not the ones who are

22   named as Plaintiffs.

23      A.    I'm not sure.

24      Q.    Would we have to ask each one?

25      A.    I assume you would.  I'm not exactly sure

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina      (919) 557-4640
                              JA3816

1  how.

2      Q.   Can you think of some other way to go about

3  doing it?

4      A.   I can't.

5      Q.   Do you recall whether you were the

6  person -- strike that.  Never mind.

7          Ms. McNeil, do you have any reason to

8  believe that you're going to receive another mailer

9  from any of the Defendants in this case?

10      A.   I'm not sure.  I don't have any reason to

11  believe so.

12      Q.   Have you received any mailers from any of

13  the Defendants since 2016, three years ago when the

14  lawsuit was filed?

15      A.   I have not.

16          MR. SHELTON:  Okay.  Those are all my

17      questions.

18          MR. HOLMES:  Okay.  I just have a few here.

19                         EXAMINATION

20  BY MR. HOLMES:

21      Q.   Ms. McNeil, Mr. Reich went through a bunch

22  of Complaints in Summary Ejectment that various

23  apartment operations had filed against you.  Do you

24  recall that discussion with Mr. Reich?

25      A.   Yes.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3817

1      Q.   Before Mr. Reich showed you the exhibits

2   related to those matters, were you aware that any of

3   those had been filed in court?

4      A.   I was not.

5      Q.   Ms. McNeil, are you aware that this action

6   could become a class action?

7      A.   Yes.

8      Q.   And it has not yet been certified as a

9   class, but if you are approved -- if it does become

10  certified as a class action and you're approved as a

11  named plaintiff in the class, will you protect and

12  pursue all the rights of the class?

13     A.   I will.

14     Q.   Have you cooperated with Mr. Stradley and

15  me in participating in this lawsuit?

16     A.   Yes.

17     Q.   Have you responded to all of our emails

18  where we asked you to respond and either have taken

19  our phone calls or returned our phone calls?

20     A.   I have.

21     Q.   Earlier, I believe that you said that you

22  have not taken any action to stay updated on the

23  case, but have you received periodic emails from me

24  or Mr. Stradley regarding things that are going on in

25  the case?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3818

1      A.    Yes.

2      Q.    And have you read those emails?

3      A.    I have.

4      Q.    Going forward in this case, and if it is

5  certified by the Court as a class action, will you

6  continue to cooperate with Mr. Stradley and me to do

7  everything necessary to participate in the case?

8      A.    I will.

9      Q.    Did you provide to us the information that

10 was contained in your interrogatory responses?

11     A.    Yes.

12     Q.    If other people who are not named currently

13 in the lawsuit but who are situated similarly to you

14 become members of this lawsuit, will you do your best

15 to represent their interests as class members?

16     A.    I will.

17     Q.    And considering the conduct of this lawsuit

18 and any decisions you make about how the lawsuit

19 proceeds forward, will you put the interests of the

20 class members ahead of your own personal interests?

21     A.    I will.

22     Q.    And if it is certified as a class action

23 and if one or more of the Defendants were to make a

24 settlement offer in the case, do you agree that you

25 would not settle the matter unless the Court approves

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                  JA3819

1  the settlement?

2      A.   Correct.

3           MR. HOLMES:  Mr. Reich, I believe that you

4      attached already the interrogatory responses to

5      the -- that you have labeled those -- and I just

6      want to confirm.  I'm not asking any questions

7      about that.  I just want to --

8           MR. REICH:  The supplement, yes.

9           MR. HOLMES:  So it looks like 340 and 341

10     are her -- respectively her interrogatory

11     responses and her amended responses to -- amended

12     response to No. 6.  So I'll just request that

13     those be attached to the transcript and as part

14     of the record.

15          MR. REICH:  (Nods head up and down).

16          MR. HOLMES:  And I think that's everything.

17     Let me just glance over a few things.

18  BY MR. HOLMES:

19     Q.   Ms. McNeil, when we were doing preparation

20  for this deposition, did I review with you portions

21  of the First Amended Complaint?

22     A.   Repeat that.  I'm sorry.

23     Q.   When we were doing preparation for this

24  deposition, did I review with you the portions of the

25  First Amended Complaint that pertained to you?

www.NCDepo.com            Depositions, Inc.
info@NCDepo.com      Serving all of North Carolina        (919) 557-4640
                         JA3820

1  A.   Yes.

2       MR. HOLMES:   That's all the questions I

3  have.

4       MR. REICH:   I don't have any other

5  follow-up questions.

6       MR. SHELTON:   Thank you for your time,

7  Ms. McNeil.

8       THE DEPONENT:   Thank you.

9            (SIGNATURE RESERVED.)

10    (THE DEPOSITION CONCLUDED AT 2:28 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                            JA3821

```
1                        ERRATA SHEET

2    Case name:      JAMES WEAVER GAREY, et al.
                              vs.
3                    JAMES S. FARRIN, P.C., et al.,

4    Case number:    1:16-CV-00542

5    Witness name:  ADILAH HANEEFAH-KHADI McNEIL

6    Date:           October 23, 2019

7

8    PAGE    LINE    READS          SHOULD READ

9    _____/_____/_____/_____

10   _____/_____/_____/_____

11   _____/_____/_____/_____

12   _____/_____/_____/_____

13   _____/_____/_____/_____

14   _____/_____/_____/_____

15   _____/_____/_____/_____

16   _____/_____/_____/_____

17   _____/_____/_____/_____

18   _____/_____/_____/_____

19   _____/_____/_____/_____

20   _____/_____/_____/_____

21   _____/_____/_____/_____

22   _____/_____/_____/_____

23   _____/_____/_____/_____

24   _____/_____/_____/_____

25   _____/_____/_____/_____
```

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com              *Serving all of North Carolina*        *(919) 557-4640*
                              **JA3822**

```
1                    SIGNATURE PAGE

2            I, ADILAH HANEEFAH-KHADI McNEIL, do hereby

3   state under oath that I have read the above and

4   foregoing deposition in its entirety and that the

5   same is a full, true and correct transcript of my

6   testimony, subject to the attached list of

7   corrections, if any.

8

9
    _____
10  ADILAH HANEEFAH-KHADI McNEIL

11

12           Sworn to and subscribed before me

13  this_____day of_____ , 20_____.

14

15

16

17

18
    _____
19  Notary Public
    My commission expires:  _____
20

21
    Mail to:
22
    Depositions, Inc.
23  1000 N. Main Street
    Suite 215
24  Fuquay-Varina, NC 27526

25  ED
```

www.NCDepo.com          Depositions, Inc.
info@NCDepo.com     Serving all of North Carolina     (919) 557-4640
JA3823

1                    CERTIFICATE OF REPORTER

2

3    STATE OF NORTH CAROLINA )

4    COUNTY OF WAKE          )

5

6          I, Eileen M. Dunne, the officer before whom

7    the foregoing deposition was taken, do hereby certify

8    that the witness whose testimony appears in the

9    foregoing deposition was duly sworn by me; that the

10   testimony of said witness was taken by me to the best

11   of my ability and thereafter reduced to typewriting

12   under my direction; that I am neither counsel for,

13   related to, nor employed by any of the parties to the

14   action in which this deposition was taken, and

15   further that I am not a relative or employee of any

16   attorney or counsel employed by the parties thereto,

17   nor financially or otherwise interested in the

18   outcome of the action.

19

20

21   _____
     EILEEN M. DUNNE
     Notary Public # 201314900195

22

23

24

25

www.NCDepo.com                  *Depositions, Inc.*
info@NCDepo.com          *Serving all of North Carolina*          *(919) 557-4640*
**JA3824**

**Exhibits**

**Exhibit 331**   3:11 8:7,14 126:1

**Exhibit 332**   3:13 18:4,7 21:3,16 24:14 29:16 30:3 32:19 36:11 37:18 42:19 46:16 80:21 98:18 100:4 107:6,7 124:13 132:14

**Exhibit 333**   3:14 48:3,7 49:19 100:9

**Exhibit 334**   3:15 50:24 76:11 77:13 99:13

**Exhibit 335**   3:16 52:4 71:10 100:15

**Exhibit 336**   3:17 53:24 54:2 55:11,24 56:23 108:2,3

**Exhibit 337**   3:19 96:2,5

**Exhibit 338**   3:20 101:18 108:4, 10 110:5,10 112:19 114:2 133:2,5 134:4

**Exhibit 339**   3:21 117:1,3,23

**Exhibit 340**   3:23 124:25 125:3 126:18

**Exhibit 341**   4:3 125:16

**Exhibit 342**   4:5 132:22 133:8,12

**Exhibit 343**   4:7 135:19,22 136:6

**Exhibit 344**   4:8 137:7,10 139:1

**Exhibit 345**   4:10 139:19

**Exhibit 346**   4:11 141:19 142:12

**Exhibit 347**   4:13 143:12,16,17

**Exhibit 348**   4:14 145:17,20,24 148:7

**Exhibit 349**   4:16 149:19,21

**Exhibit 350**   4:17 151:25 152:3,8

**Exhibit 351**   4:19 153:4,7

**Exhibit 352**   4:20 157:12,15 159:10

**Exhibit 353**   4:22 179:13

**Exhibit 354**   4:23 187:9,10 192:10

**Exhibit 355**   4:25 191:11

**$**

**$1,001**   138:4,8
**$1,400**   128:18
**$10,000**   178:11
**$3,000**   195:4
**$37.10**   145:3
**$500**   76:22
**$693**   142:18
**$742**   144:9 145:3
**$779.10**   145:8

**(**

**(b)**   105:11
**(c)**   105:14

**0**

**05-26-14**   165:21
**06**   99:25
**07062016**   99:21
**08/22/16**   103:16
**08SP**   169:10
**09**   171:18,19

**1**

**1**   33:15,18 34:4 104:24 148:10 190:10
**10**   53:5 59:16 132:5 166:14
**11/18/14**   164:9,12
**130**   116:23
**132**   114:12 115:1,10 134:7
**133**   115:12 116:1,17,18 117:20 134:10,11,16
**136**   134:25 135:6
**14**   104:22 175:22
**140**   135:13
**141**   135:13

**15**   28:22 105:6
**15-minute**   53:3
**16**   99:25 156:14 157:1 159:15
**16th**   153:17
**1711**   169:10
**17th**   143:10
**19**   13:12
**19-year-old**   182:1
**1978**   173:14
**1995**   159:14
**1996**   163:7
**1999**   167:9,15
**1st**   18:19 29:8 35:20 36:16 39:21 45:25 46:15 47:24 64:8 75:8 82:18 83:17 100:5 105:22 112:23 138:20 140:4 142:24

**2**

**2**   33:15,19,24 34:3,5,8,14 42:19 54:22 55:23 56:23 57:10 148:15 154:22 187:18
**20**   40:25
**200**   84:7 85:23 86:8 130:22
**2000**   12:9
**2004**   97:23
**2006**   12:9
**2010**   137:4 140:4,8,12
**2011**   137:23 138:20 139:17 142:6,24 143:10 160:10
**2012**   12:9 162:16,18
**2013**   143:21 146:1,5 149:11,17 153:17
**2014**   127:16 150:14 164:18 165:5
**2016**   13:13 14:5,10 15:4 16:8 17:7 18:19 19:2,9,11,23 20:3 29:8 42:25 45:25 58:16 65:10 75:8 76:14 77:4 82:18 83:17 99:7 100:12,16 103:10,11,20,21 104:24 105:22 112:24 120:4 174:25 176:21,22 177:5 181:18 186:7,14 197:13

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
Serving all of North Carolina

*(919) 557-4640*

**JA3825**

**2017** 83:17

**210** 57:6

**22nd** 103:20,21

**24th** 173:14

**261** 159:11

**2660** 171:19

**27616** 5:15

**28** 142:6

**28th** 143:21

**2:28** 201:10

---

**3**

**3** 127:10 187:18,21,24 188:1,7

**30** 31:19 114:11 115:21

**30th** 162:16

**31** 115:22

**3143** 136:8 144:9 160:6,17 161:15

**3143-H2** 137:18 142:20

**31st** 140:8 149:10

**331** 8:5,6,7,14 126:1

**332** 18:4,7,17 21:3,16 22:10 24:14 29:16 30:3 32:19 36:11 37:18 42:19 46:16 80:21 98:18 99:3 100:4 107:7 124:13 132:14

**333** 48:3,7,12,14,16 49:1,19 51:24 100:9

**334** 50:24 51:1,6,25 76:11 77:13 99:13

**335** 52:4,6,8,10 71:10 100:15

**336** 53:24 54:2 55:11,24 56:23 108:2,3

**337** 96:2,5,25 102:18

**338** 101:18,20 102:18,23 103:1, 15 108:4,10 110:5,10 112:19 114:2 118:3 133:2,5,16 134:4

**339** 116:24,25 117:1,3,23

**340** 124:25 125:2,3 126:7,18 200:9

**341** 125:15,16,22 126:7 127:9 200:9

**342** 132:22 133:8,12,18 134:6

**343** 135:19,22 136:6 141:3

**344** 137:7,10 139:1 141:3

**345** 139:19,21,25 141:4

**346** 141:19,22,25 142:12

**347** 143:12,14,17

**348** 145:17,20,24 148:7

**349** 149:19,21 150:9,20

**35** 31:19 33:2,9

**350** 151:25 152:3,8

**351** 153:4,7,12,24

**352** 157:12,15 158:8,25 159:10

**353** 179:12,13,16

**354** 187:9,10 192:10

**355** 191:11,13

**37** 102:1

**3rd** 137:4

---

**4**

**4** 54:9,12 143:1 187:19

**40** 134:6

**41** 135:13

**417790E** 160:20

**43** 134:25

**44** 135:5

**46** 135:14

**4717** 5:14 52:13 56:4 174:20

---

**5**

**52** 104:22

**565** 192:5

**565731F** 191:7

---

**6**

**6** 76:13 77:12 125:23 126:20,23 127:14 200:12

**60** 32:24 105:6

**61** 33:7

**64** 34:11 35:2

**6910725** 163:1

**6th** 100:6

---

**7**

**7** 71:13,18 73:7 74:10,17 100:11, 16

**7/1/2016** 46:9 60:1

**7780** 57:5

---

**8**

**85** 33:25 34:3

**8th** 101:9

---

**9**

**9** 126:20

**911** 23:14,15 24:8

**919 637-3382** 42:23

**939** 147:9

---

**A**

**Aaron** 108:23

**ability** 53:15

**absentee** 98:4

**absolutely** 71:22

**accept** 73:12 78:2 94:1

**accepted** 133:8

**accident** 18:13,15,19 19:9 20:9 21:4,15 24:12 26:18 28:9 29:6,9, 13 30:2,16 31:2,8 35:14,21 36:11, 14 37:25 39:21 40:6 41:8,11,14 42:2 43:3 44:9 45:1,17,20 46:8,15 47:5,17,20 48:24 49:16,20,24 50:7,13,19,21 51:21 52:16 54:18 60:1 62:3,13 63:2 64:8 65:11 66:23 67:7 68:7,21 71:5 73:16 74:1 75:5,8,9,20 76:5,14 77:3 80:23 81:19 83:13,18 88:20 89:9 98:19 99:3,9 100:3,4 101:2 105:1, 2,22 107:21 110:16,25 112:23

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA3826

130:24 132:13 176:21,22 177:1,4, 10,13,16,19 178:14 183:24 186:7, 9,14,16,19,20 187:5,13,19,22 188:2,13,22 189:4,13,15 190:6,9 191:16 192:8,15

**accidents** 18:20 19:1,2,6,9,22 20:6

**account** 179:2,4 181:8,14

**accounts** 178:24 180:18

**accurate** 35:23 128:19

**accused** 138:7

**accustomed** 157:18

**acknowledge** 7:9,15,17

**acquainted** 82:14

**act** 175:11,16,23

**action** 54:17 103:25 104:6,12,14 109:23 112:3,7 114:5,16 115:19 120:11,14 126:15 127:18 128:4 154:19 164:4 176:10 196:12,20 198:5,6,10,22 199:5,22

**actions** 194:21

**actual** 99:17 144:24

**ad** 92:11 176:6

**addition** 83:9 182:20

**address** 5:13 13:3,9 27:8 48:23 56:5 79:19 93:9 96:22 97:1 105:8, 13,17 137:21 150:8,20 159:11 161:15 174:18 187:7 190:12 195:12

**addressed** 16:22 21:1 56:17 57:1

**Adilah** 5:3,11 14:15,16,17 137:18 142:1 147:5 158:24 159:1 172:18

**adjuster** 41:21 44:11 67:13 71:20 72:1 75:13 183:8

**adjusters** 71:23 72:16,23 73:3 74:18

**ads** 61:6,9 101:14

**advertisement** 31:6 48:19 50:3 51:11 56:12 58:25

**advertisements** 59:5 66:24 69:23 92:9

**advice** 74:19

**affect** 53:15

**affray** 156:10 159:18,21

**afraid** 111:17

**African** 97:7

**age** 9:16

**Agent** 150:21

**agree** 72:22,23 73:20 100:6,7 192:18 199:24

**agreement** 183:3

**ahead** 180:10 199:20

**airplane** 132:4,9

**alcohol** 130:13

**Alias** 144:21

**alleged** 127:20 143:2 146:4

**allegedly** 193:1

**Amanda** 108:23

**Amazon** 94:18,21,24

**Amazon.com** 94:16

**ambulance** 27:23 28:7

**amended** 108:6 117:4 125:22 127:10 133:5 200:11,21,25

**amendment** 133:10

**American** 97:8

**amount** 90:11,18 128:17 138:8 145:6,10,13 149:14

**Andrew** 108:24

**Angell** 56:8

**anger** 68:13,18 90:19 193:9

**angry** 65:3 68:4,5,13 78:22 79:13,15 98:13 99:8 101:4

**answering** 124:3

**anymore** 174:9

**anytime** 120:13

**apartment** 5:14 15:15 16:16,25 66:16 78:21 79:6 86:19 93:2 101:2 139:7,8 146:11 149:11 150:5 151:23 167:12 174:20 197:23

**Apartments** 136:12 139:6,16 140:13 143:10 146:2 154:4

166:15

**apologies** 102:18

**apologize** 166:9

**app** 43:23,24 91:20,21,23 92:7 94:4

**apparently** 140:14,15

**appeal** 155:19

**appears** 50:5 56:23 117:3,22 155:5 168:1

**applied** 70:6

**applies** 126:6

**approved** 198:9,10

**approves** 199:25

**area** 15:17

**arising** 45:24 113:5 120:10

**arrived** 25:8,17

**arrives** 25:14

**aspirin** 38:7

**assessing** 138:15

**assign** 189:3

**assistant** 12:2 36:4 174:9,17

**Associates** 51:21 57:3,12,24 115:15

**association** 89:10 169:10,18 170:7,22 171:10

**associations** 89:15

**assume** 6:17 186:17 195:8,17 196:25

**assumed** 170:12

**at-fault** 19:23 192:24 193:1

**Atkins** 56:8

**Atlantic** 21:7,8,9,10 24:19 29:1 31:22 33:5

**attached** 200:4,13

**attorney** 6:21 52:25 58:15 71:25 77:9 89:15 117:19 120:7 150:21 184:10

**attorney's** 78:3

**attorneys** 54:5 67:8 182:24 183:2

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3827**

**audio** 44:19

**August** 14:20 103:20,21 140:8 176:21

**Authorized** 32:24

**auto** 47:1

**automatically** 63:14 105:12,16

**automobile** 18:14 19:21 176:25

**Avenue** 21:7 24:19 29:1 31:22 33:5

**avoid** 177:18

**aware** 109:22 193:15 198:2,5

---

**B**

**back** 15:4 16:9,15 20:22 30:19 34:10 35:12 36:16 37:12,13 42:25 44:19 47:4,19 49:5 51:15 52:16 55:10 65:6 66:2,15 71:10 76:14 87:13 97:23 98:18 99:12 105:15, 21 106:7 107:6 111:4 134:2 139:6 144:24 149:13 151:22 165:16 166:5 177:4 181:18 190:8 191:1,2

**background** 61:25

**bad** 43:14 50:19 60:18

**badly** 27:25

**balance** 167:23

**bank** 127:19 170:5,8

**bankrupt** 70:23

**bankruptcy** 20:20 170:9,14,16

**Baptist** 97:16

**bar** 89:10,11,15

**based** 79:2

**basically** 22:8 54:21

**bear** 173:19

**bed** 37:6

**bedroom** 17:4

**begin** 37:19

**begins** 114:12

**behalf** 54:6,14 104:15,19 114:16 115:19

**belief** 103:18

**believes** 128:17

**Belinda** 133:19

**bell** 165:24

**belt** 166:4

**big** 10:21,23 16:19 51:12 70:18 75:12 87:15

**bill** 89:24 136:15

**billboards** 101:12

**bills** 75:7,9,12 87:1 182:21 194:12

**binder** 158:3

**birth** 105:8 173:13

**bit** 54:8 103:24 149:2 181:19

**black** 97:7 99:24

**Blackplanet** 180:21 181:7

**Blakeslee** 108:25

**blame** 189:8

**Blount** 12:25

**Blue** 10:19 11:4,14

**Board** 96:18

**bodily** 110:17 113:5 120:10 193:16

**body** 39:5 44:6 47:1

**bones** 38:21

**book** 96:13

**booth** 96:12

**born** 9:9 95:11

**bother** 95:3 118:22 119:8

**bottom** 51:12 71:14 96:22 103:14 115:21 134:25 142:5 143:21 146:23 150:20 153:16 172:7 189:18

**bought** 94:13 130:22 131:4 132:2

**box** 32:23 33:7,25 34:11 35:2 42:19 70:18 87:16 90:17 148:10, 16,22 149:2 190:11,15

**boxes** 32:20,22 35:8

**brake** 177:18

**braked** 177:23

**brakes** 31:21 32:1,10 177:20

**Brantley** 114:14

**break** 52:24 53:3,20,23 107:1,4 123:22 157:8,11 173:1,3

**Brent** 108:25

**briefly** 12:13

**Brier** 57:5

**bring** 16:15 104:12 112:9,11 114:15 115:19

**bringing** 104:14

**broken** 38:17,21

**brought** 170:2

**Brownlee** 150:22 151:4

**building** 15:16 144:9

**built** 68:17,20

**bulletin** 93:18

**bunch** 32:20 64:14 110:13 197:21

**business** 79:2 81:22 84:23

**busy** 65:21

**buy** 70:17 84:10 94:21

**buying** 94:25

---

**C**

**C-A-R-M-O-N** 14:25

**Cable** 11:6

**calculate** 90:3,5,9

**call** 23:3,14 28:4,6 29:3 41:19,20 42:4 67:8 69:2 86:15 89:10 105:2 107:20 108:10 150:25 151:7

**called** 22:10 24:7 41:21,22 42:7 69:19 80:18 82:5,10 85:11 127:18 154:19 183:23

**calling** 111:18

**calls** 43:3 198:19

**Calvary** 136:8 137:18 142:21 160:6 161:15

**Cameron** 167:10,11,14

**campus** 10:23

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3828**

**candidates** 70:1

**Capital** 150:2 151:7

**caption** 108:11 117:16 127:2 196:14

**car** 18:20 19:1,6,9 21:4,15,22,23, 24 22:2,17,21 23:1,2,11,18,22,25 24:5,7,18 25:2,25 26:3 27:14,25 28:24 32:14 34:20,25 35:15 37:19 40:21 41:10 43:15,20 44:8 45:24 60:5 62:22 63:1,14 65:8 74:12 78:12 80:10,19,25 81:3,10 83:10, 21,25 84:11,12,20 85:1,8,15,22 86:4,8,9 106:2 110:16 113:5,6,8, 10 120:10 130:23,24,25 131:9,12 166:6 171:3 177:12,15 178:1,6,9, 13,17 181:17,19 182:3,8

**card** 70:5 88:12,13

**carded** 130:12

**care** 36:20,23 37:7 38:13 189:6,9

**Carmon** 14:23 15:2,5,10 36:17 40:13 42:15 64:16 113:12

**Carolina** 10:19 57:6 77:5 89:19 95:18 96:17 109:23 156:15,17 166:11 168:7,16

**carrier** 183:23

**carrying** 111:3 189:14

**cars** 131:3,10

**case** 6:22 54:6 70:25 72:17 77:17 78:2 90:4,14 117:16 118:10,13,16 119:11,16 120:18,21 121:6 126:22 127:24 128:2,14 129:9,14, 19 133:7 143:2 148:11 152:21 168:7,10 169:9,25 170:2 171:18 173:10,11 174:24 176:17 183:15, 19 193:4 195:9,13,15 196:12 197:9 198:23,25 199:4,7,24

**cases** 64:4 77:5 146:24

**cat** 162:25

**catch** 71:5

**catch-up** 141:7

**caused** 37:7 43:13 45:20 110:17, 22 111:9 193:8,20,24 194:5,11, 14,17

**Cavalry** 160:17

**cell** 23:22 42:4,6,7,9,25 67:14 69:3

**center** 8:24

**certificate** 14:20

**certified** 165:4 198:8,10 199:5, 22

**change** 14:18 15:2 173:19 174:1, 2,4

**charge** 77:16

**Charge/arrest** 191:21

**charged** 156:7,10 157:5 163:4 166:6

**Charged/arraigned** 159:21 161:1,23 162:12

**Charges** 189:22

**Charlotte** 108:24

**Chase** 127:19

**cheap** 64:5

**check** 148:22

**Check-out** 10:9

**checkbox** 152:21

**checked** 131:21 148:11,16 190:15

**checkmark** 146:15

**Chesterfield** 165:21,24

**chewing** 130:20

**child** 129:13,20,22,23 167:6 168:1,18

**children's** 12:21

**chiropractor** 41:8 76:8

**chiropractors** 46:23

**choose** 104:12

**Christopher** 108:25

**Chrysler** 84:7 85:23 86:8 130:22

**church** 21:13 41:4 58:11 93:20 97:16

**churches** 93:21

**cigarettes** 130:18

**circle** 192:2

**citation** 160:20,23 161:19 162:2, 7,19,25 192:8,14

**cited** 157:2,5 190:19

**civil** 128:23 166:12 168:7,16

**claim** 45:24 184:7 185:18

**claimants** 71:25 74:19,21

**claiming** 50:15

**claims** 72:1,2 118:6

**clarify** 14:2 58:14

**class** 103:25 104:6,12,16,20 109:23 110:8 112:3,6,14 114:5, 16,21,25 115:3,4,20,25 116:16 119:2 120:11,13 126:15 127:17 128:4 134:7 176:1,4,10 196:12,20 198:6,9,10,11,12 199:5,15,20,22

**classes** 114:2,6 134:4

**clear** 5:23 6:7 43:13 71:8 183:22

**cleared** 141:2

**Clevenger** 108:24,25

**click** 94:1

**client** 77:7

**clients** 54:6,15

**Clinic** 10:18

**clinics** 10:10

**clip** 54:24,25 157:25 158:3

**clips** 157:21

**close** 96:23 105:3

**Cochran** 115:17

**code** 99:20 105:14 106:6

**codes** 36:1

**Cole** 115:14

**collect** 24:6

**collected** 23:8

**collecting** 65:25 94:24

**college** 9:21

**collided** 34:5

**collision** 47:1 177:22

**color** 52:7 99:16 121:21 171:5

**colored** 76:12

**column** 73:6 143:2 159:20 160:2, 19 161:5,19 162:6 163:13,16

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA3829

**columns** 33:15

**companies** 41:14 64:2 69:17 70:5 80:8 84:23 86:13

**company** 17:8 62:23 63:2,7,21 70:24 71:21,22 74:22 75:2,16 76:4 79:1 80:22 81:1,22 82:23 127:18 184:17,19

**compensation** 128:6

**complain** 86:15 89:11,14

**complained** 38:18

**complaint** 108:5,6,7 112:9,11 117:4,20 133:5 137:14 138:23 142:14 144:25 149:7 152:11 153:13 154:1 174:23,24 196:15 200:21,25

**Complaints** 197:22

**completely** 163:21

**complex** 15:15 150:6 167:12

**computer** 105:12,16

**concepts** 83:4

**concluded** 17:12 201:10

**conduct** 199:17

**confess** 52:6

**confirm** 29:25 200:6

**confused** 64:22 65:5 67:1,4 80:6,12 98:16 99:8 101:4

**confusion** 79:23 80:1 193:8

**consciousness** 38:3

**considered** 19:23

**consistent** 34:7,22

**consolidation** 70:9

**consultation** 76:25

**consultations** 76:16

**consulted** 170:18

**contacted** 183:18

**contained** 152:7 199:10

**contingency** 77:5 78:9,12,15 183:3

**continue** 6:24 138:13 199:6

**contract** 113:18,22

**conversation** 120:14

**conversations** 60:2 120:7

**cooperate** 199:6

**cooperated** 198:14

**copies** 55:11 81:16

**copy** 7:6 29:13 30:3,6,10,13,16 35:14,21 44:19 46:16 47:3 49:15, 20,24 50:7,18 51:21 52:16 54:24, 25 62:2 101:16 118:3 124:12,22 125:17 130:4 135:24 138:23 140:1 142:8 146:8 147:22 154:13 155:1 186:19,23 187:3 189:14 192:2,3

**copying** 105:9

**corner** 6:6 55:17 96:22 99:14 142:5 143:21

**correct** 11:11,13 19:14 28:17 29:20,25 33:12 35:3,4 37:20,21 40:15 41:12 42:8,24 43:1 45:22 46:18,21 48:22,25 49:17 50:4,8, 14,17 51:10,13,19 52:14,17,18,21 54:13 56:6,9,10,15,16,19,21,25 57:1,2,4,8 68:19 70:2 73:5 74:9 75:10,14 76:7,24 77:2,11,24 79:8, 11 81:8 83:8,11,16 84:16,19 86:2 87:3 88:14 95:19 96:16 97:1,3,4, 8,9,10,11,14 98:7 100:13,18,22 102:18,21 103:6 106:13 113:1 125:12 127:12,22 128:7,20,25 130:6 134:17 137:1,19 142:1,2,3, 7,15,16,19,22,25 143:19,22 146:5,6 147:3,10,14 149:3,4 150:10 152:13,23 153:18 154:5,6 158:23 159:5,7 160:15,16,18 161:13,14,17 162:17 168:3 169:3 172:18,19 174:21,22 178:2,25 179:3 185:4,7 188:12 200:2

**correctly** 72:4,20 73:18 74:23 77:19 78:6 97:19 105:3,19 117:7 127:4,21 129:1 148:13 149:8 183:21

**cost** 77:16

**costs** 118:13,16

**couch** 17:3

**counseling** 111:24

**Count** 114:4

**counter** 17:3

**County** 89:21 97:3 98:19 161:5

**couple** 19:4 37:3,7 47:20 66:11 67:25 68:13 73:8 74:5 84:4 92:3, 13,18 95:7 119:12,18 165:19 167:5

**coupon** 87:24,25

**coupons** 69:18,20 70:15

**court** 5:22 6:10 8:4 116:24 128:1 129:14,16 130:1,5 133:9,13 137:3 140:23,25 141:5 144:14 148:1,3, 10 152:21 156:5 158:11 165:21 179:11 184:15 198:3 199:5,25

**courts** 127:3

**cousin** 166:5

**coverage** 183:11

**coworkers** 41:2

**Craig's** 94:14

**crash** 107:7 124:13

**create** 186:9,16

**credit** 70:5,12

**Creek** 57:6 167:1 169:10,17 171:10,13

**crimes** 156:8

**criminal** 129:9

**Cross/blue** 10:19 11:5,14

**Crossing** 150:3

**Crumley** 115:16

**Cruthis** 108:23

**CSC** 155:18

**current** 150:8

**custody** 129:14

**Customer** 11:3

**cut** 159:3

**cutting** 171:2

---

**D**

---

**D-A-I-R-Y** 81:7

**daily** 130:8,9,11

**dairy** 81:7

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA3830

**Dairyland** 81:5,6

**damage** 19:4 83:9 113:5 178:3,4, 17 182:21

**damaged** 27:25 178:1,13

**damages** 43:5 90:4

**Dansey** 5:14 13:3,8 14:12 15:5 52:13 56:5 93:1,8 174:20

**date** 54:18 105:8 137:4 140:3,8 142:4,23 148:1 152:22 153:16 155:16 163:17 173:13

**dated** 143:20 164:9

**dates** 150:17

**daughter** 13:10,11,15 15:5,8 40:18 42:14 93:11 182:1 183:1,6

**daughter's** 167:4

**David** 174:13

**Davis** 56:8 108:23

**day** 16:8,11,13 41:24 43:2 45:17 47:3,8 65:12,25 66:11 67:25 68:1, 2,12 71:5 74:1 75:20 78:24 92:1, 18 103:11 178:21 183:23

**days** 35:15 37:3,4,7 45:10 47:5, 20,23,25 60:8 68:14,16 74:5 75:17 76:5 83:14 92:13,18 100:21

**Dazed** 23:7

**deal** 66:22 75:2

**dealership** 84:11,12 130:25

**debt** 70:9

**December** 173:14

**decide** 100:24

**decided** 112:2

**decision** 58:9

**decisions** 199:18

**defend** 156:19

**defendant** 54:17 59:5 64:9 127:1 128:24 137:1 142:1 143:4 147:2 148:16,23 149:5 154:23 192:21, 23

**defendants** 104:11 114:13 115:14,16,17,18 117:24 118:2 126:21 173:9,11 193:4,7,20,24 194:5,11,14 195:16,18,20,25 197:9,13 199:23

**Defendants'** 7:2,8 127:14 194:21

**defer** 122:10

**defined** 114:16,22 115:25

**definition** 116:17 134:8

**delivered** 31:1 94:22

**demanded** 143:3

**Demayo** 115:18

**Democrat** 97:5

**department** 30:13 79:21 80:2 98:20 107:20 187:3

**depending** 59:15

**depends** 116:7

**DEPONENT** 5:7 14:4 55:18 102:2,15 116:2,4,15,21 124:1 136:3 171:23 201:8

**deposed** 5:16 127:24 128:11 129:6

**deposition** 6:8 8:9 30:4 122:15 124:18,22 125:9,21 126:1 130:3 175:4 200:20,24 201:10

**depositions** 52:23

**deputy** 147:6,16 155:18

**describe** 21:15 117:7,24 126:24

**describing** 24:17

**Desire** 22:10 45:4 63:6 68:21 189:19 191:18

**detail** 46:2 114:25 123:24 126:24

**details** 120:6

**direct** 86:1 102:12

**directing** 121:1

**direction** 22:1

**directly** 26:13 74:21 75:2 109:6 186:14

**disclose** 91:4

**disclosed** 175:17

**Discovery** 80:22

**discuss** 6:23 77:17 133:14

**discussion** 8:2 13:20 197:24

**dismiss** 141:8

**dismissal** 136:22 142:5,9 143:17 148:5 152:19,20

**dismissed** 144:17

**disposed** 168:10

**Disposition** 163:17

**dispute** 132:15

**disservice** 73:13

**Distance** 34:11

**distress** 111:10,12

**Division** 164:4

**DMV** 95:23

**DMV-349** 105:11,14,18

**doctor** 36:23

**document** 6:6 7:24 8:15,17,20 9:1 18:9 35:9 36:7 48:12,14,16,18 52:10 54:1,9 55:11 61:14 96:11 101:20 102:4,7,23 103:1,15,19 125:2,4,14,22 127:9 132:24 133:8,12 139:1 141:22 144:21 149:21 150:12 152:2 153:6 155:5 157:14 172:21,23

**documents** 36:10 51:5 124:21 125:8 136:5 141:22 145:23 149:24 152:7

**dog** 138:14

**dollar** 90:10,18 195:2

**dollars** 19:5

**Donnie** 147:12

**door** 15:14 23:12 64:3 139:7,8,13 146:10,11 147:23

**doors** 15:23

**downhill** 31:23

**download** 43:23

**downloaded** 94:4

**downtown** 12:19,21

**DPPA** 124:3 175:14,21,24

**draft** 29:15

**draw** 27:5

**drawing** 24:14 34:1

**drinking** 177:7

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3831**

drivable 177:13,15

drive 5:14 13:3,8 14:12 15:5 29:1
52:13 56:5 93:2,9 106:21 131:7,
12 136:9 137:18 142:21 160:7,17
161:15 174:20

driven 89:18

driver 19:24 20:10 22:5 32:4
43:13 62:23 63:2 166:6 177:6
178:19 182:6 189:12

driver's 22:3 27:9,11 29:19 42:22
105:9,15,17,23 106:13,18 130:5,
8,15,25 131:7,13,22,24 132:8
157:3 175:19 178:20 183:8,23
184:21 189:14 190:5,12,18,19

drivers 82:20 182:11

Drivers' 175:10

driving 21:10 24:24 157:6
158:14,17 162:2 163:24

drop 160:25

dropped 93:4

drove 131:3,10

due 140:3 142:23 145:6

duly 5:4

Durham 10:22,24,25 11:5,7,18

Dvorsky 109:18

**E**

earlier 8:21 9:4 34:23 47:20
49:23 52:22 95:10 107:7 126:14
129:7 130:3 133:4,15 156:3
170:13 177:3,25 198:21

earn 71:24

economic 194:20

education 9:20

effort 175:7

eject 149:12

ejected 145:11

ejecting 149:11

ejectment 137:15 138:23 141:10
142:15 144:25 146:24 152:11
153:13 154:2,20 167:19 197:22

elaborate 188:16

election 69:22

elections 95:8 96:18 97:23 98:2

electronic 99:24 100:10

electronically 87:2

else's 129:9

email 67:9 109:9 133:23,24

emailed 124:9,11

emails 109:6 198:17,23 199:2

embrace 177:23

emergency 38:12

emotional 111:12

emotions 64:23 67:19 193:9

employed 10:1

employment 20:22

end 14:20 36:22 118:23 184:4,23

ended 22:2 118:22 140:8

enforcement 19:3 25:8,14 99:4
107:13

engagement 113:17,22

engine 180:6

entitled 128:6 143:5 155:5
196:15

entries 159:1 171:25

entry 164:8 165:20

envelope 49:2,6,12 51:9,15,18
56:2,15,24 59:17

envelopes 57:9

Epperson 109:20

equally 50:20,23 52:1

errand 28:15

estimate 33:7,8 178:3,8,16

estimated 178:5

eventually 24:3,6 37:6 38:23
43:9 75:23 83:18 99:2 112:24
113:9 149:13

evidence 148:12

exact 145:12 150:17

EXAMINATION 5:8 173:4
197:19

examined 5:5

exceed 32:1

exhibit 8:7,9,14 18:4,7 21:3,16
24:14 29:16 30:3 32:19 36:11
37:18 42:19 46:16 48:3,7 49:19
50:24 52:4 53:24 54:2,22 55:11,
23,24 56:23 57:10 71:10 76:11,12
77:13 80:21 96:2,5 98:18 99:13
100:4,9,15 101:18 107:6 108:2,3,
4,10 110:5,10 112:19 114:2
116:23 117:1,3,23 124:13,25
125:3,16 126:1,18 132:14,22
133:2,5,8,12 134:4 135:18,19,22
136:6 137:7,10 139:1,19 141:19
142:12 143:12,16 145:17,20,24
148:7 149:19,21 151:25 152:3,8
153:4,7 157:12,15 159:10 179:10,
13 187:9,10 189:18 191:10,11
192:10

exhibits 141:3 198:1

expect 79:1 118:9

expert 36:7

explain 6:16 21:17

explained 21:15 78:16

explanation 44:25

Expressway 89:22

extended 85:1,15,21 86:3,9

exterior 56:15

**F**

F835685 161:19

F934120 162:9

Facebook 40:10 91:5,8,13,15,19
92:7,19 93:23 94:14 179:2,4,18,
21,23 180:1,12,15,19 181:1,8

fact 75:15

failed 146:5

failing 136:15

Failure 164:12

faint 166:9

fair 117:25

fall 111:7

familiar 102:4 144:6

www.NCDepo.com
info@NCDepo.com
Depositions, Inc.
Serving all of North Carolina
(919) 557-4640
JA3832

familiarize 175:21

family 89:4 122:5 165:13 185:23

Farrin 114:13 115:14 134:11

fast 21:19 31:17 32:16

father 167:4

fault 20:4,10 188:23 189:3

February 140:4,12

fee 77:5 78:9,15 144:15 145:4 183:3

feed 92:8,9,11,19,22

feel 44:15 64:18 66:14,17 67:4 72:10 78:22 79:12,15,18 80:12,15 86:10 88:3 98:11,13 101:3 111:14 188:19

feeling 66:25 79:23 80:1

feelings 64:24 67:17 90:8 193:10,11

fees 78:3,12 138:16 170:22

feet 34:20 35:3

felt 17:14 43:17 63:12,14 72:7

female 26:19 97:10

FID 172:13

field 10:2,5

figure 16:20

file 20:7 44:19 45:3,6 82:22 83:6, 13 104:19 148:3,5 184:11 192:17

filed 13:6 20:20 103:7,12,15,19 109:23 152:11 154:4 167:14 170:14,16 174:24 175:2 197:14, 23 198:3

filing 137:25

fill 27:8

filled 35:9 79:21

final 152:18 155:11 168:10

finally 128:21

financing 131:1

find 38:21 62:5 73:13 88:23 89:5 101:5,16 123:11 175:7 187:13

finding 185:20 196:17

Findings 148:9 154:22

finds 148:10

fine 158:5

fines 171:2

finish 51:3 52:7

finished 96:8 101:23 125:5 153:10

firm 11:24 30:15 36:4 46:12 52:15 54:16 56:8 57:11 58:2 61:21 79:24 89:2 112:23 114:13 173:9,10 181:21 185:16

firms 47:14 57:17,20 58:5,8,21, 25 59:5 61:7 64:9,10,14 76:15 81:11 82:1 100:24 109:24 113:24 114:2 115:8,10 183:19 186:2 193:3,7 195:9,11

firms' 186:5

five- 53:2

fix 70:11

fixed 43:8

flip 55:10 139:22 157:17 190:8

floor 144:8

flown 132:4

flyer 71:13,18

flyers 70:17 87:15 88:6

focused 44:8

follow-up 6:5 40:3 201:5

Food 88:13

footer 71:15

foreclosure 169:14,25 170:11 171:11

forever 72:17

forward 138:25 140:17 146:13 162:4,21 163:20 167:25 168:5 169:8 171:18 199:4,19

found 20:4,9 60:6 170:10 171:21

fourth 152:14

Fox 7:2,7 126:21 127:13

Foy 147:9

frame 84:1 168:15

Francis 22:10 45:3 63:6 68:21 189:13,19 191:18

free 76:15,25 77:23 145:3

frequent 53:16

friends 40:20 91:7 179:23 185:23

front 22:3,5,6,14 32:5,7 33:22 37:22 56:11 77:8 99:12 112:19 117:3 133:16 177:23 178:20

frustrated 65:1 67:16,21 78:22 98:14 99:8 101:4

frustration 68:17 90:19

full 65:14,18 66:6,8 76:12 158:20 160:14 161:13 162:6,23

full-time 20:23

## G

Garey 108:22,23

gave 9:2 27:15,21 50:10

gender 97:10

general 89:15 98:2 123:7 134:7

generally 74:20 78:8 90:22

gentleman 14:7

give 30:9 44:19 55:2 76:15 114:24 171:20 173:13 178:16 183:7

giving 123:7

glance 59:17 200:17

glasses 106:20,23,24

goal 88:15,17

good 5:23 39:17,20 53:8,19 74:11 121:19

Google 93:6,9

grabbed 32:9

Grady 171:14 172:9,12

grass 171:2

greater 148:12

Greve 51:20 60:13,22 76:12 115:17

Greve's 77:12 81:13

grew 95:11

grocery 70:14,15 87:21,23 88:2, 7

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA3833

ground 52:23

Group 49:9 100:9 114:15

grouped 108:17

grow 9:8

guard 12:14

guess 6:17 27:21 28:15 64:22 69:19 74:13 84:10 111:16 145:7 177:22,24 184:23 188:9,21 190:25

guessing 66:5 144:20

guidance 71:24

guilty 156:21,25 160:3 163:10, 14,18

gun 132:2

guys 101:6

**H**

habits 94:25 95:1

hair 122:2,8

half 18:1 76:23 95:13

hand 7:5,13 18:6 27:4,7 52:6 96:4 101:17 125:2,14

handed 117:18 118:3 145:24

handing 8:13 48:6 51:1 54:1 101:20 135:21 137:9 139:21 141:21 143:14 145:19 149:21 152:2 153:6 157:14

handle 185:17

handwriting 117:11,13

Haneefah 159:2,3

HANEEFAH-KHADI 5:3

Haneefah-khadij 158:24

happened 21:6 23:2,5 24:8 26:17 27:5 31:18 40:6 42:2 45:1 73:22 76:14 77:3 89:10 101:3 113:3 141:13 156:18 175:1,8

happening 21:4

happy 53:2

harassed 88:21 194:6

hard 71:15 90:10

Hardee 115:18

harder 32:11 177:21

Hardison 115:16

Hargett 12:24,25

harm 50:19 111:1,10

harmed 50:16,20 52:1

Harrison 147:12

Hasler 100:15

Hatch 109:13 110:2

head 6:2 64:24 66:4 71:8 87:11 153:1 200:15

headaches 37:25

heading 148:9 166:11

hear 6:21 82:13 101:11,14 122:24 147:25

heard 58:4 60:22 61:9 64:2 82:5, 10 108:13 110:1 150:2 164:22 166:18,25 169:20 171:14 176:6 181:25

Heather 150:21,25 169:23

Heatherbrook 166:18,21,23 168:7,11 169:1,23 171:9

held 8:2 81:18

helped 23:12

helpful 61:17,23 62:2,6,9,10,11 78:15 177:9 186:25 187:2

helps 116:6

Hey 80:10 107:20

high 9:11,20 71:4 93:11,14

highlighting 117:5

highly 128:9

highway 25:3,5 165:7

hill 31:21

hire 45:23 58:21 59:1 60:4,18,22 61:1 74:19,25

hired 183:13,17 185:3,5,17

history 20:22 97:22

hit 22:2,3,4,18 24:5 28:11 32:14 34:20 37:19 62:23 63:2

hold 55:5,7 168:19,21

Holmes 7:1,5,12,15,18,22 8:8,11 9:1 13:17,21,24 14:2 53:4,8,22 55:1,5,7,16 101:25 102:6,9,12 107:2 114:8 116:3,5,11,16,19 123:4,9,11,14,19,23 124:15 125:19 153:19,23,25 157:9,20,23 158:6 168:14,19,21,25 169:4 171:20 172:3,6,20 173:2 187:24 188:4 197:18,20 200:3,9,16,18 201:2

home 28:19 36:17,21 37:5 42:5 48:23 65:24 78:25 94:11

Homecomings 127:19 170:12

Homeowners 167:1 169:10,17 170:7 171:10

homework 88:21,22 89:5

Hope 21:13

hopping 173:17

hospital 36:18,23

hotel 131:16,21

hour 33:2,9 76:23

hours 65:12 119:12,18,19 167:5 173:7

house 31:1 35:13 57:13 58:16 60:16 63:25 68:25 69:13 79:4 93:15,21 94:22 99:6 170:10 171:5

houses 64:4

Howard 56:7 57:10 58:2,11

hundred 19:4

hundreds 72:1

hurt 37:8 111:4 182:12,21 183:4

hurting 74:2

husband 13:10,15 14:8 176:9, 20,24

husband's 14:22

hut 15:18 16:12 66:3

Hutson 56:8

**I**

ibuprofen 38:7

ID 166:6

idea 112:16 172:16 178:8

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA3834

**identification** 8:7 18:4 48:3
50:24 52:4 53:24 96:2 101:18
117:1 124:25 125:16 132:22
135:19 137:7 139:19 141:19
143:12 145:17 149:19 151:25
153:4 157:12 179:13 187:10
191:11

**identified** 54:17 115:10

**identity** 193:21,24

**immediately** 23:3 24:2 65:8
73:25 83:3 99:23 168:17,20
172:18

**impact** 21:22,23 34:12 35:5
37:22 194:20

**important** 5:19,25

**improprieties** 127:20

**incident** 166:1

**incline** 177:21

**including** 99:25 127:1

**incorrect** 31:15

**incur** 194:12

**incurred** 75:7

**indicating** 192:3

**Indifferent** 188:20

**individual** 15:25 114:4

**Individually** 59:11

**inform** 117:23

**information** 13:25 29:19,25
35:22 61:17 67:6,10 74:10 79:22
91:4 93:20 94:25 96:14 98:8
99:25 105:10 106:12 123:9
175:17,18 177:9 180:5,11 187:5,
6,22,23 188:7,8 190:11 192:13
195:21 196:3,9 199:9

**infractions** 156:5

**Ingle** 171:15 172:9,12

**Ingram** 28:25

**initially** 25:9 38:14 66:19

**initiate** 112:2

**injured** 74:11 80:15 192:18 193:6
195:13,25 196:10,16,18

**injuries** 44:5,6 73:15 110:17
113:5 120:10 193:14

**injury** 45:24 46:10 61:21 76:15
77:4,23 89:2 120:9 132:14 181:20
184:7 185:18 193:16 194:23

**inside** 51:18 59:15

**Instagram** 40:10 180:20,25

**instance** 152:10,24

**instances** 130:7

**instant** 22:25

**instituted** 171:11

**insurance** 41:14,16 62:22 63:1,
7,21 64:2 69:6 70:24 71:20,22,23
74:22 75:2,13,16 76:4 80:8,9,10,
19,22 81:1,3,22 82:6,8,23 157:6
161:2,10,24 162:2,13,19 183:8,23
184:17,18,21

**insured** 82:6

**interests** 62:24 63:3,8 73:4
199:15,19,20

**internet** 89:8 185:25 188:10,14

**interrogatories** 7:3,8 122:16
126:4 128:13 175:3

**interrogatory** 124:22 125:11,23
127:14 199:10 200:4,10

**intersection** 28:25

**interstate** 19:16,18,20

**interview** 183:7

**intoxicated** 177:7

**invaded** 86:10

**investigating** 24:11 105:7

**investigation** 25:15

**involved** 18:15 19:22 78:11
103:24 105:1 126:15,25 128:9,22
169:24 196:13,19

**involving** 127:20

**issued** 155:17

---

**J**

**jamb** 139:7 146:11

**James** 108:22 167:3,7 168:2,23

**January** 140:4,12

**jarring** 21:20,21 35:5

**Jennings** 144:4

**Jersey** 9:10 95:12,15 156:16
164:18,25 165:1,5,14,22

**Jesse** 9:15

**job** 20:23,25 173:24

**jobs** 174:2

**join** 112:11

**joined** 118:18

**Jonathan** 109:13

**Jordan** 56:20 57:11 58:1,11

**judgment** 121:25 122:12 154:19
155:2 168:11,12

**July** 18:19 19:9,11,23 29:8 35:20
36:16 39:21 45:25 46:15 47:24
58:16 64:8 75:8 76:14 77:4 82:18
83:17 99:7,25 100:5,6,11,16
101:9 104:24 105:22 112:23
149:16 153:17 177:5

**jump** 23:2 31:14 33:25

**jumping** 148:15

**June** 137:4 139:17,18 149:15,16

**junk** 17:9,13,14 69:15,17

**jury** 90:13,17

**Justin** 108:25

---

**K**

**K-H-A-D** 159:6

**Kaneefah** 159:1

**keeping** 119:14

**Kelly** 109:20

**Kent** 108:23

**key** 16:3,5

**Khadij** 159:6

**kick** 68:13

**kind** 13:13 23:6 24:24 26:6 31:23,
25 32:19 36:10 58:14 64:7,24
68:14,17,18 71:4,15 72:6 80:12,
16 85:25 90:22,25 93:18 122:10
132:20 133:2 159:10 164:2 166:9

**King** 166:15

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA3835

**kiosk** 15:20 66:2

**knee** 37:14,16 38:19 39:7,8 40:4 45:9 53:17 74:2

**knew** 30:22 36:13 40:13 46:12 58:10,25 61:20 76:21 77:21 82:17 83:3,4,12 112:3 181:17

**knocking** 64:3

**knowledge** 72:11

**Kohl's** 70:17

---

**L**

**labeled** 200:5

**landlord** 137:25 138:6 140:21 141:5 143:2 144:13 145:2 146:4 150:15 152:19 155:6

**Lanier** 49:9,18 50:6 60:13 61:1 100:9 114:15

**Lanier's** 81:14

**Laningham** 114:15 115:15

**Laningham/greve** 135:2

**laptop** 106:10

**large** 158:3

**lasted** 47:10

**late** 28:19 138:16,18,19 144:15 145:3,4

**law** 11:24 19:2 25:7,14 30:15 36:3 47:14 49:9 54:16 56:8 57:11,17, 20 58:2,4,7,21,25 59:5 61:7,21 64:9,10,14 76:15 79:24 81:11 82:1 89:2 99:4 100:9,24 107:13 109:24 112:23 113:23 114:1,15 173:10 183:19 185:16 186:2,4 193:3,6 195:9,11

**laws** 175:22

**lawsuit** 13:5,13 20:7 45:3,6 50:15 57:21 82:22 83:14 88:16 101:12,17 103:4,25 104:11,19 105:1 109:23 110:2,4 112:3,7,9, 11 113:23 114:1,3 118:3,24 120:10 121:2 128:10 133:9,10 138:1 143:18 167:14 175:2 176:7 184:11 192:25 197:14 198:15 199:13,14,17,18

**lawsuits** 83:6 129:4 192:17

**lawyer** 30:8,18,20,22,24 31:1 45:23 46:3,16 47:21 49:25 50:2 72:16 75:4 88:23 89:4,5 98:24 101:5 120:8 156:19 170:9 183:14 184:17 185:21

**lawyer's** 58:9

**lawyers** 20:17 46:10,19 47:6 50:6,12 60:14 66:6 74:20,25 77:4 78:21 88:8 89:3 99:7 111:14 113:7,19 121:5

**learn** 85:15 181:23

**lease** 138:12 140:7,8

**leasing** 151:7

**leave** 28:25

**leaving** 28:8,12,13

**led** 176:14

**Lee** 133:19

**left** 22:4,9 32:23 71:17 96:22 99:23 142:5 143:21 161:19 162:6 191:17

**left-hand** 34:4

**legal** 12:2 36:4 51:12 56:12,20 57:11 58:1 61:24 74:19 174:9

**legs** 37:12,13

**letter** 35:13 47:21 49:8,12,13 51:20 77:13,22 78:16 79:3 100:5 107:19 113:18,22 115:9 172:13 183:14,18 195:9,13,16,17,22

**letters** 20:17 47:6,13,25 50:16 58:18 64:10,19 79:24 80:19 88:8, 17,18 89:11 110:24,25 111:4,7,22 113:7,23 115:8 183:18 193:10,12

**liable** 118:13

**license** 27:9,11 29:19 84:13,21 105:9,10,11,15,17,23 106:3,13,18 130:5,8,16 131:1,7,13,22,24 132:8 157:3 163:5,11 175:19 178:21 189:14 190:2,5,13,18,19 191:22 192:14

**lick** 99:18

**liens** 155:22,25

**life** 9:6,17 95:13 130:8,9 194:21

**lifetime** 72:3

**limit** 32:2,24 33:5

**limitation** 127:2

**lines** 160:25 161:18 162:11 163:3 164:8 165:19 191:20

**Lion** 88:13

**Lisa** 49:8,18 50:6 60:13 61:1 81:14

**List** 94:14

**listed** 33:9,24 34:19 110:8 115:21

**lists** 163:17

**literally** 17:16

**litigation** 126:24 127:2,3 128:23

**live** 5:13 97:3 150:4 174:19

**lived** 9:6,16 11:19 13:2 160:6 170:20

**lives** 13:8

**living** 11:17 13:14 14:10 15:4 136:8 137:20,23 139:5 143:9 144:8 146:1 159:12 160:7,17

**LLC** 154:5

**loans** 155:24

**local** 89:15 99:4 107:13

**locally** 10:20

**locations** 12:16 19:5

**Locking** 155:6

**Loebsack** 150:22 151:3

**log** 91:15 119:14

**long** 10:15 11:15 12:3,6 13:2 28:7 31:11 39:20 132:18

**longer** 65:12

**looked** 36:10 48:14 95:24 96:18 124:12,21 125:8 179:20 186:4 190:18

**lose** 82:3,4 111:21 194:15,17

**lost** 38:2 83:14 87:9 182:15

**lot** 46:2 66:23 133:4 166:17 171:25 173:17

**lots** 196:13

**Lucas** 167:3,7 168:2,23,24

---

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

JA3836

# M

**M-O-R-R-I-S-V-I-L-L** 11:10

**Macdonald** 150:22 151:1

**Macy's** 65:20 70:21

**made** 38:17 50:19 66:14,16 67:4, 21 68:5 99:8 175:7

**Magistrate** 136:18 139:1 140:18 144:21 146:14 151:11 152:15 154:8,13

**mail** 15:6,8,10,13 16:9,10,13,20, 23 17:7,9,13,14,23 20:25 30:20, 25 46:6,19,22,25 50:12 58:15,22, 24 59:2 60:12,17 61:7,16 64:9,14 65:25 66:2,6,12 67:3,10,22 68:1 69:13,15,17,25 70:4,8 78:21,25 79:10,16 80:5,9,13,16 81:9,16,21, 25 82:1,2 84:22 85:21,22 86:1,10, 18,22,23 87:6,9,24 89:25 99:7 100:20,21,24 101:3 104:10 107:8 165:4 184:2

**mailbox** 15:13 79:1

**mailboxes** 15:17 16:1 66:3

**mailed** 84:17 87:12 93:15,21 99:20 100:5,11 124:9 187:3

**mailer** 49:18 52:12 100:9,15 197:8

**mailers** 52:20 55:12 59:10 88:10 110:14 176:25 186:1 197:12

**mailing** 30:8 49:2 51:9,15 54:16 56:2,24 99:17

**Mailings** 66:10

**maintain** 91:2

**major** 14:23 15:5 21:9

**majority** 37:13

**make** 5:22 28:18 63:5 64:18 79:12,15,18 98:11,13 107:19 121:18 123:4,5 124:1,3 141:7 199:18,23

**makes** 88:6 115:3,4 180:15

**making** 29:8,9 34:4 147:6

**mall** 70:21 87:16

**man** 109:12,18,20

**Maps** 93:6,9

**Marbles** 12:18

**Marcari** 52:15 60:13 71:11 100:14 114:13 115:14

**March** 143:21

**Marco** 180:23

**mark** 8:3 109:18 116:11,12,22 124:24 135:17 187:8

**marked** 8:7,14 18:4,7 42:19 48:3, 7 50:24 52:4 53:24 54:2 55:3,4,7 96:2,4 100:16 101:18 117:1 124:25 125:16 132:22 135:19,21 137:7,10 139:19,21 141:19,21 143:12,14 145:17,19 149:19 151:25 152:3 153:4,6 155:18 157:12,15 165:20 179:13,16 187:10 191:11

**Marketplace** 94:14

**marking** 191:10

**married** 14:4,18,19

**matter** 7:19 116:13 188:13 199:25

**matters** 168:18,24 198:2

**Matthew** 97:15

**Mcneil** 5:3,11,12 7:24 8:13 14:15, 16 54:1 55:17 105:2 107:6 128:9 137:18 142:1 147:5 157:14 158:10,24 172:11,18 173:6 179:15 188:7 197:7,21 198:5 200:19 201:7

**Mcneil's** 7:7

**means** 77:7 190:1,3

**media** 40:7,16 178:24 180:18

**medical** 10:5,7,13,18 37:7 38:6, 14,24 73:14 74:4 75:7,8 182:11, 21 194:12

**medications** 53:11,15

**meet** 113:9

**meeting** 120:9,15

**member** 114:25 115:3,4,25 122:5 128:4 176:9,18

**members** 104:16,20 119:1,5 199:14,15,20

**membership** 94:18

**memory** 51:25 53:16 116:6 161:8

**meniscus** 39:10,11

**mental** 111:9

**mentioned** 66:25 126:14 156:3 160:11 166:2 173:7

**met** 68:21 108:20 109:1 120:8 179:21

**metal** 15:23

**middle** 9:5 24:15,19 32:19,24 34:11 48:21 54:11 97:22 158:22 159:3 160:2 163:13 164:2 190:11 192:1

**Midweek** 69:19

**Miguel** 45:6 68:22

**miles** 33:2,9

**milk** 81:7

**mind** 72:1 123:7 157:20 197:6

**minute** 53:7

**minutes** 28:22 53:5 59:13,23 68:10

**missed** 45:15,20 75:17,23 76:6 83:12

**missing** 65:7

**Mission** 150:2 151:7

**model** 85:22

**Moffat** 108:24

**moment** 24:6 48:9 96:7 101:22 135:22 137:10 145:20 172:21

**monetary** 104:4

**money** 63:11,18 71:22 72:17 74:21 75:1 77:8 82:3 83:7,14 118:10,23 119:7 127:17 128:17 167:17 182:20 194:17

**month** 84:4 142:18 144:10 145:3

**monthly** 144:9 145:15

**months** 35:17 39:23 73:13 74:7 75:9 76:1

**Morrisville** 11:8

**mortgages** 127:20

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3837**

**motor** 104:25 176:21

**motorist** 21:23 25:18 26:24 82:6, 8,21 183:11

**motorists** 63:20

**move** 11:18 21:23 139:15

**moved** 32:14 34:25 35:3,6 149:15 167:23

**moving** 7:22 23:1 115:12 149:1

**multiple** 68:14,15 112:10 141:15

**Municipal** 165:21

**museum** 12:18,21

**MVP** 88:13

**Myspace** 180:20 181:6

**N**

**Nagle** 57:3,12,23

**Nah** 44:15

**nail** 6:5

**nails** 121:14,18 122:11

**named** 55:12 109:12,15,18,20 118:19 171:14 193:7 196:22 198:11 199:12

**names** 108:16 112:18 133:15 196:14

**Nancy** 174:13,15

**narrative** 34:1,3

**Nationwide** 41:16,19 42:15 43:3 44:1,4,11 62:14 63:7,24 67:12,13 69:6 72:8 183:22 184:5,19 185:1, 18

**Nationwide's** 42:11 63:18

**natural** 115:6

**Nature** 164:3

**NC** 163:24

**neck** 37:12

**negotiated** 152:25

**neighborhood** 170:21

**neighbors** 40:21

**news** 92:8,9,11,19,22

**newsletter** 93:17

**Newton** 159:11,12

**Nicholson** 109:16

**night** 37:2,6 111:21

**nods** 6:2 66:4 87:11 153:1 200:15

**normal** 78:24

**North** 9:9 10:19 57:6 77:5 89:19 95:18 96:17 109:23 136:11 138:19 139:5,9,15 140:12,22 143:9 146:2 147:25 149:11 152:10 154:4 156:15,17 166:11, 15 168:6,15

**notes** 26:21 27:1

**notice** 128:5 136:22 142:4 143:17 152:18,20

**noticeable** 73:15

**notified** 127:16

**number** 27:9 32:22 42:5,9,12,16 67:14 105:9,11,17 158:7 169:9 179:10 192:8 194:23 195:1

**numbered** 54:10,11 55:16

**numbers** 42:23 71:14 117:5,15 191:4

**nurse** 10:3

**nursing** 9:25 10:1

**O**

**object** 6:21

**objection** 6:23 127:6

**obligation** 71:23 121:5

**obtained** 105:7 195:11,20 196:8

**obtaining** 78:4

**obvious** 185:11

**Ochoa** 45:7 68:22

**October** 142:6,24 143:10

**offense** 159:21 161:1,23 162:12 191:21

**offer** 199:24

**offering** 43:7 70:9,11

**office** 124:8 151:7 185:8

**officer** 24:11 26:9,12,15,16,19 27:4 28:8 29:7 34:19 35:9 105:7, 22 186:9,15 189:3,7 190:17

**officer's** 25:12

**officers** 25:8

**OL** 190:1 191:2

**OL/FAILED** 189:23

**one-stop** 98:5

**ongoing** 132:15

**online** 95:25 98:9,16,21,25 99:4, 10

**onsite** 12:14

**open** 16:3,5 17:10 58:16 59:2,17 79:7

**opened** 16:23 17:11 23:11 57:15 58:17,19 59:4

**opening** 17:7 49:12 58:18,24 59:6

**Operate** 161:1 162:12

**operates** 10:13

**operating** 104:25 161:9,23 162:19

**operation** 45:10,15

**operations** 197:23

**operative** 133:9

**operator's** 157:3 163:4,11 190:2 191:21 192:14

**opposing** 192:24

**opposite** 26:4

**Order** 149:1,2

**original** 7:6 8:8 33:8 174:24

**originally** 95:11

**Orthopaedic** 39:2

**oversee** 121:5

**overwhelmed** 64:20,22 66:15, 17,18 78:22 99:9 101:4

**overwhelming** 66:20

**owed** 167:17

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3838**

---

**P**

---

**P.M.** 201:10

**packet** 136:5 149:24

**pages** 48:18 49:15 51:18 54:10 55:20 102:1 135:13 136:21 138:25 140:17 146:13 154:7,12, 18 157:17 160:5,13 161:12 162:5, 22 163:21 166:9 167:25 168:5,6 169:8 171:18 180:20

**paid** 140:25 141:2 144:15 145:10 148:4 151:20 165:11 167:23 169:19

**pain** 37:9,11,14,15 38:5,19 45:9, 14 83:4,7 110:22 182:20

**Painting** 171:5

**Pam** 144:4

**paper** 27:5,7 54:24,25

**papers** 139:7 140:22,25 141:6,10 144:14 148:3 184:13,24

**paperwork** 84:17

**paragraph** 71:18 72:15 73:9 74:16 77:13 78:1 104:22 105:6 114:12 115:1,10,12 116:1 117:19 134:7,11,25 135:6

**Paragraphs** 134:10

**Parker** 108:23

**parking** 171:3

**Parkway** 57:6

**part** 39:5 65:15,17,19 79:20 99:21 118:5 121:22 180:12 191:17 200:13

**participate** 199:7

**participating** 198:15

**party** 84:11 103:25 114:4 129:4 172:8,12 192:24 193:1

**past** 175:8

**patch** 43:15,18 63:15

**patrol** 106:2

**pay** 43:7 76:22 77:8 87:1 118:16 129:22,23,24 136:15 146:5 149:13 167:16 170:22 182:11

**payment** 104:4 141:7

**payments** 141:8

**penalties** 171:2

**people** 16:20 22:23 61:24 62:5,9 72:10,11 74:11,25 75:1 77:22 78:11 83:6 84:25 89:3 90:17 108:16,18 109:1,7,10 110:7,8,12 112:8,10,13,19 133:16 151:8 158:12 174:2 189:2,6,9 192:17 196:13,14,16,17 199:12

**people's** 64:4 158:14,17

**percentage** 77:9

**Perfect** 9:4

**periodic** 198:23

**permanent** 73:15

**person** 27:2 44:2,4 62:14 90:24 97:12 98:6 113:10 121:19 122:10, 18 124:8 197:6

**personal** 45:24 46:9 61:21 76:15 77:4,23 89:2 120:9 132:14 181:20 184:7 185:18 199:20

**personalized** 86:1,9

**personally** 61:12 108:18 128:1

**persons** 115:6

**pertained** 200:25

**pestering** 111:18

**phone** 23:22 40:9 42:5,7,9,12,15, 23,25 43:21,24 67:14 69:3 85:12 91:19 107:19 109:4 111:19 122:19,20 198:19

**photocopy** 7:13,16

**photographs** 43:20,24 44:2

**physical** 37:15 44:5 83:9 110:17, 22 111:1,2 113:4

**physically** 32:14

**pick** 16:12

**picked** 29:2 93:1

**picks** 36:17

**picture** 15:12 27:5

**pictures** 23:21,23 24:1,3 40:9

**piece** 17:7 27:4,7 30:25 68:10 85:22

**pieces** 17:23 58:15 66:11 67:3, 22,25 82:2 85:21 86:9 100:20,24

**Pierce** 114:14 115:15

**pile** 16:19 17:20

**place** 12:17 16:25 97:18 169:5

**places** 41:5

**plaintiff** 104:24 127:1 128:23 143:3,5 148:11 149:6 152:20 172:8 198:11

**Plaintiff's** 150:21

**Plaintiff-driver** 105:18

**Plaintiff-driver's** 105:8,13

**Plaintiffs** 55:12 114:15 115:19 118:19 196:22

**plan** 59:1 112:14 120:21

**planning** 15:1

**plate** 84:21

**play** 44:18,19

**plea** 160:3 163:14

**plead** 156:21

**pleading** 156:25 163:10

**PLLC** 56:20 115:15 150:22

**Pluries** 144:22

**pocket** 63:18

**point** 126:17 140:7 158:1

**pointing** 6:4,6

**points** 6:22

**police** 24:10 30:9,12 98:20 107:20 186:15 187:2 189:3,7

**political** 69:24

**polling** 97:13,18

**Polo** 180:23

**pop** 92:19

**pops** 92:15 187:18

**populated** 105:12,16

**Portales-rios** 22:11 45:4 68:22 130:24 189:13,19 190:4 191:17

**Portales-rios's** 63:7 190:10

**portions** 200:20,24

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3839**

**possession** 143:3,6 149:6 155:12

**possibly** 127:16

**post** 40:7,16,18 98:21 147:16

**posted** 98:9,24 99:4,10 107:9 147:22

**posting** 147:2 148:24

**potentially** 83:13

**premises** 143:3 149:7 155:7

**preparation** 124:21 125:8,21 200:19,23

**prepare** 122:14

**prepared** 54:5

**preparing** 124:17

**present** 54:18 148:17 154:23

**press** 177:21

**pressure** 71:3,4

**pretty** 35:18,19,21 41:25 59:25 61:18 65:21 73:22

**previous** 190:9

**primary** 98:1

**Prime** 94:18

**printed** 96:21

**printout** 191:16

**printouts** 166:10

**prior** 11:4 18:19 19:1 28:11 30:3

**privacy** 86:11 88:3 90:23 91:2,12 107:12 175:10

**private** 84:11 90:23 107:17,18 179:5,6,7 180:1,3,13,16,17 181:1, 3,5,7,11 187:6,23 188:8

**probation** 156:23,24 159:25

**problem** 195:15

**proceeded** 127:3

**proceeding** 129:14 171:19

**proceeds** 199:19

**process** 68:6 88:20 140:23

**Produce** 54:15

**product** 92:13 123:5,6

**products** 94:21

**profile** 179:21 180:12,16,25 181:2,6

**profiles** 181:7

**Properties** 166:16

**property** 19:4 113:5 155:12 182:21

**proposed** 133:10

**protect** 198:11

**Protection** 175:11

**proved** 148:11

**provide** 13:24 199:9

**provided** 180:12

**psychological** 111:10

**public** 107:9,16,18 179:5 181:13 196:6,9

**publicly** 98:9

**pull** 108:1

**pulled** 22:6,14 177:22 178:20

**pulling** 32:7

**pulls** 32:4

**purchase** 86:3 130:13

**pursue** 198:12

**put** 16:19 17:20 40:10 61:14 90:10,18 91:3 99:12 100:20 107:16 133:3 149:6 180:6 194:23, 25 199:19

**puts** 107:13

**putting** 171:1

**Q**

**qualified** 127:17

**quality** 166:10

**question** 6:5,14,17,19 13:18,22 54:15,19 116:19 117:19 123:19, 24 124:4 126:21,23 127:11 184:23 188:6

**questions** 5:18 6:1,13 18:18 102:5,10 104:8 107:24 128:13 133:4 134:3 172:23 177:4 181:16 197:17 200:6 201:2,5

**quick** 35:18,19 59:18 73:12

**quickly** 35:21 107:24 173:20

**quit** 58:18

**R**

**race** 97:7

**radio** 61:9 101:14 176:6

**raised** 95:12

**Raleigh** 5:15 9:6,9,12,17 10:20 11:7,17,19 12:17,19 30:12 57:6 98:20

**rate** 142:17

**reach** 113:4,6

**reached** 67:12

**read** 35:25 59:6,23 71:15,18 72:4, 19 73:7,17 74:23 77:14,18 78:6 79:9 93:24 94:4 101:25 105:3,19 126:11 127:4,21 129:1 148:13 149:8 175:22,24 190:23,24 199:2

**reading** 59:10 61:15 66:16 94:8 96:8 106:23 185:11

**ready** 123:12

**real** 59:18 74:18 155:12

**realize** 107:9

**rear** 22:2

**reason** 53:10 74:18 147:15 174:3 193:23 194:2,8 197:7,10

**recall** 12:10 16:22 18:23 20:19 23:13 26:11 37:1 38:1 43:8 44:3 53:16 65:9,18 68:15 75:18 85:3,4 102:25 128:22 130:11 133:1 136:8 157:7 158:13 170:25 171:8 177:2 197:5,24

**receipt** 110:24

**receive** 66:19 69:12 74:20 75:1 78:20 83:7,14 104:3 118:24 127:17 165:4 197:8

**received** 14:20 30:18 35:13 51:7 52:11,13 54:16 58:15 60:12 81:9 89:12 104:10 115:8 119:7 128:5, 18 162:2 164:17 183:15,18 185:24 186:1 193:12 195:8,17 197:12 198:23

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3840**

**receiving** 7:9,15 50:16 51:17
60:16 99:7 107:8 110:25 118:23
162:18

**recipient** 16:19

**recognize** 17:8

**recollection** 127:15 162:1
179:25

**record** 5:10 7:20 8:2 58:14 77:14
107:17 158:15,18,21 160:6 164:4
168:1 169:9,12 200:14

**recorded** 44:12,16,22 69:9 183:7

**records** 96:15 119:15 163:24
168:4

**recover** 182:15,20

**recovered** 39:17

**recovery** 77:9

**Recreation** 166:21 168:8 169:1
171:9

**redacted** 49:15

**reddish** 99:16

**redeem** 87:25

**refer** 38:23 102:6

**reference** 168:15 172:6

**referred** 9:2 108:13

**reflected** 132:14

**refresh** 116:6 179:25

**refused** 143:4

**registered** 95:5,14,17,21 97:5

**registration** 27:17 84:14,21
95:25

**regular** 145:15

**Reich** 5:9 7:1,4,12,14,17,21,23
8:3,6,10,12 13:19,22 14:1,3,6
18:5 50:25 52:5 53:6,9,25 55:4,9,
19 96:3 101:19 102:3,8,11,14,16
107:1,3,5 108:6,8 116:7,9,12,18,
20,22,25 117:2 123:8,10,13,15,21
124:6,16,24 125:1,17,20 132:23
135:17,20,24 136:2,4 137:8
139:20 141:20 143:13 145:18
149:20 152:1 153:5,21,24 154:1,3
157:8,13,22 158:2,8 168:14,17,
20,23 169:3,6,7 171:21,24 172:4,
5,8,10,22 173:7 181:16 197:21,24

198:1 200:3,8,15 201:4

**Reich's** 123:23

**Reilly** 108:24

**related** 84:18 101:12 113:22
167:7 191:16 198:2

**relationship** 66:7

**release** 184:4

**relevant** 54:18

**remember** 12:8,12 19:5,15,19
20:16 21:4 22:20 23:10,17 25:7,
11 26:2,12,15,22 27:3 30:15
31:11 35:5,15 38:2,4,11 39:20
41:13,22 44:24 45:13,16,18
46:24,25 47:12,13 48:1 49:8,11
51:17 52:19 57:12,15 60:20 65:7
84:22,24,25 85:8,11,20 95:20,22,
23 102:22 113:17,21 124:4,7,12
128:12 129:3 130:24 131:3,6,15,
20 132:7,11,18 134:3 136:14
137:3,20,25 138:3,6,15,22
140:11,14 141:12 142:8 144:8
145:12 147:24 148:19 149:10
150:14 156:18,22,25 157:1
159:11 160:7,22,24 162:18 163:7,
10 165:6 167:21 169:22,24 170:2,
20 171:1 178:4,5,10,12 180:24

**remind** 174:18,23 177:12 179:9

**removed** 149:5

**renew** 138:13

**renewing** 138:12

**rent** 136:15 138:3,7,11 140:3,12,
25 141:2,7 142:17,23 144:9,14
145:2,15 146:5 148:5 150:16
151:6,22 167:16 174:21

**rep** 11:3

**repair** 39:9

**repeat** 183:16 188:6 195:14
200:22

**rephrase** 6:16 61:5 87:5

**replace** 130:23

**replacement** 83:18,25

**report** 18:13 29:9,10,13 30:16
31:2,8 35:14,22 36:14 49:16,20,
24 50:7,13,19,21 51:22 52:16
62:3 98:19 100:3 107:7,21 124:13
183:24 186:10,16,20 187:6,13,19,

22 188:3,14,22 189:4 190:9 192:9

**reporter** 5:22 8:4 116:24 130:5
179:11

**reports** 36:11 99:3,10 158:12

**represent** 20:18 54:4 60:4 78:3
104:20 112:14 133:7 179:20
183:3 187:12 191:15 199:15

**representative** 176:1,4

**represented** 49:19 51:6 57:10

**represents** 48:17 173:9,10

**request** 155:6 200:12

**required** 110:17

**research** 81:10

**RESERVED** 201:9

**resolution** 152:25 167:22

**resolved** 72:18

**respond** 198:18

**responded** 198:17

**response** 125:23 127:10 200:12

**responses** 124:22 125:11
199:10 200:4,11

**responsibility** 71:21

**rest** 9:16

**restrictions** 106:17

**result** 127:17,19 130:23

**results** 187:18

**Return** 87:13 147:6

**returned** 198:19

**revealed** 123:6

**reverse** 49:5

**review** 200:20,24

**reviewed** 122:16

**rewards** 88:12

**ridden** 182:8

**Riddle** 114:14

**Ridge** 167:10,11,14

**rights** 104:13 198:12

**ring** 165:24

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA3841

**rip** 17:25 18:1 59:17

**road** 21:10,13 25:4 89:18 159:11, 12

**Rob** 122:17,18 125:17 174:14

**Rob's** 54:25

**Roberts** 115:16

**role** 121:1

**room** 38:12 122:23 131:16

**roughly** 12:8 24:8 33:12

**rules** 52:23 175:22

**run** 28:14 38:15 158:11

**running** 64:24

**runs** 21:10

**Russotto** 52:15 60:13 71:11 100:14 114:14

**S**

**Saint** 97:15

**sale** 87:18 94:10

**salon** 121:15,18 122:2

**Sanderson** 9:15

**sat** 23:4

**save** 63:11 71:21

**saved** 81:25

**scan** 106:6

**scanning** 105:14

**Scary** 21:19

**scenario** 195:24

**scene** 28:8 105:21

**schedule** 53:12 65:22

**school** 9:11,14,20 89:3 93:11,14, 15

**scrolling** 92:8

**search** 158:11 163:25 166:12 168:7,16 180:6

**Sears** 70:23

**seat** 166:4

**seatbelt** 166:7

**seconds** 59:16

**section** 33:5 42:22 154:22

**security** 12:13,14

**seek** 37:7 38:5 74:4,19

**sell** 85:1

**send** 39:1 43:19 46:5 50:13 69:17,20 80:9 86:22,23 89:24 93:17 107:19

**Sender** 87:13

**sending** 58:21 67:10 70:1,3 80:19 138:22

**sense** 111:16

**sentence** 73:8 77:25 115:13 128:8,16

**sentences** 73:8,17 77:18

**separate** 115:21 120:14,15

**September** 150:14 162:16

**series** 5:18 107:23

**serve** 7:1

**served** 147:2 148:23 162:15 175:3

**service** 11:3 93:24 94:5

**Services** 51:12 56:12,20 57:11 58:1

**set** 7:8 9:5 48:5 180:17 181:5

**settings** 91:13

**settle** 64:4 72:2 74:21 184:7 199:25

**settled** 132:15,16,17,18 184:16

**settlement** 73:12 78:4 88:19 90:3 104:4 184:13 199:24 200:1

**settles** 72:1

**settling** 70:25

**shaped** 121:21

**Shaterika** 109:15

**sheet** 117:23

**Shelton** 7:6,9,11 9:2 55:6 108:5 123:17 136:1 172:25 173:5,6 179:9,14 187:11 188:1,5 191:12 197:16 201:6

**Sheriff** 147:6,12 155:6

**sheriff's** 98:20 147:16

**Shield** 10:19 11:5,15

**shifts** 65:13

**shocking** 21:19

**shopping** 94:25

**shops** 47:1

**shortly** 8:10

**shoulder** 25:4,6

**shout** 25:22

**show** 27:23 28:2 29:15 64:10 130:4,7 132:7 165:12 179:15 187:8 191:9

**showed** 19:3 24:11 131:24 198:1

**shows** 26:9

**shred** 17:23

**sic** 91:21 177:23 183:18

**side** 9:5 21:8 22:4,9 24:10,18 25:2 26:4 32:23 37:20 49:5 61:15 71:17 73:7 133:3 145:7 148:6

**sign** 7:24 8:20 69:7,10 85:14 88:9

**signature** 147:6 155:17 201:9

**signed** 8:19 113:21 126:4

**signing** 113:17 126:12 184:4,24

**similar** 109:22 125:7

**similarly** 109:12 199:13

**simple** 156:10 159:18,21

**sir** 7:11 16:7 102:14 172:5

**sit** 24:5 68:8 121:17

**sitting** 23:17 171:8 185:8 186:22

**situated** 199:13

**situation** 144:12 151:19 167:6

**size** 56:24 157:24

**skimmed** 93:25 94:7

**skip** 54:8 103:23

**skipping** 134:24

**slam** 32:10

**sleep** 37:5 111:21

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3842**

**slightly** 177:20

**slip** 111:6

**slope** 31:20

**slot** 15:13

**slow** 32:1

**small** 32:22 88:18 90:3

**smoke** 130:18

**snuff** 130:20

**social** 40:7,16 178:24 180:18

**sold** 94:13

**solicitations** 84:22 85:9,17

**someone's** 22:10

**sort** 10:21 16:18 17:13 19:2 43:15 51:25 52:23 61:24 84:14 92:17 99:24 102:19 104:3 117:23 121:5 147:11 152:25 159:24 173:16

**sotto** 13:20

**sought** 111:24

**sound** 190:20

**sounds** 59:24 65:22 128:5

**Southern** 89:22

**SP** 171:19

**speak** 26:13 170:9

**speakerphone** 122:21

**speaking** 29:7

**Special** 171:19

**specific** 16:25 63:6

**specifically** 46:8 112:21

**specifics** 60:2

**speed** 32:2,24 33:4,8

**speeding** 20:12,17 156:4 160:10

**spelled** 11:9 14:24

**spend** 59:9 118:9 120:18

**spent** 31:11 94:8 119:10,15

**spoke** 112:24 122:17,18

**spot** 84:15

**square** 15:23

**stalked** 194:6

**stalking** 111:15

**Stallings** 56:7 57:10 58:2,12

**stamp** 99:18,24 100:11,16 147:11

**stamped** 154:13

**stamping** 99:16 151:13

**stand** 25:1,2,3 90:16

**standard** 61:19 105:14

**standing** 17:6,16 24:10,18 26:3 101:1

**start** 67:5 103:9 111:18 157:19 164:2

**started** 13:14 24:11 25:15 43:12 74:3 75:16 93:23 130:4 173:16

**starting** 8:4 47:23 137:13 143:16 153:12

**starts** 73:11 192:5

**state** 5:10 89:11 158:20

**statement** 44:12,16,22 69:9 72:22 192:19

**station** 97:13

**stay** 138:13 151:22 198:22

**stayed** 131:15

**staying** 142:20

**Steinmetz** 133:19,21

**step** 30:19 35:12 113:3 123:14,15

**stolen** 87:9 193:21,25

**Stone** 167:1 169:10,17 171:10,12

**stood** 25:5

**stop** 6:15,23 16:12 53:2 80:18 88:18 173:22

**stops** 23:1

**store** 70:14,15 80:3 87:21,23 88:2,7

**stores** 70:18,20 79:21 87:16,17 88:3

**Stradley** 11:22,24 12:1,3,7,12 36:9 46:4,10 54:5 60:3,4,19 62:18 82:15 112:22,25 113:4,7,17 118:17 120:8 158:11 173:23

174:5,12 181:21 185:3,5,16,17 198:14,24 199:6

**Stradley's** 185:8

**straight** 34:4

**street** 12:25 21:8 26:5

**stress** 193:8

**strike** 182:25 197:6

**strong** 38:9

**stuck** 139:7 146:10

**Student** 155:24

**study** 9:24

**stuff** 31:4 44:9 51:18 61:20 70:3, 14,20 80:2 84:14 93:14

**stuffed** 66:5,8

**Sub-subclasses** 134:14 135:7

**Subclass** 134:11 135:2

**subclasses** 134:19,22 135:10, 12

**subdivision** 166:24

**subjects** 173:20

**submitted** 133:13

**subparts** 114:17,24 115:21

**successful** 39:18 78:4

**sue** 20:10 57:17,20 58:7 86:13 100:24 101:5 118:2

**sued** 117:24 195:16

**suffering** 83:4,7 182:20

**suggest** 190:4

**suing** 193:3

**suit** 78:5 118:5

**Suite** 57:6

**Summary** 137:14 138:23 142:14 144:25 146:24 152:11 153:13 154:1,19 167:19 197:22

**summertime** 139:18

**summons** 136:18 139:1 140:18 144:21,22 146:14 147:16 151:11 152:15 154:8,14

**supervise** 121:12

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3843**

**supplement** 200:8

**support** 129:20,22,23 167:6
168:1,18

**surgery** 39:3,6,8,16,21,25 40:3
45:19 60:7 74:8 75:24 110:18

**surrender** 143:4

**switch** 80:10

**sworn** 5:4

---

**T**

---

**t-boned** 22:2

**tag** 84:13 180:23

**takes** 106:3

**taking** 26:21 27:1 38:6 53:11,15,
16 107:6

**talk** 5:20 25:17,20,25 26:10,23
43:4 44:5 46:9 62:15 64:16 69:5
76:22 77:22 90:22 110:1 150:25
151:2,3 176:13 180:9

**talked** 27:2 41:17 67:13 75:13,20
87:4 109:3 110:12,16 112:22
113:16 120:9,11,13 129:6 166:16
167:5

**talking** 22:13 41:13 44:1 62:14
72:7 75:16 76:4 92:12 110:24
116:17 124:15 168:25 169:2
172:7 185:22

**taped** 139:12 146:10

**tax** 84:13

**Tech** 9:23,24

**Ted** 51:20 60:13,22 76:12 77:12
81:13

**television** 61:6

**telling** 150:15

**terms** 82:14 93:24 94:5

**test** 131:3,7,10,12

**testified** 5:5 32:13 34:23 49:23
129:8,13 177:25 178:23 179:1
186:8

**testify** 181:25

**testifying** 129:7

**testimony** 6:10,23 79:2

**then-fiance** 29:2

**thing** 125:25 167:19

**things** 87:21 88:2 94:13 198:24
200:17

**thinking** 101:5

**thinks** 62:11

**thought** 17:8 58:23 60:21,24,25
170:8 180:17

**thousand** 91:11

**threaten** 69:3

**throw** 17:9,21,24,25 18:3 59:20
81:23

**throwing** 17:17

**ticket** 20:12,17 156:4 161:9
164:17 165:7 166:3

**tickets** 160:10

**tight** 32:9

**Timbers** 136:11 138:20 139:6,9,
16 140:13,22 143:9 146:2 147:25
149:11 152:11 154:4 166:15

**time** 5:19 7:3 11:6,20 12:6 23:23
24:8 30:6 36:6 48:23 49:24 50:10
52:24 53:3,8,12,19 59:9 65:11,15,
17,18,19 66:22 68:6,8,18,20
69:22 75:15 80:22 83:2 84:1
88:20 94:7 98:5 102:23 119:10,15
120:17 125:4 131:15 174:7,8
178:9 183:25 186:7,14,18,19
189:15 190:5,18 201:6

**times** 74:20 92:3,5 122:17 129:25
141:12,15

**titled** 8:23 139:1 144:21 168:6

**tobacco** 130:20

**today** 7:25 8:21 30:3 78:25 99:2
122:15 126:1,4 130:3 186:22

**told** 40:23 87:7 108:3 140:21
141:5 144:13 170:11 176:16,18

**toll** 89:18 90:2

**top** 8:24 17:17 32:19,23 34:10
96:25 99:13 102:19 108:9,17
110:9 145:7 159:10 160:14
161:13 162:5,23 163:24 191:17

**torn** 39:11

**total** 43:14 47:13 119:13 138:7
145:6

**totaled** 28:1,24 41:10 43:10
83:22 130:23 178:6,7

**totaling** 63:14

**Townhomes** 171:9

**townhouse** 166:19,24 170:21

**Township** 165:21

**traffic** 24:22 156:5 189:22 192:7

**trained** 71:24

**transcript** 5:23 6:8 185:12
200:13

**trash** 17:17,18

**trashed** 17:15

**traveled** 34:12,20

**traveling** 33:8 34:4

**treatment** 38:6,24 73:14 74:5
182:12

**trial** 90:14 120:20,21 129:7
148:17,20 154:16,23 168:11

**trick** 70:25 71:2

**trip** 165:16

**Troy** 172:24 173:6

**true** 72:18

**trust** 71:24

**truth** 5:4,5

**truthfully** 124:5

**TSA** 132:8

**turn** 24:13 34:5 39:16 54:9 55:23
56:14,22 71:13 76:12 102:17
105:5 114:11 126:18 134:6
136:21 144:19 146:13 147:18
151:16 154:7,12,18 155:4,11
160:5,13 161:12 166:8 167:13,25
169:8 171:17 189:17

**turned** 13:12 39:17

**turning** 22:4 49:4 76:11 97:21
104:22 134:1 136:17 138:25
140:17 142:11 144:1 146:7
151:10 152:14 159:9

**twelve** 90:17

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3844**

**two-minute** 173:1

**two-thirds** 108:9

**Tylenol** 38:7

**type** 56:24 69:17 113:18 129:19 156:5 167:19 188:19

**typed** 93:8 106:9 187:17

**types** 78:20

**typewritten** 155:5

**typically** 65:11

**typing** 105:11 106:10

---

### U

**Uber** 92:24 93:1

**uh-huh** 6:2 37:17 98:3 105:24

**UIM** 82:11

**ultimately** 76:6 145:10

**Um-hmm** 13:1 14:9 25:16 31:24 33:16 34:2 36:5 37:10 38:20 39:13 42:21 47:22 50:22 59:12 67:2,18 79:5,25 86:24 90:6 98:7 99:15 110:6,19 112:12 115:5 120:5 121:24 124:23 126:2,5 130:10 133:6,17 134:5 136:13 137:16 139:2,10 140:16 145:1 146:16 150:7 153:8 164:6 173:12 181:22

**underinsured** 82:21 183:11

**underneath** 34:14 54:14 99:20 127:7 147:12 152:21 155:16 162:15 172:12

**understand** 6:14,15 63:20 78:8 79:3 112:6 113:2 121:3 134:18 135:12 196:15

**understanding** 103:19 118:15 181:17,19 184:16 186:8

**understands** 183:10

**understood** 6:17 124:2 183:21

**unh-unh** 6:2 136:24

**uninsured** 82:8 183:11

**Unit** 42:19 190:10

**unsolicited** 46:6 58:22 59:4 60:12,17 61:15 64:9,14 66:11 67:3,22 69:12 78:20 81:9 82:1

86:18 88:18 104:10 113:23

**unsupervised** 156:23

**unwanted** 79:16 85:17

**updated** 198:22

**urgent** 36:20,22 38:13

**Urology** 10:9,18

---

### V

**v-i-l-l-e** 11:12

**Van** 114:14 115:15 135:2

**variety** 69:20

**vehicle** 24:18 33:15,18,19,24 34:3,4,5,8,14 43:5 83:19 104:25 161:1,9,23 162:12,19 176:21

**vehicles** 33:9

**Verdict** 163:17

**verification** 7:2,6,7,10 8:8,24 126:3,6

**victims** 77:23

**videos** 122:17 123:1,20,25

**violated** 88:4 104:13

**violates** 107:12

**Violations** 189:22

**visit** 165:17

**voce** 13:20

**voluntary** 136:22 142:4,9 143:17 152:19,20

**vote** 95:5,14,18,21 96:15 97:12, 15 98:4,6

**voted** 95:7 97:23 98:1

**voter** 69:22

**voter's** 95:25

**voting** 96:12,15 98:5

---

### W

**W-R-I-G-H-T-S-T-O-W-N** 164:23

**wages** 83:14 182:15 194:15

**wait** 123:17

**Wake** 9:23,24 10:7,9,13,17 38:14 39:2 89:21,22 97:3 98:19 161:5

**Wakemed** 20:23

**walked** 106:1

**walks** 106:4

**Wallace** 114:14

**Walmart** 21:12 28:15

**wanted** 7:19 174:4

**wanting** 20:17

**Warner** 11:6,20 12:6 174:7,8

**warranties** 85:1,2,15 86:4

**warranty** 85:8,21 86:9

**watched** 122:16 123:2 124:8

**water** 53:14 136:15

**wear** 106:20

**wearing** 106:23

**Weaver** 108:22

**website** 30:13 42:12 81:13,14 92:18,19,21 96:18 107:10,16,18 180:23 185:22,25 187:12 196:5,6, 10

**websites** 89:6 107:13 186:5

**week** 47:17 64:7 86:17,20 92:3,5 101:2

**weekend** 28:12

**weeks** 45:15,21 47:11 60:9 64:7 74:7 75:23 84:1,4 86:20 120:24

**weight** 111:3 148:12

**White** 11:22,24 12:1,3,7,11 36:9 46:4,10 54:5 60:3,4,19 62:18 82:15 112:22,24 113:4,6,16 118:17 120:8 158:11 173:22 174:5,12,13 181:21 185:3,5,8,15, 17

**White's** 174:15

**William** 108:22

**win** 78:5

**wine** 130:12

**woman** 109:15

---

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA3845**

word 6:16

words 6:1,2,18 21:14

work 10:6,18 11:5,15,21 12:3
28:12,13,19 45:10,21 57:23 58:1
65:8,21 75:17,23 76:5 78:9 83:12,
15 89:2 110:13 123:5,6 135:14
174:11 181:20 182:15 185:6

worked 10:15 11:14 12:6,7,12
36:3,9 45:16 46:13 61:21 62:17
76:18 78:15 82:15 134:4 158:10
181:18,20 185:15

working 10:5,17 11:4 12:11,17
65:10,12,14,19 119:10 121:19
173:22

works 53:8 71:20 122:11

worse 50:19

worth 71:1

Wow 92:12

wreck 23:1 28:11 31:18 35:15,18,
20 40:21 43:14 45:24 60:5 65:8
76:22 81:10 82:18,21 83:2,3
100:21 113:6,8,10 120:11 131:9
182:12,22

wrecker 28:2,4,5

wrecks 74:12 78:12 181:17,20
182:4

Wrightstown 164:22,25

writ 155:12,17

write 117:15

written 54:19 117:5 119:14
126:20 128:12

wrong 35:9 108:4 171:3,5

wrote 155:18

## X

X'D 149:3

X-RAYS 38:15

## Y

yard 94:10

year 72:2 84:2 85:22 103:8
156:13,22

years 10:16 11:16 12:4,5,7,8 13:4
40:1 93:13 119:16 127:15 131:18
132:5,19 159:15 175:8 186:22
197:13

yield 189:23

you-all 152:25

Youtube 181:14

Yup 72:5

## Z

zip 99:20

www.NCDepo.com
info@NCDepo.com
Depositions, Inc.
Serving all of North Carolina
(919) 557-4640
JA3846

In the Matter Of:

GAREY, ET AL. vs FARRIN, ET AL.

BELINDA STEINMETZ

*November 04, 2019*



Info@NCDepo.com   1-919-557-4640

DEPOSITIONS, INC.

www.NCDepo.com

1000 N. Main St., Suite 215, Fuquay Varina, NC 27526

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2                    1:16-CV-00542

3

4

5     -------------------------------
      JAMES WEAVER GAREY, ET AL., on
6     behalf of themselves and others
      similarly situated,
7
                    Plaintiffs,
8
          vs.
9
      JAMES S. FARRIN, P.C., ET AL.,
10
                    Defendants.
11    -------------------------------

12

13

14                    DEPOSITION

15                        OF

16                 BELINDA STEINMETZ

17

18              Taken by Defendants
             Raleigh, North Carolina
19             November 4, 2019

20

21

22

23    Reported by:  Tracy D. Daniels, RPR
                    Notary Public
24

25

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3848

```
 1                    APPEARANCES

 2

 3   On behalf of the Plaintiffs:

 4        Robert P. Holmes, Esq.
          White & Stradley, PLLC
 5        3105 Charles B. Root Wynd
          Raleigh, NC  27612
 6        rob@whiteandstradley.com

 7

     On behalf of the Defendants James S. Farrin, P.C.,
 8   d/b/a Law Offices of James Scott Farrin; James
     S. Farrin; Marcari, Russotto, Spencer & Balaban, P.C.,
 9   Donald W. Marcari; Riddle & Brantley, L.L.P; Sean A.
     Cole; Wallace Pierce Law, PLLC; Jared Pierce; Van
10   Laningham & Associates, PLLC d/b/a Bradley Law Group;
     R. Bradley Van Laningham; Lanier Law Group, P.A.; Lisa
11   Lanier; Crumley Roberts, LLP; Chris Roberts; Hardee &
     Hardee, LLP; Charles Hardee; and G. Wayne Hardee:

12

          Jeffrey R. Whitley, Esq.
13        Fox Rothschild LLP
          434 Fayetteville St.
14        Suite 2800
          Raleigh, NC 27601
15        jwhitley@foxrothschild.com

16

17   On behalf of the Defendants:

18        Gemma Saluta, Esq.
          Womble Bond Dickinson (US) LLP?
19        One W. 4th St.
          Winston-Salem, NC 27101
20        gemma.saluta@wbd-us.com

21

22

23

24

25
```

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                           JA3849

1

2          Deposition of BELINDA STEINMETZ, taken by the

3    Defendants, at White & Stradley, PLLC, Raleigh, North

4    Carolina, on November 4, 2019, at 11:04 a.m., before

5    Tracy D. Daniels, Registered Professional Reporter and

6    Notary Public.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.NCDepo.com                      Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                    JA3850

CONTENTS

THE WITNESS: BELINDA STEINMETZ      EXAMINATION

    By Mr. Whitley .............................5

    By Ms. Saluta ...........................128

INDEX OF THE EXHIBITS

EXHIBIT NO.                            PAGE

Exhibit 362     North Carolina State Board of    61
                  Elections printout

Exhibit 363     Tax records                    67

Exhibit 364     NC State Highway Patrol      75
                  Collision Information

Exhibit 365     Facebook printout         155

Exhibit 366     Property tax bill         160

Exhibit 367     Business Corporation Annual    166
                  Report

Exhibit 368     US Bankruptcy Court, Voluntary   169
                  Petition

Exhibit 369     Bankruptcy Administrator's     172
                  Statement of Position Regarding
                  Trustee's Final Report and
                  Proposed Distribution

Exhibit 370     US Bankruptcy Court, Voluntary   174
                  Petition

Exhibit 371     Consent Order Granting Relief    176
                  From Automatic Stay

Exhibit 372     Certificate of Cancellation of   176
                  Judgment

Exhibit 373     Final Report and Account of     182
                  Foreclosure Sale

www.NCDepo.com      Depositions, Inc.
info@NCDepo.com    Serving all of North Carolina    (919) 557-4640
**JA3851**

1                        PROCEEDINGS

2                        * * * * *

3    Whereupon,

4                   BELINDA STEINMETZ,

5              having first been duly sworn,

6         was examined and testified as follows:

7                        * * * * *

8                       EXAMINATION

9    BY MR. WHITLEY:

10       Q.    Hi, Ms. Steinmetz.  Just to start off,

11   will you state your full name for the record?

12       A.    Belinda Steinmetz.

13       Q.    My name is Jeff Whitley.  I represent a

14   number of the law firm defendants in this case.

15   Have you ever had your deposition taken before?

16       A.    No, sir.

17       Q.    Not in any -- any past case?

18       A.    Not that I can recall.

19       Q.    It would be an experience you might

20   remember, I would think.

21       A.    I figured as much, but sketchy memory

22   sometimes though.

23       Q.    Sure.  So my goal here today is for us

24   to essentially have a conversation with just a few

25   subtle differences.  One being that you were just

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                 JA3852

1  sworn by the court reporter, so this is just as if

2  you were testifying in court.  It's sworn

3  testimony.  I'm going to try my best to let you

4  finish all your answers before I introduce my next

5  question, and I'm going to ask that you try to let

6  me get my question out before you start your answer

7  just so we can have a clean record of this

8  conversation, which is what the court reporter's

9  going to make.  Is that okay?

10       A.    Yes, uh-huh.

11       Q.    And we can take breaks as you need, so

12  please just let me know if you need to take a

13  break.  Try to, if you can, give a yes or no answer

14  so the court reporter, again, can build that

15  record.  No head nods and uh-huhs.  It happens a

16  lot more than you would think.

17       A.    As I'm over here nodding.  Okay.

18       Q.    Can you tell me what you did to prepare

19  for the deposition today?

20       A.    I had two meetings here, three videos

21  that I reviewed, and a couple of phone calls.

22       Q.    Okay.  And with this next set of

23  questions, I don't want to know anything that you

24  and your attorneys discussed if it was at any of

25  those meetings, but can you tell me about some of

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3853

1   the documents or the videos, if you reviewed any?

2       A.    Yes.  So the videos were prepared by

3   Robert, and they were just preparatory, just kind

4   of making sure that I had a clear understanding of

5   everything and just to, you know, make sure that I

6   was prepared.

7       Q.    And did you look at any specific

8   documents?

9       A.    Yes.  I brought it with me because I

10  wouldn't remember.  The declaration in support of

11  the class.  And also I read and reviewed the Second

12  Amended Complaint that was filed.

13      Q.    Okay.  Did you look at your accident

14  report that's at issue in this case?

15      A.    Yes, sir.

16      Q.    What's your date of birth?

17      A.    1/13/74.

18      Q.    And are you married?

19      A.    I am not.

20      Q.    Do you have any immediate family?

21      A.    My son.

22      Q.    Okay.  Hold is he?

23      A.    He's 25.

24      Q.    It happens quickly, doesn't it?

25      A.    It does.  He was just this big.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3854

1        Q.     And what's his name?

2        A.     Justin.

3        Q.     Justin Steinmetz?

4        A.     Yes.

5        Q.     Can you tell me what your highest level

6   of education is?

7        A.     I graduated high school, and I did one

8   semester of community college.

9        Q.     Where did you graduate high school?

10       A.     Surrattsville Senior High School in

11  Clinton, Maryland.

12       Q.     Okay.  And how about community college?

13       A.     It was PG County Community College in

14  Maryland also.

15       Q.     And how did you end up down in North

16  Carolina?

17       A.     My ex-husband had a job opportunity down

18  here, so we moved for that.

19       Q.     What's the ex-husband's name?

20       A.     Craig.

21       Q.     Craig?

22       A.     Steinmetz.

23       Q.     Steinmetz.  Thank you.  Had you lived in

24  Maryland your whole life before North Carolina?

25       A.     No, I also lived in Virginia.  Mostly

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3855

1  Maryland but a little bit in Virginia.

2      Q.    In between Maryland and North Carolina?

3      A.    Uh-huh.

4      Q.    Okay.  What took you to Virginia?

5      A.    I was dating somebody that lived in

6  Virginia.

7      Q.    You currently employed?

8      A.    I am.

9      Q.    Where?

10     A.    Raleigh Neurology.

11     Q.    And what do you do there?

12     A.    I'm a medical -- medical secretary is

13 the term, but I do scheduling for MRI.

14     Q.    Okay.  Any other jobs since you've been

15 in North Carolina?

16     A.    I worked with my ex-husband's company at

17 Lakeside Concrete and about three -- in between

18 then and here.

19     Q.    I think I understand Raleigh Neurology

20 has several locations.  Is there a specific one?

21     A.    Two.  They have two locations.  I work

22 at the Raleigh location right down the street here

23 at Edwards Mill and Trinity.

24     Q.    And where was -- you said Lakeside

25 Concrete?

www.NCDepo.com         Depositions, Inc.
info@NCDepo.com    Serving all of North Carolina    (919) 557-4640
JA3856

1    A.    Uh-huh.

2    Q.    Where was that located?

3    A.    Lakeside Concrete was -- for a while it

4  was out of our home.  Then it was -- also we had an

5  address in Apex, North Carolina, for a while, and

6  then it moved to our home with us when we moved to

7  Harnett County.  And then that's where the business

8  dissolved was in Harnett County.

9    Q.    What did you do for Lakeside Concrete?

10    A.    Accounting, payroll, taxes, billing.

11    Q.    A little bit of everything if it was a

12  small business?

13    A.    Pretty much everything.  If it involved

14  paper or money, I was involved.

15    Q.    Sure.  Did you work anywhere else in

16  North Carolina before Lakeside Concrete?

17    A.    No.

18    Q.    Are you registered to vote in North

19  Carolina?

20    A.    I am.

21    Q.    Do you remember how you registered when

22  you moved down here?

23    A.    How I physically did it?

24    Q.    Sure.  Yes.

25    A.    I want to say that I went to one of

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                    JA3857

1  the -- no, I didn't go anywhere.  When I did my

2  address change, I got a thing in the mail and I

3  filled it out, and I think I mailed it back.  That

4  was a long time ago.

5      Q.    Sure.  Now, we're going to talk during

6  this deposition about a motor vehicle accident that

7  you were in on November 15th, 2016.

8      A.    Uh-huh.

9      Q.    So if I just generally refer to the

10  accident, you'll understand that's what I'm talking

11  about?

12      A.    Yes.

13      Q.    What was your address at the time of

14  that accident?

15      A.    I was living at -- all of a sudden, I

16  can't remember my prior address.  I want to say it

17  was 2451 Mount Pleasant Road in Willow Springs.

18      Q.    Willow Springs.  What county is Willow

19  Springs in?

20      A.    That is Johnston County.

21      Q.    And what's your current address?

22      A.    82 Winwood, Angier, in Angier, North

23  Carolina.  And that's Harnett County.

24      Q.    And what's your home phone number?

25      A.    I don't have a home phone.  Just a cell

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3858

1   phone.

2        Q.    Just a cell phone?

3        A.    Uh-huh.

4        Q.    What's the cell phone number?

5        A.    (910)814-7277.

6        Q.    So I'm going to refer to them as the

7   Willow Springs address and the Angier address if we

8   have to go back and forth.

9        A.    Okay.

10       Q.    Some of the issues in this case are

11  about mail, mail that you received at your -- at

12  your home.  So I want to understand how you

13  received mail at the address in Willow Springs,

14  which was the address you were at when you were in

15  your accident.

16       A.    Okay.

17       Q.    Is that okay?  Was anybody else living

18  with you in Willow Springs?

19       A.    Yes.

20       Q.    Who?

21       A.    Rachel Delafield.

22       Q.    Okay.  Who's that?

23       A.    Significant other.

24       Q.    Okay.  Did you have -- was this a house?

25       A.    Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3859

1      Q.     So did it have an independent mailbox?

2      A.     Yes.

3      Q.     Between you two, was there someone

4    designated to pick up the mail from the mailbox?

5      A.     Whoever got home first.

6      Q.     So you did it sometimes?

7      A.     Uh-huh.

8      Q.     Okay.  Did you both receive mail at that

9    address?

10     A.     Uh-huh, yes.

11     Q.     Okay.  Did you ever throw away mail

12   addressed to you without opening it?

13     A.     I don't think so.  I think I opened

14   pretty much everything.  I mean, if it's like a

15   Food Lion flier, I might not have opened that.

16     Q.     Right.  Sure.

17     A.     But I pretty much open everything that

18   comes because you just never know what's --

19     Q.     Sure.  And your significant other is

20   Rachel?  Did I get that right?

21     A.     Correct.

22     Q.     Did you ever throw away mail that was

23   addressed to Rachel --

24     A.     No.

25     Q.     -- without showing her?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3860

1      A.     No.

2      Q.     What did you do after you go out to the

3   mailbox, pick up the mail?  What happens next with

4   the mail at your house?

5      A.     Typically I go inside, sit down at the

6   kitchen table, put my purse down, take my shoes off

7   and, you know, check over the mail.  Decipher

8   "keep" from "trash," and that's it.

9      Q.     Sure.  And "keep" you might open right

10   then or sometime during that day?

11      A.     I pretty much open all of my mail when I

12   get it, just because, if not, it's just sitting

13   around creating clutter.  So open it and get it out

14   of the way.

15      Q.     That's what it does at my house for

16   sure.  Two piles:  One for keep, one for trash.

17   Did you still open the mail that was in the trash?

18      A.     Yes.

19      Q.     Okay.  And then once you've confirmed

20   that it wasn't anything you were interested in, you

21   threw it away?

22      A.     That's correct.

23      Q.     Have you ever had any speeding tickets

24   or traffic citations?

25      A.     Several.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                          JA3861

1      Q.    Do you -- do you get notice of those

2    through the mail?

3      A.    Notice of the tickets?  No, they were

4    all handed to me by nice officers.  I might have

5    gotten one -- one red light.  I might have gotten

6    one ticket by mail.  Now that I think back, I might

7    have gotten one.  And I don't recall if it was

8    myself or my ex-husband that was driving, but it

9    was my vehicle, so.

10     Q.    Right.

11     A.    So I got the ticket.

12     Q.    Do you have a toll transponder in your

13   car?

14     A.    I do not.

15     Q.    When you got the red light ticket, do

16   you remember getting any follow-on mail from law

17   firms or the like related to that?

18     A.    I do not.

19     Q.    Okay.  Do you remember ever getting any

20   mail from law firms or other entities after you

21   were handed a traffic citation by a police officer?

22     A.    I do not.

23     Q.    Can you just tell me in your own words

24   what your understanding of this lawsuit is about?

25     A.    So the lawsuit is about the driver

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3862

1  privacy protection act being violated with the DMV

2  information being illegally accessed and used.  Is

3  that general enough?

4      Q.    Your own words.  I mean, we may drill

5  down into that a little bit.  What is your

6  understanding of what the law firms did and what

7  their practices are in this case?

8      A.    To my understanding, what they did was

9  they accessed protected DMV information for

10 purposes that weren't outlined in what the law says

11 is allowable.

12     Q.    And do you have any understanding about

13 how these firms actually accessed that information?

14     A.    I do not.

15     Q.    Okay.  And what is -- you referred to, I

16 believe you said, protected information.  What's

17 your understanding of what that protected

18 information is that's at issue?

19     A.    So it's information that the DMV holds,

20 my personal information that the DMV holds.  So

21 driver's license information, tag information, I

22 guess, would be the gist or the limits of what my

23 understanding is.

24     Q.    Is there -- is there any information

25 that the DMV would hold that you would be

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                                JA3863

1    particularly concerned about these defendants

2    having?

3         A.    I think that -- I think it's not so much

4    about having the information.  It's about the fact

5    that it was accessed illegally.  I'm one of those

6    sticklers for the rules.  I also have concerns

7    about identity theft.  I've had some issues with

8    that in the past, and so I think there's an awful

9    lot of information made available in these reports

10   that, you know, could contribute to that.

11        Q.    Do you -- do you know when the Complaint

12   was filed in this case?

13        A.    I think the initial Complaint was -- no,

14   I don't know the date.

15        Q.    Okay.  You said you read the Complaint

16   in preparation for this deposition.

17        A.    I did.  Yes, sir.

18        Q.    Was that the first time you read it?

19        A.    The Second Amendment, that is -- yes,

20   that was the first time I had read the whole thing.

21        Q.    Had you read any previous iteration of

22   the Complaint?

23        A.    I don't think I had read any.  I think

24   we discussed -- it was discussed in a phone call or

25   a meeting, but I don't think I read any of it.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3864

1      Q.    Do you -- do you know what had happened

2   in this suit up to the point that the Second

3   Amendment Complaint was filed?

4      A.    I don't.  Or I guess I don't recall.  I

5   might know, but I can't put my finger on it.

6      Q.    That's fair.  And who are your attorneys

7   in this lawsuit?

8      A.    Stradley.

9      Q.    Do you know the names of all the

10  attorneys working on this particular case?

11     A.    I do not.  Names I'm very bad with.

12  It's a curse.

13     Q.    How many hours would you say you've

14  spent on this lawsuit in total?

15     A.    I would say probably no more than seven.

16     Q.    And what's the rough breakdown of what

17  those seven hours would have entailed?

18     A.    I think we've had two -- two meetings

19  that were about an hour and a half to two hours

20  each, and then the videos that I watched were close

21  to two hours and a few minutes.  And then just the

22  time that I spent, you know, reading out the

23  amendment.  It's a lot of reading.

24     Q.    It is a pretty substantial Complaint.

25  Have you suggested any guidance or direction to the

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3865

1  attorneys about how to -- how to handle this

2  lawsuit?

3       A.    Not as of yet.

4       Q.    Do you think you will?

5       A.    If I feel it's needed.

6       Q.    I want to back up a little bit to -- you

7  referenced the Driver's Privacy Protection Act.  Do

8  you -- can you just give me your understanding of

9  what that act is?

10      A.    The Driver's Privacy Protection Act

11 is -- was enacted to protect DMV records, to limit

12 the access and the use of DMV records, private DMV

13 records.

14      Q.    Have you ever read the statute?

15      A.    I read some of it.  I didn't read all of

16 it.

17      Q.    Do you know the types of information

18 that are protected by the act?

19      A.    I couldn't list them.

20      Q.    And you understand that this is a

21 purported class action lawsuit?

22      A.    I don't know what that means.

23      Q.    Okay.  Do you understand that the

24 plaintiffs, your attorneys, are requesting that

25 this be treated on a class basis?

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                            JA3866

1         A.    Yes, sir.

2         Q.    Okay.  And have they explained to you

3    that you are going to be a class representative in

4    that class action suit?

5         A.    Yes, sir.

6         Q.    Okay.  Do you know what a class

7    representative is?

8         A.    Yes, sir.

9         Q.    Okay.  Can you just explain to me your

10   understanding of it?

11        A.    To my recollection, the class

12   representative is -- there's a little bit more

13   involved as far as keeping up with what's going on

14   with the case, being able to make decisions in the

15   best interest of the class, and being able to speak

16   to the attorneys as far as any settlement or any --

17   how the case, I guess, ends.

18        Q.    And have you had to provide any input

19   about the best interest of the class so far?

20        A.    No, not yet.

21        Q.    Do you understand that no class has been

22   certified in this -- this case yet?

23        A.    Yes, sir.

24        Q.    Okay.  And if the class is certified,

25   that the court is going to have to decide what law

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3867

1   firm will represent the class?

2       A.    No.

3       Q.    So at a point at which, if the court

4   decides that this should be treated as a class

5   action, the court will have to determine an

6   appropriate law firm to represent the entire class

7   of individuals.

8       A.    Uh-huh.

9       Q.    So not just you but the class of people

10  who are not yet named in it.  So I want to ask you

11  about that.  The court has to make that

12  determination of who the appropriate law firm would

13  be.  Do you think the court -- do you think it's

14  appropriate for the court to choose a law firm that

15  had previously obtained information and sent

16  mailers like the defendants are alleged to have

17  done in this case?

18      A.    I'm understanding your question, but I'm

19  getting hung up on a word.  Can you ask it one more

20  time?  I apologize.

21      Q.    Sure.  When the court makes its

22  determination about what the appropriate firm is to

23  represent the class of plaintiffs, do you think

24  it's appropriate for the firm that the court

25  selects to be a firm that had previously obtained

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com      Serving all of North Carolina      (919) 557-4640
                        JA3868

1    information and sent mailers in the way that the

2    defendants in this case are alleged to have done?

3         A.    Gotcha.  I don't -- I don't think I

4    would know what would be appropriate for the court

5    to do.  I don't think I would be able to determine

6    that, so I think that would just be more of a legal

7    thing that I don't -- is over my head.

8         Q.    Do you think it would be more

9    appropriate for a court to appoint a firm that had

10   never obtained information like this or sent

11   informational mailers?

12             MR. HOLMES:  Objection.  Asked and

13   answered.  You can go ahead.

14             THE WITNESS:  Yeah.  I just -- I think

15   that it's not really a question I'm qualified to

16   answer.  Legally, I don't understand all the

17   finites.

18   BY MR. WHITLEY:

19        Q.    That's fine.  How did you learn about

20   this lawsuit?

21        A.    I had an accident, and one of my friends

22   is a paralegal, and she recommended that I stop by

23   and consult over here.

24        Q.    Paralegal for whom?

25        A.    I don't recall what company she works

www.NCDepo.com                  *Depositions, Inc.*
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
**JA3869**

 1   for.  It's been -- it's been a few years and she's

 2   long since moved and lost touch.

 3        Q.    What's her name?

 4        A.    Niki.

 5        Q.    Last name?

 6        A.    Owens.

 7        Q.    Owens.  And she specifically recommended

 8   this law firm?

 9        A.    She did.

10        Q.    And who did you meet with when you --

11   when you first came to talk about this case?

12        A.    Robert.

13        Q.    Robert.  Did you ever hear a radio

14   advertisement about this case?

15        A.    I don't recall.

16        Q.    Are you paying anything for your

17   representation in this case so far?

18        A.    No, sir.

19        Q.    Do you know if your attorneys are

20   working on a contingency fee basis?

21        A.    I believe they are not.  I don't --

22   actually, I don't think I know how to answer that

23   question.  I hate to ask you to oversimplify

24   things.

25        Q.    No, please do.  I want to make sure that

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3870

1   we understand and you understand the question I'm

2   asking.  How do you understand your attorneys will

3   be compensated in this case?

4        A.    To my understanding, if there's a

5   settlement, that at that time then compensation

6   would be designated to my attorneys.

7        Q.    Out of some proportion of what the

8   settlement number is?

9        A.    Yes, sir.

10       Q.    Do you understand that if a class is

11  certified in this case that notice will have to be

12  sent out to people who are potentially members of

13  the class?

14       A.    I didn't know that, but that makes

15  sense.

16       Q.    Okay.  Do you know whether your

17  attorneys have agreed to fund or provide the

18  costs -- provide for the costs that are involved in

19  sending that notice?

20       A.    We haven't discussed it.

21       Q.    Do you think there's a chance that you

22  personally will be responsible for some of that

23  cost?

24       A.    No, sir.

25       Q.    You don't think there's a chance?

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              **JA3871**

1        A.     That's correct.

2        Q.     I want to go back and we'll talk about

3   the accident on November 15th.  Can you just tell

4   me what you remember about that accident in

5   general?

6        A.     I was on my way to work, and I was at a

7   stop sign and I was rear-ended, and then we pulled

8   out of the road and police came, took a report and

9   we both went on our way.

10       Q.     Sounds pretty typical of an accident.

11  You were stopped at the stoplight?

12       A.     Yes.

13       Q.     Okay.

14       A.     Stop sign.

15       Q.     Stop sign.  I'm sorry.

16       A.     That's okay.

17       Q.     Do you know how fast the other car was

18  going?

19       A.     No idea.

20       Q.     Do you know if the other driver was

21  intoxicated?

22       A.     I don't know, but it was early in the

23  morning.  She had a kid with her, so I'm kind of

24  hoping not, but, I mean, she didn't appear

25  intoxicated to me in any way.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                 JA3872

1       Q.     Would you have wanted to know if she

2  was?

3       A.     Yes.

4       Q.     Was anybody hurt?

5       A.     Not really.  I had -- I went and had

6  some -- had a -- you know, went and got checked out

7  by my doctor and had a couple of visits with the

8  chiropractor for some neck pain.  I don't know if

9  she had any injuries or her son either.

10      Q.     Did you go to the chiropractor as a

11 preventive measure?

12      A.     No, my neck hurt.  I went -- I was

13 uncomfortable and somebody said that might help,

14 and I tried it out.

15      Q.     Did you ever get diagnosed with

16 anything, whiplash or something like that?

17      A.      I don't recall a specific diagnosis.  I

18 just had neck and head pain, and it was just a --

19 you know, I asked my doctor, and, you know, they

20 said, what do you want to do?  They wanted to give

21 me pain meds, and I don't -- I declined pain meds.

22 And so in lieu of that, I went and saw a

23 chiropractor.

24      Q.     Do you know if the other driver was

25 injured?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina          (919) 557-4640
                                   JA3873

1      A.    I don't.  She didn't appear injured to
2  me, but I don't know for sure.
3      Q.    Was there anybody else in your car with
4  you?
5      A.    No.
6      Q.    And the other driver had a child in the
7  car; is that right?
8      A.    Uh-huh.
9      Q.    What road did that occur on; do you
10 remember?
11     A.    It was at the intersection of Old Stage,
12 and I can't remember the cross street.  It was Old
13 Stage and something at a little store.  There was a
14 little store across the street from the
15 intersection.
16     Q.    That's fine.  I realize this was several
17 years ago.  Was it a public street that you went
18 on?
19     A.    Yes, sir.
20     Q.    Was your car drivable after the
21 accident?
22     A.    It was.  It ended up being totaled, but
23 it was drivable.
24     Q.    It's a fine line between those two.
25     A.    It -- it was totaled.  The frame was

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina      (919) 557-4640
                          JA3874

1   bent.  So it did drive, but when I took it for an

2   estimate, I asked if it could be fixed; and they

3   said it could be fixed, but it would never be safe.

4   If there was ever another accident, somebody would

5   get hurt bad, so they said, you know, don't fix it,

6   it's totaled, frame is bent, so.

7         Q.    Was the other car drivable?

8         A.    She drove away as well, yes.

9         Q.    Neither car was towed?

10        A.    No.

11        Q.    Do you recall if the other driver braked

12  at all before rear-ending you?

13        A.    I was -- I don't.  I was -- I was at a

14  stop sign with traffic going both ways, and I was

15  looking at traffic coming that way, and so I never

16  even saw her in my rearview mirror.

17        Q.    Your car eventually was totaled, right?

18        A.    Yes.

19        Q.    Do you know what the damages amount was

20  for that?

21        A.    I honestly can't remember what they put

22  the number at.  I can't remember.  I'm sorry.

23        Q.    That's all right.  So you -- you're in

24  the accident, pull off to the side of the road.  Do

25  you know who called the police?

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*        *(919) 557-4640*
**JA3875**

1        A.      I did.

2        Q.      You did.  How many police officers came

3   to the scene?

4        A.      Just one.

5        Q.      Just one.  Do you remember his -- his or

6   her name?

7        A.      It was a man, but I don't recall his

8   name.

9        Q.      And so what happens next when the police

10  officer comes on the scene?

11       A.      He asks for -- well, he asked what

12  happened, if everybody was okay, if we need an

13  ambulance.  And then he asked for both of our IDs,

14  and he went back to his car and then came back a

15  little while later, asked if we needed tow trucks,

16  and he give us -- I feel like he gave us a piece of

17  paper.  I don't have it anymore.  But he gave us

18  something, and that was it.  Told us we were free

19  to go.

20       Q.      Any idea what was -- what the paper was

21  that he gave you?

22       A.      I want to say it was the driver exchange

23  paper that they typically do at accidents so I

24  would have the person who hit me, her insurance

25  information so my insurance could call them.  I

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina          (919) 557-4640
                                  JA3876

1  think that's what it was.

2       Q.    So you talked with the police officer

3  about whether you were hurt?

4       A.    Uh-huh.

5       Q.    Whether or not you needed a tow truck?

6       A.    Uh-huh.

7       Q.    Do you remember having any other

8  conversation with them?

9       A.    He just -- he asked what happened, and

10  it was just a brief.  I mean, I was stopped and I

11  was rear-ended.  Realized I was sitting out in the

12  middle of traffic, so pulled across the street and

13  made a phone call.

14       Q.    Did you talk to the other driver at all?

15       A.    A little bit.

16       Q.    Before the police got there?

17       A.    Uh-huh.  Yes, sir.

18       Q.    What did -- what did y'all talk about?

19       A.    She didn't want me to call the police

20  because she didn't want to have a claim on her

21  insurance.  She wanted to know if she could pay out

22  of pocket, and I was not comfortable with that, so.

23       Q.    I'm sure that's a conversation that

24  happens a lot after accidents.

25       A.    It was super uncomfortable.  It was a

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3877

1   lot of damage.  So as I kept looking at the back of

2   my car I was, like, I don't think that's a good

3   idea.

4        Q.    Do you remember giving the police

5   officer your -- your name?

6        A.    I introduced myself as Belinda, yes.

7        Q.    Belinda and Steinmetz?

8        A.    I don't think I gave him my last name.

9   I think I just said -- when he -- when he

10  responded, I think he did ask my name, and I just

11  said Belinda.

12       Q.    Did he ask for your address?

13       A.    He did not.

14       Q.    Do you remember giving him your address?

15       A.    I don't remember.

16       Q.    Did you -- did the officer ask for your

17  driver's license?

18       A.    He did.

19       Q.    Did he ask for your registration?

20       A.    I don't remember if he asked for my

21  registration or not.  I know he asked for my

22  license, but I don't recall if he asked for my

23  registration.

24       Q.    And did you give him your license?

25       A.    Yes, sir.

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*        *(919) 557-4640*
                          **JA3878**

1      Q.    And may or may not have given

2   registration?

3      A.    If he asked, I would have given it,

4   absolutely.

5      Q.    Sure.  And what do you recall the

6   officer doing with your license, and if you gave

7   him your registration, what do you recall him doing

8   after you gave those to him?

9      A.    He went to his patrol car, and I just

10  waited at my car, so I don't --

11     Q.    Not sure what he did once he got back to

12  his car?

13     A.    No, sir.

14     Q.    Do you remember whether -- did he ever

15  ask you any particular questions about the

16  information on your license?

17     A.    I don't recall him asking anything.

18  He -- I think that he may have asked if everything

19  was accurate.  If he asked anything, that's -- I

20  don't -- I don't recall him asking anything, but if

21  he did, I'm sure that would have been just is

22  everything on here correct.

23     Q.    Some people move and don't update their

24  driver's license address and the like, so he may

25  have asked if it was a correct address, that sort

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3879

1  of thing?

2        A.    He might have.  I don't recall that -- I

3  don't recall him specifically asking that.  He

4  didn't say a lot.  He was -- he didn't ask a lot of

5  questions.  It was early.  It was very early.

6        Q.    The driver exchange form that you think

7  might have been the paper that he gave to you, was

8  that something that was printed or handwritten?

9        A.    We handwrote on that.  The lady that

10  rear-ended me and myself, we handwrote our

11  information on that.

12        Q.    Okay.  So he -- at some point the police

13  officer handed you a document and you handwrote

14  your information in?

15        A.    Yes, sir.

16        Q.    And then she handwrote her information

17  in?

18        A.    To my -- yes, to my recollection.

19        Q.    And then you got some copy of that that

20  had both sets of information?

21        A.    Yes, sir.

22        Q.    Any other paper or document you can

23  recall getting from the police officer?

24        A.    No, sir.

25        Q.    Do you remember what -- what department

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                    JA3880

1   of law enforcement it was that responded?

2        A.    I feel like he was highway patrol, but

3   I'm not a hundred percent.  It was a long time ago.

4   It was early.  I was tired.

5        Q.    I understand.

6        A.    I was shook up.

7        Q.    Do you remember the other driver's name?

8        A.    Her name was Patricia.

9        Q.    Do you remember her last name at all?

10       A.    No.

11       Q.    Did you, in the conversation you had

12  with her at all, did you ask for any other

13  information from her?

14       A.    No.

15       Q.    Didn't ask for address?

16       A.    No.

17       Q.    Do you remember if the other driver gave

18  her driver's license to the police officer?

19       A.    I didn't see her do that, so I don't

20  know.

21       Q.    So I'm just trying to get the full scope

22  of things that happened from the time the police

23  officer comes on the scene until -- until the end.

24  Police officer goes back to his car with your

25  license?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3881

1      A.    Uh-huh.

2      Q.    What happens after that?

3      A.    I just waited.  I mean, he came back, he

4  returned my license, and asked if we needed a tow

5  truck.  Again, asked if everybody was okay, you

6  know, are we sure we didn't need an ambulance.  And

7  he said we're free to go.

8      Q.    And where did you go after you left the

9  accident?

10     A.    Work.  Always work.

11     Q.    It's a long day after an accident in the

12 morning.

13     A.    It was, yes.

14     Q.    Did you -- did you have to make any

15 calls about the accident while you were at work

16 that day?

17     A.    Yes, I called my insurance company.

18     Q.    Okay.  And what was that conversation

19 like?

20     A.    I just told them I had been rear-ended,

21 and they said you need to call the insurance

22 company, the person that hit you, and that was it.

23 I did call them and spent a little bit of time on

24 the phone with them and then just went back to

25 work.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                                JA3882

1      Q.     So you -- you personally called the

2   insurance company of the other driver?

3      A.     I did.  Yes, sir.

4      Q.     Okay.  And do you remember what the

5   substance of that conversation?

6      A.     Not really.  I mean, they asked what

7   happened, and they asked for my information and

8   gave me a reference number.  And I think they asked

9   if I needed a tow truck.  Not a tow truck.  If I

10  needed a rental vehicle.  And at that point, I

11  didn't yet.  They said that I needed to take my car

12  to get it looked at, and that was it.

13     Q.     And when you -- when you say they took

14  your information, what information did you give

15  them?

16     A.     They asked for my name and my insurance

17  information, my phone number.  I think that they

18  asked for my vehicle information, what kind of car

19  I was driving.  That's all I can recall them asking

20  for.

21     Q.     Home address?

22     A.     I don't recall them asking for my

23  address information.

24     Q.     And when they -- when the insurance

25  company said you need to have your car looked at,

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3883

1    did they suggest any particular places?

2          A.    They -- I think that they gave a list of

3    a couple of places that I could choose from, and if

4    there was a place that was kind of in between home

5    and work, and so I just picked that one.

6          Q.    Do you remember the name of that place?

7          A.    I don't.

8          Q.    Was there any discussion of payment or

9    settlement of the claim in that first conversation

10   with the insurance company?

11         A.    No.

12         Q.    So I want to come back and talk a little

13   bit more about the insurance company, but just

14   keeping with the narrative that day.  So you go to

15   work.  At some point you have a conversation

16   with -- with your insurance company and the other

17   driver's insurance company?

18         A.    Uh-huh.

19         Q.    Any other conversations you had about

20   the wreck that day?

21         A.    I mean, I told my boss that I had an

22   accident, I was going to be late, and she asked

23   what happened, and I just said I was rear-ended.

24   But a couple of people stopped by and said, hey,

25   your car looks trashed.  But just minor.  Just

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina       (919) 557-4640
                              JA3884

1   people noticing that my car was no longer perfect.

2       Q.    And then you drove your car home that

3   day?

4       A.    I don't recall if I drove it home that

5   day or if I took it to the body shop that day.  I

6   honestly don't remember if it was that day or the

7   next day that I took it, but, I mean, it was one or

8   the other, that day or the next day that I took it.

9       Q.    One of the body shops that the other

10  driver's insurance company recommended --

11      A.    Yes, sir.

12      Q.    -- or gave you a list?

13      A.    Yes.

14      Q.    Okay.  And what do you recall the body

15  shop sort of concluding about your car?

16      A.    They only kept it -- well, I mean, they

17  had it for a full day, I think, before they -- I

18  called them, they didn't call me.  And he said that

19  they had submitted information to the insurance

20  company, that it was totaled, and that I had a

21  certain number of days to come and get my

22  belongings out of it.

23      Q.    And did you then contact the other

24  driver's insurance company again?

25      A.    I did.

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                            JA3885

1      Q.    Okay.  And what was -- what was that
2   conversation?
3      A.    We kind of went back and forth about
4   what they were willing to -- what they were willing
5   to settle on for the value of the car, and that was
6   just kind of, you know, hey, we'll give you this
7   much, and I didn't agree with that, and we went
8   back and forth a couple of times, and they ended up
9   giving me what they offered me.
10          It was an older car, but it was in
11  really good shape.  So I felt like it wasn't a good
12  offer, but it was what it was.
13     Q.    So you didn't engage an attorney to
14  represent you in this?
15     A.    I didn't.  I did not.
16     Q.    Okay.  And their first offer was -- the
17  insurance company's first offer is what you
18  ultimately settled for?
19     A.    I feel like they might have increased it
20  a small amount, but it wasn't much.  So I think
21  that there may have been a little additional funds
22  that were added to that, but it wasn't much.
23     Q.    What was the final amount; do you
24  remember?
25     A.    I do not.

www.NCDepo.com                  *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*        (919) 557-4640
                              **JA3886**

1        Q.      What was the car?

2        A.      It was a Ford Fusion.

3        Q.      At that point -- well, let me ask this.

4   You called the insurance company immediately after

5   you got the information from the body shop?

6        A.      I did.

7        Q.      Okay.  So within a day or two of the

8   wreck?

9        A.      It was pretty quick, yes.

10       Q.      Had you been to the doctor at all at

11  that point?

12       A.      I don't remember.  I don't -- I don't

13  remember.

14       Q.      In talking with the other driver's

15  insurance company, did you have any conversations

16  about potential medical treatment as part of the

17  settlement?

18       A.      We did talk about that, yes.

19       Q.      Okay.  Did they -- do you know if they

20  factored that into the settlement amount?

21       A.       It was separate.  So the settlement on

22  the car was separate from the small medical claim.

23  So the medical claim covered just a doctor's visit

24  and a couple of trips to the chiropractor, and that

25  was -- that was it.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3887

1      Q.     And did you have an attorney assist you

2  with that part of the settlement?

3      A.     No.

4      Q.     Same insurance company?

5      A.     Yes.

6      Q.     And was there any negotiation about the

7  amount for the separate medical settlement?

8      A.     No.

9      Q.     So you accepted essentially what they

10 offered?

11     A.     Well, I mean, I just asked them to cover

12 my doctor's visits.  I didn't ask for anything

13 additional, and they didn't offer anything

14 additional.  I felt like that was more than fair.

15     Q.     I realize this may seem like jumping

16 around a little bit, so bear with me.  Do you have

17 any social media accounts?

18     A.     I do.

19     Q.     Facebook?

20     A.     Uh-huh.

21     Q.     Instagram?

22     A.     Yes.

23     Q.     Twitter?

24     A.     Yes.

25     Q.     Any others that I am not up on?

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina      (919) 557-4640
                          JA3888

1      A.     Not that I can recall.  I don't use them

2  all.  I have them because my son and my friends out

3  of town have them, so that's kind of a way to help

4  keep in touch with my out-of-town family and

5  friends.

6      Q.     Do you know the name that your Facebook

7  account is under?

8      A.     Belinda Tauber Steinmetz.

9      Q.     Same thing for the Instagram?

10     A.     I don't have any idea for the Instagram.

11  I don't use it very much, so I don't -- I set it up

12  to be in touch with my child, and I don't use it

13  much.  Don't recall.

14     Q.     How about Twitter, do you know the --

15     A.     I very, very seldom even remember that

16  they're on my phone.

17     Q.     That's fine.  Do you consider any

18  information that you put on those accounts to be

19  private information?

20     A.     I don't know how to answer that.  As

21  private as social media can be.  I don't post

22  anything that I consider to be vital on there, but

23  it's social media so I feel like anything can be --

24  anything on social media can be hacked or accessed

25  but -- so.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina       (919) 557-4640
                              JA3889

1     Q.    For instance, if you put a post up on

2   Facebook that wasn't restricted to any certain

3   group so that anybody could see it, would you

4   consider that information, that post, to be

5   private?

6     A.    No, not really because it's social

7   media, so it's not really a private entity.

8     Q.    Did you post about your accident?

9     A.    I put pictures of my car when it

10  happened, yes.

11    Q.    Did you give any description about what

12  happened in the post or just pictures of the car?

13    A.    I don't recall.  I don't think I put a

14  description.  It was one of those big Facebook

15  posts of, like, guess what?

16    Q.    It conveys information on -- just on its

17  own with the pictures?

18    A.    Yeah.  Well, everybody knew how much I

19  loved my car.  It was old, it had a million miles

20  on it, but, I mean, it was just -- it was old.  I

21  was attached, very attached, to my vehicle.  When

22  it was all damaged, everybody was sad.

23    Q.    Had you been in a car accident before

24  this one in November of 2016?

25    A.    Uh-huh.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3890

1      Q.     How many; do you know?

2      A.     To the best of my knowledge, two.  To

3  the best of my knowledge, two.

4      Q.     That's fine.  And those other two

5  accidents, were either one of them relatively

6  severe damage to the car?

7      A.     Uh-huh.

8      Q.     Any of those cars totaled?

9      A.     Uh-huh.

10      Q.     Both of them?

11      A.     Uh-huh.

12           MR. HOLMES:  Just for the -- you

13  indicated "yes" to all three of those questions?

14           THE WITNESS:  Yes, I'm sorry.

15           MR. HOLMES:  Okay.  If you don't mind --

16           MR. WHITLEY:  Sure.

17           MR. HOLMES:  -- Mr. Whitley.  If you can

18  remember to --

19           THE WITNESS:  Gotcha.

20           MR. HOLMES:  -- verbalize --

21           MR. WHITLEY:  Thank you.

22           MR. HOLMES:  -- the record will be

23  clearer.

24           MR. WHITLEY:  I'm glad you noticed it

25  because I didn't.  So thank you.

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com          *Serving all of North Carolina*        (919) 557-4640
**JA3891**

1   BY MR. WHITLEY:

2       Q.    When you got into the accident in

3   November of 2016, did you know that the other

4   driver's insurance company may pay for the property

5   damage of your car?

6       A.    I did.

7       Q.    Okay.  Because you had been through that

8   process before?

9       A.    Yes, sir.

10      Q.    Did you know that they might pay for any

11  medical treatment you received?

12      A.    I did.

13      Q.    Because you had been through the process

14  before?

15      A.    Yes.

16      Q.    Did you keep track of any bills that you

17  had related to the accident?

18      A.    Yes.

19      Q.    Okay.  Did you do that because you had

20  been through that process before?

21      A.    Yes.

22      Q.    Okay.  You didn't miss any time for work

23  for the accident in November 2016, did you?

24      A.    I was late for work.

25      Q.    Did you have any lost wages because you

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com      Serving all of North Carolina      (919) 557-4640
                          JA3892

1    were late?

2         A.    I did.

3         Q.    Did you?  You paid hourly?

4         A.    Yes, sir.

5         Q.    Okay.  Did you file a claim for any lost

6    wages?

7         A.    I don't -- I don't recall if I did.

8         Q.    Did you know that you potentially could

9    recover lost wages?

10        A.    I figured as much.  I just can't

11   remember if I did or not.

12        Q.    Had you ever filed a claim for lost

13   wages in the other previous two accidents?

14        A.    I did.

15        Q.    You did?

16        A.    The first one.

17        Q.    In either of the other two accidents,

18   did you have an attorney assist you?

19        A.    I did not.

20        Q.    When you -- when you did file a claim

21   for lost wages in a prior accident, how did you

22   know that was possible?

23        A.    It just seemed like common sense.  If,

24   you know, somebody caused me to lose work and it

25   seemed -- it just made sense that that would be

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3893

1   part of, you know, the compensation for the

2   accident and everything involved in it.

3        Q.    Do you think that everybody would know

4   that they could potentially seek lost wages after

5   they got into an accident?

6        A.    I wouldn't know.

7        Q.    Do you think every person would know

8   that you could have your medical treatment covered

9   after an accident?

10       A.    I think it would depend on their level

11  of education.

12       Q.    So might vary from person to person?

13       A.    I believe that would be correct.

14       Q.    Was any part of your claim for the

15  accident in November of 2016 for pain and

16  suffering?

17       A.    No.

18       Q.    Okay.  Did you know that you could

19  potentially seek a settlement payment for pain and

20  suffering?

21       A.    Yes.

22       Q.    Do you think everybody that gets into a

23  car wreck would know they could seek some sort of

24  compensation for pain and suffering?

25       A.    I wouldn't know.  I mean, you see

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3894

1  commercials about it all the time on TV, so it

2  seems like it would be common knowledge, but, I

3  mean, from person to person, I don't know.

4        Q.    Do you think knowing that you can

5  potentially seek compensation for pain and

6  suffering or for medical bills or for lost wages,

7  would that be helpful to a person who wouldn't

8  otherwise know?

9        A.    I think that would be helpful.

10        Q.    Now, you didn't engage an attorney for

11  any of the three accidents that we're discussing,

12  right?

13        A.    That's correct.

14        Q.    Okay.  Before you engaged your attorneys

15  in this case, did you know that some attorneys are

16  willing to represent people who have been involved

17  in an accident on a contingency basis?

18        A.    I believe I understand that, yes.

19        Q.    Do you think that everybody who gets

20  into an accident knows that there are attorneys

21  who'll essentially represent them for no cost and

22  only recover or only be paid if there's a

23  settlement or a recovery?

24        A.    I don't know.

25        Q.    Again, depending on person to person?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA3895

1      A.      Yeah.

2      Q.      Do you think it would be useful for

3  people who didn't know that there was an attorney

4  who would represent them at no cost, would that be

5  useful to them?

6      A.      I guess it would depend on the

7  situation.

8      Q.      Could you -- do you think there may be

9  people who wouldn't seek out compensation because

10  they didn't think they could get an attorney to

11  represent them at no cost?

12      A.      That's -- that seems -- I mean, that

13  could happen, yes.

14      Q.      For the wreck in November of 2016, did

15  you give a written or recorded statement to the

16  other driver's insurance company?

17      A.      I don't remember if I did.

18      Q.      In all three of the accidents we're

19  discussing, did the other driver have insurance?

20      A.      Yes.

21      Q.      To your knowledge, have you ever been in

22  a wreck when the other driver was uninsured or

23  underinsured?

24      A.      Not to my knowledge, no.

25      Q.      Do you know how the uninsured and

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3896

1  underinsured motorist coverage works?

2      A.    I have a vague understanding of that,

3  but not -- I mean, if you were going to ask me a

4  lot of questions, I wouldn't be able to -- I

5  wouldn't be able to go deep on that.  But I

6  understand the term and the concept, and I know a

7  little bit but not much.

8      Q.    I don't intend to ask you a lot of

9  questions on that.  If you had been in an accident

10  where the other driver was uninsured or

11  underinsured, would it be helpful to you to have

12  some information provided to you about what that

13  situation means or what other avenues you might

14  have to seek compensation?

15      A.    I think it would probably be helpful.  I

16  would -- I mean, honestly, I would call my

17  insurance company if something happened and I

18  didn't know what to do.  I've had my policy with

19  the gentleman -- with Farm Bureau for a while, and

20  when I have questions, I just call him and he helps

21  me to understand what I need to understand.  It's

22  outside of my realm of education.

23      Q.    So going back to the accident we've been

24  talking about in November of 2016, do you

25  remember -- it was on November 15th; is that

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina      (919) 557-4640
                        JA3897

1  correct?

2       A.    I think so.

3       Q.    Okay.  Do you remember when you first

4  got a letter from a law firm after the accident?

5       A.    It was within a couple of days.  I don't

6  recall the exact date.

7       Q.    Sure.  Do you remember how many letters

8  you got in total?

9       A.    I don't recall the number.

10      Q.    More than five?

11      A.    Definitely.

12      Q.    More than 10?

13      A.    Probably.

14      Q.    More than 20?

15      A.    No, I don't think so.

16      Q.    Somewhere between 10 and 20?

17      A.    Yes, sir.

18      Q.    Okay.  Over what period of time did you

19  get letters?

20      A.    It was about a week.

21      Q.    Do you know, as you sit here today,

22  without having to look back at anything, do you

23  know any of the names of the firms that you

24  received letters from?

25      A.    I don't.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3898

1        Q.    We talked earlier about two piles of

2    mail that you had:  The to be read and perhaps junk

3    mail.  When these law firm letters came in, which

4    pile did they go in?

5        A.    I read them.

6        Q.    You read each one of them?

7        A.    Yes, I did.

8        Q.    Can you tell me what any one particular

9    packet or letter said from the firms?

10       A.    They all said similar -- similar things.

11   You know, you've been in an accident, we can help

12   you get the most amount of money for your claims

13   and damages, basically, call us.

14       Q.    And what was your immediate reaction

15   when you received the letters?

16       A.    I was a little bit -- well, I was -- I

17   was irritated because I just had this trauma, and

18   now here's all this solicitation for, hey, you

19   know, let us help you sue somebody.  It was -- it

20   was -- it just seemed that it happened very

21   quickly, and it was a lot.  It was just a lot of --

22   a lot of mail that I don't think that needed to

23   happen.

24       Q.    And you said you read each one of the

25   letters that came in?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3899

1      A.    I did.

2      Q.    Or packages.  Let me ask this.  Did some

3  of them include more than a letter?

4      A.    Yes.

5      Q.    Was there any information in any of the

6  packages that were sent by the law firms that you

7  found helpful?

8      A.    No.

9      Q.    Did any of the packages discuss

10  underinsured or uninsured insurance and the

11  potential issues one might have to face in seeking

12  compensation?

13      A.    I don't recall reading that in any of

14  them.

15      Q.    Did any of them discuss representing you

16  on a contingency fee basis?

17      A.    I don't recall.

18      Q.    Did any of them discuss having the other

19  driver's side insurance pay for medical treatment?

20      A.    I recall that it said about other --

21  other person's insurance paying for stuff, but I

22  don't recall if it specifically said medical.

23      Q.    Do you recall any of them discussing

24  about seeking compensation for lost wages?

25      A.    I couldn't say with certainty.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina      (919) 557-4640
                              JA3900

1      Q.    So you didn't particularly find anything

2   in these packages helpful?

3      A.    No.

4           MR. HOLMES:  Objection.  Asked and

5   answered.  You can go ahead and answer.

6           THE WITNESS:  Oh, no, I didn't.

7   BY MR. WHITLEY:

8      Q.    We talked about earlier there may be

9   some people, varies from person to person, who

10  might find information about seeking lost wages

11  helpful; is that right?

12     A.    They might, yes.

13     Q.    Okay.  So some people that got these

14  letters that would be in an accident might have

15  information that they find helpful?

16     A.    They might.

17     Q.    Now, did you engage the services of any

18  of the attorneys that you received a letter from?

19     A.    No, sir.

20     Q.    Do you think that some people, when they

21  receive letters like this after an accident, that

22  they engage the services of one of these law firms?

23     A.    Probably.  I don't know, but I assume

24  that some people, you know, some people may act on

25  that.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3901

1        Q.    Now, you will probably have a better

2   sense of this than me because it all goes in a big

3   pile, but you have a pile of mail that you sort of

4   designate as junk mail.  Still look through it, but

5   it's junk mail?

6        A.    (Witness nods head up and down.)

7        Q.    How much unsolicited mail do you think

8   you get in a week?

9        A.    I don't get a lot of unsolicited mail.

10  I'm on the do not mail list, so I don't get a lot

11  of -- I don't get a lot of junk mail.

12       Q.    What kinds of stuff do you get that you

13  still think is junk mail?

14       A.    I'm get some fliers from the grocery

15  stores.  I'm trying to visualize my mail.  Every

16  once in a while I think I get a credit card offer,

17  and I find those particularly irritating.  But

18  that's pretty much it.  Just mostly the grocery

19  store ads, fliers, that kind of thing.

20       Q.    Do you ever use something from the

21  grocery store like a coupon that's sent to you in

22  the mail?

23       A.    Occasionally.

24       Q.    Certainly just be a rough estimate, and

25  I don't want to hold you to this, but how many

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3902

1    pieces of unsolicited mail do you think you get in

2    a week?

3            A.     Maybe three or four.  Not a lot.

4            Q.     Three or four.  So maybe somewhere

5    between 10 and 12 a month?

6            A.     Sounds about right.

7            Q.     Do you think it would be difficult to

8    keep all the unsolicited mail that you receive for

9    three months?

10           A.     Do I think it would be difficult to keep

11   it?  No.

12           Q.     Do you think keeping and holding on to

13   mail over a three-month period, unsolicited mail

14   for a three-month period, that would be a burden

15   that you could bear as a class representative?

16           A.     The word "burden" is a little bit

17   confusing.  I don't think that -- I don't consider

18   keeping mail a burden or not.  I think that I -- I

19   like things neat and tidy, and I don't like a bunch

20   of extra stuff.  Like, this is too much.  There's

21   stuff everywhere.

22                  So it would be -- it would be

23   problematic for me to have a bunch of mail stacked

24   up.  Yes, that would be -- that would be a problem

25   for me.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3903

1      Q.     If you could find a way to not have it

2   stacked up on your counter, do you think it would

3   be fair, as a class representative, to have to hold

4   on to mail for a three-month period and hand it

5   over to your attorneys, for instance?

6      A.     Related to the case?

7      Q.     Yes.

8      A.     That would be fair.

9      Q.     Again, apologies for jumping around.

10  I'm going to jump back to your conversations with

11  the other driver's insurance company.  Do you

12  remember what insurance company that was?

13     A.     I think she had State Farm.

14     Q.     Do you remember any documents that you

15  had to sign based on your conversations or the

16  ultimate settlement with State Farm?

17     A.     I feel like they either e-mailed me or

18  sent me something that I had to sign for my -- the

19  settlement for my car.

20     Q.     Do you remember what that document was?

21     A.     I think that we had to do the -- all of

22  a sudden, I'm losing the word, the -- not the deed,

23  but the title.  I think we had to do a title thing

24  because it was totaled and they took possession of

25  it, so I think I had to sign the title over.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3904

1      Q.     And how long after the wreck did you

2   ultimately settle with State Farm; do you remember?

3      A.     It seems like it was a few weeks.  Seems

4   like it took kind of a while.

5          MR. HOLMES:  Mr. Whitley, no rush, but

6   when you get to a natural stopping point, if we

7   could take a five-minute break.  I just --

8          THE WITNESS:  I could use a bathroom

9   break too, so.

10          MR. WHITLEY:  Right now is good a time as

11   any.

12          MR. HOLMES:  Okay.

13            (A BRIEF RECESS WAS TAKEN.)

14   BY MR. WHITLEY:

15      Q.     Welcome back, Ms. Steinmetz.  Before we

16   took a break, we were talking a little bit about

17   documents you had to sign for the other driver's

18   insurance company?

19      A.     Yes, sir.

20      Q.     Particularly the title transfer.  Do you

21   think there was a -- that was a "yes," I'm sorry?

22      A.     Yes, yes.

23      Q.     Easy to forget.  Was there a final

24   settlement document accepting the amount of money

25   that they were willing to pay for the -- for the

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                            JA3905

1   car?

2       A.    I believe there was.

3       Q.    And was there another separate document

4   for medical bills?

5       A.    I believe there was.

6       Q.    Any other documents that you can recall?

7       A.    No, sir.

8       Q.    I believe you said earlier that you --

9   you took less than what you thought was fair for

10  the car; is that right?

11      A.    Yes, that's correct.

12      Q.    Did you feel like the other driver's

13  insurance company was on your side?

14      A.    No.

15      Q.    Did you feel like you could entirely

16  trust them?

17      A.    I never thought about it.

18      Q.    Okay.  In your experiences in two prior

19  wrecks and dealing with those other drivers'

20  insurance companies, did you feel those insurance

21  companies were on your side?

22      A.    I felt like they were on the best

23  interest of their client's side actually.

24      Q.    Which that would make sense, right?

25      A.    Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3906

1      Q.     You said you were registered to vote in
2  North Carolina; is that right?
3      A.     That's correct.
4      Q.     Okay.  Do you remember what information
5  you provide to the state when you register to vote?
6      A.     I don't.
7      Q.     Okay.  Do you think your -- you have to
8  give your home address to the state?
9      A.     That would make sense.  I believe so.
10      Q.     And your -- your name?
11      A.     Yes, sir.
12      Q.     Do you consider your name and address to
13  be private information?
14      A.     I do not.
15      Q.     Do you think your race or ethnicity is
16  private information?
17      A.     I do not.
18      Q.     Your gender private information?
19      A.     No.
20      Q.     Do you think whether you've voted in a
21  particular primary for Republican or Democrat, do
22  you think that's private information?
23          MR. HOLMES:  Well, now, wait a minute,
24  just a technical matter.
25          MR. WHITLEY:  Sure.

www.NCDepo.com              *Depositions, Inc.*
info@NCDepo.com       *Serving all of North Carolina*      (919) 557-4640
                          **JA3907**

1          MR. HOLMES:  Who she voted for?

2          MR. WHITLEY:  No.

3          MR. HOLMES:  Because --

4          MR. WHITLEY:  Let me -- let me clarify.

5          MR. HOLMES:  Please.

6  BY MR. WHITLEY:

7     Q.    Do you think the fact that you voted in

8  a particular primary, whether it was the Democratic

9  primary or the Republican primary, do you think

10 that fact is private information?

11    A.    I don't know actually.

12    Q.    Okay.  Do you think the fact that you

13 voted in 2016 or 2012 in a particular election, do

14 you think that's private information?

15    A.    I don't.

16    Q.    I haven't made you look at documents

17 yet, but we're going to at least look through a few

18 now.

19          And I believe we said this is going to

20 be Exhibit 362?

21          MR. HOLMES:  What is that number?

22          MR. WHITLEY:  362.

23          (Exhibit 362 was marked.)

24 BY MR. WHITLEY:

25    Q.    So, Ms. Steinmetz, the document you've

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina        (919) 557-4640
                          JA3908

1   been handed as 362 is titled North Carolina State

2   Board of Elections.  Did I read that right?

3        A.    Yes.

4        Q.    Okay.  Are you at all familiar with the

5   general layout of what this document is?

6        A.    No.

7        Q.    And please take your time if you need to

8   look through it, but I'll represent to you that

9   this is a printout from the North Carolina State

10  Board of Elections website.

11       A.    Okay.

12       Q.    Have you ever visited that website?

13       A.    I think I have when I was trying to find

14  out where I needed to vote at one point.

15       Q.    Okay.

16       A.    So I think -- I think I probably have

17  been to this website.

18       Q.    Have you ever looked up to see if the

19  Board of Elections has any information on you at

20  this website?

21       A.    I don't recall if I've looked it up, but

22  it would make sense that they would since I'm a

23  registered voter.

24       Q.    So if you'll -- I'll just explain

25  generally what this document is.  The first seven

www.NCDepo.com                  *Depositions, Inc.*
info@NCDepo.com          *Serving all of North Carolina*        (919) 557-4640
**JA3909**

1   pages are just the printout of the home page of the

2   North Carolina State Board of Elections.  Just

3   happens to only fit within seven pages.  If you'll

4   look back to the eighth page, and at the top, very

5   top it should say "voter search."

6          A.    Uh-huh.

7          Q.    And then you see your name there, and

8   first name and Steinmetz and the last name --

9          A.    Yes.

10         Q.    -- in search inquiries?

11               And then going back to the ninth page,

12  the search results from that search.

13         A.    I see.

14         Q.    Do you see that?

15         A.    Yep.  Yes.

16         Q.    Okay.  And do you recall doing any type

17  of search like this on the Board of Elections

18  website?

19         A.    I don't recall.  Well, like I said, I

20  know that I went -- I know that I've been on the

21  website at least once because I wasn't sure where

22  to vote, so that would -- that would make sense.

23         Q.    Okay.  And then to the final two pages,

24  the search results.

25         A.    Uh-huh.

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina        (919) 557-4640
JA3910

1        Q.    Clicked on your name.  Were you aware

2    that you were able to get to this information

3    pertaining to you --

4        A.    No.

5        Q.    -- on the Board of Elections website?

6        A.    Had no idea.

7        Q.    And just walking through the information

8    on here, it's got your first and last name; is that

9    right?

10       A.    Yes.

11       Q.    Okay.  And 82 Winwood Drive, Angier,

12   North Carolina 27501?

13       A.    That's correct.

14       Q.    That's your current address?

15       A.    That is correct.

16       Q.    Okay.  Harnett County --

17       A.    Yes, sir.

18       Q.    -- is currently where you live?

19       A.    Yes.

20       Q.    Your voter registration number.  Not

21   that I would expect you to necessarily know that

22   off the top of your head, but any reason to doubt

23   that's your voter registration number?

24       A.    I'll take note of that.

25       Q.    It's got your party listed as

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3911

1   Republican.

2        A.    Uh-huh.

3        Q.    Okay.  Your race is white, ethnicity

4   undesignated.

5        A.    That's correct.

6        Q.    Your gender is female?

7        A.    Yep.

8        Q.    The date you registered to vote?

9        A.    Okay.

10       Q.    Whether or not you're a customer of the

11  North Carolina DMV.

12       A.    Yes, I am.

13       Q.    The place where you go for your polling

14  location?

15       A.    Uh-huh, yes.

16       Q.    Then lists your -- your various

17  jurisdictions that you vote for.

18       A.    Yes, sir.

19       Q.    Then on the final page, you see your

20  voter history there?

21       A.    Yes, sir.

22       Q.    Does that look accurate, that you had

23  voted in each one of these elections?

24       A.    It does.

25       Q.    Any of that information you feel to be

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3912

1    private information?

2         A.    No.

3         Q.    But you did not know that this

4    information was posted on the Board of Elections

5    website?

6         A.    I didn't.  Or if I did, I didn't

7    remember.

8         Q.    Right.  How does it feel to have -- to

9    know now that this information is on the Internet

10   on a governmental website?

11        A.    I feel like it's -- I don't really know

12   how I feel.  I didn't know that it was this

13   specific, but I -- I know that voter information

14   seems like it's pretty -- it's pretty public, so I

15   don't -- I don't have any feelings really, I guess,

16   one way or the other.  I just didn't know.  More of

17   an enlightenment than a feeling.

18        Q.    Sure.  Do you feel harmed by having this

19   information on the State Board of Elections

20   website?

21        A.    I do not.

22        Q.    Obviously, home address is part of the

23   information that's there on the Board of Elections

24   website.  So the address of where your home is, you

25   don't feel that's private information?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina           (919) 557-4640
                                    JA3913

1       A.      That's correct.

2       Q.      Do you feel any of that information

3  that's in Exhibit 300 -- 362, is that information

4  protected by the DPPA, to your understanding?

5       A.      Not to my understanding.

6       Q.      Do you think it's private information to

7  know how much you paid for your home?

8       A.      No, I think that's pretty public.

9       Q.      The amount of taxes you paid on your

10  home, is that public?

11       A.      Public.

12       Q.      Sort of walk through the same exercise,

13  although I think you've sort of answered the

14  question.

15              If I could enter Exhibit 363.

16              (Exhibit 363 was marked.)

17       A.      Thanks.

18       Q.      And you can take a minute if you want to

19  look through it.

20              (Pause.)

21              Do you understand what the document 363

22  is?

23       A.      Uh-huh, yes.

24       Q.      Does it appear to be the one particular

25  set of tax records for your current address?

www.NCDepo.com                     Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3914

1      A.     Yes, sir.

2      Q.     Did you know -- had you ever accessed

3  this information on the tax department's website

4  for Harnett County?

5      A.     I had not.  And you said for my current

6  address, but this is actually my old address.

7  Well, some of it is my old address.

8      Q.     Thank you for that clarification.

9             So I'm looking at --

10     A.     The last page?

11     Q.     Well, let me look at page 4 first.  I'll

12 represent to you that's your last and first name

13 entered into the one search --

14     A.     Yes.

15     Q.     -- box for -- that's on the Harnett

16 County Tax Assessor's website.

17     A.     Yes.

18     Q.     And then the next page, does that appear

19 to be a list of different entries for different

20 addresses associated with you?

21     A.     Yes.

22     Q.     Okay.  And 82 Winwood Drive is your

23 current address?

24     A.     That's correct.

25     Q.     And then the final page, does that

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3915

1    appear to be a property tax bill for your current

2    address?

3          A.    That's what it looks like.

4          Q.    And on the final page, that has your

5    full name; is that right?

6          A.    Yes.

7          Q.    Okay.  Including your middle name, Lee.

8          A.    Yes.

9          Q.    And then your current, correct address;

10   is that right?

11         A.    Yes, sir.

12         Q.    Okay.  Is that the amount of the value

13   of the real property for your house?

14         A.    Yes.

15         Q.    The tax assessed value.

16         A.    Yes.

17         Q.    And then the amount of current taxes

18   due.

19         A.    Correct.

20         Q.    And if I could back you up one page to

21   the list of different addresses.  Do you recognize

22   the 886 Griffin Road in Lillington?

23         A.    I do.

24         Q.    Okay.  Was that -- that's not the Willow

25   Springs address; is that right?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3916

1    A.    That's correct.  Address before Willow

2    Springs.

3    Q.    Okay.  Did you own the home in Willow

4    Springs?

5    A.    No, that was a rental.

6    Q.    So you wouldn't have gotten a tax bill

7    for that particular address?

8    A.    Correct.

9    Q.    Did you know that this information was

10   on the Harnett County Tax Department's web page?

11   A.    I was not aware of that.

12   Q.    Okay.  Well, how do you feel now knowing

13   that that information is there?

14   A.    I mean, that's a lot of information, but

15   I guess if somebody wants to look hard enough,

16   they're going to find it anyway, so.

17   Q.    Do you -- do you think you're harmed by

18   having that information on the tax department's web

19   page?

20   A.    No.

21   Q.    Do you think the information that's on

22   the tax department's web page is information

23   protected by the DPPA?

24   A.    No.

25   Q.    And you can -- you're welcome to read it

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3917

1  if you want to, but I'm not going to ask you

2  anymore on that right now.

3           When you were in your accident in

4  November of 2016, did you know that the police

5  officer was going to generate an accident report?

6       A.    Yes, sir.

7       Q.    Okay.  How did you know that?

8       A.    Previous accidents.

9       Q.    Okay.  When you had had previous

10  accidents, did you ever go get a copy of your

11  accident report?

12       A.    Yes, sir.

13       Q.    Where did you go to get it?

14       A.    The -- the one before this one, I want

15  to say I went right to the police department in

16  Harnett County.  I think it was Harnett County.  I

17  went to the police department to pick it up.

18       Q.    Okay.  Actually went ahead and asked

19  them for a copy?

20       A.    I did, yes, sir.

21       Q.    And someone in the receptionist area

22  gave you a copy?

23       A.    Yes, sir.

24       Q.    Okay.  When did you first learn that

25  police officers generate accident reports after an

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3918

1  accident?

2      A.    I don't recall.  It's been a very long

3  time.

4      Q.    Did you know that you could access

5  accident reports -- certain accident reports over

6  the Internet?

7      A.    I did not know.  Me personally?

8      Q.    Yes.

9      A.    No, I did not know.

10     Q.    Have you ever gone and gotten a copy of

11  any of your accident reports from the Internet?

12     A.    No.

13     Q.    Would it have been helpful if the police

14  department had mailed you a copy of the accident

15  report after your accident?

16     A.    I don't know that it would have been

17  helpful.  Everything -- I mean, everything is --

18  went as smoothly as it could, you know, the

19  circumstances considered.

20     Q.    Sure.  Do you think every driver knows

21  that they can get a copy of their accident report

22  at the police department?

23     A.    I don't know.  I don't know what -- I

24  mean, I feel like everybody has different

25  information, so I don't -- I don't know what

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3919

1  everybody knows.

2        Q.     It would depend on the person.

3        A.     It would definitely depend on the

4  person.

5        Q.     Depend on if they've ever been in an

6  accident before?

7        A.     I think that makes a difference, yes.

8        Q.     Was there anything on your accident

9  report that you disagreed with?

10       A.     Not to my recollection.

11       Q.     You weren't listed as the at-fault

12 driver?

13       A.     That's correct.

14       Q.     When you went to the police department

15 to get a copy of the accident report for the

16 November 2016 accident, how did you ask for it?

17       A.     I didn't go for the 2016 accident.  It

18 was the one prior to that that I went to the police

19 department.  I don't actually -- I can't actually

20 remember how I got my accident report from the

21 police department for the 2016 accident.  I'm

22 trying to recall.  I'm trying to think.  I don't

23 remember how I got it, but I don't think it was --

24 that was the one that I went to get.  That was the

25 accident prior.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3920

1      Q.    Okay.  Thank you for that clarification.

2            Do you remember seeing the one for the

3  November 2016 accident?

4      A.    I do, yes, sir.

5      Q.    Okay.  So at some point, it was given to

6  you.

7      A.    Yes, sir.

8      Q.    Just not sure how you got it?

9      A.    Correct.

10     Q.    When you had gone to the police station

11 prior to 2016 and picked up an accident report, how

12 did you ask for it?

13     A.    I gave them a report number that the

14 officer gave me at the time of the accident.

15     Q.    Do you recall them asking for any

16 information from you other than the report number?

17     A.    I don't recall.

18     Q.    Do you remember whether the police

19 department asked you to confirm your identity

20 before you could pick up a copy of the accident?

21     A.    I don't remember if she asked me or not.

22 I think that -- yeah, I don't remember if she asked

23 me or not.

24     Q.    What -- what information do you remember

25 is on your -- your accident reports generally, but

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3921

1    I'll ask you about the one from November 2016?

2    What types of information are on there?

3         A.    My -- my information, the other person

4    that was involved in the accident's information,

5    and our insurance information.

6         Q.    Do you consider any of that information

7    that you just listed to be private information?

8         A.    No.

9         Q.    When you went to the police department

10   at any point to get an accident report, did you

11   understand that accident report to be a public

12   record?

13        A.    I did not have an understanding of that

14   one way or the other.

15        Q.    Okay.  When did you learn that some

16   accident reports are available online?

17        A.    Today.

18        Q.    Okay.  Fair.  Now might be a good time

19   to walk through this, so if we could look at 364.

20        A.    Thank you.

21             (Exhibit 364 was marked.)

22        Q.    So you're welcome to look through it

23   individually or we can walk through it sort of

24   together.

25        A.    Okay.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3922

1      Q.    So I'll represent to you that I was able

2  to go and obtain this information right before your

3  deposition today.  Have you ever been to the

4  website that's listed there on the front page of

5  Exhibit 364?

6      A.    I don't recall ever going to this

7  website.

8      Q.    Okay.  But does it appear to be the

9  North Carolina --

10                  (Interruption.)

11  BY MR. WHITLEY:

12      Q.    Does 364, does it appear to be from the

13  North Carolina State Highway Patrol?

14      A.    Yes.

15      Q.    And it's collision information?

16      A.    Yes, sir.

17      Q.    Okay.  Have you ever been to this

18  website before?

19      A.    I don't think so.

20      Q.    Okay.  That first page, you can see

21  where I input your last name?

22      A.    Uh-huh.

23      Q.    And a date range from January 2015 to

24  the present -- or yesterday, it looks like.

25      A.    Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3923

1      Q.     And then on the second page is a number
2  of search results.
3      A.     Uh-huh.
4      Q.     Your name appears there twice; is that
5  right?
6      A.     Yes.
7      Q.     Okay.  And it's got your November 15,
8  2016, date of accident there?
9      A.     Uh-huh, yes.
10      Q.     Okay.  And then one from October 15th of
11  2015?
12      A.     Correct.
13      Q.     Is that one of the ones you were
14  remembering earlier?
15      A.     Yes.
16      Q.     Okay.  None of those other instances
17  appear to be you or related to you?
18      A.     Correct.  Ex-husband, correct.
19      Q.     Oh, there you go.  And then the next
20  page is the start of a two-page accident report for
21  your November 15th accident.  Does that look
22  familiar to you?
23      A.     Yes.
24      Q.     And so you did not know before today
25  that you could access this through the highway

www.NCDepo.com                     Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina       (919) 557-4640
                                    JA3924

1    patrol website?

2         A.    That's correct.

3         Q.    How do you feel now knowing that

4    information?

5         A.    I don't know.  I guess I don't know.

6    I've never -- I've never thought about it, that it

7    was just -- that you could just go online and look

8    that up, so I had no idea.

9         Q.    Does it matter to you that the highway

10   patrol has made this information public?

11        A.    I don't -- it matters, yes.

12        Q.    Okay.  Tell me why.

13        A.    I just don't think this should be public

14   information.  I mean, anybody could look this up.

15   That's not -- I don't think that's okay.

16        Q.    And I'll ask you about some of the

17   specific information, but you just learned this

18   today so I can assume you haven't asked the highway

19   patrol to take your information off the Internet;

20   is that right?

21        A.    That's correct.

22        Q.    Would you agree that once information is

23   posted out on the Internet for everyone to see,

24   that it's public?

25        A.    It's made public, yeah.  If it's -- I

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3925

1   mean, if it's put out there, then that becomes

2   public.

3        Q.    Do you think the North Carolina Highway

4   Patrol is violating your privacy by putting this

5   document online?

6        A.    Somewhat.

7        Q.    Okay.  Tell me how.

8        A.    I mean, what if I had a stalker?  They

9   could just get all my information.

10        Q.    Well, let me ask you about that.  The

11   accident report has your name there, right?

12        A.    Yes, sir.

13        Q.    Okay.  It has your address?

14        A.    Uh-huh.

15        Q.    Your address at the time, excuse me --

16        A.    Correct.

17        Q.    -- in 2016.

18        A.    Correct.

19        Q.    It's got your phone number.

20        A.    Yes.

21        Q.    Okay.  Do you think your name, address

22   and phone number are private information?

23        A.    They are not.

24        Q.    Can you tell me how the information in

25   this accident report would facilitate a stalker?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3926

1      A.     Having access to my address and phone

2   number I believe would make it pretty easy for

3   somebody to get to me if they were trying to.

4      Q.     In the same way that someone could

5   access the tax document we looked at, Exhibit 363?

6      A.     Yeah.  Yes, sir.

7      Q.     Or the voter records that we looked at,

8   362?

9      A.     Yes, sir.

10     Q.     Okay.  So that information is out in the

11  public in a number of ways; is that right?

12     A.     That's correct.

13     Q.     Now that you -- now that you know that

14  this is available through the highway patrol

15  website, do you have any thoughts about suing the

16  highway patrol?

17     A.     No, sir.

18     Q.     Did you know that North Carolina state

19  law requires the highway patrol to make accident

20  reports available?

21     A.     I did not know that.

22           MR. HOLMES:  Well, objection to the -- I

23  think that somewhat mischaracterizes the true

24  facts.

25           MR. WHITLEY:  That's fair.  Objection's

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3927

1    noted.

2    BY MR. WHITLEY:

3         Q.    Do you realize there's a statute that

4    provides that highway patrol may make accident

5    reports available as public records?

6         A.    I was not aware of that statute.

7         Q.    Okay.  Does the accident report itself,

8    does this look familiar to the one that you

9    eventually got in the course of -- after your

10   accident in dealing with the insurance company?

11        A.    Yes, sir.

12        Q.    Okay.  Is this accident report, is it a

13   document -- is it a report prepared by a law

14   enforcement agency?

15        A.    To the best of my knowledge, it was

16   prepared by the highway patrol so, yes, sir.

17        Q.    I'm looking in -- under the block of

18   your name.  Under the second block of your name

19   down towards the bottom, do you see "estimated

20   damage"?

21        A.    Yes.

22        Q.    $2,500?

23        A.    Uh-huh.

24        Q.    Is that less or more than what you

25   ultimately settled for?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3928

1        A.     I don't remember exactly what the
2    settlement was.  I think it was close to that, but
3    I don't -- I don't recall the exact number.
4        Q.     Okay.  But it's your understanding that
5    was what the highway patrolman estimated the damage
6    to be at the time?
7        A.     Yes, sir, that was my understanding.
8        Q.     And the address that is listed, that's
9    your correct address at the time?
10       A.     At the time, that's the correct address.
11       Q.     Is there anything on there about your
12   car or any of the other information in those two
13   boxes on the first page of the accident report,
14   does any of that look inaccurate to you?
15       A.     No, not that I can -- not that I can
16   point out, no.
17       Q.     Okay.  Can you see in each of the boxes
18   that are sort of at the periphery or the edges,
19   there's a box -- yes -- Number 1, Number 2,
20   Number 3, and they have a -- they have numbers
21   within them?
22       A.     Yes.
23       Q.     Okay.  Do you know what any of those
24   mean?
25       A.     No, sir.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                  JA3929

1     Q.    Okay.  Did you ever learn what any of

2  those meant in the course of dealing with the other

3  insurance company?

4     A.    No, sir.

5     Q.    Okay.  Do you think it would be helpful

6  to know what those mean as you're trying to decide

7  whether to settle a case?

8     A.    I think it could be helpful.

9     Q.    Do you know if any of those codes

10  indicate whether you're an at-fault driver or not

11  an at-fault driver?

12     A.    I do not know that.

13     Q.    Would it be helpful to know what the

14  police listed you as in determining whether or not

15  you are going to settle a case?

16     A.    I don't think it would be helpful

17  because I know I was not at fault, so.

18     Q.    Sure.  But let me just ask it a

19  different way.  If you thought yourself to not be

20  at fault, knew yourself not to be at fault but the

21  police report inaccurately listed you as at fault,

22  would that make a difference to you?

23     A.    It would be useful information in that

24  aspect, yes, sir.

25     Q.    If, for instance, the other driver's

www.NCDepo.com                      Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                   JA3930

1   insurance company had represented that you were the

2   at-fault driver, do you think it would have been

3   helpful to be able to point to something on this

4   accident report and say, no, I wasn't?

5        A.    It might have been helpful.  I don't

6   know that -- I don't know.  I haven't -- hadn't

7   really thought about it.

8        Q.    If I can, just for a second, have you

9   flip back after the November 2016 accident report,

10  there should be two more pages at the end of

11  Exhibit 364.

12       A.    Uh-huh.  Yes.

13       Q.    Does that appear to be the other

14  accident report listed on your search results

15  earlier in this document?

16       A.    Yes, sir.

17       Q.    Okay.  That's for October 15th, 2015?

18       A.    Yes, sir.

19       Q.    Okay.  Did you know that this accident

20  report was available online?

21       A.    No.

22       Q.    Okay.  Just looking it over, does the

23  information about you appear to be correct at the

24  time?

25       A.    Yes.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3931

1          Q.    Do you remember if you ever got any

2    mailings from law firms after this accident in

3    October of 2015?

4          A.    I don't recall.

5          Q.    And do you remember the circumstances of

6    this accident?

7          A.    I do.

8          Q.    Do you remember whether you were at

9    fault?

10         A.    I was.

11         Q.    Okay.  On the second page of the

12   October 2015 accident, there's a -- towards the

13   bottom there's a narrative down there.  Do you see

14   that?

15         A.    Yes.

16         Q.    Give you a second to look at it.  And my

17   question is, is -- does that appear to be accurate

18   as far as your representation of what happened in

19   this accident?

20         A.    That's -- yes.

21         Q.    Were you given a traffic or moving

22   citation after this accident?

23         A.    I don't believe I was.

24         Q.    Looking back at the 2016 accident, I'll

25   point you to the narrative on the second page.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                               JA3932

1   Does that narrative appear to be accurate?

2          A.     (Witness reads narrative to herself.)

3                 Yes, that's accurate.  Well, I don't

4   know if that's accurate actually.  I don't know if

5   she was stopped, so I don't know.  I don't -- I

6   didn't -- I don't recall seeing her in my rearview

7   mirror, so I don't recall if she was stopped or if

8   she was moving and then stopped and then started

9   moving again.  I know I was stopped.

10         Q.     You don't know if she was behind you and

11  then accelerated faster than you started or whether

12  she never stopped and just ran right into you?

13         A.     That's correct.

14         Q.     Okay.  Understood.  You eventually saw a

15  copy of this report after your accident; is that

16  right?

17         A.     Yes, sir.

18         Q.     Okay.  But you don't know when?

19         A.     That's correct.

20         Q.     And you're not sure where you got it

21  from?

22         A.     Correct.

23         Q.     Which is fine.  What I want to ask is,

24  had you seen a copy of this accident report before

25  you started talking to the other driver's insurance

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3933

1  company?

2       A.     I don't believe I had.

3       Q.     Okay.  Do you think you saw a copy of

4  this report before you ultimately settled with the

5  other driver's insurance company?

6       A.     I don't recall exactly, but probably.  I

7  would say I probably did.  If anything, just in the

8  exchange of getting the report to the other -- the

9  person that hit me's insurance company if they had

10  asked for it.  I don't remember.  I know that I

11  need -- I know that you need an accident report

12  when there's an accident, and so I just knew that

13  there was going to be one.

14      Q.     Do you know whether or not the other

15  driver's insurance company had a copy of your

16  accident report by the time you first contacted

17  them?

18      A.     I do not have -- I do not have any idea.

19      Q.     Did you know that insurance companies do

20  have access to these accident reports?

21      A.     I didn't know that.

22      Q.     We talked a little bit earlier about the

23  amount you settled with the other driver's

24  insurance company and whether or not you felt they

25  were on your side.  So my question is, do you think

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com              *Serving all of North Carolina*        *(919) 557-4640*
**JA3934**

1    it's fair for the other driver's insurance company

2    to have access to this information in talks of

3    settling your claim before you might have access to

4    this information?

5         A.    I don't think it makes a difference one

6    way or the other, honestly.

7         Q.    Would you have preferred to know all of

8    the details in the police officer's report as you

9    were discussing whether to settle your claim and

10   how much to settle for?

11        A.    It didn't matter to me.

12        Q.    Do you think any other drivers who are

13   in contact with insurance companies would like to

14   know the information that are on their accident

15   reports before they enter into settlement

16   discussions?

17        A.    I don't know what other drivers want.  I

18   mean, I think it -- they might, but I don't -- I

19   don't know.  I mean, I -- I don't really -- I don't

20   know.

21        Q.    Again, would it depend person to person?

22        A.    It would be a person-to-person thing,

23   yes, sir.

24        Q.    Different circumstances might warrant

25   having more information for talking with the

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                          JA3935

1  insurance company?

2       A.    They might.

3       Q.    Let me go back to right after your

4  November 2016 accident.  You did not engage any law

5  firm to assist you in settling that claim, correct?

6       A.    That's correct.

7       Q.    Did you ever call any of the law firms

8  that sent you a mailer?

9       A.    No, sir.

10      Q.    Do you recall whether any of the law

11 firms that mailed you included a copy of the

12 accident report?

13      A.    Yes.

14      Q.    Yes, you recall?

15      A.    Yes, I recall that there was a couple --

16 there were more than a couple that had a copy of

17 the accident report in there.

18      Q.    So that may be one way that you received

19 a copy of the accident report.

20      A.    Hadn't thought about it, but yes.

21      Q.    And at the time, you knew you could go

22 to a particular police station and get a copy of

23 the accident report?

24      A.    Yes, sir.

25      Q.    Because you had done that before.

www.NCDepo.com               Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina      (919) 557-4640
                           JA3936

1      A.    Correct.

2      Q.    But you didn't know that you could go

3   online necessarily and get a copy; is that right?

4      A.    Correct.

5      Q.    There was never any litigation about

6   your November of 2016 accident; is that right?

7      A.    That's correct.

8      Q.    No case was ever filed?

9      A.    Correct.

10      Q.    Okay.  Generally when people file

11   lawsuits, it's to seek compensation for some

12   injury.  Does that make sense to you?

13      A.    Yes, sir.

14      Q.    Would you agree with that statement?

15      A.    Yes.

16      Q.    In this lawsuit, you understand that the

17   defendants are law firms and some individual

18   attorneys?

19      A.    Yes, sir.

20      Q.    Okay.  In a lawsuit seeking compensation

21   for injuries, can you tell me how these defendants

22   have injured?

23      A.    Yes, sir.  They violated my protected

24   personal information through the DPPA for purposes

25   that they weren't supposed to.  And so not only did

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com              *Serving all of North Carolina*      *(919) 557-4640*
**JA3937**

1    they access it, but they used it then for purposes

2    that were not allowed by the DPPA.

3         Q.    Okay.  So I think I heard you say two

4    things there; they accessed information and then

5    used it?

6         A.    Yes, sir.

7         Q.    Okay.  So I want to talk about both of

8    those.  What is your understanding how the

9    defendants accessed the information?

10        A.    How they accessed it?

11        Q.    Yes.

12        A.    I don't actually know.  I don't have an

13   understanding of how they were able to access my

14   information.  Yeah, I don't know.

15        Q.    And so looking back at the exhibit we

16   were just looking at with the information available

17   online --

18        A.    Yes, sir.

19        Q.    -- do you understand that one way these

20   defendants could have accessed it is by looking

21   online?

22        A.    I do now.

23        Q.    Is there anything in your understanding

24   that would prevent any other general person in the

25   public to go on that website and access the same

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina          (919) 557-4640
                              JA3938

1    information?

2         A.    Not to my understanding.

3         Q.    When did you -- when did you first know

4    that any of the defendants accessed your

5    information on the accident report?

6         A.    When I got the mail, the letters in the

7    mail.

8         Q.    Okay.  So presumably the defendants had

9    accessed that information at some point before you

10   received the mail, right?

11        A.    Yes, sir.

12        Q.    Okay.  But you did not know that they

13   had accessed the information at that point?

14        A.    Correct.

15        Q.    Can you tell me whether or not you were

16   harmed when the defendants accessed the

17   information?

18        A.    By violating my privacy, yes.  That

19   was -- I mean, they -- by accessing it, they

20   violated the law so, yes, sir.

21        Q.    So let's say for a second the DPPA

22   didn't exist.  Would you have been harmed when the

23   defendants accessed the information?

24        A.    If the DPPA didn't exist, I would expect

25   not.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3939

1    Q.    Okay.  So it's a -- tell me if you agree

2    with this statement.  The question of not --

3    whether or not you were harmed is whether or not

4    the DPPA says it's a violation of the law to access

5    this information?

6              MR. HOLMES:  Objection.

7              THE WITNESS:  Correct.

8              MR. HOLMES:  Objection to the form.  You

9    can answer.

10             THE WITNESS:  I would agree with that.

11   BY MR. WHITLEY:

12   Q.    Okay.  Have you had your identity stolen

13   since the time of your -- your accident in November

14   of 2016?

15   A.    I have some actually very recent

16   questionable activity that I'm looking into with

17   the credit bureau.  But not stolen, not that I'm

18   aware of.  But I have some activity that I've been

19   alerted to that I'm investigating now or -- not

20   investigate.  I'm looking into it.

21   Q.    Sure.

22   A.    I'm filing a complaint and -- not a

23   complaint.  I'm filing a dispute with the credit

24   bureau and I'm having to put a freeze on my credit.

25   Something is happening as of late last week, so,

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3940

1    yeah.

2         Q.    And I don't want you to give away any

3    confidential information, but is that relating to a

4    particular credit card or line of credit?

5         A.    No.

6         Q.    Okay.  What brought it to your

7    attention?

8         A.    I use a credit monitoring agency, and a

9    hard inquiry was placed on my credit that I didn't

10   do.

11        Q.    And that occurred just in the last week,

12   you said?

13        A.    Yes, sir.

14        Q.    Between November 2016 and last week, did

15   you have any indication that you had your identity

16   stolen?

17        A.    No, sir.

18        Q.    Since November 2016, have you had any

19   harassment or stalking that you've experienced?

20        A.    No, sir.

21        Q.    So we talked about access a little bit,

22   and I'm going to talk about the other part when you

23   indicated the defendants used your information.

24        A.    Yes, sir.

25        Q.    What do you mean by "how they used it"?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3941

1      A.     The -- with -- they used the information

2  to create the mail that they sent to me for

3  advertising for legal services.

4      Q.     Just in your own words, can you tell me

5  how that injures you?

6      A.     Well, it exposed my information to a lot

7  of people that didn't necessarily -- would not have

8  necessarily come across my information otherwise.

9  So there were that many more instances where people

10  had access to my protected information that really

11  shouldn't have.

12      Q.     Okay.  Who are those people or

13  categories of people that would not have otherwise

14  been able to access your information?

15      A.     The -- I guess the person who accessed

16  it initially, the people who printed the fliers,

17  stuffed the envelopes, the mail carrier, my

18  neighbor.  One of them got delivered next door to

19  my neighbor, so.

20      Q.     What -- what information about you was

21  on the outside of the mailers that you got?

22      A.     To my recollection, my name and my

23  address.

24      Q.     Okay.  Would your neighbor have known

25  your name and address?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3942

1        A.      Yes, sir.

2        Q.      The person who initially got the

3   information at the law firm, would they have been

4   able to get your name and address from your voter

5   records, for instance?

6        A.      They would have.

7        Q.      Okay.  Or your tax records?

8        A.      Yes, sir.

9        Q.      Okay.  Mail carrier, do you think they

10  knew your name and address before then?

11       A.      Yes, sir.

12       Q.      But could also get it from voter

13  records?

14       A.      Correct.

15       Q.      Is there any information on the outside

16  of the envelopes or the mailers that you received

17  that someone couldn't get from another source that

18  we've talked about today?

19       A.      Information about me?

20       Q.      Yes.

21       A.      No.

22       Q.      Okay.  So other than these people being

23  able to see your name and address, how else was

24  the -- the mailing, how else did that injure you?

25       A.      It was time consuming.  It was -- I was

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                  JA3943

1    annoyed that so quickly after an accident, my

2    information was out there and I was getting

3    advertisements in the mail.  That irritated me.

4    And then the time that I sat and read the letters

5    and then considered, do I need to make a phone

6    call, you know, what's the next action that I need

7    to take?  So it was, you know, time and

8    aggravation.

9        Q.    In that time that it took you, how long

10   do you think you spent reading the mailers that you

11   received?

12       A.    Each one individually or collectively?

13       Q.    Either way you want to answer it.

14       A.    I would say I probably spent maybe,

15   like, 10 to 15 minutes on each.  I mean, I looked

16   at it.  Like, I really -- you know, I looked at the

17   information.

18       Q.    Ten to 15 minutes each, and I think you

19   estimated somewhere between 10 and 20 mailers?

20       A.    Yes, sir.

21       Q.    Okay.  Were you injured in having to

22   retrieve the mailers from the mailbox?

23       A.    I wouldn't consider that to be -- I

24   don't think I would consider that to be an injury,

25   but if they weren't there, I wouldn't have had to

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3944

1  get them, so.

2      Q.    Well, would you have walked to the

3  mailbox anyway to get other mail that you received

4  that day?

5      A.    Yes, sir.

6      Q.    Okay.

7      A.    Yes, sir.

8      Q.    In the time that you spent reading the

9  mailers, was that time after work?

10     A.    That's correct.

11     Q.    So did you lose any wages related to

12  reading these mailers?

13     A.    No, sir.

14     Q.    It's a bit of a legal term, so just tell

15  me if you don't understand it, but did receiving

16  the mailers cause you emotional distress?

17     A.    Emotional distress, I don't know if that

18  would be the word -- I mean, I was aggravated, so

19  aggravation could be emotional, so somewhat, yes.

20  It was aggravating to me that I was getting

21  advertisements right after my car got totaled.

22     Q.    And you said receiving the mailers right

23  after the accident is part of the explanation that

24  you described your injuries; is that right?

25     A.    Yes, sir.

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com        *Serving all of North Carolina*        (919) 557-4640
**JA3945**

1      Q.     What is it about the time between your

2  accident and receiving the mailers that is part of

3  the injury?

4      A.     It's just that it was so fast, like --

5  and I don't think it should have happened at all,

6  but it was so -- you know, my car is totaled and

7  here's 15 some odd, you know, advertisements for

8  legal services.  It was just -- it was aggravating.

9      Q.     Would it make a difference to you if it

10  had been 30 days out from the accident?

11     A.     No, I don't think so.

12     Q.     So we talked about the aggravation.  We

13  talked about the time that you spent reading the

14  mailers.  But you didn't lose any wages in the

15  course of reading the mailers.  Can you tell me how

16  much financial harm has occurred to you as a result

17  of receiving these mailers?

18     A.     I haven't had any financial harm.

19     Q.     Can you tell me whether there's been any

20  financial harm with respect to the -- any of the

21  defendants actually accessing the information in

22  the first instance?

23     A.     I think -- I don't understand the

24  question.  I'm sorry.

25     Q.     In the same way that I asked you whether

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina       (919) 557-4640
                             JA3946

1   there's been any financial harm from receiving the

2   mailers; if you back up a step, before you received

3   the mailers, the defendants at some point had

4   accessed that information to then send you the

5   mailer.  Did you have any financial harm from when

6   the defendants accessed the information?

7          MR. HOLMES:  Can you clarify what you

8   mean by "financial harm" so I can understand the

9   question?

10          MR. WHITLEY:  Sure.

11          MR. HOLMES:  In other words, are you

12  talking about out-of-pocket loss?

13          MR. WHITLEY:  Yes, out of -- let's say

14  out-of-pocket loss.

15          THE WITNESS:  No -- then, no.

16  BY MR. WHITLEY:

17      Q.    Okay.

18      A.    Thank you.

19      Q.    Again, I'm going to go back to our sort

20  of dual track here.  We talked about the harms from

21  receiving and reading the mailers.  I'm going to

22  switch back to the accessing portion.  I believe

23  you said you had no idea any defendant accessed the

24  information until you actually received a mailer;

25  is that right?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3947

1        A.      Yes, sir, that's right.

2        Q.      Okay.  So at the time any particular

3   defendant got this information from the accident

4   report, you weren't aware of it; is that right?

5        A.      That is correct.

6        Q.      Okay.  And so whatever irritation or

7   aggravation you had from receiving the mailers, you

8   didn't have that at the time the defendants first

9   accessed it; is that right?

10       A.      That's correct.

11       Q.      When that information was processed to

12  create a mailer, you weren't aware of that at all;

13  is that correct?

14       A.      Yes, sir, that's correct.

15       Q.      Okay.  When that information was

16  delivered to the post office to ultimately come to

17  your house, you weren't aware of that at all; is

18  that right?

19       A.      That's right.

20       Q.      Okay.  Do you believe at any of those

21  points before you received the mailers that you

22  were injured?

23       A.      I believe the fact that they accessed my

24  protected information is when I was injured

25  initially.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3948

1      Q.     Because the DPPA says that --

2      A.     Yes.

3      Q.     -- they're not allowed to do that.

4      A.     Yes, sir, that's correct.

5      Q.     Again, I ask you to pretend the DPPA

6   doesn't exist for a moment.  Were you injured in

7   receiving the mailers if the DPPA did not prohibit

8   the use of the information that you think it

9   protected?

10          MR. HOLMES:  You mean -- you're talking

11   about beyond her aggravation and irritation that

12   she's already testified to?

13          MR. WHITLEY:  Sure.

14          THE WITNESS:  If the DPPA did not protect

15   my personal information from DMV records then, no,

16   I don't think that I would be -- I would have no

17   protection against it, so I would have no -- no

18   reason to be injured.

19   BY MR. WHITLEY:

20      Q.     Do you think you still would have

21   been -- per your attorney's clarification, do you

22   still think you would have been injured with

23   respect to your irritation if the DPPA didn't

24   exist?

25      A.     I do, yes, sir.

www.NCDepo.com               Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
JA3949

1      Q.    If you had to put a number on the amount

2   you've been injured with respect to the defendants

3   accessing and using information in this case, can

4   you tell me what that number would be?

5      A.    I don't know that I would personally be

6   able to come up with a number.  I know that there

7   is an amount that they've set forth of $2,500 that

8   is what would be considered -- the amount that --

9   that they consider -- I can't think of the word I'm

10  trying to use.  Shoot.  Word finding difficulties

11  in a deposition.  That's embarrassing.

12     Q.    It happens.

13     A.    The amount that the law set forth is the

14  best number I can, you know, I could agree with.  I

15  couldn't come up with anything different on my own.

16     Q.    Do you think it's possible you've been

17  injured more than $2,500?

18     A.    Certainly possible.

19     Q.    Do you think it's possible you've been

20  injured less than $2,500?

21     A.    According to the law, no.

22     Q.    So the amount of the injury here -- are

23  you calculating at all based on your actual

24  injuries or the number that the law sets out?

25     A.    I'm -- I'm depending on the law, the

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina      (919) 557-4640
                        **JA3950**

1  information from the -- from the law.

2      Q.    In your October 2015 accident, I believe

3  I've asked you this, but do you recall receiving

4  any mailer from a law firm?

5      A.    I don't recall.

6      Q.    Okay.  And you were at fault in the 2015

7  accident; is that right?

8      A.    I was, yes, sir.

9      Q.    And it doesn't make sense that law firms

10 may not send mailers to people listed at fault?

11     A.    Yes.

12     Q.    But the other driver in that 2015

13 accident presumably was not at fault; is that

14 right?

15     A.    That's correct.

16     Q.    That may not be the circumstance every

17 time, but you can understand in a lot of accidents

18 there's an at-fault driver and a not at-fault

19 driver?

20     A.    Yes, sir.

21     Q.    Okay.  In the 2015 accident, assuming

22 that a law firm got a copy of that accident report

23 and sent a mailer to the other driver, were you

24 harmed in that process?

25     A.    I was harmed if they accessed my

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina      (919) 557-4640
                          JA3951

1    protected information, yes, sir.

2         Q.    Because your name's listed on the

3    accident report?

4         A.    Yes, sir.

5         Q.    And because -- that's because the DPPA

6    says that that information is not allowed to be

7    accessed?

8         A.    For -- yes, correct.

9         Q.    Do you understand that the other driver

10   in your accident would potentially be a class

11   member in this case?

12        A.    Which accident?

13        Q.    The 2016 accident.

14        A.    She could.  I hadn't thought about it,

15   but that -- yes, sir.

16        Q.    Okay.  And do you think she's been

17   injured based on the allegations in this case?

18        A.    I would say yes.

19        Q.    Because her information was listed on

20   the accident report that defendants obtained --

21        A.    Yes, sir.

22        Q.    -- or accessed?

23        A.    Yes, sir.

24        Q.    And that's because the DPPA says that's

25   not allowed?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina         (919) 557-4640
                                JA3952

1        A.    That's correct.  Yes, sir.

2        Q.    Now, we looked at how I was able to go

3   get a copy of that accident report online, right?

4        A.    Yes, correct.

5        Q.    Were you harmed when the highway patrol

6   put that information online?

7        A.    I don't believe I was.

8        Q.    Okay.  So you were not harmed with the

9   information being available to the public; is that

10  right?

11       A.    That's correct.

12       Q.    But you were harmed when the defendants

13  accessed the information?

14       A.    Illegally, yes.

15       Q.    Because the DPPA says these defendants

16  can't access that information?

17       A.    That's correct, yes, sir.

18       Q.    Would you have been harmed if your boss

19  had looked up the information on your accident to

20  confirm that you were in an accident that day and

21  not just running late?

22       A.    If she looked this up online?

23       Q.    Yes.

24       A.    I don't think so, no.

25       Q.    Okay.  Can you tell me the distinction

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3953

1  between your boss looking up the information and

2  these defendants?

3      A.      To my understanding of the DPPA -- no, I

4  can't really.  Sorry.

5      Q.      That's fine.

6      A.      I thought I had a good answer in my

7  head, but it flew away.

8      Q.      Would you agree that any person that may

9  know you could put your name into the search

10 parameters on that highway patrol and search for

11 any accident reports that are publicly available

12 for some period?

13     A.      I am aware of that now, yes, sir.

14     Q.      Okay.  Do you think you would be harmed

15 if a friend or family member accessed one of those

16 accident reports?

17     A.      I don't know how to answer that.  I

18 don't think anybody should be accessing it,

19 honestly.  But it's available, so it's -- you know,

20 it is what it is.

21     Q.      And that's right, it is available.  So

22 my question is, is if any friend or family member

23 that you knew was able to do this, go on this

24 website and access the information, do you think

25 that injures you?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3954

1            MR. HOLMES:  Asked and answered -- I

2      think that's asked and answered.  Yes, that's asked

3      and answered.  She says she didn't know.

4            MR. WHITLEY:  Well, I believe she said

5      she didn't know how to answer that.  I'd like just

6      a little clarification whether or not she has a

7      definitive answer.

8            THE WITNESS:  I don't think that they

9      should be accessing.  I don't think they should

10     have access to my personal information, no.  So I

11     think that, yes, that would -- I think that that

12     would be an injury to me.  I think that it's

13     protected, that nobody should access it --

14     BY MR. WHITLEY:

15         Q.    Okay.

16         A.    -- for purposes that aren't allowed.

17         Q.    So if a friend or family member accessed

18     your accident report, you would say that injures

19     you because the DPPA says that's not allowed?

20         A.    That's what I would say, yes.

21         Q.    Okay.  If a friend or family member

22     accessed your accident report, would you consider

23     bringing a claim in court for a DPPA violation

24     against them?

25         A.    I might.

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina       (919) 557-4640
                              JA3955

1      Q.    Can you tell me what circumstances might

2  make that possible?

3      A.    I can't think of any off the top of my

4  head.

5      Q.    Do you remember whether it was you that

6  opened the mailers that you received from the law

7  firms?

8      A.    I do.

9      Q.    Okay.  It wasn't your significant other

10 at the time?

11     A.    That's correct.

12     Q.    Okay.

13           MR. HOLMES:  Mr. Whitley, just in 10

14 minutes or so, whenever, doesn't need to be now.

15           MR. WHITLEY:  Let's go a couple more --

16           MR. HOLMES:  Sure.

17           MR. WHITLEY:  -- couple more questions.

18           THE WITNESS:  Sure.

19 BY MR. WHITLEY:

20     Q.    Do you remember whether you were the one

21 to retrieve the mailers from the mailbox?

22     A.    I don't remember each specific day but,

23 I mean, for some, absolutely.  But I don't remember

24 if every single one.

25     Q.    Because they came in over a course of a

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina        (919) 557-4640
                          JA3956

1    couple days?

2         A.    Yes, sir.

3         Q.    Possible that your significant other

4    picked up some and brought them inside on some

5    days?

6         A.    That's correct.

7         Q.    But you were the -- you read -- opened

8    and read each one?

9         A.    Yes, sir.

10        Q.    Okay.  Were you the one to throw each

11   one away?

12        A.    The ones that I threw away, yes, sir.

13        Q.    And you retained some?

14        A.    I did.

15        Q.    Any particular reason why you retained

16   some and not others?

17        A.    No.

18        Q.    Do you remember which ones you kept?

19        A.    Not off the top of my head.

20        Q.    Okay.  Did you provide all the ones you

21   kept to your attorneys?

22        A.    I did, yes, sir.

23             MR. WHITLEY:  Okay.  This will be --

24   let's take a break right now.

25             THE WITNESS:  Okay.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina          (919) 557-4640
                              JA3957

1              (A BRIEF RECESS WAS TAKEN.)

2    BY MR. WHITLEY:

3         Q.    Welcome back, Ms. Steinmetz.  I'm going

4    to try to be efficient and get done with my part as

5    quickly as I can, and then counsel for the other

6    defendants may have some questions for you.

7         A.    Okay.

8         Q.    I want to quickly point you back to

9    Exhibit 364.

10        A.    Yes, sir.

11        Q.    I'm going to look at the November 2016

12   accident report.

13        A.    Uh-huh.

14        Q.    And take as much time as you need to

15   look at it.  I just want to ask you what

16   information on this report is your understanding is

17   protected by the DPPA?

18        A.    My understanding is that the fact that

19   they compared my information to what was on my

20   driver's license, which is my protected information

21   to me -- to the best of my understanding, that's

22   the information that was protected.  So sorry.

23        Q.    That's all right.  And when you say

24   compared your information to what was on the

25   driver's license, can you just give me a little bit

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3958

1  more detail on that?

2          THE WITNESS:  Thank you so much.

3      A.    Can you ask your question again?

4      Q.    Sure.  I think I heard you say when

5  they, I presume you mean the defendants, come --

6  I'm sorry?

7      A.    The officer.

8      Q.    The officer compared your information to

9  what was on your driver's license; is that right?

10     A.    He verified the information.  He asked

11 me if the information that was on my driver's

12 license was correct.

13     Q.    Do you -- you handed the driver's

14 license to the officer; is that right?

15     A.    I did, yes, sir.

16     Q.    Okay.  Do you know how he verified that

17 information?

18     A.    I do not.

19     Q.    He asked you if it was correct; is that

20 right?

21     A.    He did ask me if what was on my driver's

22 license was correct, if I had moved or anything, if

23 anything had changed.

24     Q.    But other than that, you don't know

25 whether he verified the information.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina         (919) 557-4640
                              JA3959

1    A.    I only know based on the fact that he

2    put it on the accident report that he did and

3    verified it.

4    Q.    And that's because the box is checked

5    same address --

6    A.    Yes, sir.

7    Q.    -- on driver's license --

8    A.    Yes, sir.

9    Q.    -- is checked, yes?

10    A.    Yes, sir.

11    Q.    Okay.  Is it your understanding your --

12    the information on your driver's license is

13    protected by the DPPA?

14    A.    That's my understanding, that my DMV

15    records, part of which is my driver's license, are

16    protected, yes, sir.

17    Q.    We looked at a couple of other exhibits

18    that your name appears in other public records; is

19    that right?

20    A.    Yes, sir.

21    Q.    And that's on your driver's license.

22    A.    It is.

23    Q.    Okay.  Can you tell me your

24    understanding how it's protected in one instance

25    and not on your driver's -- or protected on the

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3960

1   driver's license and not on the other?

2        A.    Just the fact that the law states that

3   because it's a DMV record, it's protected.

4        Q.    Okay.  So the DPPA says you can't access

5   your name in one instance, but you can access it

6   from the public record, from the tax records, for

7   instance, in another instance?

8        A.    DPPA says you can't access DMV records

9   for those purposes so, yes.

10       Q.    Have you ever lost your driver's

11  license?

12       A.    Thankfully, no.

13       Q.    If you lost your driver's license and

14  somebody found it and picked it up and mailed it to

15  you, do you think they've accessed protected

16  information under the DPPA?

17       A.    I would say, yes, they have my driver's

18  license in their hand.  Yeah.

19       Q.    Do you think you would be harmed by

20  that?

21       A.    I would -- I would feel harmed by that.

22  That would bother me.

23       Q.    Why would that bother you?

24       A.    I don't know.  I just feel like my

25  driver's license is -- I don't know, it's, like,

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3961

1   coveted.  I don't know the right way to answer

2   that.  It's just a -- it's -- I don't know.  It's

3   got my name -- my full name, my full address, my

4   photo, my birthdate.  It's got everything that you

5   could use to go create a new identity or any number

6   of nefarious things people think up anymore.

7          Q.    And I'm looking at the information on

8   your accident report.  Your driver's license does

9   not -- number doesn't appear on this report, does

10  it?

11         A.    No, sir.

12         Q.    Okay.  It's redacted?

13         A.    Yes, sir.

14         Q.    Your date of birth is redacted?

15         A.    Yes, sir.

16         Q.    Okay.  So your understanding, you're a

17  class representative in this case; is that right?

18         A.    Yes, sir.

19         Q.    Okay.  So I need to ask you some

20  questions about how you're going to be

21  representative of other class members and their

22  injuries.

23         A.    Okay.

24         Q.    Does that make sense?

25         A.    Yes.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3962

1     Q.     How -- how do you think we will be able

2  to go out and determine how each class member was

3  injured in this case?

4     A.     The class representatives or

5  particular -- just everybody in the class?

6     Q.     Everybody.

7     A.     I don't -- I don't know how that would

8  happen.  That would be -- I guess, the attorneys

9  would do that.

10    Q.     Do you think some of the people who

11 would be potential class members ultimately hired

12 some firms that they received a mailer from?

13    A.     I wouldn't know.

14    Q.     We talked earlier this morning about it

15 potentially varying from person to person about

16 what information they might receive about how to

17 deal with an insurance company or what underinsured

18 motorist coverage is.  Do you remember that?

19    A.     Yes, sir.

20    Q.     Okay.  Do you think someone who didn't

21 know that information and received that information

22 from one of these mailers might have been helped by

23 receiving the mailers?

24    A.     They might have been.

25    Q.     Do you think there would be a difference

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                  JA3963

1   potentially between the injury that you think you

2   had in receiving a mailer and a person who found

3   that information helpful?

4        A.    I wouldn't know how to determine that.

5        Q.    Okay.

6              THE WITNESS:  Would it be okay if I took

7   one minute to take some Tylenol?

8              MR. WHITLEY:  Sure.

9              THE WITNESS:  I apologize.  I've got a

10  bad back and all of a sudden, it's being --

11             MR. WHITLEY:  No please.

12             THE WITNESS:  -- it's being extra bad.  I

13  apologize.

14             (DISCUSSION HELD OFF THE RECORD.)

15  BY MR. WHITLEY:

16       Q.    So just to reset, some people may

17  receive a mailer and find some information helpful.

18  Do you agree with that?

19       A.    Correct.

20       Q.    Okay.  You did not, right?

21       A.    Correct.

22       Q.    Would you agree that some people who

23  receive mailers from these law firms ultimately

24  hire the law firm?

25       A.    They probably do.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                          JA3964

1        Q.     Okay.  But you did not.

2        A.     Correct.

3        Q.     Do you think we would have to ask

4   individual people about whether they felt helped by

5   the mailer or not to determine whether they were

6   injured or the extent of their injuries?

7        A.     I wouldn't know how that would work, so.

8        Q.     Do you think there's a difference

9   between the injuries you feel you have related to

10  the accessing and receiving these mailers and

11  someone that found the information helpful and

12  ultimately hired one of these law firms?

13       A.     I don't.  I think that the law is the

14  law and that everybody should be protected the

15  same.

16       Q.     I believe you said that there were some

17  mailers you received from law firms that you threw

18  away?

19       A.     That's correct.

20       Q.     And was there any rhyme or reason

21  between the ones you threw away and the ones you

22  kept?

23       A.     I just think it was just whatever mood I

24  was in at the moment.  I think after I got a

25  certain number, I think I might have just, you

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3965

1   know, opened them up, read them and threw them

2   away.  But I don't recall ever picking up one

3   versus the other and thinking, oh, this one is

4   trash; this one I'm going to keep.  It was kind of

5   random.

6         Q.    But fair to say you received mailers

7   from law firms that were not sued as defendants in

8   this case?

9         A.    Yes, sir, that would be fair.

10        Q.    Were you -- do you think you were

11  injured by receiving mailers from those firms you

12  didn't sue?

13        A.    Yes, sir.

14        Q.    Okay.  Do you know why those other law

15  firms aren't named as defendants in this suit?

16        A.    I'm not aware of that, no.

17        Q.    Have you ever talked to your attorneys

18  about that?

19        A.    I haven't asked that, no.

20        Q.    Do you have any idea why those firms

21  aren't named as defendants?

22        A.    I mean, they might be named.  I don't

23  know.

24        Q.    That's fair.  Do you know the named

25  defendants in this case?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                                 JA3966

1        A.      I don't know them by memory, but I have

2    a list of them.

3        Q.      Okay.  Do you have any reason to think

4    that you're going to receive another mailer from

5    any of the defendants in this case?

6        A.      I don't know one way or the other if I

7    would.  I mean, I'm hoping I don't have anymore

8    accidents, so I'm hoping I would never receive any

9    from anybody.

10       Q.      But you'd have to guess whether you were

11   in an accident; is that right?

12       A.      That's correct.

13       Q.      And you'd have to guess whether you were

14   at fault or not at fault in that accident; is that

15   right?

16       A.      Yes, sir.

17       Q.      And you just can't say with any

18   certainty that at least those two things are going

19   to happen where you might get another mailer from

20   one of these defendants?

21       A.      Correct.

22       Q.      You haven't had any accidents since

23   November 2016?

24       A.      That's correct.

25       Q.      So you haven't received any mailers from

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina         (919) 557-4640
                                   JA3967

1   any of the named defendants since 2016?

2        A.    That's correct.

3        Q.    We talked a little bit about this being

4   a class action.  Do you have an understanding about

5   the potential monetary damages that are at issue in

6   this case?

7        A.    I have a vague understanding of that,

8   yes.

9        Q.    Okay.  What's your rough understanding

10  of what that might be?

11       A.    A dollar amount?

12       Q.    Sure.

13       A.    That, I don't.  I mean, I have an

14  understanding that, depending on how many class

15  members there end up being, that that would

16  determine, if a settlement was made, you know, it

17  would be based on how many people and what the

18  court determined was -- was fair.

19       Q.    Okay.  So it's -- you understand -- I

20  believe you testified to that there was a $2,500

21  amount of damages stated in the DPPA, right?

22       A.    Yes, sir, that's correct.

23       Q.    Okay.  And is it your understanding that

24  that would be multiplied by however many people

25  were in the class?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com             Serving all of North Carolina        (919) 557-4640
                                    JA3968

1        A.      Yes, sir.

2        Q.      I don't want to do the math on it, but

3    do you understand that can ultimately be billions

4    of dollars?

5        A.      I do now.

6        Q.      And I believe you said this earlier, but

7    you understand that there are individual attorneys

8    in this case as defendants?

9        A.      Yes, sir.

10       Q.      Is it fair to say that if a billion

11   dollar judgment or settlement was entered, those

12   individual attorneys would go into bankruptcy?

13       A.      I don't know what their financial status

14   is, so I'm not sure.

15       Q.      Any reason to believe any of the

16   individual attorneys are billionaires?

17       A.      I haven't looked into it, so I don't

18   know.  They could be.

19       Q.      How do you feel about the potential of

20   these individual attorneys going into bankruptcy?

21       A.      I think that would be unfortunate.

22       Q.      Okay.  The fact that it's a class

23   action, so an aggregation of damages from a lot of

24   people, do you think that's the right way to go

25   about this if the outcome is to put individual

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina      (919) 557-4640
                              JA3969

1 │ attorneys into bankruptcy?

2 │          MR. HOLMES:  Objection to the form of the

3 │ question.  You may answer.

4 │          THE WITNESS:  It was a little bit

5 │ confusing how you asked it.

6 │ BY MR. WHITLEY:

7 │     Q.    Okay.  Sure.  If you individually --

8 │ strike that.

9 │          Do you understand that you individually

10 │ could have brought a claim for a violation of your

11 │ rights under the DPPA against law firms and

12 │ attorneys who sent you a mailer and recover some

13 │ amount of damages and potentially other relief on

14 │ your own?

15 │     A.    Yes, sir.

16 │     Q.    You understand that?  And in a situation

17 │ like that, that would not be likely to put any

18 │ individual attorney into bankruptcy.

19 │     A.    Correct.

20 │     Q.    So the fact that this is a class action

21 │ is the difference between that outcome of you

22 │ individually and potentially billions of dollars in

23 │ damage.  Do you understand that?

24 │     A.    I do.

25 │     Q.    Okay.  Recognizing that, do you think

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                                    JA3970

1   the class action, potentially resulting in billions

2   of dollars of damages, is the appropriate way to

3   handle this particular type of case?

4        A.    I do.

5        Q.    Okay.  Tell me why.

6        A.    I feel like the DPPA was put into -- was

7   enacted for a reason, and I believe that people

8   should follow the law, especially attorneys.  I

9   mean, that's kind of the whole thing.  Like, aren't

10  attorneys all sworn to follow the law and uphold

11  it?  But I just feel like anybody -- not just

12  attorneys, I feel like anybody that's violating the

13  law, there should be repercussions.

14             I mean, you -- you know, you break the

15  law, you get in trouble.  That's kind of how it

16  works.  And if you don't get in trouble, you don't

17  have any repercussions, you don't stop breaking the

18  law.

19        Q.    Do you think a billion dollars is

20  proportionate to what it is the defendants are

21  alleged to have done here?

22        A.    I don't really know how to make that

23  determination in my head.

24        Q.    We looked at the highway patrol website

25  and saw that you could go online and obtain your

www.NCDepo.com                      Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3971

1   accident report immediately before this deposition.

2   Do you remember talking about that?

3       A.    Yes, sir.

4       Q.    Okay.  And to the best of your

5   knowledge, any person can go out there and do that.

6   Do you understand that?

7       A.    Yes, sir.

8       Q.    Okay.  Based on that, do you think a

9   billion dollars is an appropriate measure against

10  someone who accessed information that's made

11  available online by the highway patrol?

12          MR. HOLMES:  A billion dollars

13  appropriate as to whom?

14          MR. WHITLEY:  As to a class.

15          MR. HOLMES:  In this lawsuit?

16          MR. WHITLEY:  In this lawsuit.

17          MR. HOLMES:  Okay.  That's asked and

18  answered.

19          THE WITNESS:  I think that it is

20  appropriate.  I think that the repeated violation

21  of the law makes it appropriate.

22  BY MR. WHITLEY:

23      Q.    We talked about the individual

24  attorneys.  But you know that individual law firms

25  are also defendants --

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3972

1        A.      Yes, sir.

2        Q.      -- in this case, right?  And to the best

3    of your knowledge, these law firms have other

4    employees.  Do you think that's probably

5    appropriate or right?

6        A.      I would assume so, yes, sir.

7        Q.      Okay.  And just like the individual

8    attorneys, it's likely these law firms are going to

9    go into bankruptcy too.

10       A.      I don't know if that's likely or not.

11       Q.      Do you still think the potential outcome

12   of a class action and potentially billions of

13   dollars in damages and law firms going out of

14   business and employees being out of work, is

15   that -- that still seems appropriate to you based

16   on the harm that you feel you and the class have

17   suffered?

18       A.      It's unfortunate, but I think it's

19   appropriate.  I think that it's -- that's the

20   penalty that's set forth by law so, unfortunately,

21   yes, sir.

22       Q.      Just a couple more questions,

23   Ms. Steinmetz.  I believe you said earlier, and

24   correct me if I'm wrong, but you received one or

25   more traffic citations or tickets before?

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3973

1        A.     Yes, sir, that's correct.

2        Q.     Did you have to appear in court for any

3   of those?

4        A.     I believe that there were a couple that

5   I had to appear in court for, yes, sir.

6        Q.     When you get a traffic citation, do you

7   hand the officer a copy of your license?

8        A.     That's correct.

9        Q.     That information goes on the citation of

10  the ticket that you get?

11       A.     To my knowledge, yes.

12       Q.     Did you have to present that information

13  in court when you had to appear?

14       A.     I don't recall if I did or not.

15       Q.     Okay.  Do you think the -- do you think

16  anyone at the clerk of court or the court, when you

17  had to appear, had a copy of the citation that you

18  were issued?

19       A.     I don't know if they did or not.

20  Nobody -- it wasn't -- I don't recall specifically,

21  and I don't recall it being mentioned.  It's been a

22  very, very long time, so -- but I don't recall it

23  being mentioned or shown to me or presented in any

24  way.

25       Q.     Do you think the highway patrol should

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3974

1   not have released your accident report in this

2   case?

3          A.    I don't know why the -- the rules and

4   the laws are about that, so I don't know if they

5   should or shouldn't have, I mean.

6          Q.    It would depend on what the DPPA says?

7          A.    It would depend on -- I guess, yeah.

8                MR. WHITLEY:  That's all the questions I

9   have for right now.  I may just have a couple

10  depending on what the other defendants' counsel

11  asks and what your attorney may ask, but thank you

12  for being here with me today.

13               THE WITNESS:  Yes, sir.

14                      EXAMINATION

15  BY MS. SALUTA:

16         Q.    Good afternoon.

17         A.    Hi.

18         Q.    In case you forgot, my name is Gemma

19  Saluta, and I represent another cohort of

20  defendants in this case.

21               Do you need to stand up for your back at

22  all?

23         A.    No, it doesn't help.  Advil will kick in

24  eventually.  Thank you for asking though.

25         Q.    Okay.  If at any time you want to stand

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3975

1  up, I can even stand up with you because I know

2  sometimes people feel nervous about standing up

3  when no one else is.

4            I understand from your direct

5  examination that you've been divorced and you now

6  have a new significant other.  Have you at any time

7  used a different name other than Belinda Lee

8  Steinmetz?

9        A.    I was -- before I was married, I was

10  Belinda Lee Tauber, T-a-u-b-e-r.

11        Q.    And have you gone back to Tauber at all

12  since your divorce?

13        A.    No, ma'am.

14        Q.    Okay.  Not even on informal sites,

15  social media sites or anything like that?

16        A.    Huh-uh.

17        Q.    And have you started using your

18  significant other's name, even just socially?

19        A.    No.

20        Q.    Okay.  So a lot of my questions are

21  going to sum up what I understand that I have

22  you -- heard in order for me to make sure I can

23  kind of jump forward in my questions.

24            If I understand correctly, you believe

25  the defendants mainly did two things wrong;

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                JA3976

1   accessed your information and then also sent you

2   mailers.  Did I understand that correctly?

3       A.    Accessed it and then used it for

4   purposes that were not legal, yes, ma'am.

5       Q.    Are there any other things that the

6   defendants, in your view, did wrong?

7       A.    I can't think of anything.  No.

8       Q.    So when talking about potential damages,

9   you know, you talked a lot about that it annoyed

10  you and it bothered you -- or sorry, it aggravated

11  you and bothered you when you got those -- those

12  letters; is that correct?

13      A.    Yes, ma'am.

14      Q.    Okay.  Did you ever see a professional

15  about this aggravation?

16      A.    No, ma'am.

17      Q.    Okay.  Did you ever ask to increase any

18  medication or take any increase in medication for

19  it?

20      A.    No.

21      Q.    Was that something you ever considered

22  doing?

23      A.    No.

24      Q.    Do you think some members of the class

25  might have experienced aggravation to the point

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3977

1   that they needed to see someone to talk about it?

2         A.    It's possible.

3         Q.    We would have to talk to those people to

4   find out for sure?

5         A.    Yes.

6         Q.    Do you have an overall goal in

7   participating in this litigation?

8         A.    Yes, ma'am.

9         Q.    What is that?

10        A.    I would like to stop the access of my

11  protected information from anybody that's trying to

12  access it illegally or for illegal purposes.

13        Q.    And if I understand your meaning, it

14  means not just the attorneys that you've sued but

15  all attorneys who use such mailings?

16        A.    Anybody.  Everybody.

17        Q.    Now, from your direct testimony, it

18  sounds like you read portions of the DPPA; is that

19  right?

20        A.    Yes, ma'am.

21        Q.    Did you read the exclusions?

22        A.    I don't recall.

23        Q.    Okay.  Do you know if there are any

24  exclusions to the DPPA?

25        A.    I don't recall.

www.NCDepo.com                     Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3978

1      Q.    All right.  You made a comment when

2   talking about receiving these letters that you

3   weren't sure if you were going to call somebody

4   after receiving these letters.  What did you mean

5   by that?

6      A.    I considered if I was going to call a

7   lawyer for representation about an accident or not.

8      Q.    Okay.

9      A.    Or if I was going to call them and ask

10  them to take me off of a mailing list.

11     Q.    And I'm going to be skipping around a

12  lot, mainly to try to shorten the time period.

13  Jeff's already asked a lot of my questions.

14     A.    Okay.

15     Q.    Did you ever complain to the North

16  Carolina State Bar about these letters?

17     A.    No, ma'am.

18     Q.    What about the North Carolina Attorney

19  General?

20     A.    No, ma'am.

21     Q.    The North Carolina Bar Association?

22     A.    No, ma'am.

23     Q.    Did you know that the North Carolina

24  Attorney General considers accident reports public

25  records?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina          (919) 557-4640
                                  JA3979

1          A.     I was not aware of that.

2          Q.     Do you know that the North Carolina

3    State Bar has approved the use of direct mail

4    advertisements by lawyers?

5          A.     I was not aware of that.

6          Q.     So it sounds like from your direct

7    examination answers that between like 2014 to now

8    that you might have had three or four addresses

9    that you lived at.  Can you kind of walk me through

10   the addresses and approximately when you moved to

11   what place?

12         A.     Kind of, not really.  I'm bad with

13   dates.  So I lived at 886 Griffin Road for about, I

14   would guess, seven or eight years.

15         Q.     To approximately when?

16         A.     It was about six years ago, I think,

17   when I left that address, six-and-a-half maybe.

18         Q.     Okay.

19         A.     And then I moved to the 2351 Mount

20   Pleasant.

21         Q.     In Willow Springs?

22         A.     Yes, ma'am.

23         Q.     And then how long did you stay there?

24         A.     I can't remember if it was two or three

25   years.

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                              JA3980

1        Q.     Okay.  And then to the Angier address.

2        A.     That was June of last year.

3        Q.     Now, from the discussion that we had or

4   discussion you had with Jeff, it sounded like in

5   your Willow Springs address the only people living

6   with you at the time was just you and your

7   significant other.  Your son was not living with

8   you?

9        A.     That's correct.

10        Q.     Before you became an MRI scheduler, can

11   you walk me through your employment history from

12   Lakeside Concrete to the present?

13        A.     Uh-huh.  So after Lakeside, I believe I

14   went to River Birch Staffing in Dunn, North

15   Carolina, and I was there for a short amount of

16   time.  And then I worked at Eastern Building

17   Components, also in Dunn.  After that, for a very

18   short amount of time, I worked for -- oh, I can't

19   remember the name of the place.  Boone Edam.  Boone

20   Edam is a turnstile manufacturing company in

21   Lillington.  And then I got my job at Raleigh

22   Neurology, and that was -- I've been with Raleigh

23   Neurology for a little over ten years.

24        Q.     At Raleigh Neurology, do you ever get

25   personal mail at work?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3981

1      A.     No, never.

2      Q.     Not when you're trying to hide Christmas

3   gifts or --

4      A.     No.  No.

5      Q.     Have you ever had a problem with people

6   stealing packages at your Willow Springs address?

7      A.     No.  No.

8      Q.     What about any other addresses you've

9   had?

10     A.     No, ma'am.

11     Q.     You mentioned briefly when you were

12  answering some questions about the DMV or the --

13  I'm sorry, the collision reports that you were

14  worried that, you know, it could -- this could be

15  useful to a stalker.  Have you ever had any

16  experience being stalked?

17     A.     I have not.

18     Q.     Okay.  Good.

19     A.     Yes.  I watch too much nighttime TV.

20     Q.     So after the accident in 2016, you had

21  some neck injuries that you went to see a

22  chiropractor.  Do you know how many times you saw a

23  chiropractor?

24     A.     I don't think it was more than ten.

25  Maybe like seven to ten.  I don't recall the exact

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina        (919) 557-4640
                            JA3982

1  number, but that would be my best guess.

2       Q.    Was this a chiropractor that you had

3  already been to, or was this a completely new

4  person?

5       A.    A new person.

6       Q.    How did you come into contact with this

7  chiropractor?

8       A.    Actually, one of my friends works there.

9       Q.    Do you continue to see that

10  chiropractor?

11       A.    No, ma'am.

12       Q.    How long did it take for you to go to

13  either all seven sessions or all ten sessions?

14       A.    Total time at the appointment?

15       Q.    Or total time calendar months.  Was it

16  two months, three months?

17       A.    It was probably maybe -- maybe two

18  months.  No more than two months, I don't believe.

19       Q.    And you mentioned your neck already.

20  Were the -- were the chiropractors working on any

21  other piece of your body?

22       A.    He did general adjustments in addition

23  to just the neck adjustments.  And the way it was

24  explained was that if you're out of alignment in

25  one place, you can be, you know, out of alignment

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3983

1  all over.  So he did -- he did multiple

2  adjustments.

3        Q.    You mentioned earlier that you had some

4  back problems.  Were those back problems

5  preexisting before the 2016 accident?

6        A.    Way preexisting.

7        Q.    Can you give me an estimate of how way

8  preexisting they are?

9        A.    They date back to when I was about 17 is

10  when I started having back problems.

11        Q.    Okay.  Is it pretty much a constant pain

12  or does it just come and go?

13        A.    I have constant low back pain.

14        Q.    I'm going to jump around a little bit.

15  From some of the other papers that we'll discuss in

16  a little while, I understand that you like horses

17  and you owned a horse trailer at one point; is that

18  correct?

19        A.    I did.  Yes, ma'am.

20        Q.    Okay.  Do you still ride?

21        A.    No, ma'am.

22        Q.    When did you give up riding?

23        A.    I would guess it's been about two or

24  three years maybe.

25        Q.    So you gave up riding before the 2016

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA3984

1    accident?

2        A.    I don't have the exact date in my head.

3    I don't think I was still riding at that time.  I

4    pretty much stopped riding when I moved, so that

5    would have been about six years ago.  So that

6    was -- that was pretty much the end of my riding.

7        Q.    Was it a decision that was 'I'm never

8    going to ride again,' or was it 'life's too busy to

9    own a horse right now and I can't ride right now'?

10        A.    It was -- it was a financial decision, I

11    couldn't afford to keep my horse anymore and so I

12    ended up having to sell him.  I would have kept him

13    forever, but.

14        Q.    Was there any consideration when you

15    were discussing with State Farm about how much they

16    needed to pay in medical expenses about potential

17    future worries that your neck might spasm up based

18    on if you started riding horses again?

19        A.    There was no discussion about that.  The

20    claim that we settled, to my recollection, was this

21    is the end of the claim.  Anything after this is

22    not their responsibility.

23        Q.    So there was no consideration for, you

24    know, hey, what if, you know, something medical in

25    the future was going to happen?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3985

1        A.      No, ma'am.

2        Q.      Okay.  Do you think the rear-end

3   collision affected your previous low back injury?

4        A.      I don't feel like it did.

5        Q.      Okay.  So after the accident, you spoke

6   with State Farm and they told you to go to a body

7   shop; is that right?

8        A.      Yes, ma'am.

9        Q.      And then at some point, the body shop

10  told you that the car should be totaled; is that

11  right?

12       A.      They said that they -- they didn't say

13  it should be totaled.  They said it was considered

14  totaled.

15       Q.      Did State Farm then provide for you a

16  rental car?

17       A.      They did, yes, ma'am.

18       Q.      How long were you in that rental car?

19       A.      It was a couple of weeks, I believe.

20       Q.      Do you think your neighbor saw your

21  rental car?

22       A.      She did.

23       Q.      Did she ask you if you got a new car?

24       A.      No.  She saw my car when I brought it

25  home initially.  So, unfortunately, she saw the

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3986

1  damage to my -- to my Fusion, and so she -- she

2  knew that I had had an accident.

3         Q.    So when your neighbor, who got the

4  attorney direct mail, she had already known that

5  you were in an accident?

6         A.    She did, yes, ma'am.

7         Q.    After your 2015 accident, the one in

8  October of 2015, the year before, did your

9  insurance rates increase because of that accident?

10        A.    Yes, ma'am.

11        Q.    Do you think that's fair?

12        A.    I do.

13        Q.    Was there a lawsuit filed on that 2015

14  accident?

15        A.    Not to my recollection.

16        Q.    Do you know if that other driver

17  settled?

18        A.    I don't know.

19        Q.    Do you know if your insurance company,

20  Farm Bureau, paid for anything for that other

21  driver?

22        A.    I don't know for a fact, but I believe

23  they did.

24        Q.    So I'm interested in -- my next set of

25  questions are mainly interested about timing.

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3987

1    They're not interested about conversations you had

2    with Mr. Stradley or Mr. Holmes.

3              When did you start talking to other

4    people about the letters that you received?

5         A.    I would say within a few days of when I

6    got the first one.

7         Q.    So sometime in -- around November of

8    2016?

9         A.    Yes, ma'am.

10        Q.    And that's how you started talking to

11   Niki?

12        A.    Yes.

13        Q.    What did you -- what do you recall about

14   that conversation you had with Niki?

15        A.    Not much.  That was a long time ago.  I

16   remember that, you know, she -- well, we went

17   somewhere together, it was a bunch of us, and she

18   noticed that I was in a different vehicle and, you

19   know, she asked -- she asked, like you said, did

20   you get a new car?  I was like, no.  And then she

21   asked, of course, what happened.

22              And I explained what happened and told

23   her I was getting a bunch of letters in the mail,

24   and that was the gist of that.

25        Q.    Did she make the recommendation to White

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com              Serving all of North Carolina        (919) 557-4640
                              JA3988

1   & Stradley that same conversation or did the

2   recommendation come later?

3       A.    I can't remember.

4       Q.    Okay.

5       A.    I can't remember if we had multiple

6   conversations or not.

7       Q.    Well, based on that conversation, what

8   did you decide to do -- conversation or

9   conversations, what did you decide to do next?

10      A.    I decided to give -- to give them a call

11  and just to talk to them a little bit about what

12  they thought we should do -- I should do.

13      Q.    And was this in 2016 as well?

14      A.    I can't recall if it was in 2016 or

15  2017.  It had to have been -- yes, I think it was

16  probably 2016.  I don't have a date firm in my

17  head.  I'm sorry.

18      Q.    Again, kind of going to timing, if you

19  gave White & Stradley a call in either 2016 or

20  2017, do you recall ever signing a document with

21  the law firm explaining this litigation and how the

22  parties would treat each other, you and -- you and

23  the law firm?

24      A.    Dating back at that time, I don't

25  recall.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3989

1       Q.    Do you recall any time that you might

2    have signed a paper like that?

3       A.    We have signed a paper.

4       Q.    When did that happen?

5       A.    I would say that was not -- it was

6    recently.

7       Q.    Without giving away any conversations

8    that you had with Mr. Stradley or Mr. Holmes, why

9    was it so long between the time you went to see

10   them in 2016 or 2017 and when you signed that

11   document?

12      A.    We discussed in the initial time that we

13   met that there was a lawsuit, and we discussed it

14   and the violation of the DPPA, and was I -- I was

15   interested and to find out more about that and, you

16   know, how my information was violated.  And so we

17   decided to keep in touch to see if, you know, there

18   was anything that was going to come of that that I

19   could be involved in.

20      Q.    And from that point in time of when you

21   met with them in 2016, 2017, did you keep the rest

22   of the mailers, and those are the mailers we have?

23      A.    The mailers that we have here are the

24   only ones that I kept.

25      Q.    Okay.  Do you remember if you kept them

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3990

1    before you met with White & Stradley, or did you

2    only start keeping them after you met with White &

3    Stradley?

4         A.    Oh, no, ma'am.  I kept them before.  I

5    had them beforehand.

6         Q.    Do you have any other types of mailings

7    that you have kept that don't deal with attorneys?

8    Like, have you kept all your chiropractor

9    solicitations, or have you kept all your Publix or

10   Harris Teeter solicitations?

11        A.    I keep -- typically the only thing that

12   I keep is anything that might be -- that might have

13   my personal information, like credit card offers.

14   Like, I keep those, and every once in a while, I'll

15   just either burn them or shred them.  I just don't

16   think they should go in the trash.  But, like,

17   something from Food Lion or, you know, an

18   advertisement for chiropractic services, that I

19   would typically just read and then discard.

20        Q.    Okay.  So if I understand your answer,

21   and please correct me if I'm wrong, that other than

22   the attorney solicitations that you've kept, you

23   haven't been keeping another class of potentially

24   junk mail documents?

25        A.    No.  I keep -- well -- and it wouldn't

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA3991

1   be junk mail, yes.  So, no, that would be correct,

2   yes, ma'am.

3        Q.    And you were thinking that you might

4   have kept something.  Were those, like, bills and

5   things that were...

6        A.    Insurance.  Stuff from my insurance

7   company I keep.  So, you know, if they say, oh, you

8   know, here's your claim benefits or whatever,

9   summaries for the year, that kind of stuff I keep.

10       Q.    Something with an existing account.

11       A.    Yes, ma'am.

12       Q.    After your accident, did you receive any

13  other mailers from other companies such as

14  chiropractors, body shops, glass companies?

15       A.    I don't recall getting anything like

16  that.

17       Q.    Do you remember which mailer you got

18  first out of all the attorneys?

19       A.    I do not.

20       Q.    We can look at it, if it's helpful to

21  you.  I brought all of the attorney solicitations

22  that you attached in your pleadings, but I can --

23  let me see if we can -- I can ask you this first.

24  But if you'd like to go see them, that's fine.

25            Were there anything in the attorney

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina          (919) 557-4640
                              JA3992

1    solicitations that particularly aggravated you more

2    than other?  Like, if Attorney A said something,

3    that really aggravated you versus Attorney B?

4         A.    That being in there aggravated me.  The

5    accident report being in the mailer was the most --

6    I think at the top of my list, that was the thing

7    that was the most aggravating to me and upsetting

8    to me.

9         Q.    Anything else?

10        A.    Just the fact that they -- yeah, just

11   the fact that they came was aggravating.  I just --

12   I don't think it's appropriate.

13        Q.    Okay.  So if I understand correctly, it

14   is, first, there's the aggravation that they came

15   at all.

16        A.    That's right.

17        Q.    And then second, if they included the

18   collision report, that was -- that increased the

19   aggravation?

20        A.    Yes, ma'am.

21        Q.    Was there anything else that increased

22   the aggravation?

23        A.    No, not about this -- not specifically

24   about the mail, no.

25        Q.    Okay.  You stated earlier that you read

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com             Serving all of North Carolina        (919) 557-4640
                                  JA3993

1  every single piece of mail that was directed to

2  you; is that right?

3       A.    Yes, ma'am.

4       Q.    After you got the first two, did you

5  feel like you still needed to open up all the

6  letters?

7       A.    I wouldn't say I felt like I needed to,

8  but I just did.  It wasn't like a need.  I just --

9  they came, so I opened them.  It's kind of an

10 automatic thing for me.

11      Q.    Even though that most of the letters had

12 "this is an attorney solicitation" on the front?

13      A.    Yes, ma'am.

14      Q.    Did you show the letters to anyone else?

15      A.    I don't think so.  I mean, Rachel, I

16 showed them to Rachel, and then I brought them with

17 me to the attorney, but I don't recall showing them

18 to anybody else.

19      Q.    Did anyone come with you when you went

20 to meet with the attorneys in this case?

21      A.    No, ma'am.

22      Q.    Have you talked to anybody else other

23 than your attorneys about this case?

24      A.    As far as...

25      Q.    Updating them on what you're doing.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina         (919) 557-4640
                              JA3994

1          A.     My mom.

2          Q.     What have you told your mom about this

3    case?

4          A.     I just -- I explained to her what the

5    case was about and so that she could understand,

6    because I said something about a deposition and she

7    got all concerned, like moms do, and so I was just

8    explaining to her a little bit about the law and

9    the case and what happened.

10         Q.     Is she still up in Maryland?

11         A.     No, she's actually in Florida.

12         Q.     Do you agree with me that for your

13   accident on -- in November of 2016, that you could

14   have hired an attorney to help you negotiate with

15   State Farm?

16         A.     I could have, yes, ma'am.

17         Q.     For yourself, what would have -- strike

18   that.

19                Was there any one thing that you thought

20   needed to happen before you decided to say, Okay,

21   the negotiations with me are not working, I need to

22   hire an attorney?  Do you understand my question?

23         A.     Yes, ma'am, I understand.  I don't think

24   there was any one thing.  I didn't feel like my

25   physical injuries or time missed from work were

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA3995

1   significant enough to warrant hiring an attorney.

2        Q.    Okay.  Going back to the time lost from

3   work, did you lose -- I understand you lost time

4   from work by coming in late; is that correct?

5        A.    Yes, ma'am.

6        Q.    Okay.  Did you lose any time from work

7   by going to the chiropractor?

8        A.    Yes, ma'am.

9        Q.    Did you lose any time from work having

10  to go to the body shop?

11       A.    Yes, ma'am.

12       Q.    What about having to shop for a new car?

13       A.    Yes.  Well, no, I didn't miss time from

14  work for shopping.  The going to the body shop,

15  returning the rental car, those kind of things I

16  did miss work for.

17       Q.    And you don't recall, as you sit here

18  today, whether you got payment from State Farm for

19  that?

20       A.    I don't recall specifically.  I know

21  that I listed any time that I missed from work when

22  I sent them information about my -- I guess,

23  damages is the right word.

24       Q.    Did you have to give them, like, a W-2

25  or something to prove how much you were earning?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA3996

1        A.      No, ma'am, they didn't ask for that.

2        Q.      Did your significant other have -- did

3    your significant other have to miss any time from

4    work carting you around or anything?

5        A.      Not that I can recall.

6        Q.      Did you research any of the law firms

7    before you decided to join in this class action?

8        A.      No, ma'am.

9        Q.      Have you ever had a PO Box?

10       A.      I think I did at one time.

11       Q.      Why did you have a PO Box?

12       A.      Well, I'm trying to remember when it was

13   to remember why it was.  I honestly don't recall.

14   I recall that I had one for a while, but I don't

15   recall what the reason was.  It's been a long time.

16       Q.      Longer than 10 years?

17       A.      I would guess, yes, ma'am.

18       Q.      I understand that you purchased the

19   house in Angier, right?

20       A.      Yes, ma'am.

21       Q.      After you purchased the house, did you

22   get any mail regarding refinancing or mortgage

23   insurance or --

24       A.      Yes, ma'am.

25       Q.      Have you kept those?

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                  JA3997

1        A.    I kept them for a long time, and then

2    eventually I discarded them.

3        Q.    Why did you keep them?

4        A.    I was irritated by them.  Those were

5    especially irritating.

6        Q.    Why were they irritating?

7        A.    I don't know.  I just feel like

8    everybody just -- is invading my space.  Like, I

9    just bought a house, I was so excited, and then my

10   mailbox was full of advertisements for mortgage

11   insurance.  But I eventually did end up discarding

12   them, but I did keep them for a good long time.

13       Q.    And since your beloved Ford Fusion was

14   wrecked, I assume you had to get a new car?

15       A.    Yes, ma'am.

16       Q.    What did you get?

17       A.    I got a Nissan Rogue that I traded in

18   for a Chevy Trax because I hated the Nissan Rogue.

19   It was just -- I bought it because I was feeling

20   pressured by the insurance company to hurry up and

21   make a decision because I had a rental car, and it

22   was close to the holidays and it was, like, I just

23   need a car.  And I went in and I had a really good

24   salesman, and he talked me into buying something

25   that I didn't love.  And it had multiple problems

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA3998

1   early on, and so I just decided to trade it in for

2   something that I would love.  So now I drive a

3   Chevy Trax.

4         Q.    Okay.  Let me first ask you about the

5   Nissan Rogue, and then I'm going to ask you about

6   the Chevy Trax.  When you first got the Nissan

7   Rogue, did you notice in your mail that you got a

8   whole bunch of solicitations for extended car

9   warranties?

10        A.    I feel like that's been happening since

11  I found a car.  I don't recall an increase at that

12  time, but I do know that I've been -- I've pretty

13  regularly gotten, you know, "get this extended car

14  warranty" mail.

15        Q.    And you open those as well, right?

16        A.    Those, I actually -- I actually -- I

17  think that in the beginning -- so when I first

18  bought the car, I think I did because one of them

19  looked like it came from Nissan, and I thought they

20  had sent me something.  And then when I realized it

21  was just a solicitation, I discarded it, and I

22  don't recall opening the rest of those.

23        Q.    Before we move on to the Chevy Trax, did

24  it -- did that solicitation have the make and model

25  of your car in it?

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina      (919) 557-4640
                             JA3999

1        A.      I don't remember.

2        Q.      Do you recall any of the solicitations

3    you've seen having the make and model of your car

4    in it?

5        A.      I think that some of them do, yes,

6    ma'am.

7        Q.      How does that make you feel?

8        A.      I don't like it, but I understand that

9    that is just, I guess -- I don't know.  It just

10   seems like it's something that happens.  I don't

11   care for it.  It aggravates me that, you know,

12   8 million companies know what kind of car I drive,

13   but.

14       Q.      How do you think they get that

15   information?

16       A.      I don't know.

17       Q.      Do you think it's a DMV record?

18       A.      I don't know.

19       Q.      Have you ever thought about it?

20       A.      I haven't really -- other than the fact

21   that it's annoying, I haven't thought about how

22   they got the information, just that it's annoying

23   that they reach out to you on such a consistent

24   basis for an extended car warranty.

25       Q.      Did you get the same kind of mailing for

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4000

1  your Chevy Trax?

2       A.    I feel like there probably was the

3  same -- same stuff, yes, ma'am.

4       Q.    And with the Chevy Trax, was it, again,

5  they had the make and model of your car?

6       A.    Some of them probably did, but I

7  don't -- I couldn't tell you for sure if they did

8  or didn't, but I feel like they probably did.

9       Q.    Did you keep any of them?

10      A.    No, ma'am.

11      Q.    Particularly after you first bought

12 either the Nissan Rogue or the Chevy Trax, how many

13 of these do you think you were getting in a week?

14      A.    Just a couple.

15      Q.    Just a couple?

16      A.    Two or three.

17      Q.    Two or three?

18      A.    I don't recall it being excessive.

19      Q.    Have you ever driven on a toll road in

20 North Carolina?

21      A.    Yes, ma'am.

22      Q.    Did you get a bill in the mail for it?

23      A.    Yes, ma'am.

24      Q.    You discussed Facebook earlier.  Did you

25 know that your Facebook profile is pretty much open

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina       (919) 557-4640
                              JA4001

1  to the world?

2       A.    I know that it's listed as private, but

3  I know that it can be -- I know that people have

4  ways around that, so.

5       Q.    Okay.  I'll contend to you -- go ahead

6  and mark this.

7            You agree that we've never met before,

8  before today, correct?

9       A.    Correct.

10           (Exhibit 365 was marked.)

11           MS. SALUTA:  And this is -- what's the

12 number?

13           THE REPORTER:  365.

14 BY MS. SALUTA:

15      Q.    365.  I will admit to you that I'm not a

16 Facebook expert, but this is something my paralegal

17 pulled up.  If you'll just take a minute, and then

18 I'll ask you a couple of questions about this.

19      A.    All 65 pages or...

20      Q.    Does this appear to be your -- a

21 printout of your Facebook timeline?

22      A.    It does.

23      Q.    And I'll notice on the front page that

24 it even has when you moved to Willow Springs in

25 August of 2014?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA4002

1        A.    Uh-huh, yes.

2        Q.    So you would agree with me that there at

3   least is some way that regular people can get a

4   copy of this information?

5        A.    Yes, ma'am.  I would agree, yes.

6        Q.    If you'll turn to page 18.  Is that your

7   Angier house?

8        A.    It is.

9        Q.    Congratulations.  So that is a public

10  statement that you have on Facebook that you --

11  that you bought a new house?

12       A.    Yes.

13       Q.    And if you'll go to 64 and 65.

14             MS. SALUTA:  Can we take a break for a

15  sec?

16             (DISCUSSION HELD OFF THE RECORD.)

17  BY MS. SALUTA:

18       Q.    Does it appear that you made a post

19  about moving to Willow Springs?

20       A.    Yes, ma'am.

21       Q.    Okay.  And even later you have a second

22  comment down, kind of directing people to where

23  exactly it was.

24       A.    Between which towns, yes.

25       Q.    Okay.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA4003

1      A.      Not close to anything.

2      Q.      If you're coming to see me, you're just

3   coming to see me.

4      A.      It's in the country.  There's not much

5   out there.  Yeah.

6      Q.      And it appears that Facebook as well

7   that you have sometimes used the Marketplace

8   function; is that correct?

9      A.      I have used that, yes, ma'am.

10     Q.      Have you bought and sold or just bought?

11     A.      I believe I have done both.

12     Q.      When people bought from you, did they

13  pick up from your house?

14     A.      No, never.

15     Q.      Have you ever advertised on Craigslist?

16     A.      I have.

17     Q.      Again, the same thing.  If you've sold

18  anything, have they ever come to your house?

19     A.      Yes.  In Lillington, at the Lillington

20  house.

21     Q.      Do you have a Pinterest page?

22     A.      I think I do.

23     Q.      Do you know what the privacy settings

24  are on there?

25     A.      I tried to, whenever I create a social

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina      (919) 557-4640
                              JA4004

1    media, to choose the most private settings, but I

2    couldn't recite them to you, but I tried to make it

3    private.

4         Q.    What about LinkedIn?

5         A.    I think that I have -- I know that I

6    have a LinkedIn page, but I don't access it because

7    I think it's dumb.

8         Q.    So I'm going to make a list of entities,

9    and I'd like you to let me know if you've ever

10   given your address to these entities.

11        A.    Okay.

12        Q.    Store cards for rewards like Food Lion's

13   MVP or Harris Teeter's VIC Club?

14        A.    I've been enrolled in those for so long

15   that I don't recall if they asked me for

16   information or if, when I was at checkout, they

17   just gave me a card and I started using it.

18        Q.    Do you have a lot of rewards cards?

19        A.    I don't know what you would consider a

20   lot.  I don't shop at that many places so, I mean,

21   for a couple of grocery stores.  I do have Kohl's.

22   But I don't -- I'm not a big shopper, I don't

23   think.

24        Q.    When you provide, like, for instance,

25   Kohl's to get, like, Kohl's Cash, do you look in to

www.NCDepo.com                      Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                                JA4005

1  see what rights they have regarding your

2  information?

3          A.     I believe I skimmed over the privacy

4  agreement that they have me sign.  I couldn't

5  recite it to you, but I did look over it.

6          Q.     Do you provide your address to get,

7  like, newsletters for alumni or for other, like,

8  neighborhoods?

9          A.     No.

10         Q.     Any church bulletins?

11         A.     No, ma'am.

12         Q.     Do you use your driver's license as your

13  primary form of ID?

14         A.     I do.

15         Q.     So, for instance, if you're going to

16  jump on a flight, you use your driver's license for

17  that?

18         A.     I do, yes, ma'am.

19         Q.     And buying alcohol or buying a gun?

20         A.     (Witness nods head up and down.)

21         Q.     Can you say yes?

22         A.     Oh, yes, ma'am.  I apologize.  Yes, to

23  both.

24         Q.     Or staying at a hotel?

25         A.     Yes, ma'am.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4006

1     Q.     Have you ever had a yard sale at your

2  house?

3     A.     At my current house, no.

4     Q.     How about your Willow Springs house?

5     A.     No.

6     Q.     So way back to the Griffin Road?

7     A.     Yes.

8            (Exhibit 366 was marked.)

9     Q.     I have a quick question for you on your

10  property tax records.  Just a quick question on

11  this.  I believe he already gave you your current

12  property tax bill.  Your current property tax bill

13  has the lender being CoreLogic, but your last

14  year's property tax bill doesn't have a lender.

15  Did you not have a lender before and you got a new

16  lender, or it's just a mistake?

17     A.     I want to say that when I -- shortly

18  after I finalized the purchase of my house, the

19  mortgage was bought by another mortgage company.

20  Did I say that -- I don't know if that's the right

21  words, but it was -- I obtained my mortgage with

22  one company, and then shortly thereafter I got a

23  notice that it had -- the mortgage had been bought

24  out by another company.

25     Q.     Okay.  Did you know that it was possible

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA4007

1    that you could sue individually for violations

2    under the DPPA?

3              MR. HOLMES:  Objection, asked and

4    answered.

5              THE WITNESS:  Yes, ma'am.

6    BY MS. SALUTA:

7        Q.    Did you ever see any billboards

8    soliciting for this lawsuit?

9        A.    No, ma'am.

10       Q.    So on the Amended Complaint that you

11   reviewed, there are a number of people listed as

12   plaintiffs with you.  Have you ever met those

13   people?

14       A.    No, ma'am.

15       Q.    Have you ever had a discussion with

16   them, like, over the phone?

17       A.    Not to my knowledge.

18       Q.    Do you know anything about their cases?

19       A.    No, ma'am.

20       Q.    Did you know that there was another DPPA

21   lawsuit in North Carolina?

22       A.    Not that I can recall.

23       Q.    So if I mention those individual

24   plaintiffs' names, they wouldn't -- they wouldn't

25   sound familiar to you?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA4008

1      A.    These?

2      Q.    No, for the other DPPA.

3      A.    Oh, oh, no, ma'am.  No.

4      Q.    Do you know if there are any other

5  plaintiffs that have agreed to be named plaintiffs

6  that aren't named yet?

7      A.    I -- I don't know.

8      Q.    You mentioned that you got some credit

9  monitoring or you had some credit monitoring

10 active; is that correct?

11     A.    Yes, ma'am.

12     Q.    When did you start that credit

13 monitoring service?

14     A.    Shortly after -- shortly after I moved

15 out of the house that I had with my ex-husband.

16     Q.    When you moved out, approximately like

17 2013, 2014 when you moved to Willow Springs, did

18 you have a time period in your head of how long you

19 were going to keep that credit monitoring service?

20     A.    Forever.

21     Q.    Okay.

22     A.    As long as it was available.  I mean, I

23 thought it was a valuable tool or a valuable

24 resource.

25     Q.    How much do you pay for it?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                  JA4009

1    A.    It's free.  No charge.

2    Q.    Where do you get it from; do you know?

3    A.    I use Credit Karma.

4    Q.    I suspect that Credit Karma has an also

5    pay version of the free service.  Is that your

6    understanding?

7    A.    I don't know.  I haven't -- I haven't --

8    I don't recall ever having said, hey, if you pay $5

9    a month we can do this for that extra.  I just use

10   it as it is.  So if there's any advertising for a

11   paid service for that, I'm not aware of it.

12   Q.    Okay.  Do they make their money off of

13   advertisements?

14   A.    I don't know.

15   Q.    Did you know if Niki was going to be in

16   the class of representatives for this case?

17   A.    I -- no.

18   Q.    Did she tell you how she knew that this

19   case was pending?

20   A.    I don't recall if she did or if it just

21   kind of came up as we were talking.  I don't recall

22   how she said, no.

23   Q.    And where do you think she is now?

24   A.    So she's moved two or three times since

25   she left here, and I think she is in Ohio now.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4010

1      Q.     Okay.

2      A.     I think Texas and then Ohio.

3      Q.     Being from Harnett County, was she

4   military?

5      A.     I don't -- I don't know if she's

6   military or not.  We're not super close friends.

7   She moved because of her husband's job, is the

8   reason she's been moving is her husband has a great

9   job and it's almost like the more they move, the

10  more he gets paid.

11     Q.     Did you know that there is a potential

12  that if certain circumstances occur in this case

13  that you might be held liable for some of the

14  costs?

15     A.     No.

16     Q.     Is that surprising to you?

17     A.     Yes.

18     Q.     As far as damages go, you talked about

19  even if someone had never been mailed to at all,

20  that they have suffered some harm; is that right?

21     A.     Yes, ma'am.

22     Q.     Do you think that they should get more

23  money, the same money or less money than the people

24  who had their information obtained and got mailed

25  to?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4011

1      A.    I think that would probably be

2  determined by the court, but I think that the

3  violation of accessing the protected information

4  itself constitutes the -- the damages.

5      Q.    And so if I understand you correctly,

6  you think that they should get the same amount of

7  money, the statutory amount of money?

8      A.    I think so.  I think that would -- I

9  mean, yeah.  Yes.

10     Q.    Even though getting the collision

11 reports in the mail is really aggravating?

12     A.     It is, yes, ma'am.  Yeah.  I just feel

13 like it's the act of the -- you know, the fact that

14 it was accessed illegally against, you know, the

15 law.

16     Q.    For preparation for this deposition, did

17 you watch those videos by yourself?

18     A.    I did.  Yes, ma'am.

19          MS. SALUTA:  I have another line of

20 questioning, but this is probably a good time to

21 take a break because they're all on one subject.

22          MR. HOLMES:  Okay.

23             (A BRIEF RECESS WAS TAKEN.)

24 BY MS. SALUTA:

25     Q.    All right.  I'm going to ask you a

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com          *Serving all of North Carolina*          (919) 557-4640
**JA4012**

1    couple of questions about a pretty, from what I can

2    understand, terrible year.  So I'd like to talk to

3    you about some litigation that occurred in 2005.

4         A.    Okay.

5         Q.    It appears from the public records that

6    you and your husband had a business; is that right?

7         A.    That's correct.

8         Q.    Okay.  And you were president of that

9    business?

10        A.    No.

11        Q.    Hand you what's being marked as...

12              MR. WHITLEY:  367.

13              MS. SALUTA:  367.  I'm terrible at

14   keeping numbers.

15              (Exhibit 367 was marked.)

16   BY MS. SALUTA:

17        Q.    Do you recognize what this document is?

18        A.    I don't recognize the document itself,

19   but I'm looking at it.  I mean, I can read the

20   words, but I don't recognize -- I don't recall it.

21        Q.    Okay.  Do you know that in North

22   Carolina, in order to be a corporation, you have to

23   file an annual report with the Secretary of State?

24        A.    Is it part of tax documents?

25        Q.    It might be part of tax documents that

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                              JA4013

1  your CPA helps you prepare.

2       A.    Okay.  So if that were the case, then

3  my -- the CPA that worked with us would have

4  assisted with that.  So I would have done whatever

5  he recommended.

6       Q.    Okay.  And is the Lakeside Concrete of

7  North Carolina the company that you and your

8  husband had?

9       A.    Yes.

10      Q.    Okay.  And at the bottom it says that

11 you are the president of Lakeside Concrete.

12      A.    It sure does.

13      Q.    Okay.  And that's in 2003.

14      A.    Uh-huh.

15      Q.    Is that correct?

16      A.    Uh-huh.

17      Q.    All right.  If you flip to the second

18 page, this is a 2002 report, fiscal year ending

19 2002.  Do you see it up on the right?

20      A.    Yes, ma'am.

21      Q.    Okay.  And, again, it has your -- has

22 your signature on there?

23      A.    Yes, ma'am.

24      Q.    Okay.  And it, again, shows that you're

25 the president of the company.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina      (919) 557-4640
                              JA4014

1    A.    Yes, ma'am.

2    Q.    And you'll see that there's -- the last

3  page is fiscal year ending 2004.

4    A.    Yes, ma'am.

5    Q.    And, again, it shows you that you're the

6  president of the company.

7    A.    Yes, ma'am.

8    Q.    Is it news to you that you were listed

9  as the president?

10   A.    I don't recall ever having that title,

11  but I guess clearly I did because I wasn't in

12  the -- I recall I wasn't in the Articles of

13  Incorporation.  Just Craig and Augustino, and I

14  think they had another guy that might have been

15  involved.  But I don't recall being on the

16  corporation papers.

17        So I might have been called the

18  president because I did all the stuff in the

19  office, but clearly, yes, that's what's filed.  I

20  just didn't remember it.

21   Q.    Would you have reviewed the documents

22  before you signed them?

23   A.    Yes, ma'am.  I mean, I -- yes.  I don't

24  know that I would have read them word for word, but

25  I would have -- I would have reviewed them, yes,

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                               JA4015

1    ma'am.

2         Q.    And it appears that 2005 was a

3    particularly bad year for that company; is that

4    correct?

5         A.    There were a lot of bad years.  I don't

6    recall.  But if that's what the records show, then

7    I wouldn't disagree with you.

8         Q.    If the records show that Lakeside

9    Concrete filed for bankruptcy in 2005, would you

10   disagree with that?

11        A.    No.

12             MS. SALUTA:  Okay.  I'll mark this.  Mark

13   this as 368.

14             (Exhibit 368 was marked.)

15   BY MS. SALUTA:

16        Q.    Do you know what this is?

17        A.    Looks like a voluntary petition for

18   bankruptcy.

19        Q.    For Lakeside Concrete?

20        A.    For Lakeside Concrete, yes, ma'am.

21        Q.    And on the second page, is that your

22   signature?

23        A.    Yes, ma'am.

24        Q.    Past president of the company?

25        A.    Yes, ma'am.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4016

1      Q.     And on the third page, you agree that
2   you are going to perform all acts and deeds to
3   execute and deliver all the documents on behalf of
4   the company -- on behalf of the corporation --
5      A.     Yes, ma'am.
6      Q.     -- in connection with the bankruptcy
7   case?
8      A.     Yes, ma'am.
9      Q.     Okay.  And it appears from, at least the
10   voluntary petition, that you guys only had zero to
11   50,000 in assets, and the estimated debts were 50
12   to $100,000.
13      A.     Okay.
14      Q.     Is that approximately what you remember?
15      A.     It -- I -- it was a really stressful
16   time, and I don't -- I don't remember the numbers.
17   I just remember that it was really stressful.
18      Q.     What caused the bankruptcy, in your own
19   words?
20      A.     My opinion about what caused the
21   bankruptcy was my ex-husband making poor financial
22   decisions.
23      Q.     Okay.  Did you feel that you had the
24   power to correct those poor financial decisions?
25      A.     No.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
JA4017

1          Q.     Why not?

2          A.     I was -- I was a paper person.  I wasn't

3     a decision person.  So I did, you know, day-to-day

4     paper stuff, billings, payroll, tax stuff, but I

5     didn't make decisions.

6          Q.     Despite having the title of president?

7          A.     Despite my illustrious title that I

8     don't even remember.

9          Q.     After this bankruptcy occurred, was that

10    the final resolution for this company?  Did you

11    guys ever do any work after the bankruptcy?

12         A.     I'm so bad with dates.  I don't know.  I

13    don't remember.  I'm really, really bad with dates,

14    so.  It's 2019 -- let me think for a minute, if

15    that's okay.

16         Q.     No, take your time.

17         A.     I don't think so.  I think that -- that

18    address is, I think, the address of when we had the

19    office.  I think that Lakeside continued to operate

20    after this bankruptcy.

21         Q.     Okay.  Did Lakeside have any employees?

22         A.     Yes, ma'am.

23         Q.     Who were the employees in general?  I

24    don't need, you know, full names.

25         A.     I was an employee.  There was one or two

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA4018

1    other office people that didn't stay for very long,

2    and then we had laborers that were employees.

3         Q.    What did they do after this bankruptcy?

4    Did you have to let them go?

5         A.    If this was when the company ended,

6    truly ended then, yes, they went and just found

7    other -- other jobs.

8         Q.    How much did you work on this

9    bankruptcy?

10        A.    As far as papers?

11        Q.    Yeah, or managing it.

12        A.    This -- I want to say that I pretty much

13   provided all of the paperwork that was requested

14   from the attorneys on whatever they asked for.  I

15   think that I did -- I gave them whatever paperwork

16   they needed.  So I would say I probably did a

17   considerable amount of work.

18        Q.    Okay.  I'm going to pass you another

19   bankruptcy document.  This is the final report of

20   the bankruptcy, so I've got a couple of questions

21   about --

22             MR. HOLMES:  Is this 369?

23             (Exhibit 369 was marked.)

24   BY MS. SALUTA:

25        Q.    Yes.  Let me give you an introduction to

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina         (919) 557-4640
                              JA4019

1    this document because sometimes when you first get

2    a document, it's so much that you have to process

3    it all.  This is the trustee's final report of the

4    bankruptcy and all the assets they have gathered

5    either through a sale or accounts, and then all the

6    distributions that they propose to give with the

7    amount of money that they have collected.

8          A.    Okay.

9          Q.    Part of the ending of a bankruptcy case

10   is that the lawyers get paid money.  Does that

11   sound about right to you?

12         A.    Yes, ma'am.

13         Q.    Okay.  If you will turn to what is, for

14   instance, page number 27.  For me it is 27 of 44.

15         A.    Okay.

16         Q.    I'll propose to you that this is a bill

17   from one of the trustees.

18         A.    Okay.

19         Q.    Did you ever review any of the bills to

20   see if you agreed with the attorney charges?

21         A.    I don't remember if I looked at them and

22   reviewed them or not.

23         Q.    Okay.  So you don't remember determining

24   whether what they did was correct or how long they

25   spent on something was correct?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4020

1     A.    I don't remember reviewing it, no.

2     Q.    Okay.

3           MR. HOLMES:  Was there a specific

4   question about page 27 or just that was just, like,

5   a general reference?

6           MS. SALUTA:  That was just a general

7   reference so she could see what a bill looks like.

8           MR. HOLMES:  Thank you.

9   BY MS. SALUTA:

10    Q.    Okay.  Are you finished looking at that?

11    A.    Yes, ma'am.

12    Q.    Okay.  Also in 2005, it appears that you

13  and your husband filed individual petitions for

14  bankruptcy.

15    A.    That sounds correct.

16          (Exhibit 370 was marked.)

17    Q.    This is 370.

18    A.    Thank you.

19    Q.    And it appears from the first page that

20  you had estimated somewhere between 50,000 to

21  $100,000 in assets, but anywhere from $100,000 to

22  half a million dollars in debts; is that correct?

23    A.    That's what it shows, yes, ma'am.

24    Q.    And if you go to page 3, it appears that

25  your current income of the household was

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4021

1   $1,800-ish?

2        A.    Okay.

3        Q.    Does that look right?

4        A.    Yes.

5        Q.    And your current expenditures was about

6   two times that?

7        A.    Okay.

8        Q.    You agree?

9        A.    I mean, that's what's on here, yes.

10       Q.    And it appears that on page 5 that you

11  only had about $25 in your checking account?

12       A.    Yes.

13       Q.    And on page 12 that you had

14  approximately 15 to $16,000 in credit card bills.

15       A.    Okay.

16       Q.    Do you agree?

17       A.    That's what's on here.

18       Q.    And if you turn to page 17, do you

19  recall signing a verification that all the

20  information that you provided was true and correct?

21       A.    I don't remember specifically, but my

22  signature's here, so I certainly must have.

23       Q.    Okay.  Was the cause of your personal

24  bankruptcy, again, decisions that you believe your

25  husband made?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA4022

1      A.    Yes.

2      Q.    Were there any other reasons?

3      A.    No.

4            (Exhibit 371 was marked.)

5      Q.    Pass you what is 371.  Do you know that

6   when you file for bankruptcy, all the collection

7   efforts against you stop?

8      A.    That sounds right.

9      Q.    Did you know that you could --

10  bankruptcy court could issue an order allowing some

11  things to proceed in litigation?

12     A.    I think so.

13     Q.    Do you recall providing consent to allow

14  S.T. Wooten Corporation to pursue you guys in civil

15  court?

16     A.    I don't remember, but I remember that

17  there was an issue with S.T. Wooten.  So I don't

18  specifically remember it, but I do remember that

19  there was some issues with S.T. Wooten.

20     Q.    Okay.  What do you recall about S.T.

21  Wooten?

22     A.    They poured some concrete at the house

23  that we -- my ex-husband and I owned, and what I

24  recall, they were suing to get paid for that.

25           (Exhibit 372 was marked.)

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4023

1      Q.     I'm going to pass you another big packet

2   of paper.  372.  So this packet has several pieces

3   of paper put together, but they all are in relation

4   to a case brought by S.T. Wooten against Lakeside

5   and you and your husband individually.

6      A.     Yes, ma'am.

7      Q.     Do you see that at the top?

8      A.     Yes, ma'am.

9      Q.     Okay.  And, unfortunately, these are not

10  paginated, so we're going to have a little bit of

11  an awkward conversation.  Let's see if I can count

12  them.  Okay.  So seven pages in, you'll see a

13  Complaint.  I'll wait until you get to it.

14     A.     Okay.

15     Q.     Do you remember seeing this Complaint

16  before?

17     A.     I don't remember.  It was a long time

18  ago.

19     Q.     Okay.  After it appears that you got

20  that Complaint -- 11 pages after that, so that

21  would be 18 pages in.  Looking at a document that

22  looks like motion to extend time to respond to

23  plaintiff's Complaint.  This --

24     A.     Okay.

25     Q.     Do you see that Doug Q. Wickham has

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                    JA4024

1  signed a motion on your behalf?

2      A.    I see that.

3      Q.    Was he your attorney?

4      A.    I recall -- I think that he was.

5      Q.    And so he had requested that you have

6  more time to answer this Complaint.

7      A.    Okay.

8      Q.    Is that right?

9      A.    That's what it looks like.

10     Q.    And because -- do you think Mr. Wickham

11  would have filed this without telling you?

12     A.    I don't know.  I don't -- I don't --

13  there's so much about this that I don't remember.

14  It was a really stressful time, so I don't -- I

15  don't know.

16     Q.    Okay.  It's six pages after -- after

17  your motion to extend time.  I'd like you to go to

18  a page called Entry of Default as to Craig

19  Steinmetz and Belinda Steinmetz.  It looks like

20  this.

21     A.    I went too far.  Can I just look at the

22  one?

23     Q.    Sure.

24     A.    Okay.

25     Q.    So this looks like an Entry of Default

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA4025

1    has been entered against you.  Do you understand

2    what that means?

3         A.    No.

4         Q.    Do you remember doing anything as far as

5    litigating this case in state court against S.T.

6    Wooten?

7         A.    No.

8         Q.    Okay.  And then I'm going to ask you to

9    go to the default judgment page.  It looks like

10   this.  And it's easier to count from the back.

11        A.    I think I've got it here.

12        Q.    Okay.

13        A.    Yes.

14        Q.    Did you know that there was a default

15   judgment entered against you in this case?

16        A.    I don't remember anything really from

17   this.  I just remember being sued, and I don't -- I

18   don't remember anything else.

19        Q.    Okay.  Did you know if S.T. Wooten

20   Corporation got a lien on your property on Griffin

21   Road?

22        A.    I think they did.

23        Q.    Do you know if it was because of this

24   case?

25        A.    If it -- if they did, I think it would

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina      (919) 557-4640
                              JA4026

1 have been because of that.

2     Q.    Now, you've filed for bankruptcy before;

3 is that correct?

4     A.    Yes, ma'am.

5     Q.    In 1997?

6     A.    Sounds about right.

7     Q.    What were the circumstances that led up

8 to that bankruptcy?

9     A.    My ex-husband.  He had a lot of "get

10 rich quick" schemes, and he lived on credit instead

11 of income, and it was a hard -- it wasn't something

12 I could overcome with him in our marriage that, you

13 know, he wanted to live beyond our means and I did

14 not.

15     Q.    Did you know that in 2000 there was a

16 judgment lien filed against you with Jordan Lake

17 Land Sales and Mike Hubbard?

18     A.    I vaguely remember that.

19     Q.    What do you recall from that?

20     A.    My ex-husband and I made an offer on

21 a -- either a piece of land or land and a home, and

22 we were not able to secure financing.  And we -- I

23 believe, best of my recollection, we went to small

24 claims court over getting the deposit back, and we

25 were not successful in that, if memory serves.

www.NCDepo.com          Depositions, Inc.
info@NCDepo.com     Serving all of North Carolina     (919) 557-4640
JA4027

1      Q.     In 2014, were you aware that you had a

2   foreclosure procedure filed against you?

3      A.     Yes, ma'am.

4      Q.     What do you recall about that?

5      A.     Nothing really.  I mean, not nothing,

6   but nothing much.  I know that -- I want to say

7   that I was already out of the house when that

8   happened, and that mail did not come to me until

9   way after the fact.  I -- I made attempts to try to

10  get my ex-husband to sell the house so that the --

11  you know, that could be paid, and he refused, so,

12  yeah.

13     Q.     So you weren't aware of a 2014

14  foreclosure until, like, months later?

15     A.      I don't have a time frame, honestly.  I

16  mean, I became aware of it, but I don't remember

17  how long after -- after it happened.

18     Q.     Did you know that there was a 2017

19  foreclosure?

20     A.     Yes.

21     Q.     When did you find out about that?

22     A.     That was -- I feel like that -- I found

23  out from Credit Karma, if I'm not mistaken.

24     Q.     Did Credit Karma notify you before the

25  final order of foreclosure was entered or after?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
                              JA4028

1        A.      I'm not certain.  I don't recall.

2                (Exhibit 373 was marked.)

3        Q.      Okay.  And this is 373.

4                And for both the 2014 and the 2017

5    foreclosures, you were not living in that Griffin

6    Road address at that time, right?

7        A.      To the best of my recollection, that is

8    correct.  I had already moved out.

9        Q.      Okay.  Did you ever consider just

10   selling your stake in that house to your

11   ex-husband?

12       A.      Uh-huh.

13       Q.      Did that ever occur?

14       A.      No.

15       Q.      No?

16       A.      No.  With my ex-husband, it was -- it

17   was all or none.  Either you were in or you were

18   out.  And so since I wasn't -- we couldn't afford

19   the home and I wanted to sell it and he did not,

20   and so, therefore, nothing was considered other

21   than what, you know, he wanted, which was to keep

22   the home despite the fact that he couldn't afford

23   it.

24       Q.      Did you ever consider just giving him

25   your share of the home?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com           Serving all of North Carolina        (919) 557-4640
                                JA4029

1      A.    I feel like when we got divorced, I

2  signed over my rights.  I signed over maybe -- I

3  did a quick deed release, I think, so he could sell

4  it or try to refinance it or something.

5      Q.    Okay.

6      A.    I very much wanted my finances

7  unattached from him in every way possible.

8      Q.    All right.  If you could go to the

9  fourth page of the packet in front of you.

10          MR. HOLMES:  Fourth page of 373?

11          MS. SALUTA:  Yes.

12  BY MS. SALUTA:

13      Q.    Does this appear to be your mortgage

14  contract?

15      A.    It's a notice, this loan is not

16  assumable?

17      Q.    Yes.

18      A.    Yes.

19      Q.    Does this appear to be your mortgage

20  contract?

21      A.    This appears to be something with VA

22  about the mortgage.

23      Q.    Okay.  Is that your initials at the

24  bottom of the page that is circled?

25      A.    It could be.  I think -- I mean, it

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina        (919) 557-4640
                              JA4030

1    looks like it could be my initials.

2         Q.    Okay.  If you go to, like, the third

3    page of this document, is that your signature?

4         A.    That is, yes, ma'am.

5         Q.    Okay.  So at the very first paragraph,

6    it says, In return for the loan I have received, I

7    promise to pay $237,000 to the lender; is that

8    correct?

9         A.    Yes.

10        Q.    And it says on paragraph 3 that you will

11   pay every single month.

12        A.    Yep.

13        Q.    All right.  If you go to paragraph 8,

14   did you know that each person who signs this is

15   fully and personally obligated to pay the full

16   amount owed?

17        A.    That's what it says, yes, ma'am.

18        Q.    So did you know that at the time?

19        A.    I -- I don't remember what I knew at the

20   time.  But, I mean, it makes sense, so I would say

21   yes.

22        Q.    Did you ever consider -- I know this

23   would be very difficult -- did you ever consider

24   paying the mortgage even after you moved out?

25        A.    No.

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina      (919) 557-4640
                          JA4031

1       Q.      Okay.

2       A.      I mean, if -- if I -- if I could have

3   found a way, I guess I would have, but it wasn't --

4   I mean, I don't make that much money, so.

5       Q.      Understandable.  If you could look at

6   paragraph 7, did you know that you could give

7   notice to the lender that you had a different

8   address?

9       A.      I see that.

10      Q.      Okay.  Did you know at the time?

11      A.      I don't remember if I knew at the time

12  or not.

13      Q.      You mentioned for the 2004 foreclosure

14  that you became aware of the 2004 disclosure

15  sometime after that fact.

16      A.      2004?

17      Q.      Or 2014.

18      A.      '14.  Okay.  Yes, ma'am.

19      Q.      Okay.  Did you become aware of the 2014

20  disclosure -- or foreclosure before the 2017

21  foreclosure?

22      A.      I believe so.

23      Q.      Did you take any steps with the lender

24  to try to get your name off of the mortgage?

25      A.      I don't recall taking any steps with

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina        (919) 557-4640
                              JA4032

1   them to get my name off the mortgage, no.

2       Q.    So you never, for instance, offered them

3   your share of the mortgage?

4       A.    I couldn't have done that.  It wasn't an

5   option.

6       Q.    You asked them and it wasn't an option,

7   or you just didn't think it was an option?

8       A.    I didn't have my share of the mortgage

9   to offer.  So to me, it was not an option because I

10  didn't have 100 and however many thousand dollars

11  to say, "Here's my half."

12      Q.    Did you realize that you could just sign

13  over whatever rights you had to the mortgage?

14          MR. HOLMES:  And do you have a good faith

15  basis for asking that question, that mortgage

16  lenders readily accept that?

17          MS. SALUTA:  Yes.

18          MR. HOLMES:  Okay.

19          THE WITNESS:  Ask your question again,

20  I'm sorry.

21  BY MS. SALUTA:

22      Q.    Do you have -- did you know or did you

23  think if it was an option to sign over your rights

24  to the mortgage to -- to the lender?

25      A.    I don't think I -- I don't think I

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA4033

1    understood that right, no.

2         Q.    Okay.  And they might not have taken it,

3    but...

4         A.    It would -- I don't -- I don't think I

5    knew that.  I mean, I don't -- I don't know it now,

6    so I'm going to assume I didn't know it then.

7         Q.    Fair.  In response to the 2017

8    mortgage -- or 2017 foreclosure, did you take any

9    action regarding this foreclosure?

10        A.    No.

11        Q.    And it appears that the foreclosure was

12   successful based on the first page of this -- of

13   this document?

14        A.    It appears that way.  I haven't seen

15   this document before, so I'm -- or I don't recall

16   having seen this document, so.

17        Q.    Did you know that a foreclosure on your

18   credit report could potentially reduce your FICO

19   score anywhere from 85 points to 160 points?

20        A.    I didn't know the points, but I knew it

21   could lower your score, yes, ma'am.

22        Q.    Have you had any financial repercussions

23   from having this foreclosure on your credit report?

24        A.    Not that I've -- not that I've observed.

25        Q.    Did you know that a foreclosure can be

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                                 JA4034

1  on your credit report for up to seven years?

2       A.    I think I did know that, yes, ma'am.

3       Q.    We've gone through a lot of litigation

4  and documents.  Are there any other civil cases or

5  even criminal cases that we have not discussed

6  today, knowing that you talked about a couple of

7  potentially speeding tickets and stuff?

8       A.    Not that I can recall.  I can't remember

9  anything else, but there was some of this stuff

10  that I didn't remember, so.

11       Q.    You mentioned earlier in your testimony

12  that -- that you might have had some identity theft

13  worries.

14       A.    Yes, ma'am.

15       Q.    Have you ever had your identity stolen?

16       A.    I've had fraudulent charges on a couple

17  of accounts in the past.

18       Q.    On credit cards?

19       A.    One was a credit card.  One was actually

20  my bank account, my debit card.

21       Q.    When were those?

22       A.    The one on my debit card, my bank

23  account was right before I think I moved out of the

24  house on Griffin Road; and the one on the credit

25  card was maybe six months after I moved into the

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com       Serving all of North Carolina      (919) 557-4640
JA4035

1    house on -- in Willow Springs.

2         Q.    Given the financial difficulties that

3    your family was suffering around that time, do you

4    think it might have been your ex-husband?

5         A.    I don't.

6         Q.    Okay.  So you talked about going to the

7    police station to get your collision report --

8         A.    Yes, ma'am.

9         Q.    -- for your 2015 accident.  Why?

10        A.    I didn't remember if it was the 2015 one

11   or if it was the one before that, but I think that

12   was just the quickest way to get it.

13        Q.    Why did you want to see it?

14        A.    If memory serves, I needed it.  I don't

15   remember why I needed it, but I -- something

16   happened where somebody said, Do you have a copy

17   of -- maybe it was the insurance company that said,

18   Do you have a copy of your accident report yet?

19   And I didn't and so they said, You need to get

20   that.

21        Q.    You mentioned earlier in your testimony

22   that seeing your accident report didn't really make

23   a difference to you as far as trying to figure out

24   what had happened in the accident.  Is that a

25   correct summary?

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com         Serving all of North Carolina      (919) 557-4640
                            JA4036

1        A.     That sounds correct.

2        Q.     Would it change if the person involved

3    in the accident was unconscious?

4        A.     I don't see how that would make a

5    difference.

6        Q.     Do you think that they would want to see

7    their accident report to figure out what happened?

8        A.     They could.

9        Q.     You think that might be helpful for that

10   person?

11       A.     It could be helpful.

12       Q.     We would have to ask them.

13       A.     Yeah, I would -- I'm not able to put

14   myself in that situation.

15            MS. SALUTA:  Okay.  Those are my

16   questions.

17            THE WITNESS:  Okay.

18            MR. WHITLEY:  Nothing further from me.

19            MR. HOLMES:  I have no questions.

20       (The deposition concluded at 3:18 p.m.)

21

22

23

24

25

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina          (919) 557-4640
                              JA4037

```
1                    ERRATA SHEET

2

3  Case name:      James Weaver Garey, et al.

4                  vs.

5                  James S. Farrin, P.C., et al.

6  Case number:   1:16-CV-00542

7  Witness name:  Belinda Steinmetz

8  Date:          November 4, 2019

9

10  PAGE   LINE    READS            SHOULD READ

11  _____/_____/_____/_____

12  _____/_____/_____/_____

13  _____/_____/_____/_____

14  _____/_____/_____/_____

15  _____/_____/_____/_____

16  _____/_____/_____/_____

17  _____/_____/_____/_____

18  _____/_____/_____/_____

19  _____/_____/_____/_____

20  _____/_____/_____/_____

21  _____/_____/_____/_____

22  _____/_____/_____/_____

23  _____/_____/_____/_____

24  _____/_____/_____/_____

25
```

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina       (919) 557-4640
                                  **JA4038**

1                          SIGNATURE PAGE

2

3          I, Belinda Steinmetz, do hereby state

4     under oath that I have read the above and foregoing

5     deposition in its entirety and that the same is a

6     full, true and correct transcript of my testimony,

7     subject to the attached list of corrections, if

8     any.

9

10                         _____

11                         Belinda Steinmetz

12

13

14         Sworn to and subscribed before me this_____day

15     of_____ , 20_____.

16

17                         _____

18                         Notary Public

19

20     My commission expires:_____

21

22     Mail to:

23         Depositions, Inc.
           1000 N. Main St.
24         Suite 215
           Fuquay-Varina, NC  27526                        TD

25

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com            *Serving all of North Carolina*          *(919) 557-4640*
**JA4039**

1                    CERTIFICATE OF REPORTER

2

3   STATE OF NORTH CAROLINA )

4   COUNTY OF WAKE          )

5

6           I, Tracy D. Daniels, the officer before

7   whom the foregoing deposition was taken, do hereby

8   certify that the witness whose testimony appears in

9   the foregoing deposition was duly sworn by me; that

10  the testimony of said witness was taken by me to

11  the best of my ability and thereafter reduced to

12  typewriting under my direction; that I am neither

13  counsel for, related to, nor employed by any of the

14  parties to the action in which this deposition was

15  taken, and further that I am not a relative or

16  employee of any attorney or counsel employed by the

17  parties thereto, nor financially or otherwise

18  interested in the outcome of the action.

19

20                              *Tracy D. Daniels*

21                       _____

22                       TRACY D. DANIELS, RPR
                         Notary Public # 19922670038
23

24

25

www.NCDepo.com                  Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina            (919) 557-4640
                                  JA4040

**Exhibits**

**Exhibit 362**  4:8 61:20,23
**Exhibit 363**  4:9 67:15,16 80:5
**Exhibit 364**  4:10 75:21 76:5 84:11 111:9
**Exhibit 365**  4:12 155:10
**Exhibit 366**  4:13 160:8
**Exhibit 367**  4:14 166:15
**Exhibit 368**  4:15 169:14
**Exhibit 369**  4:17 172:23
**Exhibit 370**  4:19 174:16
**Exhibit 371**  4:21 176:4
**Exhibit 372**  4:22 176:25
**Exhibit 373**  4:24 182:2

**$**

**$1,800-ish**  175:1
**$100,000**  170:12 174:21
**$16,000**  175:14
**$2,500**  81:22 103:7,17,20 121:20
**$237,000**  184:7
**$25**  175:11
**$5**  163:8

**1**

**1**  82:19
**1/13/74**  7:17
**10**  51:12,16 56:5 97:15,19 109:13 150:16
**100**  186:10
**11**  177:20
**12**  56:5 175:13
**14**  185:18
**15**  77:7 97:15,18 99:7 175:14
**15th**  11:7 25:3 50:25 77:10,21 84:17

**160**  187:19
**17**  137:9 175:18
**18**  156:6 177:21
**1997**  180:5

**2**

**2**  82:19
**20**  51:14,16 97:19
**2000**  180:15
**2002**  167:18,19
**2003**  167:13
**2004**  168:3 185:13,14,16
**2005**  166:3 169:2,9 174:12
**2012**  61:13
**2013**  162:17
**2014**  133:7 155:25 162:17 181:1, 13 182:4 185:17,19
**2015**  76:23 77:11 84:17 85:3,12 104:2,6,12,21 140:7,8,13 189:9, 10
**2016**  11:7 43:24 45:3,23 47:15 49:14 50:24 61:13 71:4 73:16,17, 21 74:3,11 75:1 77:8 79:17 84:9 85:24 89:4 90:6 93:14 94:14,18 105:13 111:1 120:23 121:1 135:20 137:5,25 141:8 142:13,14, 16,19 143:10,21 148:13
**2017**  142:15,20 143:10,21 181:18 182:4 185:20 187:7,8
**2019**  171:14
**2351**  133:19
**2451**  11:17
**25**  7:23
**27**  173:14 174:4
**27501**  64:12

**3**

**3**  82:20 174:24 184:10
**30**  99:10
**300**  67:3

**362**  61:20,22,23 62:1 67:3 80:8
**363**  67:15,16,21 80:5
**364**  75:19,21 76:5,12 84:11 111:9
**365**  155:10,13,15
**366**  160:8
**367**  166:12,13,15
**368**  169:13,14
**369**  172:22,23
**370**  174:16,17
**371**  176:4,5
**372**  176:25 177:2
**373**  182:2,3 183:10
**3:18**  190:20

**4**

**4**  68:11
**44**  173:14

**5**

**5**  175:10
**50**  170:11
**50,000**  170:11 174:20

**6**

**64**  156:13
**65**  155:19 156:13

**7**

**7**  185:6

**8**

**8**  153:12 184:13
**82**  11:22 64:11 68:22
**85**  187:19
**886**  69:22 133:13

www.NCDepo.com
info@NCDepo.com
*Depositions, Inc.*
*Serving all of North Carolina*
*(919) 557-4640*
**JA4041**

**9**

**910 814-7277** 12:5

**A**

**absolutely** 32:4 109:23

**accelerated** 86:11

**accept** 186:16

**accepted** 41:9

**accepting** 58:24

**access** 19:12 72:4 77:25 80:1,5
87:20 88:2,3 91:1,13,25 93:4
94:21 95:10,14 106:16 107:24
108:10,13 114:4,5,8 131:10,12
158:6

**accessed** 16:2,9,13 17:5 42:24
68:2 91:4,9,10,20 92:4,9,13,16,23
95:15 100:4,6,23 101:9,23 104:25
105:7,22 106:13 107:15 108:17,
22 114:15 125:10 130:1,3 165:14

**accessing** 92:19 99:21 100:22
103:3 107:18 108:9 118:10 165:3

**accident** 7:13 11:6,10,14 12:15
22:21 25:3,4,10 27:21 28:4,24
35:9,11,15 37:22 43:8,23 45:2,17,
23 46:21 47:2,5,9,15 48:17,20
50:9,23 51:4 52:11 54:14,21 71:3,
5,11,25 72:1,5,11,14,15,21 73:6,
8,15,16,17,20,21,25 74:3,11,14,
20,25 75:10,11,16 77:8,20,21
79:11,25 80:19 81:4,7,10,12
82:13 84:4,9,14,19 85:2,6,12,19,
22,24 86:15,24 87:11,12,16,20
88:14 89:4,12,17,19,23 90:6 92:5
93:13 97:1 98:23 99:2,10 101:3
104:2,7,13,21,22 105:3,10,12,13,
20 106:3,19,20 107:11,16 108:18,
22 111:12 113:2 115:8 120:11,14
125:1 128:1 132:7,24 135:20
137:5 138:1 139:5 140:2,5,7,9,14
145:12 146:5 148:13 189:9,18,22,
24 190:3,7

**accident's** 75:4

**accidents** 29:23 30:24 44:5
46:13,17 48:11 49:18 71:8,10
104:17 120:8,22

**account** 42:7 145:10 175:11

**188:20,23**

**Accounting** 10:10

**accounts** 41:17 42:18 173:5
188:17

**accurate** 32:19 65:22 85:17 86:1,
3,4

**act** 16:1 19:7,9,10,18 54:24
165:13

**action** 19:21 20:4 21:5 97:6
121:4 122:23 123:20 124:1
126:12 150:7 187:9

**active** 162:10

**activity** 93:16,18

**acts** 170:2

**actual** 103:23

**added** 39:22

**addition** 136:22

**additional** 39:21 41:13,14

**address** 10:5 11:2,13,16,21 12:7,
13,14 13:9 31:12,14 32:24,25
34:15 36:21,23 60:8,12 64:14
66:22,24 67:25 68:6,7,23 69:2,9,
25 70:1,7 79:13,15,21 80:1 82:8,
9,10 95:23,25 96:4,10,23 113:5
115:3 133:17 134:1,5 135:6
158:10 159:6 171:18 182:6 185:8

**addressed** 13:12,23

**addresses** 68:20 69:21 133:8,10
135:8

**adjustments** 136:22,23 137:2

**admit** 155:15

**ads** 55:19

**advertised** 157:15

**advertisement** 23:14 144:18

**advertisements** 97:3 98:21 99:7
133:4 151:10 163:13

**advertising** 95:3 163:10

**Advil** 128:23

**affected** 139:3

**afford** 138:11 182:18,22

**afternoon** 128:16

**again,'** 138:8

**agency** 81:14 94:8

**aggravated** 98:18 130:10 146:1,
3,4

**aggravates** 153:11

**aggravating** 98:20 99:8 146:7,
11 165:11

**aggravation** 97:8 98:19 99:12
101:7 102:11 130:15,25 146:14,
19,22

**aggregation** 122:23

**agree** 39:7 78:22 90:14 93:1,10
103:14 107:8 117:18,22 148:12
155:7 156:2,5 170:1 175:8,16

**agreed** 24:17 162:5 173:20

**agreement** 159:4

**ahead** 22:13 54:5 71:18 155:5

**alcohol** 159:19

**alerted** 93:19

**alignment** 136:24,25

**allegations** 105:17

**alleged** 21:16 22:2 124:21

**allowable** 16:11

**allowed** 91:2 102:3 105:6,25
108:16,19

**allowing** 176:10

**alumni** 159:7

**ambulance** 29:13 35:6

**Amended** 7:12 161:10

**amendment** 17:19 18:3,23

**amount** 28:19 39:20,23 40:20
41:7 52:12 58:24 67:9 69:12,17
87:23 103:1,7,8,13,22 121:11,21
123:13 134:15,18 165:6,7 172:17
173:7 184:16

**Angier** 11:22 12:7 64:11 134:1
150:19 156:7

**annoyed** 97:1 130:9

**annoying** 153:21,22

**annual** 166:23

**answering** 135:12

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA4042

**answers** 6:4 133:7

**anymore** 29:17 71:2 115:6 120:7 138:11

**Apex** 10:5

**apologies** 57:9

**apologize** 21:20 117:9,13 159:22

**appears** 77:4 113:18 157:6 166:5 169:2 170:9 174:12,19,24 175:10 177:19 183:21 187:11,14

**appoint** 22:9

**appointment** 136:14

**approved** 133:3

**approximately** 133:10,15 162:16 170:14 175:14

**area** 71:21

**Articles** 168:12

**asks** 29:11 128:11

**aspect** 83:24

**assessed** 69:15

**Assessor's** 68:16

**assets** 170:11 173:4 174:21

**assist** 41:1 46:18 89:5

**assisted** 167:4

**Association** 132:21

**assumable** 183:16

**assume** 54:23 78:18 126:6 151:14 187:6

**assuming** 104:21

**at-fault** 73:11 83:10,11 84:2 104:18

**attached** 43:21 145:22

**attempts** 181:9

**attention** 94:7

**attorney** 39:13 41:1 46:18 48:10 49:3,10 123:18 128:11 132:18,24 140:4 144:22 145:21,25 146:2,3 147:12,17 148:14,22 149:1 173:20 178:3

**attorney's** 102:21

**attorneys** 6:24 18:6,10 19:1,24 20:16 23:19 24:2,6,17 48:14,15,

20 54:18 57:5 90:18 110:21 116:8 119:17 122:7,12,16,20 123:1,12 124:8,10,12 125:24 126:8 131:14, 15 144:7 145:18 147:20,23 172:14

**August** 155:25

**Augustino** 168:13

**automatic** 147:10

**avenues** 50:13

**aware** 64:1 70:11 81:6 93:18 101:4,12,17 107:13 119:16 133:1, 5 163:11 181:1,13,16 185:14,19

**awful** 17:8

**awkward** 177:11

---

**B**

**back** 11:3 12:8 15:6 19:6 25:2 29:14 31:1 32:11 34:24 35:3,24 37:12 39:3,8 50:23 51:22 57:10 58:15 63:4,11 69:20 84:9 85:24 89:3 91:15 100:2,19,22 111:3,8 117:10 128:21 129:11 137:4,9,10, 13 139:3 142:24 149:2 160:6 179:10 180:24

**bad** 18:11 28:5 117:10,12 133:12 169:3,5 171:12,13

**bank** 188:20,22

**bankruptcy** 122:12,20 123:1,18 126:9 169:9,18 170:6,18,21 171:9,11,20 172:3,9,19,20 173:4, 9 174:14 175:24 176:6,10 180:2,8

**Bar** 132:16,21 133:3

**based** 57:15 103:23 105:17 113:1 121:17 125:8 126:15 138:17 142:7 187:12

**basically** 52:13

**basis** 19:25 23:20 48:17 53:16 153:24 186:15

**bathroom** 58:8

**bear** 41:16 56:15

**beginning** 152:17

**behalf** 170:3,4 178:1

**Belinda** 5:4,12 31:6,7,11 42:8 129:7,10 178:19

**belongings** 38:22

**beloved** 151:13

**benefits** 145:8

**bent** 28:1,6

**big** 7:25 43:14 55:2 158:22 177:1

**bill** 69:1 70:6 154:22 160:12,14 173:16 174:7

**billboards** 161:7

**billing** 10:10

**billings** 171:4

**billion** 122:10 124:19 125:9,12

**billionaires** 122:16

**billions** 122:3 123:22 124:1 126:12

**bills** 45:16 48:6 59:4 145:4 173:19 175:14

**Birch** 134:14

**birth** 7:16 115:14

**birthdate** 115:4

**bit** 9:1 10:11 16:5 19:6 20:12 30:15 35:23 37:13 41:16 50:7 52:16 56:16 58:16 87:22 94:21 98:14 111:25 121:3 123:4 137:14 142:11 148:8 177:10

**block** 81:17,18

**Board** 62:2,10,19 63:2,17 64:5 66:4,19,23

**body** 38:5,9,14 40:5 136:21 139:6,9 145:14 149:10,14

**Boone** 134:19

**boss** 37:21 106:18 107:1

**bother** 114:22,23

**bothered** 130:10,11

**bottom** 81:19 85:13 167:10 183:24

**bought** 151:9,19 152:18 154:11 156:11 157:10,12 160:19,23

**box** 68:15 82:19 113:4 150:9,11

**boxes** 82:13,17

**braked** 28:11

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4043**

**break** 6:13 58:7,9,16 110:24 124:14 156:14 165:21

**breakdown** 18:16

**breaking** 124:17

**breaks** 6:11

**briefly** 135:11

**bringing** 108:23

**brought** 7:9 94:6 110:4 123:10 139:24 145:21 147:16 177:4

**build** 6:14

**Building** 134:16

**bulletins** 159:10

**bunch** 56:19,23 141:17,23 152:8

**burden** 56:14,16,18

**bureau** 50:19 93:17,24 140:20

**burn** 144:15

**business** 10:7,12 126:14 166:6,9

**busy** 138:8

**buying** 151:24 159:19

---

**C**

**calculating** 103:23

**calendar** 136:15

**call** 17:24 29:25 30:13,19 35:21, 23 38:18 50:16,20 52:13 89:7 97:6 132:3,6,9 142:10,19

**called** 28:25 35:17 36:1 38:18 40:4 168:17 178:18

**calls** 6:21 35:15

**car** 15:13 25:17 27:3,7,20 28:7,9, 17 29:14 31:2 32:9,10,12 34:24 36:11,18,25 37:25 38:1,2,15 39:5, 10 40:1,22 43:9,12,19,23 44:6 45:5 47:23 57:19 59:1,10 82:12 98:21 99:6 139:10,16,18,21,23,24 141:20 149:12,15 151:14,21,23 152:8,11,13,18,25 153:3,12,24 154:5

**card** 55:16 94:4 144:13 158:17 175:14 188:19,20,22,25

**cards** 158:12,18 188:18

**care** 153:11

**Carolina** 8:16,24 9:2,15 10:5,16, 19 11:23 60:2 62:1,9 63:2 64:12 65:11 76:9,13 79:3 80:18 132:16, 18,21,23 133:2 134:15 154:20 161:21 166:22 167:7

**carrier** 95:17 96:9

**cars** 44:8

**carting** 150:4

**case** 5:14,17 7:14 12:10 16:7 17:12 18:10 20:14,17,22 21:17 22:2 23:11,14,17 24:3,11 48:15 57:6 83:7,15 90:8 103:3 105:11, 17 115:17 116:3 119:8,25 120:5 121:6 122:8 124:3 126:2 128:2, 18,20 147:20,23 148:3,5,9 163:16,19 164:12 167:2 170:7 173:9 177:4 179:5,15,24

**cases** 161:18 188:4,5

**Cash** 158:25

**categories** 95:13

**caused** 46:24 170:18,20

**cell** 11:25 12:2,4

**certainty** 53:25 120:18

**certified** 20:22,24 24:11

**chance** 24:21,25

**change** 11:2 190:2

**changed** 112:23

**charge** 163:1

**charges** 173:20 188:16

**check** 14:7

**checked** 26:6 113:4,9

**checking** 175:11

**checkout** 158:16

**Chevy** 151:18 152:3,6,23 154:1, 4,12

**child** 27:6 42:12

**chiropractic** 144:18

**chiropractor** 26:8,10,23 40:24 135:22,23 136:2,7,10 144:8 149:7

**chiropractors** 136:20 145:14

**choose** 21:14 37:3 158:1

**Christmas** 135:2

**church** 159:10

**circled** 183:24

**circumstance** 104:16

**circumstances** 72:19 85:5 88:24 109:1 164:12 180:7

**citation** 15:21 85:22 127:6,9,17

**citations** 14:24 126:25

**civil** 176:14 188:4

**claim** 30:20 37:9 40:22,23 46:5, 12,20 47:14 88:3,9 89:5 108:23 123:10 138:20,21 145:8

**claims** 52:12 180:24

**clarification** 68:8 74:1 102:21 108:6

**clarify** 61:4 100:7

**class** 7:11 19:21,25 20:3,4,6,11, 15,19,21,24 21:1,4,6,9,23 24:10, 13 56:15 57:3 105:10 115:17,21 116:2,4,5,11 121:4,14,25 122:22 123:20 124:1 125:14 126:12,16 130:24 144:23 150:7 163:16

**clean** 6:7

**clear** 7:4

**clearer** 44:23

**clerk** 127:16

**Clicked** 64:1

**client's** 59:23

**Clinton** 8:11

**close** 18:20 82:2 151:22 157:1 164:6

**Club** 158:13

**clutter** 14:13

**codes** 83:9

**cohort** 128:19

**collected** 173:7

**collection** 176:6

**collectively** 97:12

**college** 8:8,12,13

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4044**

**collision** 76:15 135:13 139:3 146:18 165:10 189:7

**comfortable** 30:22

**comment** 132:1 156:22

**commercials** 48:1

**common** 46:23 48:2

**community** 8:8,12,13

**companies** 59:20,21 87:19 88:13 145:13,14 153:12

**company** 9:16 22:25 35:17,22 36:2,25 37:10,13,16,17 38:10,20, 24 40:4,15 41:4 45:4 49:16 50:17 57:11,12 58:18 59:13 81:10 83:3 84:1 87:1,5,9,15,24 88:1 89:1 116:17 134:20 140:19 145:7 151:20 160:19,22,24 167:7,25 168:6 169:3,24 170:4 171:10 172:5 189:17

**company's** 39:17

**compared** 111:19,24 112:8

**compensated** 24:3

**compensation** 24:5 47:1,24 48:5 49:9 50:14 53:12,24 90:11, 20

**complain** 132:15

**complaint** 7:12 17:11,13,15,22 18:3,24 93:22,23 161:10 177:13, 15,20,23 178:6

**completely** 136:3

**Components** 134:17

**concept** 50:6

**concerned** 17:1 148:7

**concerns** 17:6

**concluded** 190:20

**concluding** 38:15

**concrete** 9:17,25 10:3,9,16 134:12 167:6,11 169:9,19,20 176:22

**confidential** 94:3

**confirm** 74:19 106:20

**confirmed** 14:19

**confusing** 56:17 123:5

**Congratulations** 156:9

**connection** 170:6

**consent** 176:13

**considerable** 172:17

**consideration** 138:14,23

**considered** 72:19 97:5 103:8 130:21 132:6 139:13 182:20

**considers** 132:24

**consistent** 153:23

**constant** 137:11,13

**constitutes** 165:4

**consult** 22:23

**consuming** 96:25

**contact** 38:23 88:13 136:6

**contacted** 87:16

**contend** 155:5

**contingency** 23:20 48:17 53:16

**continue** 136:9

**continued** 171:19

**contract** 183:14,20

**contribute** 17:10

**conversation** 5:24 6:8 30:8,23 34:11 35:18 36:5 37:9,15 39:2 141:14 142:1,7,8 177:11

**conversations** 37:19 40:15 57:10,15 141:1 142:6,9 143:7

**conveys** 43:16

**copy** 33:19 71:10,19,22 72:10,14, 21 73:15 74:20 86:15,24 87:3,15 89:11,16,19,22 90:3 104:22 106:3 127:7,17 156:4 189:16,18

**Corelogic** 160:13

**corporation** 166:22 168:16 170:4 176:14 179:20

**correct** 13:21 14:22 25:1 32:22, 25 47:13 48:13 51:1 59:11 60:3 64:13,15 65:5 67:1 68:24 69:9,19 70:1,8 73:13 74:9 77:12,18 78:2, 21 79:16,18 80:12 82:9,10 84:23 86:13,19,22 89:5,6 90:1,4,7,9 92:14 93:7 96:14 98:10 101:5,10, 13,14 102:4 104:15 105:8 106:1,

4,11,17 109:11 110:6 112:12,19, 22 117:19,21 118:2,19 120:12,21, 24 121:2,22 123:19 126:24 127:1, 8 130:12 134:9 137:18 144:21 145:1 149:4 155:8,9 157:8 162:10 166:7 167:15 169:4 170:24 173:24,25 174:15,22 175:20 180:3 182:8 184:8 189:25 190:1

**correctly** 129:24 130:2 146:13 165:5

**cost** 24:23 48:21 49:4,11

**costs** 24:18 164:14

**counsel** 111:5 128:10

**count** 177:11 179:10

**counter** 57:2

**country** 157:4

**county** 8:13 10:7,8 11:18,20,23 64:16 68:4,16 70:10 71:16 164:3

**couple** 6:21 26:7 37:3,24 39:8 40:24 51:5 89:15,16 109:15,17 110:1 113:17 126:22 127:4 128:9 139:19 154:14,15 155:18 158:21 166:1 172:20 188:6,16

**coupon** 55:21

**court** 6:1,2,8,14 20:25 21:3,5,11, 13,14,21,24 22:4,9 108:23 121:18 127:2,5,13,16 165:2 176:10,15 179:5 180:24

**cover** 41:11

**coverage** 50:1 116:18

**covered** 40:23 47:8

**coveted** 115:1

**CPA** 167:1,3

**Craig** 8:20,21 168:13 178:18

**Craigslist** 157:15

**create** 95:2 101:12 115:5 157:25

**creating** 14:13

**credit** 55:16 93:17,23,24 94:4,8,9 144:13 162:8,9,12,19 163:3,4 175:14 180:10 181:23,24 187:18, 23 188:1,18,19,24

**criminal** 188:5

**cross** 27:12

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4045**

**current** 11:21 64:14 67:25 68:5,
23 69:1,9,17 160:3,11,12 174:25
175:5

**curse** 18:12

**customer** 65:10

## D

**damage** 31:1 44:6 45:5 81:20
82:5 123:23 140:1

**damaged** 43:22

**damages** 28:19 52:13 121:5,21
122:23 123:13 124:2 126:13
130:8 149:23 164:18 165:4

**date** 7:16 17:14 51:6 65:8 76:23
77:8 115:14 137:9 138:2 142:16

**dates** 133:13 171:12,13

**dating** 9:5 142:24

**day** 14:10 35:11,16 37:14,20
38:3,5,6,7,8,17 40:7 98:4 106:20
109:22

**day-to-day** 171:3

**days** 38:21 51:5 99:10 110:1,5
141:5

**deal** 116:17 144:7

**dealing** 59:19 81:10 83:2

**debit** 188:20,22

**debts** 170:11 174:22

**decide** 20:25 83:6 142:8,9

**decided** 142:10 143:17 148:20
150:7 152:1

**decides** 21:4

**Decipher** 14:7

**decision** 138:7,10 151:21 171:3

**decisions** 20:14 170:22,24 171:5
175:24

**declaration** 7:10

**declined** 26:21

**deed** 57:22 183:3

**deeds** 170:2

**deep** 50:5

**default** 178:18,25 179:9,14

**defendant** 100:23 101:3

**defendants** 5:14 17:1 21:16 22:2
90:17,21 91:9,20 92:4,8,16,23
94:23 99:21 100:3,6 101:8 103:2
105:20 106:12,15 107:2 111:6
112:5 119:7,15,21,25 120:5,20
121:1 122:8 124:20 125:25
128:20 129:25 130:6

**defendants'** 128:10

**definitive** 108:7

**Delafield** 12:21

**deliver** 170:3

**delivered** 95:18 101:16

**Democrat** 60:21

**Democratic** 61:8

**department** 33:25 71:15,17
72:14,22 73:14,19,21 74:19 75:9

**department's** 68:3 70:10,18,22

**depend** 47:10 49:6 73:2,3,5
88:21 128:6,7

**depending** 48:25 103:25 121:14
128:10

**deposit** 180:24

**deposition** 5:15 6:19 11:6 17:16
76:3 103:11 125:1 148:6 165:16
190:20

**description** 43:11,14

**designate** 55:4

**designated** 13:4 24:6

**detail** 112:1

**details** 88:8

**determination** 21:12,22 124:23

**determine** 21:5 22:5 116:2 117:4
118:5 121:16

**determined** 121:18 165:2

**determining** 83:14 173:23

**diagnosed** 26:15

**diagnosis** 26:17

**difference** 73:7 83:22 88:5 99:9
116:25 118:8 123:21 189:23
190:5

**differences** 5:25

**difficult** 56:7,10 184:23

**difficulties** 103:10 189:2

**direct** 129:4 131:17 133:3,6
140:4

**directed** 147:1

**directing** 156:22

**direction** 18:25

**disagree** 169:7,10

**disagreed** 73:9

**discard** 144:19

**discarded** 151:2 152:21

**discarding** 151:11

**disclosure** 185:14,20

**discuss** 53:9,15,18 137:15

**discussed** 6:24 17:24 24:20
143:12,13 154:24 188:5

**discussing** 48:11 49:19 53:23
88:9 138:15

**discussion** 37:8 117:14 134:3,4
138:19 156:16 161:15

**discussions** 88:16

**dispute** 93:23

**dissolved** 10:8

**distinction** 106:25

**distress** 98:16,17

**distributions** 173:6

**divorce** 129:12

**divorced** 129:5 183:1

**DMV** 16:1,9,19,20,25 19:11,12
65:11 102:15 113:14 114:3,8
135:12 153:17

**doctor** 26:7,19 40:10

**doctor's** 40:23 41:12

**document** 33:13,22 57:20 58:24
59:3 61:25 62:5,25 67:21 79:5
80:5 81:13 84:15 142:20 143:11
166:17,18 172:19 173:1,2 177:21
184:3 187:13,15,16

**documents** 7:1,8 57:14 58:17
59:6 61:16 144:24 166:24,25

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4046**

168:21 170:3 188:4

**dollar** 121:11 122:11

**dollars** 122:4 123:22 124:2,19 125:9,12 126:13 174:22 186:10

**door** 95:18

**doubt** 64:22

**Doug** 177:25

**DPPA** 67:4 70:23 90:24 91:2 92:21,24 93:4 102:1,5,7,14,23 105:5,24 106:15 107:3 108:19,23 111:17 113:13 114:4,8,16 121:21 123:11 124:6 128:6 131:18,24 143:14 161:2,20 162:2

**drill** 16:4

**drivable** 27:20,23 28:7

**drive** 28:1 64:11 68:22 152:2 153:12

**driven** 154:19

**driver** 15:25 15:20 26:24 27:6 28:11 29:22 30:14 33:6 34:17 36:2 49:19,22 50:10 72:20 73:12 83:10,11 84:2 104:12,18,19,23 105:9 140:16,21

**driver's** 16:21 19:7,10 31:17 32:24 34:7,18 37:17 38:10,24 40:14 45:4 49:16 53:19 57:11 58:17 59:12 83:25 86:25 87:5,15, 23 88:1 111:20,25 112:9,11,13,21 113:7,12,15,21,25 114:1,10,13, 17,25 115:8 159:12,16

**drivers** 88:12,17

**drivers'** 59:19

**driving** 15:8 36:19

**drove** 28:8 38:2,4

**dual** 100:20

**due** 69:18

**duly** 5:5

**dumb** 158:7

**Dunn** 134:14,17

---

**E**

---

**e-mailed** 57:17

**earlier** 52:1 54:8 59:8 77:14 84:15 87:22 116:14 122:6 126:23 137:3 146:25 154:24 188:11 189:21

**early** 25:22 33:5 34:4 152:1

**earning** 149:25

**easier** 179:10

**Eastern** 134:16

**easy** 58:23 80:2

**Edam** 134:19,20

**edges** 82:18

**education** 8:6 47:11 50:22

**Edwards** 9:23

**efficient** 111:4

**efforts** 176:7

**eighth** 63:4

**election** 61:13

**elections** 62:2,10,19 63:2,17 64:5 65:23 66:4,19,23

**embarrassing** 103:11

**emotional** 98:16,17,19

**employed** 9:7

**employee** 171:25

**employees** 126:4,14 171:21,23 172:2

**employment** 134:11

**enacted** 19:11 124:7

**end** 8:15 34:23 84:10 121:15 138:6,21 151:11

**ended** 27:22 39:8 138:12 172:5,6

**ending** 167:18 168:3 173:9

**ends** 20:17

**enforcement** 34:1 81:14

**engage** 39:13 48:10 54:17,22 89:4

**engaged** 48:14

**enlightenment** 66:17

**enrolled** 158:14

**entailed** 18:17

**enter** 67:15 88:15

**entered** 68:13 122:11 179:1,15 181:25

**entire** 21:6

**entities** 15:20 158:8,10

**entity** 43:7

**entries** 68:19

**Entry** 178:18,25

**envelopes** 95:17 96:16

**essentially** 5:24 41:9 48:21

**estimate** 28:2 55:24 137:7

**estimated** 81:19 82:5 97:19 170:11 174:20

**ethnicity** 60:15 65:3

**eventually** 28:17 81:9 86:14 128:24 151:2,11

**ex-husband** 8:17 15:8 77:18 162:15 170:21 176:23 180:9,20 181:10 182:11,16 189:4

**ex-husband's** 8:19 9:16

**exact** 51:6 82:3 135:25 138:2

**examination** 5:8 128:14 129:5 133:7

**examined** 5:6

**excessive** 154:18

**exchange** 29:22 33:6 87:8

**excited** 151:9

**exclusions** 131:21,24

**excuse** 79:15

**execute** 170:3

**exercise** 67:12

**exhibit** 61:20,23 67:3,15,16 75:21 76:5 80:5 84:11 91:15 111:9 155:10 160:8 166:15 169:14 172:23 174:16 176:4,25 182:2

**exhibits** 113:17

**exist** 92:22,24 102:6,24

**existing** 145:10

**expect** 64:21 92:24

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA4047

**expenditures** 175:5

**expenses** 138:16

**experience** 5:19 135:16

**experienced** 94:19 130:25

**experiences** 59:18

**expert** 155:16

**explain** 20:9 62:24

**explained** 20:2 136:24 141:22
148:4

**explaining** 142:21 148:8

**explanation** 98:23

**exposed** 95:6

**extend** 177:22 178:17

**extended** 152:8,13 153:24

**extent** 118:6

**extra** 56:20 117:12 163:9

---

### F

**face** 53:11

**Facebook** 41:19 42:6 43:2,14
154:24,25 155:16,21 156:10
157:6

**facilitate** 79:25

**fact** 17:4 61:7,10,12 101:23
111:18 113:1 114:2 122:22
123:20 140:22 146:10,11 153:20
165:13 181:9 182:22 185:15

**factored** 40:20

**facts** 80:24

**fair** 18:6 41:14 57:3,8 59:9 75:18
80:25 88:1 119:6,9,24 121:18
122:10 140:11 187:7

**faith** 186:14

**familiar** 62:4 77:22 81:8 161:25

**family** 7:20 42:4 107:15,22
108:17,21 189:3

**Farm** 50:19 57:13,16 58:2 138:15
139:6,15 140:20 148:15 149:18

**fast** 25:17 99:4

**faster** 86:11

**fault** 83:17,20,21 85:9 104:6,10,
13 120:14

**fee** 23:20 53:16

**feel** 19:5 29:16 34:2 39:19 42:23
57:17 59:12,15,20 65:25 66:8,11,
12,18,25 67:2 70:12 72:24 78:3
114:21,24 118:9 122:19 124:6,11,
12 126:16 129:2 139:4 147:5
148:24 151:7 152:10 153:7 154:2,
8 165:12 170:23 181:22 183:1

**feeling** 66:17 151:19

**feelings** 66:15

**felt** 39:11 41:14 59:22 87:24
118:4 147:7

**female** 65:6

**FICO** 187:18

**figure** 189:23 190:7

**figured** 5:21 46:10

**file** 46:5,20 90:10 166:23 176:6

**filed** 7:12 17:12 18:3 46:12 90:8
140:13 168:19 169:9 174:13
178:11 180:2,16 181:2

**filing** 93:22,23

**filled** 11:3

**final** 39:23 58:23 63:23 65:19
68:25 69:4 171:10 172:19 173:3
181:25

**finalized** 160:18

**finances** 183:6

**financial** 99:16,18,20 100:1,5,8
122:13 138:10 170:21,24 187:22
189:2

**financing** 180:22

**find** 54:1,10,15 55:17 57:1 62:13
70:16 117:17 131:4 143:15
181:21

**finding** 103:10

**fine** 22:19 27:16,24 42:17 44:4
86:23 107:5 145:24

**finger** 18:5

**finish** 6:4

**finished** 174:10

**finites** 22:17

**firm** 5:14 21:1,6,12,14,22,24,25
22:9 23:8 51:4 52:3 89:5 96:3
104:4,22 117:24 142:16,21,23

**firms** 15:17,20 16:6,13 51:23
52:9 53:6 54:22 85:2 89:7,11
90:17 104:9 109:7 116:12 117:23
118:12,17 119:7,11,15,20 123:11
125:24 126:3,8,13 150:6

**fiscal** 167:18 168:3

**fit** 63:3

**five-minute** 58:7

**fix** 28:5

**fixed** 28:2,3

**flew** 107:7

**flier** 13:15

**fliers** 55:14,19 95:16

**flight** 159:16

**flip** 84:9 167:17

**Florida** 148:11

**follow** 124:8,10

**follow-on** 15:16

**Food** 13:15 144:17 158:12

**Ford** 40:2 151:13

**foreclosure** 181:2,14,19,25
185:13,20,21 187:8,9,11,17,23,25

**foreclosures** 182:5

**forever** 138:13 162:20

**forget** 58:23

**forgot** 128:18

**form** 33:6 93:8 123:2 159:13

**forward** 129:23

**found** 53:7 114:14 117:2 118:11
152:11 172:6 181:22 185:3

**fourth** 183:9,10

**frame** 27:25 28:6 181:15

**fraudulent** 188:16

**free** 29:18 35:7 163:1,5

**freeze** 93:24

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4048**

**friend** 107:15,22 108:17,21

**friends** 22:21 42:2,5 136:8 164:6

**front** 76:4 147:12 155:23 183:9

**full** 5:11 34:21 38:17 69:5 115:3 151:10 171:24 184:15

**fully** 184:15

**function** 157:8

**fund** 24:17

**funds** 39:21

**Fusion** 40:2 140:1 151:13

**future** 138:17,25

### G

**gathered** 173:4

**gave** 29:16,17,21 31:8 32:6,8 33:7 34:17 36:8 37:2 38:12 71:22 74:13,14 137:25 142:19 158:17 160:11 172:15

**Gemma** 128:18

**gender** 60:18 65:6

**general** 16:3 25:5 62:5 91:24 132:19,24 136:22 171:23 174:5,6

**generally** 11:9 62:25 74:25 90:10

**generate** 71:5,25

**gentleman** 50:19

**get all** 79:9

**gifts** 135:3

**gist** 16:22 141:24

**give** 6:13 19:8 26:20 29:16 31:24 36:14 39:6 43:11 49:15 60:8 85:16 94:2 111:25 137:7,22 142:10 149:24 172:25 173:6 185:6

**giving** 31:4,14 39:9 143:7 182:24

**glad** 44:24

**glass** 145:14

**goal** 5:23 131:6

**good** 31:2 39:11 58:10 75:18 107:6 128:16 135:18 151:12,23 165:20 186:14

**Gotcha** 22:3 44:19

**governmental** 66:10

**graduate** 8:9

**graduated** 8:7

**great** 164:8

**Griffin** 69:22 133:13 160:6 179:20 182:5 188:24

**grocery** 55:14,18,21 158:21

**group** 43:3

**guess** 16:22 18:4 20:17 43:15 49:6 66:15 70:15 78:5 95:15 116:8 120:10,13 128:7 133:14 136:1 137:23 149:22 150:17 153:9 168:11 185:3

**guidance** 18:25

**gun** 159:19

**guy** 168:14

**guys** 170:10 171:11 176:14

### H

**hacked** 42:24

**half** 18:19 174:22 186:11

**hand** 57:4 114:18 127:7 166:11

**handed** 15:4,21 33:13 62:1 112:13

**handle** 19:1 124:3

**handwritten** 33:8

**handwrote** 33:9,10,13,16

**happen** 49:13 52:23 116:8 120:19 138:25 143:4 148:20

**happened** 18:1 29:12 30:9 34:22 36:7 37:23 43:10,12 50:17 52:20 85:18 99:5 141:21,22 148:9 181:8,17 189:16,24 190:7

**happening** 93:25 152:10

**harassment** 94:19

**hard** 70:15 94:9 180:11

**harm** 99:16,18,20 100:1,5,8 126:16 164:20

**harmed** 66:18 70:17 92:16,22 93:3 104:24,25 106:5,8,12,18

107:14 114:19,21

**harms** 100:20

**Harnett** 10:7,8 11:23 64:16 68:4, 15 70:10 71:16 164:3

**Harris** 144:10 158:13

**hate** 23:23

**hated** 151:18

**head** 6:15 22:7 26:18 55:6 64:22 107:7 109:4 110:19 124:23 138:2 142:17 159:20 162:18

**hear** 23:13

**heard** 91:3 112:4 129:22

**held** 117:14 156:16 164:13

**helped** 116:22 118:4

**helpful** 48:7,9 50:11,15 53:7 54:2,11,15 72:13,17 83:5,8,13,16 84:3,5 117:3,17 118:11 145:20 190:9,11

**helps** 50:20 167:1

**hey** 37:24 39:6 52:18 138:24 163:8

**hide** 135:2

**high** 8:7,9,10

**highest** 8:5

**highway** 34:2 76:13 77:25 78:9, 18 79:3 80:14,16,19 81:4,16 82:5 106:5 107:10 124:24 125:11 127:25

**hire** 117:24 148:22

**hired** 116:11 118:12 148:14

**hiring** 149:1

**history** 65:20 134:11

**hit** 29:24 35:22 87:9

**hold** 7:22 16:25 55:25 57:3

**holding** 56:12

**holds** 16:19,20

**holidays** 151:22

**Holmes** 22:12 44:12,15,17,20,22 54:4 58:5,12 60:23 61:1,3,5,21 80:22 93:6,8 100:7,11 102:10 108:1 109:13,16 123:2 125:12,15, 17 141:2 143:8 161:3 165:22

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4049**

172:22 174:3,8 183:10 186:14,18 190:19

**home** 10:4,6 11:24,25 12:12 13:5 36:21 37:4 38:2,4 60:8 63:1 66:22,24 67:7,10 70:3 139:25 180:21 182:19,22,25

**honestly** 28:21 38:6 50:16 88:6 107:19 150:13 181:15

**hoping** 25:24 120:7,8

**horse** 137:17 138:9,11

**horses** 137:16 138:18

**hotel** 159:24

**hour** 18:19

**hourly** 46:3

**hours** 18:13,17,19,21

**house** 12:24 14:4,15 69:13 101:17 150:19,21 151:9 156:7,11 157:13,18,20 160:2,3,4,18 162:15 176:22 181:7,10 182:10 188:24 189:1

**household** 174:25

**Hubbard** 180:17

**Huh-uh** 129:16

**hundred** 34:3

**hung** 21:19

**hurry** 151:20

**hurt** 26:4,12 28:5 30:3

**husband** 164:8 166:6 167:8 174:13 175:25 177:5

**husband's** 164:7

---

**I**

**ID** 159:13

**idea** 25:19 29:20 31:3 42:10 64:6 78:8 87:18 100:23 119:20

**identity** 17:7 74:19 93:12 94:15 115:5 188:12,15

**IDS** 29:13

**illegal** 131:12

**illegally** 16:2 17:5 106:14 131:12 165:14

**illustrious** 171:7

**immediately** 40:4 125:1

**inaccurate** 82:14

**inaccurately** 83:21

**include** 53:3

**included** 89:11 146:17

**Including** 69:7

**income** 174:25 180:11

**Incorporation** 168:13

**increase** 130:17,18 140:9 152:11

**increased** 39:19 146:18,21

**independent** 13:1

**indication** 94:15

**individual** 90:17 118:4 122:7,12, 16,20,25 123:18 125:23,24 126:7 161:23 174:13

**individually** 75:23 97:12 123:7, 9,22 161:1 177:5

**individuals** 21:7

**informal** 129:14

**information** 16:2,9,13,16,18,19, 20,21,24 17:4,9 19:17 21:15 22:1, 10 29:25 32:16 33:11,14,16,20 34:13 36:7,14,17,18,23 38:19 40:5 42:18,19 43:4,16 50:12 53:5 54:10,15 60:4,13,16,18,22 61:10, 14 62:19 64:2,7 65:25 66:1,4,9, 13,19,23,25 67:2,3,6 68:3 70:9, 13,14,18,21,22 72:25 74:16,24 75:2,3,4,5,6,7 76:2,15 78:4,10,14, 17,19,22 79:9,22,24 80:10 82:12 83:23 84:23 88:2,4,14,25 90:24 91:4,9,14,16 92:1,5,9,13,17,23 93:5 94:3,23 95:1,6,8,10,14,20 96:3,15,19 97:2,17 99:21 100:4,6, 24 101:3,11,15,24 102:8,15 103:3 104:1 105:1,6,19 106:6,9,13,16, 19 107:1,24 108:10 111:16,19,20, 22,24 112:8,10,11,17,25 113:12 114:16 115:7 116:16,21 117:3,17 118:11 125:10 127:9,12 130:1 131:11 143:16 144:13 149:22 153:15,22 156:4 158:16 159:2 164:24 165:3 175:20

**informational** 22:11

**initial** 17:13 143:12

**initially** 95:16 96:2 101:25 139:25

**initials** 183:23 184:1

**injure** 96:24

**injured** 26:25 27:1 90:22 97:21 101:22,24 102:6,18,22 103:2,17, 20 105:17 116:3 118:6 119:11

**injures** 95:5 107:25 108:18

**injuries** 26:9 90:21 98:24 103:24 115:22 118:6,9 135:21 148:25

**injury** 90:12 97:24 99:3 103:22 108:12 117:1 139:3

**input** 20:18 76:21

**inquiries** 63:10

**inquiry** 94:9

**inside** 14:5 110:4

**Instagram** 41:21 42:9,10

**instance** 43:1 57:5 83:25 96:5 99:22 113:24 114:5,7 158:24 159:15 173:14 186:2

**instances** 77:16 95:9

**insurance** 29:24,25 30:21 35:17, 21 36:2,16,24 37:10,13,16,17 38:10,19,24 39:17 40:4,15 41:4 45:4 49:16,19 50:17 53:10,19,21 57:11,12 58:18 59:13,20 75:5 81:10 83:3 84:1 86:25 87:5,9,15, 19,24 88:1,13 89:1 116:17 140:9, 19 145:6 150:23 151:11,20 189:17

**intend** 50:8

**interest** 20:15,19 59:23

**interested** 14:20 140:24,25 141:1 143:15

**Internet** 66:9 72:6,11 78:19,23

**Interruption** 76:10

**intersection** 27:11,15

**intoxicated** 25:21,25

**introduce** 6:4

**introduced** 31:6

**introduction** 172:25

**invading** 151:8

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4050**

**investigate** 93:20

**investigating** 93:19

**involved** 10:13,14 20:13 24:18
47:2 48:16 75:4 143:19 168:15
190:2

**irritated** 52:17 97:3 151:4

**irritating** 55:17 151:5,6

**irritation** 101:6 102:11,23

**issue** 7:14 16:18 121:5 176:10,17

**issued** 127:18

**issues** 12:10 17:7 53:11 176:19

**iteration** 17:21

### J

**January** 76:23

**Jeff** 5:13 134:4

**Jeff's** 132:13

**job** 8:17 134:21 164:7,9

**jobs** 9:14 172:7

**Johnston** 11:20

**join** 150:7

**Jordan** 180:16

**judgment** 122:11 179:9,15
180:16

**jump** 57:10 129:23 137:14
159:16

**jumping** 41:15 57:9

**June** 134:2

**junk** 52:2 55:4,5,11,13 144:24
145:1

**jurisdictions** 65:17

**Justin** 8:2,3

### K

**Karma** 163:3,4 181:23,24

**keeping** 20:13 37:14 56:12,18
144:2,23 166:14

**kick** 128:23

**kid** 25:23

**kind** 7:3 25:23 36:18 37:4 39:3,6
42:3 55:19 58:4 119:4 124:9,15
129:23 133:9,12 142:18 145:9
147:9 149:15 153:12,25 156:22
163:21

**kinds** 55:12

**kitchen** 14:6

**knew** 43:18 83:20 87:12 89:21
96:10 107:23 140:2 163:18
184:19 185:11 187:5,20

**knowing** 48:4 70:12 78:3 188:6

**knowledge** 44:2,3 48:2 49:21,24
81:15 125:5 126:3 127:11 161:17

**Kohl's** 158:21,25

### L

**laborers** 172:2

**lady** 33:9

**Lake** 180:16

**Lakeside** 9:17,24 10:3,9,16
134:12,13 167:6,11 169:8,19,20
171:19,21 177:4

**land** 180:17,21

**late** 37:22 45:24 46:1 93:25
106:21 149:4

**law** 5:14 15:16,20 16:6,10 20:25
21:6,12,14 23:8 34:1 51:4 52:3
53:6 54:22 80:19 81:13 85:2 89:4,
7,10 90:17 92:20 93:4 96:3
103:13,21,24,25 104:1,4,9,22
109:6 114:2 117:23,24 118:12,13,
14,17 119:7,14 123:11 124:8,10,
13,15,18 125:21,24 126:3,8,13,20
142:21,23 148:8 150:6 165:15

**laws** 128:4

**lawsuit** 15:24,25 18:7,14 19:2,21
22:20 90:16,20 125:15,16 140:13
143:13 161:8,21

**lawsuits** 90:11

**lawyer** 132:7

**lawyers** 133:4 173:10

**layout** 62:5

**learn** 22:19 71:24 75:15 83:1

**learned** 78:17

**led** 180:7

**Lee** 69:7 129:7,10

**left** 35:8 133:17 163:25

**legal** 22:6 95:3 98:14 99:8 130:4

**Legally** 22:16

**lender** 160:13,14,15,16 184:7
185:7,23 186:24

**lenders** 186:16

**letter** 51:4 52:9 53:3 54:18

**letters** 51:7,19,24 52:3,15,25
54:14,21 92:6 97:4 130:12 132:2,
4,16 141:4,23 147:6,11,14

**level** 8:5 47:10

**liable** 164:13

**license** 16:21 31:17,22,24 32:6,
16,24 34:18,25 35:4 111:20,25
112:9,12,14,22 113:7,12,15,21
114:1,11,13,18,25 115:8 127:7
159:12,16

**lien** 179:20 180:16

**lieu** 26:22

**life** 8:24

**life's** 138:8

**light** 15:5,15

**Lillington** 69:22 134:21 157:19

**limit** 19:11

**limits** 16:22

**Linkedin** 158:4,6

**Lion** 13:15 144:17

**Lion's** 158:12

**list** 19:19 37:2 38:12 55:10 68:19
69:21 120:2 132:10 146:6 158:8

**listed** 64:25 73:11 75:7 76:4 82:8
83:14,21 84:14 104:10 105:2,19
149:21 155:2 161:11 168:8

**lists** 65:16

**litigating** 179:5

**litigation** 90:5 131:7 142:21
166:3 176:11 188:3

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA4051

**live** 64:18 180:13

**lived** 8:23,25 9:5 133:9,13 180:10

**living** 11:15 12:17 134:5,7 182:5

**loan** 183:15 184:6

**located** 10:2

**location** 9:22 65:14

**locations** 9:20,21

**long** 11:4 23:2 34:3 35:11 58:1 72:2 97:9 127:22 133:23 136:12 139:18 141:15 143:9 150:15 151:1,12 158:14 162:18,22 172:1 173:24 177:17 181:17

**longer** 38:1 150:16

**looked** 36:12,25 62:18,21 80:5,7 97:15,16 106:2,19,22 113:17 122:17 124:24 152:19 173:21

**lose** 46:24 98:11 99:14 149:3,6,9

**losing** 57:22

**loss** 100:12,14

**lost** 23:2 45:25 46:5,9,12,21 47:4 48:6 53:24 54:10 114:10,13 149:2,3

**lot** 6:16 17:9 18:23 30:24 31:1 33:4 50:4,8 52:21,22 55:9,10,11 56:3 70:14 95:6 104:17 122:23 129:20 130:9 132:12,13 158:18, 20 169:5 180:9 188:3

**love** 151:15 152:2

**loved** 43:19

**low** 137:13 139:3

**lower** 187:21

---

**M**

---

**made** 17:9 30:13 46:25 61:16 78:10,25 121:16 125:10 132:1 156:18 175:25 180:20 181:9

**mail** 11:2 12:11,13 13:4,8,11,22 14:3,4,7,11,17 15:2,6,16,20 52:2, 3,22 55:3,4,5,7,9,10,11,13,15,22 56:1,8,13,18,23 57:4 92:6,7,10 95:2,17 96:9 97:3 98:3 133:3 134:25 140:4 141:23 144:24 145:1 146:24 147:1 150:22 152:7, 14 154:22 165:11 181:8

**mailbox** 13:1,4 14:3 97:22 98:3 109:21 151:10

**mailed** 11:3 72:14 89:11 114:14 164:19,24

**mailer** 89:8 100:5,24 101:12 104:4,23 116:12 117:2,17 118:5 120:4,19 123:12 145:17 146:5

**mailers** 21:16 22:1,11 95:21 96:16 97:10,19,22 98:9,12,16,22 99:2,14,15,17 100:2,3,21 101:7, 21 102:7 104:10 109:6,21 116:22, 23 117:23 118:10,17 119:6,11 120:25 130:2 143:22,23 145:13

**mailing** 96:24 132:10 153:25

**mailings** 85:2 131:15 144:6

**make** 6:9 7:5 20:14 21:11 23:25 35:14 59:24 60:9 62:22 63:22 80:2,19 81:4 83:22 90:12 97:5 99:9 104:9 109:2 115:24 124:22 129:22 141:25 151:21 152:24 153:3,7 154:5 158:2,8 163:12 171:5 185:4 189:22 190:4

**makes** 21:21 24:14 73:7 88:5 125:21 184:20

**making** 7:4 170:21

**man** 29:7

**managing** 172:11

**manufacturing** 134:20

**mark** 155:6 169:12

**marked** 61:23 67:16 75:21 155:10 160:8 166:11,15 169:14 172:23 174:16 176:4,25 182:2

**Marketplace** 157:7

**marriage** 180:12

**married** 7:18 129:9

**Maryland** 8:11,14,24 9:1,2 148:10

**math** 122:2

**matter** 60:24 78:9 88:11

**matters** 78:11

**me's** 87:9

**meaning** 131:13

**means** 19:22 50:13 131:14 179:2 180:13

**meant** 83:2

**measure** 26:11 125:9

**media** 41:17 42:21,23,24 43:7 129:15 158:1

**medical** 9:12 40:16,22,23 41:7 45:11 47:8 48:6 53:19,22 59:4 138:16,24

**medication** 130:18

**meds** 26:21

**meet** 23:10 147:20

**meeting** 17:25

**meetings** 6:20,25 18:18

**member** 105:11 107:15,22 108:17,21 116:2

**members** 24:12 115:21 116:11 121:15 130:24

**memory** 5:21 120:1 180:25 189:14

**mention** 161:23

**mentioned** 127:21,23 135:11 136:19 137:3 162:8 185:13 188:11 189:21

**met** 143:13,21 144:1,2 155:7 161:12

**middle** 30:12 69:7

**Mike** 180:17

**miles** 43:19

**military** 164:4,6

**Mill** 9:23

**million** 43:19 153:12 174:22

**mind** 44:15

**minor** 37:25

**minute** 60:23 67:18 117:7 155:17 171:14

**minutes** 18:21 97:15,18 109:14

**mirror** 28:16 86:7

**mischaracterizes** 80:23

**missed** 148:25 149:21

**mistake** 160:16

**mistaken** 181:23

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

JA4052

**model** 152:24 153:3 154:5

**mom** 148:1,2

**moment** 102:6 118:24

**moms** 148:7

**monetary** 121:5

**money** 10:14 52:12 58:24 163:12
164:23 165:7 173:7,10 185:4

**monitoring** 94:8 162:9,13,19

**month** 56:5 163:9 184:11

**months** 56:9 136:15,16,18
181:14 188:25

**mood** 118:23

**morning** 25:23 35:12 116:14

**mortgage** 150:22 151:10 160:19,
21,23 183:13,19,22 184:24
185:24 186:1,3,8,13,15,24 187:8

**motion** 177:22 178:1,17

**motor** 11:6

**motorist** 50:1 116:18

**Mount** 11:17 133:19

**move** 32:23 152:23 164:9

**moved** 8:18 10:6,22 23:2 112:22
133:10,19 138:4 155:24 162:14,
16,17 163:24 164:7 182:8 184:24
188:23,25

**moving** 85:21 86:8,9 156:19
164:8

**MRI** 9:13 134:10

**multiple** 137:1 142:5 151:25

**multiplied** 121:24

**MVP** 158:13

## N

**name's** 105:2

**named** 21:10 119:15,21,22,24
121:1 162:5,6

**names** 18:9,11 51:23 161:24
171:24

**narrative** 37:14 85:13,25 86:1,2

**natural** 58:6

**neat** 56:19

**necessarily** 64:21 90:3 95:7,8

**neck** 26:8,12,18 135:21 136:19,
23 138:17

**needed** 19:5 29:15 30:5 35:4
36:9,10,11 52:22 62:14 131:1
138:16 147:5,7 148:20 172:16
189:14,15

**nefarious** 115:6

**negotiate** 148:14

**negotiation** 41:6

**negotiations** 148:21

**neighbor** 95:18,19,24 139:20
140:3

**neighborhoods** 159:8

**nervous** 129:2

**Neurology** 9:10,19 134:22,23,24

**news** 168:8

**newsletters** 159:7

**nice** 15:4

**nighttime** 135:19

**Niki** 23:4 141:11,14 163:15

**ninth** 63:11

**Nissan** 151:17,18 152:5,6,19
154:12

**nodding** 6:17

**nods** 6:15 55:6 159:20

**North** 8:15,24 9:2,15 10:5,16,18
11:22 60:2 62:1,9 63:2 64:12
65:11 76:9,13 79:3 80:18 132:15,
18,21,23 133:2 134:14 154:20
161:21 166:21 167:7

**note** 64:24

**noted** 81:1

**notice** 15:1,3 24:11,19 152:7
155:23 160:23 183:15 185:7

**noticed** 44:24 141:18

**noticing** 38:1

**notify** 181:24

**November** 11:7 25:3 43:24 45:3,
23 47:15 49:14 50:24,25 71:4

73:16 74:3 75:1 77:7,21 84:9 89:4
90:6 93:13 94:14,18 111:11
120:23 141:7 148:13

**now'** 138:9

**number** 5:14 11:24 12:4 24:8
28:22 36:8,17 38:21 51:9 61:21
64:20,23 74:13,16 77:1 79:19,22
80:2,11 82:3,19,20 103:1,4,6,14,
24 115:5,9 118:25 136:1 155:12
161:11 173:14

**numbers** 82:20 166:14 170:16

## O

**objection** 22:12 54:4 80:22 93:6,
8 123:2 161:3

**Objection's** 80:25

**obligated** 184:15

**observed** 187:24

**obtain** 76:2 124:25

**obtained** 21:15,25 22:10 105:20
160:21 164:24

**Occasionally** 55:23

**occur** 27:9 164:12 182:13

**occurred** 94:11 99:16 166:3
171:9

**October** 77:10 84:17 85:3,12
104:2 140:8

**odd** 99:7

**offer** 39:12,16,17 41:13 55:16
180:20 186:9

**offered** 39:9 41:10 186:2

**offers** 144:13

**office** 101:16 168:19 171:19
172:1

**officer** 15:21 29:10 30:2 31:5,16
32:6 33:13,23 34:18,23,24 71:5
74:14 112:7,8,14 127:7

**officer's** 88:8

**officers** 15:4 29:2 71:25

**Ohio** 163:25 164:2

**older** 39:10

**online** 75:16 78:7 79:5 84:20

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA4053

90:3 91:17,21 106:3,6,22 124:25
125:11

**open** 13:17 14:9,11,13,17 147:5
152:15 154:25

**opened** 13:13,15 109:6 110:7
119:1 147:9

**opening** 13:12 152:22

**operate** 171:19

**opinion** 170:20

**opportunity** 8:17

**option** 186:5,6,7,9,23

**order** 129:22 166:22 176:10
181:25

**other's** 129:18

**out-of-pocket** 100:12,14

**out-of-town** 42:4

**outcome** 122:25 123:21 126:11

**outlined** 16:10

**overcome** 180:12

**oversimplify** 23:23

**owed** 184:16

**Owens** 23:6,7

**owned** 137:17 176:23

---

**P**

**p.m.** 190:20

**packages** 53:2,6,9 54:2 135:6

**packet** 52:9 177:1,2 183:9

**pages** 63:1,3,23 84:10 155:19
177:12,20,21 178:16

**paginated** 177:10

**paid** 46:3 48:22 67:7,9 140:20
163:11 164:10 173:10 176:24
181:11

**pain** 26:8,18,21 47:15,19,24 48:5
137:11,13

**paper** 10:14 29:17,20,23 33:7,22
143:2,3 171:2,4 177:2,3

**papers** 137:15 168:16 172:10

**paperwork** 172:13,15

**paragraph** 184:5,10,13 185:6

**paralegal** 22:22,24 155:16

**parameters** 107:10

**part** 40:16 41:2 47:1,14 66:22
94:22 98:23 99:2 111:4 113:15
166:24,25 173:9

**participating** 131:7

**parties** 142:22

**party** 64:25

**pass** 172:18 176:5 177:1

**past** 5:17 17:8 169:24 188:17

**Patricia** 34:8

**patrol** 32:9 34:2 76:13 78:1,10,19
79:4 80:14,16,19 81:4,16 106:5
107:10 124:24 125:11 127:25

**patrolman** 82:5

**Pause** 67:20

**pay** 30:21 45:4,10 53:19 58:25
138:16 162:25 163:5,8 184:7,11,
15

**paying** 23:16 53:21 184:24

**payment** 37:8 47:19 149:18

**payroll** 10:10 171:4

**penalty** 126:20

**pending** 163:19

**people** 21:9 24:12 32:23 37:24
38:1 48:16 49:3,9 54:9,13,20,24
90:10 95:7,9,12,13,16 96:22
104:10 115:6 116:10 117:16,22
118:4 121:17,24 122:24 124:7
129:2 131:3 134:5 135:5 141:4
155:3 156:3,22 157:12 161:11,13
164:23 172:1

**percent** 34:3

**perfect** 38:1

**perform** 170:2

**period** 51:18 56:13,14 57:4
107:12 132:12 162:18

**periphery** 82:18

**person** 29:24 35:22 47:7,12 48:3,
7,25 54:9 73:2,4 75:3 87:9 88:21
91:24 95:15 96:2 107:8 116:15
117:2 125:5 136:4,5 171:2,3

184:14 190:2,10

**person's** 53:21

**person-to-person** 88:22

**personal** 16:20 90:24 102:15
108:10 134:25 144:13 175:23

**personally** 24:22 36:1 72:7
103:5 184:15

**pertaining** 64:3

**petition** 169:17 170:10

**petitions** 174:13

**PG** 8:13

**phone** 6:21 11:24,25 12:1,2,4
17:24 30:13 35:24 36:17 42:16
79:19,22 80:1 97:5 161:16

**photo** 115:4

**physical** 148:25

**physically** 10:23

**pick** 13:4 14:3 71:17 74:20
157:13

**picked** 37:5 74:11 110:4 114:14

**picking** 119:2

**pictures** 43:9,12,17

**piece** 29:16 136:21 147:1 180:21

**pieces** 56:1 177:2

**pile** 52:4 55:3

**piles** 14:16 52:1

**Pinterest** 157:21

**place** 37:4,6 65:13 133:11 134:19
136:25

**places** 37:1,3 158:20

**plaintiff's** 177:23

**plaintiffs** 19:24 21:23 161:12
162:5

**plaintiffs'** 161:24

**pleadings** 145:22

**Pleasant** 11:17 133:20

**PO** 150:9,11

**pocket** 30:22

**point** 18:2 21:3 33:12 36:10
37:15 40:3,11 58:6 62:14 74:5

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA4054

75:10 82:16 84:3 85:25 92:9,13
100:3 111:8 130:25 137:17 139:9
143:20

**points** 101:21 187:19,20

**police** 15:21 25:8 28:25 29:2,9
30:2,16,19 31:4 33:12,23 34:18,
22,24 71:4,15,17,25 72:13,22
73:14,18,21 74:10,18 75:9 83:14,
21 88:8 89:22 189:7

**policy** 50:18

**polling** 65:13

**poor** 170:21,24

**portion** 100:22

**portions** 131:18

**possession** 57:24

**post** 42:21 43:1,4,8,12 101:16
156:18

**posted** 66:4 78:23

**posts** 43:15

**potential** 40:16 53:11 116:11
121:5 122:19 126:11 130:8
138:16 164:11

**potentially** 24:12 46:8 47:4,19
48:5 105:10 116:15 117:1 123:13,
22 124:1 126:12 144:23 187:18
188:7

**poured** 176:22

**power** 170:24

**practices** 16:7

**preexisting** 137:5,6,8

**preferred** 88:7

**preparation** 17:16 165:16

**preparatory** 7:3

**prepare** 6:18 167:1

**prepared** 7:2,6 81:13,16

**present** 76:24 127:12 134:12

**presented** 127:23

**president** 166:8 167:11,25
168:6,9,18 169:24 171:6

**pressured** 151:20

**presume** 112:5

**pretend** 102:5

**pretty** 10:13 13:14,17 14:11
18:24 25:10 40:9 55:18 66:14
67:8 80:2 137:11 138:4,6 152:12
154:25 166:1 172:12

**prevent** 91:24

**preventive** 26:11

**previous** 17:21 46:13 71:8,9
139:3

**previously** 21:15,25

**primary** 60:21 61:8,9 159:13

**printed** 33:8 95:16

**printout** 62:9 63:1 155:21

**prior** 11:16 46:21 59:18 73:18,25
74:11

**privacy** 16:1 19:7,10 79:4 92:18
157:23 159:3

**private** 19:12 42:19,21 43:5,7
60:13,16,18,22 61:10,14 66:1,25
67:6 75:7 79:22 155:2 158:1,3

**problem** 56:24 135:5

**problematic** 56:23

**problems** 137:4,10 151:25

**procedure** 181:2

**proceed** 176:11

**PROCEEDINGS** 5:1

**process** 45:8,13,20 104:24 173:2

**processed** 101:11

**professional** 130:14

**profile** 154:25

**prohibit** 102:7

**promise** 184:7

**property** 45:4 69:1,13 160:10,12,
14 179:20

**proportion** 24:7

**proportionate** 124:20

**propose** 173:6,16

**protect** 19:11 102:14

**protected** 16:9,16,17 19:18 67:4
70:23 90:23 95:10 101:24 102:9
105:1 108:13 111:17,20,22

113:13,16,24,25 114:3,15 118:14
131:11 165:3

**protection** 16:1 19:7,10 102:17

**prove** 149:25

**provide** 20:18 24:17,18 60:5
110:20 139:15 158:24 159:6

**provided** 50:12 172:13 175:20

**providing** 176:13

**public** 27:17 66:14 67:8,10,11
75:11 78:10,13,24,25 79:2 80:11
81:5 91:25 106:9 113:18 114:6
132:24 156:9 166:5

**publicly** 107:11

**Publix** 144:9

**pull** 28:24

**pulled** 25:7 30:12 155:17

**purchase** 160:18

**purchased** 150:18,21

**purported** 19:21

**purposes** 16:10 90:24 91:1
108:16 114:9 130:4 131:12

**purse** 14:6

**pursue** 176:14

**put** 14:6 18:5 28:21 42:18 43:1,9,
13 79:1 93:24 103:1 106:6 107:9
113:2 122:25 123:17 124:6 177:3
190:13

**putting** 79:4

---

### Q

**qualified** 22:15

**question** 6:5,6 21:18 22:15
23:23 24:1 67:14 85:17 87:25
93:2 99:24 100:9 107:22 112:3
123:3 148:22 160:9,10 174:4
186:15,19

**questionable** 93:16

**questioning** 165:20

**questions** 6:23 32:15 33:5 44:13
50:4,9,20 109:17 111:6 115:20
126:22 128:8 129:20,23 132:13
135:12 140:25 155:18 166:1
172:20 190:16,19

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4055**

**quick** 40:9 160:9,10 180:10 183:3

**quickest** 189:12

**quickly** 7:24 52:21 97:1 111:5,8

---

### R

**race** 60:15 65:3

**Rachel** 12:21 13:20,23 147:15,16

**radio** 23:13

**Raleigh** 9:10,19,22 134:21,22,24

**ran** 86:12

**random** 119:5

**range** 76:23

**rates** 140:9

**reach** 153:23

**reaction** 52:14

**read** 7:11 17:15,18,20,21,23,25 19:14,15 52:2,5,6,24 62:2 70:25 97:4 110:7,8 119:1 131:18,21 144:19 146:25 166:19 168:24

**readily** 186:16

**reading** 18:22,23 53:13 97:10 98:8,12 99:13,15 100:21

**reads** 86:2

**real** 69:13

**realize** 27:16 41:15 81:3 186:12

**realized** 30:11 152:20

**realm** 50:22

**rear-end** 139:2

**rear-ended** 25:7 30:11 33:10 35:20 37:23

**rear-ending** 28:12

**rearview** 28:16 86:6

**reason** 64:22 102:18 110:15 118:20 120:3 122:15 124:7 150:15 164:8

**reasons** 176:2

**recall** 5:18 15:7 18:4 22:25 23:15 26:17 28:11 29:7 31:22 32:5,7,17, 20 33:2,3,23 36:19,22 38:4,14 42:1,13 43:13 46:7 51:6,9 53:13, 17,20,22,23 59:6 62:21 63:16,19 72:2 73:22 74:15,17 76:6 82:3 85:4 86:6,7 87:6 89:10,14,15 104:3,5 119:2 127:14,20,21,22 131:22,25 135:25 141:13 142:14, 20,25 143:1 145:15 147:17 149:17,20 150:5,13,14,15 152:11, 22 153:2 154:18 158:15 161:22 163:8,20,21 166:20 168:10,12,15 169:6 175:19 176:13,20,24 178:4 180:19 181:4 182:1 185:25 187:15 188:8

**receive** 13:8 54:21 56:8 116:16 117:17,23 120:4,8 145:12

**received** 12:11,13 45:11 51:24 52:15 54:18 89:18 92:10 96:16 97:11 98:3 100:2,24 101:21 109:6 116:12,21 118:17 119:6 120:25 126:24 141:4 184:6

**receiving** 98:15,22 99:2,17 100:1,21 101:7 102:7 104:3 116:23 117:2 118:10 119:11 132:2,4

**recent** 93:15

**recently** 143:6

**receptionist** 71:21

**RECESS** 58:13 111:1 165:23

**recite** 158:2 159:5

**recognize** 69:21 166:17,18,20

**Recognizing** 123:25

**recollection** 20:11 33:18 73:10 95:22 138:20 140:15 180:23 182:7

**recommendation** 141:25 142:2

**recommended** 22:22 23:7 38:10 167:5

**record** 5:11 6:7,15 44:22 75:12 114:3,6 117:14 153:17 156:16

**recorded** 49:15

**records** 19:11,12,13 67:25 80:7 81:5 96:5,7,13 102:15 113:15,18 114:6,8 132:25 160:10 166:5 169:6,8

**recover** 46:9 48:22 123:12

**recovery** 48:23

**red** 15:5,15

**redacted** 115:12,14

**reduce** 187:18

**refer** 11:9 12:6

**reference** 36:8 174:5,7

**referenced** 19:7

**referred** 16:15

**refinance** 183:4

**refinancing** 150:22

**refused** 181:11

**register** 60:5

**registered** 10:18,21 60:1 62:23 65:8

**registration** 31:19,21,23 32:2,7 64:20,23

**regular** 156:3

**regularly** 152:13

**related** 15:17 45:17 57:6 77:17 98:11 118:9

**relating** 94:3

**relation** 177:3

**release** 183:3

**released** 128:1

**relief** 123:13

**remember** 5:20 7:10 10:21 11:16 15:16,19 25:4 27:10,12 28:21,22 29:5 30:7 31:4,14,15,20 32:14 33:25 34:7,9,17 36:4 37:6 38:6 39:24 40:12,13 42:15 44:18 46:11 49:17 50:25 51:3,7 57:12,14,20 58:2 60:4 66:7 73:20,23 74:2,18, 21,22,24 82:1 85:1,5,8 87:10 109:5,20,22,23 110:18 116:18 125:2 133:24 134:19 141:16 142:3,5 143:25 145:17 150:12,13 153:1 168:20 170:14,16,17 171:8, 13 173:21,23 174:1 175:21 176:16,18 177:15,17 178:13 179:4,16,17,18 180:18 181:16 184:19 185:11 188:8,10 189:10, 15

**remembering** 77:14

**rental** 36:10 70:5 139:16,18,21 149:15 151:21

repeated 125:20

repercussions 124:13,17 187:22

report 7:14 25:8 71:5,11 72:15, 21 73:9,15,20 74:11,13,16 75:10, 11 77:20 79:11,25 81:7,12,13 82:13 83:21 84:4,9,14,20 86:15, 24 87:4,8,11,16 88:8 89:12,17,19, 23 92:5 101:4 104:22 105:3,20 106:3 108:18,22 111:12,16 113:2 115:8,9 125:1 128:1 146:5,18 166:23 167:18 172:19 173:3 187:18,23 188:1 189:7,18,22 190:7

reporter 6:1,14 155:13

reporter's 6:8

reports 17:9 71:25 72:5,11 74:25 75:16 80:20 81:5 87:20 88:15 107:11,16 132:24 135:13 165:11

represent 5:13 21:1,6,23 39:14 48:16,21 49:4,11 62:8 68:12 76:1 128:19

representation 23:17 85:18 132:7

representative 20:3,7,12 56:15 57:3 115:17,21

representatives 116:4 163:16

represented 84:1

representing 53:15

Republican 60:21 61:9 65:1

requested 172:13 178:5

requesting 19:24

requires 80:19

research 150:6

reset 117:16

resolution 171:10

resource 162:24

respect 99:20 102:23 103:2

respond 177:22

responded 31:10 34:1

response 187:7

responsibility 138:22

responsible 24:22

rest 143:21 152:22

restricted 43:2

result 99:16

resulting 124:1

results 63:12,24 77:2 84:14

retained 110:13,15

retrieve 97:22 109:21

return 184:6

returned 35:4

returning 149:15

review 173:19

reviewed 6:21 7:1,11 161:11 168:21,25 173:22

reviewing 174:1

rewards 158:12,18

rhyme 118:20

rich 180:10

ride 137:20 138:8,9

riding 137:22,25 138:3,4,6,18

rights 123:11 159:1 183:2 186:13,23

River 134:14

road 11:17 25:8 27:9 28:24 69:22 133:13 154:19 160:6 179:21 182:6 188:24

Robert 7:3 23:12,13

Rogue 151:17,18 152:5,7 154:12

rough 18:16 55:24 121:9

rules 17:6 128:3

running 106:21

rush 58:5

---

## S

S.T. 176:14,17,19,20 177:4 179:5, 19

sad 43:22

safe 28:3

sale 160:1 173:5

Sales 180:17

salesman 151:24

Saluta 128:15,19 155:11,14 156:14,17 161:6 165:19,24 166:13,16 169:12,15 172:24 174:6,9 183:11,12 186:17,21 190:15

sat 97:4

scene 29:3,10 34:23

scheduler 134:10

scheduling 9:13

schemes 180:10

school 8:7,9,10

scope 34:21

score 187:19,21

search 63:5,10,12,17,24 68:13 77:2 84:14 107:9,10

sec 156:15

secretary 9:12 166:23

secure 180:22

seek 47:4,19,23 48:5 49:9 50:14 90:11

seeking 53:11,24 54:10 90:20

seldom 42:15

selects 21:25

sell 138:12 181:10 182:19 183:3

selling 182:10

semester 8:8

send 100:4 104:10

sending 24:19

Senior 8:10

sense 24:15 46:23,25 55:2 59:24 60:9 62:22 63:22 90:12 104:9 115:24 184:20

separate 40:21,22 41:7 59:3

serves 180:25 189:14

service 162:13,19 163:5,11

services 54:17,22 95:3 99:8 144:18

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

JA4057

**sessions** 136:13

**set** 6:22 42:11 67:25 103:7,13 126:20 140:24

**sets** 33:20 103:24

**settings** 157:23 158:1

**settle** 39:5 58:2 83:7,15 88:9,10

**settled** 39:18 81:25 87:4,23 138:20 140:17

**settlement** 20:16 24:5,8 37:9 40:17,20,21 41:2,7 47:19 48:23 57:16,19 58:24 82:2 88:15 121:16 122:11

**settling** 88:3 89:5

**severe** 44:6

**shape** 39:11

**share** 182:25 186:3,8

**shoes** 14:6

**shook** 34:6

**Shoot** 103:10

**shop** 38:5,15 40:5 139:7,9 149:10,12,14 158:20

**shopper** 158:22

**shopping** 149:14

**shops** 38:9 145:14

**short** 134:15,18

**shorten** 132:12

**shortly** 160:17,22 162:14

**show** 147:14 169:6,8

**showed** 147:16

**showing** 13:25 147:17

**shown** 127:23

**shows** 167:24 168:5 174:23

**shred** 144:15

**side** 28:24 53:19 59:13,21,23 87:25

**sign** 25:7,14,15 28:14 57:15,18, 25 58:17 159:4 186:12,23

**signature** 167:22 169:22 184:3

**signature's** 175:22

**signed** 143:2,3,10 168:22 178:1 183:2

**significant** 12:23 13:19 109:9 110:3 129:6,18 134:7 149:1 150:2,3

**signing** 142:20 175:19

**signs** 184:14

**similar** 52:10

**single** 109:24 147:1 184:11

**sir** 5:16 7:15 17:17 20:1,5,8,23 23:18 24:9,24 27:19 30:17 31:25 32:13 33:15,21,24 36:3 38:11 45:9 46:4 51:17 54:19 58:19 59:7 60:11 64:17 65:18,21 68:1 69:11 71:6,12,20,23 74:4,7 76:16 79:12 80:6,9,17 81:11,16 82:7,25 83:4, 24 84:16,18 86:17 88:23 89:9,24 90:13,19,23 91:6,18 92:11,20 94:13,17,20,24 96:1,8,11 97:20 98:5,7,13,25 101:1,14 102:4,25 104:8,20 105:1,4,15,21,23 106:1, 17 107:13 110:2,9,12,22 111:10 112:15 113:6,8,10,16,20 115:11, 13,15,18 116:19 119:9,13 120:16 121:22 122:1,9 123:15 125:3,7 126:1,6,21 127:1,5 128:13

**sit** 14:5 51:21 149:17

**sites** 129:14,15

**sitting** 14:12 30:11

**situation** 49:7 50:13 123:16 190:14

**six-and-a-half** 133:17

**sketchy** 5:21

**skimmed** 159:3

**skipping** 132:11

**small** 10:12 39:20 40:22 180:23

**smoothly** 72:18

**social** 41:17 42:21,23,24 43:6 129:15 157:25

**socially** 129:18

**sold** 157:10,17

**solicitation** 52:18 147:12 152:21,24

**solicitations** 144:9,10,22 145:21 146:1 152:8 153:2

**soliciting** 161:8

**son** 7:21 26:9 42:2 134:7

**sort** 32:25 38:15 47:23 55:3 67:12,13 75:23 82:18 100:19

**sound** 161:25 173:11

**sounded** 134:4

**sounds** 25:10 56:6 131:18 133:6 174:15 176:8 180:6 190:1

**source** 96:17

**space** 151:8

**spasm** 138:17

**speak** 20:15

**specific** 7:7 9:20 26:17 66:13 78:17 109:22 174:3

**specifically** 23:7 33:3 53:22 127:20 146:23 149:20 175:21 176:18

**speeding** 14:23 188:7

**spent** 18:14,22 35:23 97:10,14 98:8 99:13 173:25

**spoke** 139:5

**Springs** 11:17,18,19 12:7,13,18 69:25 70:2,4 133:21 134:5 135:6 155:24 156:19 160:4 162:17 189:1

**stacked** 56:23 57:2

**Staffing** 134:14

**Stage** 27:11,13

**stake** 182:10

**stalked** 135:16

**stalker** 79:8,25 135:15

**stalking** 94:19

**stand** 128:21,25 129:1

**standing** 129:2

**start** 5:10 6:6 77:20 141:3 144:2 162:12

**started** 86:8,11,25 129:17 137:10 138:18 141:10 158:17

**state** 5:11 57:13,16 58:2 60:5,8 62:1,9 63:2 66:19 76:13 80:18 132:16 133:3 138:15 139:6,15 148:15 149:18 166:23 179:5

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4058**

**stated** 121:21 146:25

**statement** 49:15 90:14 93:2 156:10

**states** 114:2

**station** 74:10 89:22 189:7

**status** 122:13

**statute** 19:14 81:3,6

**statutory** 165:7

**stay** 133:23 172:1

**staying** 159:24

**stealing** 135:6

**Steinmetz** 5:4,10,12 8:3,22,23 31:7 42:8 58:15 61:25 63:8 111:3 126:23 129:8 178:19

**step** 100:2

**steps** 185:23,25

**sticklers** 17:6

**stolen** 93:12,17 94:16 188:15

**stop** 22:22 25:7,14,15 28:14 124:17 131:10 176:7

**stoplight** 25:11

**stopped** 25:11 30:10 37:24 86:5, 7,8,9,12 138:4

**stopping** 58:6

**store** 27:13,14 55:19,21 158:12

**stores** 55:15 158:21

**Stradley** 18:8 141:2 142:1,19 143:8 144:1,3

**street** 9:22 27:12,14,17 30:12

**stressful** 170:15,17 178:14

**strike** 123:8 148:17

**stuff** 53:21 55:12 56:20,21 145:6, 9 154:3 168:18 171:4 188:7,9

**stuffed** 95:17

**subject** 165:21

**submitted** 38:19

**substance** 36:5

**substantial** 18:24

**subtle** 5:25

**successful** 180:25 187:12

**sudden** 11:15 57:22 117:10

**sue** 52:19 119:12 161:1

**sued** 119:7 131:14 179:17

**suffered** 126:17 164:20

**suffering** 47:16,20,24 48:6 189:3

**suggest** 37:1

**suggested** 18:25

**suing** 80:15 176:24

**suit** 18:2 20:4 119:15

**sum** 129:21

**summaries** 145:9

**summary** 189:25

**super** 30:25 164:6

**support** 7:10

**supposed** 90:25

**surprising** 164:16

**Surrattsville** 8:10

**suspect** 163:4

**switch** 100:22

**sworn** 5:5 6:1,2 124:10

---

**T**

**T-A-U-B-E-R** 129:10

**table** 14:6

**tag** 16:21

**taking** 185:25

**talk** 11:5 23:11 25:2 30:14,18 37:12 40:18 91:7 94:22 131:1,3 142:11 166:2

**talked** 30:2 52:1 54:8 87:22 94:21 96:18 99:12,13 100:20 116:14 119:17 121:3 125:23 130:9 147:22 151:24 164:18 188:6 189:6

**talking** 11:10 40:14 50:24 58:16 86:25 88:25 100:12 102:10 125:2 130:8 132:2 141:3,10 163:21

**talks** 88:2

**Tauber** 42:8 129:10,11

**tax** 67:25 68:3,16 69:1,15 70:6, 10,18,22 80:5 96:7 114:6 160:10, 12,14 166:24,25 171:4

**taxes** 10:10 67:9 69:17

**technical** 60:24

**Teeter** 144:10

**Teeter's** 158:13

**telling** 178:11

**ten** 97:18 134:23 135:24,25 136:13

**term** 9:13 50:6 98:14

**terrible** 166:2,13

**testified** 5:6 102:12 121:20

**testifying** 6:2

**testimony** 6:3 131:17 188:11 189:21

**Texas** 164:2

**Thankfully** 114:12

**theft** 17:7 188:12

**thing** 11:2 17:20 22:7 33:1 42:9 55:19 57:23 88:22 124:9 144:11 146:6 147:10 148:19,24 157:17

**things** 23:24 34:22 52:10 56:19 91:4 115:6 120:18 129:25 130:5 145:5 149:15 176:11

**thinking** 119:3 145:3

**thought** 59:9,17 78:6 83:19 84:7 89:20 105:14 107:6 142:12 148:19 152:19 153:19,21 162:23

**thoughts** 80:15

**thousand** 186:10

**three-month** 56:13,14 57:4

**threw** 14:21 110:12 118:17,21 119:1

**throw** 13:11,22 110:10

**ticket** 15:6,11,15 127:10

**tickets** 14:23 15:3 126:25 188:7

**tidy** 56:19

**time** 11:4,13 17:18,20 18:22 21:20 24:5 34:3,22 35:23 45:22

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

**JA4059**

48:1 51:18 58:10 62:7 72:3 74:14
75:18 79:15 82:6,9,10 84:24
87:16 89:21 93:13 96:25 97:4,7,9
98:8,9 99:1,13 101:2,8 104:17
109:10 111:14 127:22 128:25
129:6 132:12 134:6,16,18 136:14,
15 138:3 141:15 142:24 143:1,9,
12,20 148:25 149:2,3,6,9,13,21
150:3,10,15 151:1,12 152:12
162:18 165:20 170:16 171:16
177:17,22 178:6,14,17 181:15
182:6 184:18,20 185:10,11 189:3

**timeline** 155:21

**times** 39:8 135:22 163:24 175:6

**timing** 140:25 142:18

**tired** 34:4

**title** 57:23,25 58:20 168:10 171:6,
7

**titled** 62:1

**today** 5:23 6:19 51:21 75:17 76:3
77:24 78:18 96:18 128:12 149:18
155:8 188:6

**told** 29:18 35:20 37:21 139:6,10
141:22 148:2

**toll** 15:12 154:19

**tool** 162:23

**top** 63:4,5 64:22 109:3 110:19
146:6 177:7

**total** 18:14 51:8 136:14,15

**totaled** 27:22,25 28:6,17 38:20
44:8 57:24 98:21 99:6 139:10,13,
14

**touch** 23:2 42:4,12 143:17

**tow** 29:15 30:5 35:4 36:9

**towed** 28:9

**town** 42:3

**towns** 156:24

**track** 45:16 100:20

**trade** 152:1

**traded** 151:17

**traffic** 14:24 15:21 28:14,15
30:12 85:21 126:25 127:6

**trailer** 137:17

**transfer** 58:20

**transponder** 15:12

**trash** 14:8,16,17 119:4 144:16

**trashed** 37:25

**trauma** 52:17

**Trax** 151:18 152:3,6,23 154:1,4,
12

**treat** 142:22

**treated** 19:25 21:4

**treatment** 40:16 45:11 47:8
53:19

**Trinity** 9:23

**trips** 40:24

**trouble** 124:15,16

**truck** 30:5 35:5 36:9

**trucks** 29:15

**true** 80:23 175:20

**trust** 59:16

**trustee's** 173:3

**trustees** 173:17

**turn** 156:6 173:13 175:18

**turnstile** 134:20

**TV** 48:1 135:19

**Twitter** 41:23 42:14

**two-page** 77:20

**Tylenol** 117:7

**type** 63:16 124:3

**types** 19:17 75:2 144:6

**typical** 25:10

**typically** 14:5 29:23 144:11,19

---

**U**

**uh-huh** 6:10 9:3 10:1 11:8 12:3
13:7,10 21:8 27:8 30:4,6,17 35:1
37:18 41:20 43:25 44:7,9,11 63:6,
25 65:2,15 67:23 76:22 77:3,9
79:14 81:23 84:12 111:13 134:13
156:1 167:14,16 182:12

**uh-huhs** 6:15

**ultimate** 57:16

**ultimately** 39:18 58:2 81:25 87:4
101:16 116:11 117:23 118:12
122:3

**unattached** 183:7

**uncomfortable** 26:13 30:25

**unconscious** 190:3

**underinsured** 49:23 50:1,11
53:10 116:17

**understand** 9:19 11:10 12:12
19:20,23 20:21 22:16 24:1,2,10
34:5 48:18 50:6,21 67:21 75:11
90:16 91:19 98:15 99:23 100:8
104:17 105:9 121:19 122:3,7
123:9,16,23 125:6 129:4,21,24
130:2 131:13 137:16 144:20
146:13 148:5,22,23 149:3 150:18
153:8 165:5 166:2 179:1

**Understandable** 185:5

**understanding** 7:4 15:24 16:6,
8,12,17,23 19:8 20:10 21:18 24:4
50:2 67:4,5 75:13 82:4,7 91:8,13,
23 92:2 107:3 111:16,18,21
113:11,14,24 115:16 121:4,7,9,
14,23 163:6

**understood** 86:14 187:1

**undesignated** 65:4

**unfortunate** 122:21 126:18

**uninsured** 49:22,25 50:10 53:10

**unsolicited** 55:7,9 56:1,8,13

**update** 32:23

**Updating** 147:25

**uphold** 124:10

**upsetting** 146:7

---

**V**

**VA** 183:21

**vague** 50:2 121:7

**vaguely** 180:18

**valuable** 162:23

**varies** 54:9

**vary** 47:12

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4060**

**varying** 116:15

**vehicle** 11:6 15:9 36:10,18 43:21 141:18

**verbalize** 44:20

**verification** 175:19

**verified** 112:10,16,25 113:3

**version** 163:5

**versus** 119:3 146:3

**VIC** 158:13

**videos** 6:20 7:1,2 18:20 165:17

**view** 130:6

**violated** 16:1 90:23 92:20 143:16

**violating** 79:4 92:18 124:12

**violation** 93:4 108:23 123:10 125:20 143:14 165:3

**violations** 161:1

**Virginia** 8:25 9:1,4,6

**visit** 40:23

**visited** 62:12

**visits** 26:7 41:12

**visualize** 55:15

**vital** 42:22

**voluntary** 169:17 170:10

**vote** 10:18 60:1,5 62:14 63:22 65:8,17

**voted** 60:20 61:1,7,13 65:23

**voter** 62:23 63:5 64:20,23 65:20 66:13 80:7 96:4,12

---

**W**

**W-2** 149:24

**wages** 45:25 46:6,9,13,21 47:4 48:6 53:24 54:10 98:11 99:14

**wait** 60:23 177:13

**waited** 32:10 35:3

**walk** 67:12 75:19,23 133:9 134:11

**walked** 98:2

**walking** 64:7

**wanted** 26:1,20 30:21 180:13 182:19,21 183:6

**warrant** 88:24 149:1

**warranties** 152:9

**warranty** 152:14 153:24

**watch** 135:19 165:17

**watched** 18:20

**ways** 28:14 80:11 155:4

**web** 70:10,18,22

**website** 62:10,12,17,20 63:18,21 64:5 66:5,10,20,24 68:3,16 76:4, 7,18 78:1 80:15 91:25 107:24 124:24

**week** 51:20 55:8 56:2 93:25 94:11,14 154:13

**weeks** 58:3 139:19

**whiplash** 26:16

**white** 65:3 141:25 142:19 144:1,2

**Whitley** 5:9,13 22:18 44:16,17, 21,24 45:1 54:7 58:5,10,14 60:25 61:2,4,6,22,24 76:11 80:25 81:2 93:11 100:10,13,16 102:13,19 108:4,14 109:13,15,17,19 110:23 111:2 117:8,11,15 123:6 125:14, 16,22 128:8 166:12 190:18

**who'll** 48:21

**Wickham** 177:25 178:10

**Willow** 11:17,18 12:7,13,18 69:24 70:1,3 133:21 134:5 135:6 155:24 156:19 160:4 162:17 189:1

**Winwood** 11:22 64:11 68:22

**Wooten** 176:14,17,19,21 177:4 179:6,19

**word** 21:19 56:16 57:22 98:18 103:9,10 149:23 168:24

**words** 15:23 16:4 95:4 100:11 160:21 166:20 170:19

**work** 9:21 10:15 25:6 35:10,15,25 37:5,15 45:22,24 46:24 98:9 118:7 126:14 134:25 148:25 149:3,4,6,9,14,16,21 150:4 171:11 172:8,17

**worked** 9:16 134:16,18 167:3

**working** 18:10 23:20 136:20 148:21

**works** 22:25 50:1 124:16 136:8

**world** 155:1

**worried** 135:14

**worries** 138:17 188:13

**wreck** 37:20 40:8 47:23 49:14,22 58:1

**wrecked** 151:14

**wrecks** 59:19

**written** 49:15

**wrong** 126:24 129:25 130:6 144:21

---

**Y**

**y'all** 30:18

**yard** 160:1

**year** 134:2 140:8 145:9 166:2 167:18 168:3 169:3

**year's** 160:14

**years** 23:1 27:17 133:14,16,25 134:23 137:24 138:5 150:16 169:5 188:1

**yesterday** 76:24

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

*(919) 557-4640*

**JA4061**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others
similarly situated*,

          Plaintiffs,

     v.

JAMES S. FARRIN, P.C., et al.,

          Defendants.

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of
themselves and others similarly situated*,

          Plaintiffs,

     v.

MICHAEL A. DEMAYO, et al.,

          Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 29</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

_____
                             )
JAMES WEAVER GAREY, et al.,   )
on behalf of themselves and   )
others similarly situated,    )
                             )
         Plaintiffs,    )
     vs.                 ) Case No.
                             ) 1:16-CV-542-LCB-LPA
JAMES S. FARRIN, P.C. d/b/a   )
LAW OFFICES OF JAMES SCOTT    )
FARRIN et al.,              )
                             )
         Defendants.    )
_____)

VIDEOTAPED DEPOSITION OF RONALD BRADLY BALABAN

30(b)(6) FOR MARCARI, RUSSOTTO, SPENCER AND BALABAN P.C.

FRIDAY, OCTOBER 18, 2019

CHARLOTTE, NORTH CAROLINA

REPORTED BY:

AMANDA SMITH

COMMISSION NO. 201816300072

1

JA4063
Case 1:16-cv-00542-LCB-LPA   Document 269-29   Filed 06/15/20   Page 2 of 5

1  to discuss that as well.

2          A.  All right.  They were typically looking at

3  two pieces of information, so spreadsheets and then

4  accident reports.  The spreadsheets were used to

5  essentially merge information onto an envelope and onto

6  a letter.  The accident reports were packaged with an

7  envelope, a letter, you know, an informational booklet

8  on the things that we discussed previously.  You know,

9  things to consider after you're involved in an accident.

10 Along with the report, there's a key, if you will, on

11 the coding that goes into an accident report that

12 allowed you to decipher for what information was in your

13 accident report.

14         Q.  Okay.  Where did you get the spreadsheets

15 and the accident reports?

16         A.  That information came from an outside

17 entity, Digital Solutions.

18         Q.  Have I also seen that company as Digital

19 Solutions of the Carolinas Inc.  or something like that?

20         A.  It's certainly possible that that's the

21 full name --

22         Q.  You know it as Digital Solutions?

23         A.  Yes.

24         Q.  Is that the same company -- was there a

25 gentleman named Ronald Pienner?

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

```
 1              A.  Yes.

 2              Q.  -- who's associated with that business?

 3    That's spelled P-I-E-N-N-E-R.  And for the whole period

 4    of time of the relevant period that we discussed of the

 5    direct mail program, did all the spreadsheets and

 6    accident reports come from Digital Solutions?

 7              A.  Yes.

 8              Q.  Would they go to one office or multiple

 9    offices?

10              A.  Well, when you say go to --

11              Q.  Let's just back up.  In what form did that

12    information come in to you?

13              A.  Well, it was electronic, but it -- it

14    didn't necessarily go to -- there was -- you had a

15    password, you logged in, and then the information was,

16    you know, obtainable to you.

17              Q.  So it wasn't pushed to you through e-mail,

18    you had to kind of pull it by going through a website

19    and downloading the information from a website?  Was

20    that an accurate representation?

21              A.  Right.  The websites, going to it, yes.  I

22    believe there may have been occasions where they were

23    having technical difficulty and they may have had the

24    option of doing something through e-mail, but my

25    understanding is the normal course was going to their
```

23

1    particular site.

2          Q.  I'm sorry.  Once you got to the site, what

3    did the site look like?  For instance, did it have a

4    button where you could -- well, how did you get the

5    spreadsheet and accident reports into your system?  I

6    take it you had to get them into your electronic system?

7          A.  Well, they could be opened and then I

8    suppose downloaded and then used to merge.

9          Q.  So you downloaded the accident reports and

10   spreadsheets from the Digital Solutions website?

11         A.  Our staff, I believe would -- would do

12   that.

13         Q.  The firm?

14         A.  Yes.

15         Q.  Again, you being the firm.

16         A.  Again, there may have been occasions where,

17   again, where the site was down where it had to be pushed

18   through an e-mail, but I believe on a regular basis it

19   was taken directly from the website.

20         Q.  And so would you get spreadsheets and

21   accident reports from like every geographic area that

22   Digital Solutions covered or only from specified

23   geographic areas?

24         A.  Well, we had our own individual, you know,

25   password log in, you know, to have access to the

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others*
*similarly situated*,

      Plaintiffs,

    v.

JAMES S. FARRIN, P.C., et al.,

      Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of*
*themselves and others similarly situated*,

      Plaintiffs,

    v.

MICHAEL A. DEMAYO, et al.,

      Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 30</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

```
              UNITED STATES DISTRICT COURT

        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

_____
JAMES WEAVER GAREY, et al.,        )
on behalf of themselves and others )
similarly situated,                )
                                   )
              Plaintiffs,          )
                                   )
         vs.                       ) Case No.
                                   ) 1:16-CV-542-LCB-LPA
JAMES S. FARRIN, P.C. d/b/a LAW    )
OFFICES OF JAMES SCOTT FARRIN, et  )
al.,                               )
              Defendants.          )
_____  )
```

```
              VIDEOTAPED DEPOSITION OF MARY BIBB

           30(b)(6) FOR HARDEE & HARDEE, LLP

               MONDAY, OCTOBER 28, 2019

                RALEIGH, NORTH CAROLINA
```

```
REPORTED BY:

CANDICE GREEN

COMMISSION NO. 201424100144
```

1

1   Triad, West and NC Crash?

2           A. Yes.

3           Q. What was NC Crash?

4           A. NC Crash was kind of -- it was part of

5   Eastern North Carolina but it wasn't the far east. The

6   far east was more like New Bern or Edenton.  NC Crash

7   actually kind of was Greenville's area.

8           So it was --

9           Q. Okay.

10          A. -- kind of central to where our office is

11  located.

12          Q. All right, and did you subscribe to all five

13  of those regions, um, for the entire time between May

14  of 2012 and October of 2017?

15          A. Yes.

16          Q. When you would go to Digital Solution's

17  website, what information were you procuring from that

18  website?

19          A. So when you would go to the website, you

20  would have each little location kind of split up.

21  There'd just be the links and kind of like a box, you

22  have Crash, East, Triad, Triangle and then West and

23  when you clicked on -- say you clicked on Crash.

24          When you open up Crash, you would have access to

25  a spreadsheet which would contain all the data from

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

JA4069
Case 1:16-cv-00542-LCB-LPA   Document 269-30   Filed 06/15/20   Page 3 of 4

```
1    all the local Law Enforcement Agencies and then you
2    would have the listing of each jurisdiction.  And it
3    would show say for example it's say Greenville Police
4    Department, it would say New Bern Police Department.
5         So it would have under those, you would have the
6    links to the spread -- to the actual spread -- um, the
7    actual PDFs of the accident reports.
8          So there would be a comprehensive total
9    spreadsheet of all the locales within that group and
10   then they would have the actual accident report as well.
11        Q. All right.  The, um, the accident reports,
12   let's say you -- you -- you chose Greenville Police
13   Department.
14        A. Mm-hm.
15        Q. Would that be one PDF, one big PDF or
16   however many -- contained however many accident
17   reports or available for Greenville that day?
18        A. Yes, it would be one big PDF with every
19   single one unless it was too big of a file size.  Say
20   there were you know, a hundred or something like that,
21   then there might be a second just I guess for file
22   size regulations on a PDF.
23        Q. Okay.  All right.  Um, and did Hardee &
24   Hardee download the spreadsheet as well as the PDFs?
25        A. Yes, sir.
```

JA4070
Case 1:16-cv-00542-LCB-LPA   Document 269-30   Filed 06/15/20   Page 4 of 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others
similarly situated*,

        Plaintiffs,

    v.

JAMES S. FARRIN, P.C., et al.,

        Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of
themselves and others similarly situated*,

        Plaintiffs,

    v.

MICHAEL A. DEMAYO, et al.,

        Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 31</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Action No.  1:16-CV-00542-LCB-LPA

JAMES WEAVER GAREY, et al.,        )
on behalf of themselves and        )
others similarly situated,         )
                                   )
            Plaintiffs,            )
                                   )
       -vs-                        )
                                   )
JAMES S. FARRIN, P.C., et          )
al.,                               )
                                   )
            Defendants.            )
                                   )

-----------------------------------


DEPOSITION OF JUSTIN B. BLAKESLEE

(Taken by the Defendants)

101 North Tryon Street - Suite 1300
Charlotte, North Carolina

Friday, October 18, 2019



REPORTED BY:        Beverly J. Gramm, RPR
                    Notary Public

www.NCDepo.com          *Depositions, Inc.*
info@NCDepo.com      *Serving all of North Carolina*          *(919) 557-4640*
**JA4072**
Case 1:16-cv-00542-LCB-LPA   Document 269-31   Filed 06/15/20   Page 2 of 4

1      Q.   Okay.  Do you remember -- so, earlier you

2  testified you thought you first saw the accident

3  report from like an insurance company?

4      A.   Um-hmm.

5      Q.   But do you remember getting it from any

6  law firms?

7      A.   I do remember, as I stated, getting it.

8  Some provided it, some did not.

9           MR. REICH:  Okay.  One more set of

10  these -- two more sets.

11           (Defendants' Exhibit 316, Bradley Law

12  Group Advertisement for Legal Services - 10 pages,

13  was marked for identification.)

14  BY MR. REICH:

15      Q.   I'm handing you document 316.

16      A.   Do I keep these or give them back?

17      Q.   You'll eventually give them to the court

18  reporter at the end.  I've just handed you 316.

19      A.   Correct.

20      Q.   Have you ever seen this document before?

21      A.   Yes.

22      Q.   Okay.  Do you think car insurance

23  companies are there to look out for you or to make

24  money for themselves?

25      A.   To make money for themselves.

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com        Serving all of North Carolina        (919) 557-4640
                            JA4073
Case 1:16-cv-00542-LCB-LPA   Document 269-31   Filed 06/15/20   Page 3 of 4

1      Q.   Do you know after a car accident you don't
2   have to talk to the insurance company?
3      A.   I did not know that.
4           (Defendants' Exhibit 317, Lanier Law Group
5   Advertisement for Legal Services - 8 pages, was
6   marked for identification.)
7   BY MR. REICH:
8      Q.   Okay.  So I'm handing you the last of
9   these mailers I'm going to hand you, which is
10  document Number -- Exhibit Number 317.
11     A.   317, got it.
12     Q.   Correct.  And if you'll just take a look
13  through that one.
14     A.   (Witness complies.)
15          MR. RISINGER:  I'm sorry, Jonathan, are we
16  on 17?
17          MR. REICH:  317.
18          MR. RISINGER:  Okay, thank you.
19     A.   Okay.
20  BY MR. REICH:
21     Q.   And do you remember getting this mailer?
22     A.   Yes, I remember seeing it before.
23     Q.   And again, page 1 appears to be the front
24  outside of an envelope and page 2 appears to be the
25  reverse outside of the envelope?

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com            Serving all of North Carolina        (919) 557-4640
                              JA4074
Case 1:16-cv-00542-LCB-LPA   Document 269-31   Filed 06/15/20   Page 4 of 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others*
*similarly situated*,

            Plaintiffs,

    v.

JAMES S. FARRIN, P.C., et al.,

            Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of*
*themselves and others similarly situated*,

            Plaintiffs,

    v.

MICHAEL A. DEMAYO, et al.,

            Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 32</u> IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

**JA4075**

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

_____
JAMES WEAVER GAREY, et al.,        )
on behalf of themselves and others )
similarly situated,                )
                                   )
            Plaintiffs,            )
                                   )
        vs.                        ) Case No.
                                   ) 1:16-CV-542-LCB-LPA
JAMES S. FARRIN, P.C. d/b/a LAW    )
OFFICES OF JAMES SCOTT FARRIN, et  )
al.,                               )
            Defendants.            )
_____)


VIDEOTAPED DEPOSITION OF CHAD CLARK

30(b)(6) FOR VAN LANINGHAM & ASSOCIATES, PLLC

FRIDAY, OCTOBER 25, 2019

GREENSBORO, NORTH CAROLINA


REPORTED BY:

CANDICE GREEN

COMMISSION NO. 201424100144

1

1    period -- we're talking about May of 2012 through end of
2    September 2017 -- I'd like for you to let me know that.
3        A.   Okay.
4        Q.   Can you do that?
5        A.   I can do that.
6        Q.   So let's start with the source of the data
7    that -- or, you know, how did you find out the names and
8    addresses of people to whom Bradley Law Group wanted to
9    send direct mail?
10       A.   It was through a aggregator.
11       Q.   And who was the aggregator?
12       A.   The one that would have been referenced in 2012
13   until, it was sometime early spring of '13, that would
14   have been America PI, APII Alex Mesa, and then from when
15   that switch was made going forth to the ceasing of
16   marketing, would have been Ron Pinner with Digital
17   Solutions.
18       Q.   Okay.  All right.  I have more familiarity with
19   Digital Solutions, so I want to talk about that, and we
20   can contrast that with America PI?
21       A.   Okay.
22       Q.   My understanding is that the way Digital
23   Solutions worked was that they would send e-mails to
24   their subscribers, which contained spreadsheets and
25   accident report forms with the spreadsheets contained

19

**JA4077**
Case 1:16-cv-00542-LCB-LPA   Document 269-32   Filed 06/15/20   Page 3 of 4

```
 1  certain information on the people who had then been
 2  involved in accidents; is that accurate?
 3      A.   That's accurate.
 4      Q.   All right.  In both respects we just talked
 5  about, did America PI work the same way?
 6      A.   Very similar.
 7      Q.   Send out an e-mail to -- to your firm or
 8  somebody at the firm containing a spreadsheet and
 9  DMV-349s or accident reports?
10      A.   Yes.
11      Q.   All right.  And that's -- were both of those
12  subscription services where you paid money to be able to
13  get those e-mails?
14      A.   Correct.
15      Q.   And the -- and the understanding was that you
16  were going to be getting spreadsheets with information
17  that had been extracted from these DMV-349 forms or
18  accident reports, true?
19      A.   True.
20      Q.   The Digital Solutions' spreadsheets contained a
21  number of fields, it's my understanding; is that -- is
22  that right?
23      A.   There were a number of fields.  Yes.
24      Q.   And those included name, address, whether the
25  person was a driver or passenger?
```

20

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others*
*similarly situated,*

        Plaintiffs,

    v.

JAMES S. FARRIN, P.C., et al.,

        Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of*
*themselves and others similarly situated,*

        Plaintiffs,

    v.

MICHAEL A. DEMAYO, et al.,

        Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 33</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY
# JUDGMENT

```
                UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
_____

JAMES WEAVER GAREY, et al.,            )
on behalf of themselves and others )
similarly situated,                    )
                                       )
               Plaintiffs,             )
                                       )
          vs.                          ) Case No.
                                       ) 1:16-CV-542-LCB-LPA
JAMES S. FARRIN, P.C. d/b/a LAW        )
OFFICES OF JAMES SCOTT FARRIN, et  )
al.,                                   )
               Defendants.             )
_____)
```

```
          VIDEOTAPED DEPOSITION OF ROBERT ANDRE FLEURY, JR.

               30(b)(6) FOR CRUMLEY ROBERTS, LLP

                  WEDNESDAY, OCTOBER 23, 2019

                  GREENSBORO, NORTH CAROLINA
```

```
REPORTED BY:

CANDICE GREEN

COMMISSION NO. 201424100144
```

1

JA4080
Case 1:16-cv-00542-LCB-LPA   Document 269-33   Filed 06/15/20   Page 2 of 4

1   specific numbers, month to month, or quarter to

2   quarter.  But generally, the process has remained

3   the same, as far as vendors and that sort of detail.

4        Q.  So, let's -- let's start then with the

5   process of obtaining names and addresses of people

6   who've been involved in car wrecks.  How have -- how

7   does the firm do that, or how has the firm done

8   that?  If there are any differences in time period

9   like if you got them from source A at one point, and

10  then you switched to source B or something like

11  that, let me know that.  How does that work?

12       A.  Sure.  We get the -- the information from

13  a company called Digital Solutions, and we have

14  since 2012.

15       Q.  And I have learned from other depositions

16  that some folks get e-mails from Digital Solutions,

17  other people go download stuff from Digital

18  Solutions.  Have you done it both ways?  Do you know

19  which way you've done it?

20       A.  I did, and I -- I confirmed with Darrin

21  Edwards to just have him walk me through the

22  process.  So, if --- if you'd like, I can show you

23  what --

24       Q.  Sure.  We'll just do that.

25       A.  -- what he's told me, and if you have some

1    questions to fill in the gaps, I'll be glad to do my

2    best.  So Digital Solutions about 20 to 40 times a

3    day would send e-mails to one of our employees.  To

4    probably to just a generic, you know, mailers at

5    Crumley Roberts e-mail address, or something like

6    that that they've set up.  I don't have the specific

7    on what the e-mail address is.  And throughout the

8    day, the employee would open the e-mails, and

9    e-mails would have a spreadsheet that had, you know,

10    the various information that I, you know,

11    identified.  Maybe the -- the name, the injury code,

12    the -- a number of criteria that I think were in the

13    interrogatory responses.  And then additionally,

14    there will be a PDF file with all of the

15    corresponding, you know, police reports, and those,

16    to my understanding, were just all in one big PDF.

17    And then the -- okay, so that's -- and now, we

18    actually used an outside mail house called

19    Excalibur, and simultaneously, they would be getting

20    those same e-mails.  And if it was an injury code

21    four or five in an area that we've chosen to mail at

22    that time period, Excalibur would take that from

23    Digital Solutions, compile a letter -- you know, a

24    letter that we had created, and a -- you know, in an

25    envelope, and would send to those recipients, not

17

**JA4082**
Case 1:16-cv-00542-LCB-LPA   Document 269-33   Filed 06/15/20   Page 4 of 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others
similarly situated*,

    Plaintiffs,

  v.

JAMES S. FARRIN, P.C., et al.,

    Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of
themselves and others similarly situated*,

    Plaintiffs,

  v.

MICHAEL A. DEMAYO, et al.,

    Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 34</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

```
                    UNITED STATES DISTRICT COURT

              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


_____
                               )
JAMES WEAVER GAREY, et al.,    )
on behalf of themselves and    )
others similarly situated,     )
                               )
          Plaintiffs,          )
     vs.                       ) Case No.
                               ) 1:16-CV-542-LCB-LPA
JAMES S. FARRIN, P.C. d/b/a    )
LAW OFFICES OF JAMES SCOTT     )
FARRIN et al.,                 )
                               )
          Defendants.          )
_____)
```

```
VIDEOTAPED DEPOSITION OF DUWAYNE JOSEPH GILCHRIST, JR.

          30(b)(6) FOR RIDDLE & BRANTLEY

             TUESDAY, OCTOBER 22, 2019

             RALEIGH, NORTH CAROLINA
```

```
REPORTED BY:

AMANDA SMITH

COMMISSION NO. 201816300072
```

1

JA4084

Case 1:16-cv-00542-LCB-LPA   Document 269-34   Filed 06/15/20   Page 2 of 4

1    targeted direct mailing operation, can we have an

2    understanding that unless something is said

3    otherwise, it's going to be concerning the period

4    from May of 2012 through July 18th, 2016?

5          A.  Yes.

6          Q.  All right.  If there are any -- if I ask

7    you a question and the answer would be different for

8    some parts of that period, as opposed to other parts

9    of that period, will you let me know?

10         A.  I will.

11         Q.  All right.  Okay.  What I would like for

12    you to do then, with that understanding, is to take

13    me through the process of your targeted direct

14    mailing from the acquisition of names and addresses

15    through the actual transmission or sending of the

16    printed materials.  If you can just sort of walk me

17    through step-by-step.

18         A.  In the morning, first thing, the girls

19    would get on their computers and download any

20    information we could get from the Raleigh Police

21    Department.  We did this because that information

22    was accessible right away.  The information we would

23    get from Digital Solutions did not usually start

24    coming in until 10:00.  And then, at 10:00, we would

25    start receiving emails from Digital Solutions, which

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

JA4085

Case 1:16-cv-00542-LCB-LPA  Document 269-34  Filed 06/15/20  Page 3 of 4

1    would contain a spreadsheet that listed the
2    accidents involved and then copies of the actual
3    accident reports for each of those incidences.  We
4    would then print off all of the accident reports,
5    and we would go through them individually and based
6    on the injury code and the property damage that was
7    assigned by the officer, we would sort through those
8    and based on criteria we had set up, select the ones
9    we were going to send to and then discard the ones
10   we were not sending to.

11        At that point, the girls would go ahead and
12   create a spreadsheet with the name and address of the
13   individual we were mailing to.  Do a mail merge that
14   would generate the envelopes and the letter, which, you
15   know, on our letterhead explaining what was going on.
16   And then we would actually make an additional copy of
17   the letters and everything to keep the -- the
18   information was then put together with the police
19   report that explains how to read your accident
20   report.

21        The letter of introduction, the letterhead,
22   the DVD, and all of that was put into a mailer.  The
23   mailers were run through a machine that actually put
24   the address on them and then everything we tried to
25   have done by 4:00 in the afternoon so that we could

19

www.storycloud.co | (866) 787-6774 | depos@storycloud.co
JA4086
Case 1:16-cv-00542-LCB-LPA   Document 269-34   Filed 06/15/20   Page 4 of 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others
similarly situated*,

                    Plaintiffs,

         v.

JAMES S. FARRIN, P.C., et al.,

                    Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of
themselves and others similarly situated*,

                    Plaintiffs,

         v.

MICHAEL A. DEMAYO, et al.,

                    Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 35</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

_____
JAMES WEAVER GAREY, et al.,          )
on behalf of themselves and others )
similarly situated,                  )
                                     )
              Plaintiffs,            )
                                     )
        vs.                          ) Case No.
                                     ) 1:16-CV-542-LCB-LPA
JAMES S. FARRIN, P.C. d/b/a LAW      )
OFFICES OF JAMES SCOTT FARRIN, et    )
al.,                                 )
              Defendants.            )
_____)

VIDEOTAPED DEPOSITION OF LISA LANIER

30(b)(6) FOR LANIER LAW GROUP

FRIDAY, OCTOBER 25, 2019

GREENSBORO, NORTH CAROLINA

REPORTED BY:

CANDICE GREEN

COMMISSION NO. 201424100144

1

JA4088
Case 1:16-cv-00542-LCB-LPA   Document 269-35   Filed 06/15/20   Page 2 of 3

1  him.

2     Q.   Okay.  From November of 2013, what -- what

3  happened in terms of where you got the data from?

4     A.   I switched to a company called Digital Solutions

5  of the Carolinas and I've used them since then.

6     Q.   Since I'm familiar with Digital Solutions, let's

7  talk about that for a minute and then we can go back and

8  perhaps compare and contrast that with America PI --

9        My understanding is that Digital Solutions

10  provides spreadsheets with information of people who've

11  been involved in wrecks gleaned from accident reports or

12  DMV-349s; is that what you understand?

13     A.   They -- my understanding of what Digital

14  Solutions does is they go to the public records offices

15  at local law enforcement agencies -- and each one does it

16  quite differently, I think -- you know, some -- a little

17  small town, you know, police department might put out

18  records in a box, literally, you know, they might do it

19  once or twice a week; whereas, a highway patrol office

20  might have a notebook or something a littler fancier and

21  more daily and that sort of thing.

22        And Digital Solutions then they take that public

23  information and they put it into the form of spreadsheet

24  and they also scan records that are available there.  And

25  then they send that to us in a form of -- of a

15

**JA4089**
Case 1:16-cv-00542-LCB-LPA  Document 269-35  Filed 06/15/20  Page 3 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others
similarly situated*,

              Plaintiffs,

      v.

JAMES S. FARRIN, P.C., et al.,

              Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of
themselves and others similarly situated*,

              Plaintiffs,

      v.

MICHAEL A. DEMAYO, et al.,

              Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 36</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY
# JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


JOHNATHAN HATCH, et al., on behalf )
of themselves and others similarly )
situated,                          )
                                   )
              Plaintiffs,          )
                                   )
     vs.                           )   Civil Action Number:
                                   )   1:16-cv-00925-LCB-LPA
MICHAEL A. DEMAYO, individually,   )
THE LAW OFFICES OF MICHAEL A.      )
DEMAYO, P.C., et al.,              )
                                   )
              Defendants.          )
_____)
                                   )
JAMES WEAVER GAREY, et al., on     )
behalf of themselves and others    )
similarly situated,                )
                                   )
              Plaintiffs,          )
                                   )
     vs.                           )   Civil Action Number:
                                   )   1:16-cv-542-LCB-LPA
JAMES S. FARRIN, P.C., d/b/a LAW   )
OFFICES OF JAMES SCOTT FARRIN,     )
et al.,                            )
                                   )
              Defendants.          )

_____

**RULE 30(b)(6) DEPOSITION**

**OF**

**HARDISON & COCHRAN, PLLC**

**(BETHANY CAROL WADE)**
_____

Raleigh, North Carolina
October 2, 2019
10:10 a.m.


Reporter:  Rebecca P. Scott

**Scott Court Reporting, Inc.**
130 Angle Place
Stokesdale, North Carolina 27357
336-548-4371
JA4091

Case 1:16-cv-00542-LCB-LPA   Document 269-36   Filed 06/15/20   Page 2 of 5

1      day.

2           We usually got the list between 3:00 and

3      3:30, and we had to have everything pretty much

4      finalized by 7:00.  It had to be delivered to the

5      Business Mail Entry Unit off of Floretta Drive in

6      Raleigh.

7   Q.  Is that out off of Westgate?

8   A.  It is.  Westgate, that's the name of the post

9      office.

10  Q.  And so you say it finalized by 7:00.  Did it have

11     to be there by 7:00?

12  A.  We had to have it loaded in the docks, paper in

13     hand by 7:00.

14  Q.  Okay.  I want to unpack some of that stuff.

15  A.  Okay.

16  Q.  Let's start with the portal.

17  A.  Okay.

18  Q.  Was that portal operated by Digital Solutions of

19     the Carolinas?

20  A.  Yes, it was.

21  Q.  My understanding -- and correct me if I'm wrong --

22     is that Digital Solutions, on sort of a

23     subscription basis, would provide access to its

24     portal to various law firms, is that accurate?

25  A.  Correct, yes.

1    Q.    And you paid by the month to get access to that?

2    A.    We did pay by the month.

3    Q.    Now I also understand that Digital Solutions

4          offered subscriptions to different geographic

5          areas.  For example, you could buy the whole state

6          of North Carolina or maybe you could just buy a

7          particular smaller part of North Carolina, is that

8          accurate?

9    A.    Yes, it is.

10   Q.    What did you-all subscribe to?

11   A.    Well, in 2012 all the way to the beginning of

12         2013, I think we were subscribed to two regions.

13         They were the eastern regions.  And then January

14         2013, we went statewide, and that was through the

15         end of the mailing in June of 2016.

16   Q.    Now the eastern regions that you described, I seem

17         to recall seeing something like an eastern North

18         Carolina subscription.  Was there also a

19         subscription for Raleigh that you guys subscribed

20         to?

21   A.    Yes, sir.

22   Q.    So were those the two subscriptions you had,

23         Raleigh and eastern North Carolina?

24   A.    Yes, sir, pretty much.  And then I believe it

25         branched into -- Greensboro and Charlotte were the

1    other two areas, I believe.

2  Q.  Now let's talk about the next step in the process.

3    You got a subscription to the portal.  You're

4    provided with a password---

5  A.  Correct.

6  Q.  ---by Digital Solutions?

7  A.  Correct, for each portal.

8  Q.  Okay.  So there would be a different portal for

9    Raleigh than, say, eastern North Carolina?

10  A.  Yes.  There was a total of four portals.

11  Q.  And only two of which you used in '12 and '13, but

12    then you would have used all four beginning in

13    January of 2013?

14  A.  Yes.

15  Q.  Okay.  So someone would log into a portal and

16    download a spreadsheet?

17  A.  They would not download the spreadsheet.  So when

18    you log into the portal is the option data summary

19    or it has different dates.  So you could click on

20    a couple of dates and look maybe three days back,

21    if you wanted to, at a spreadsheet of accidents,

22    or you click on "data summary" and it gives you

23    just a spreadsheet of, you know, who has been

24    involved in an accident for that day or the day

25    before, and that is what was available at 3:00.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others
similarly situated,*

          Plaintiffs,

     v.

JAMES S. FARRIN, P.C., et al.,

          Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of
themselves and others similarly situated*,

          Plaintiffs,

     v.

MICHAEL A. DEMAYO, et al.,

          Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 37</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHNATHAN HATCH, et al., on behalf )
of themselves and others similarly )
situated,                          )
                                   )
            Plaintiffs,            )
                                   )
      vs.                          )    Civil Action Number:
                                   )    1:16-cv-00925-LCB-LPA
MICHAEL A. DEMAYO, individually,   )
THE LAW OFFICES OF MICHAEL A.      )
DEMAYO, P.C., et al.,              )
                                   )
            Defendants.            )
_____)
                                   )
JAMES WEAVER GAREY, et al., on     )
behalf of themselves and others    )
similarly situated,                )
                                   )
            Plaintiffs,            )
                                   )
      vs.                          )    Civil Action Number:
                                   )    1:16-cv-542-LCB-LPA
JAMES S. FARRIN, P.C., d/b/a LAW   )
OFFICES OF JAMES SCOTT FARRIN,     )
et al.,                            )
                                   )
            Defendants.            )

_____

### RULE 30(b)(6) DEPOSITION

#### OF

### TED A. GREVE & ASSOCIATES, PA

#### (THEODORE ALLEN GREVE)
_____

Charlotte, North Carolina
September 24, 2019
2:28 p.m.


Reporter:  Rebecca P. Scott

**Scott Court Reporting, Inc.**
130 Angle Place
Stokesdale, North Carolina 27357
336-548-4371
JA4096

1     of them, I'm just going to jump in and start

2     asking questions.

3          Number 1 talks about the methods and

4     practices by which your firm accesses any

5     information derived -- I'm paraphrasing here --

6     any information derived from a DMV-34 form -- 349

7     form -- excuse me -- whether in spreadsheet form

8     or otherwise, from Digital Solutions or any other

9     vendor.

10          So tell us, if you would -- and it

11     encompasses any time since January 1 to today --

12     describe, if you would, the practices that your

13     firm uses to access this information.

14  A.  We have a service through Digital Solutions of the

15     Carolinas that they provide us a list of names,

16     and we use those names to send out our

17     informational piece.  And so we access that

18     information through a portal, and that's done many

19     days out of the year.

20  Q.  Take us through the process, if you would.

21  A.  The process is that there is a password, I guess,

22     that we log on with, and in logging on, we're able

23     to access through the portal a database.  We then

24     take the database and use that information to

25     produce a set of labels that then get peeled off

Scott Court Reporting, Inc.
130 Angle Place
Stokesdale, North Carolina 27357
336-548-4371
JA4097
Case 1:16-cv-00542-LCB-LPA   Document 269-37   Filed 06/15/20   Page 3 of 14

1       and stuck on or printed on envelopes that are sent

2       out to people who may be in need of our legal

3       services or anybody's legal services, for that

4       matter.

5    Q.  The database password is used, the portal is

6       opened, the database is accessed?

7    A.  Uh-huh.  Yes.

8    Q.  And then how do you use that database to generate

9       mailing labels?

10   A.  It, I guess, gets merged through a label merge, if

11      you will, program, and those labels are generated

12      and just printed out on labels -- those names and

13      addresses are printed out on labels.

14   Q.  And then what happens to those labels?

15   A.  They get stuck on an envelope.

16   Q.  And then what happens to the envelope?

17   A.  They get put in the mail.

18   Q.  With your mailing, whether it's called an

19      informational mailing or an advertising piece, the

20      mailing that is the subject of this litigation---

21   A.  Uh-huh.  Yes.

22   Q.  ---gets put in that envelope?

23   A.  Correct.  The one -- we had reviewed that

24      envelope---

25   Q.  Yes.

Scott Court Reporting, Inc.
130 Angle Place
Stokesdale, North Carolina 27357
(336) 548-4371
JA4098

Case 1:16-cv-00542-LCB-LPA   Document 269-37   Filed 06/15/20   Page 4 of 14

1    A.    ---previously at the last deposition.  It's put on

2          an envelope like that, yes.

3    Q.    So the spreadsheet is -- does every name on the

4          spreadsheet get merged into an envelope?

5    A.    That is my understanding.

6    Q.    Okay.  So that if we get your spreadsheet, we'll

7          have everybody who you mailed a letter to, is that

8          right?

9    A.    No.

10   Q.    Okay.  How would that be different?

11   A.    We discussed at the last deposition that we do

12         send out some other mailings to other people who

13         are not involved in accidents.  They might be

14         involved in accidents, but they're just randomly

15         selected.

16   Q.    There you go.  Okay.  So the list of folks that

17         got mailings might be bigger than that which is on

18         the spreadsheet?

19   A.    Correct.

20   Q.    But not smaller?

21   A.    It just depends.  It just depends on -- I mean

22         that is our information -- the spreadsheet is our

23         information to go by.  You know, whether it gets

24         put in -- I mean the system is that we use the

25         spreadsheet, we generate labels, they get stuck on

1    an envelope, they get put in the post office or

2    mailed out, and that's just assuming that all

3    happens.

4         So to the extent that happens, that's the way

5    it happens.  Who it happens with, I cannot say

6    that everybody that's on a spreadsheet gets an

7    envelope because I can't say that we do the

8    mailing every day.

9    Q.  But if everything is clicking along as it's

10        supposed to, they're supposed to get a mailing?

11   A.  That's -- that's what they're supposed to do.

12        That's my understanding.

13   Q.  Okay.  And the spreadsheets are downloaded onto

14        your computer to be able to merge and create the

15        mailing list, is that right?

16   A.  I'm not a computer expert, and I don't do this --

17        I've actually never done this, but that's my

18        understanding.

19   Q.  Okay.  And so my question is, since we've not

20        received any spreadsheets nor any labels, why not?

21   A.  Well, because that's not our -- our practice is

22        not to print those out.  Our practice is just that

23        they get overwritten every day.  So if you wanted

24        the labels that would come and be available

25        through the portal, the best information is going

1          through Digital Solutions of the Carolinas.

2    Q.    Okay.  Do you believe that your firm has a duty to

3          preserve the electronic data that is being

4          generated pursuant to this process?

5    A.    To the extent we would be destroying data that

6          cannot be created, you know, we think we should

7          preserve it.

8    Q.    Okay.  Have you taken any steps to preserve it?

9    A.    It is my understanding that Digital Solutions of

10         the Carolinas has all that information, and the

11         steps I've taken is that that's what I've

12         confirmed, that they have a list of the data.

13   Q.    Okay.  Has your firm taken any steps to preserve

14         the data that it has, that is, the spreadsheets

15         and the mailing label -- the mailing labels?

16   A.    We have a computer system that is pretty

17         state-of-the-art, and that information comes

18         through our computer system, and I would think it

19         may be available somewhere deep in the computer

20         system that someone could -- like you could hire

21         someone to come in and see if they could find it.

22         I don't know.

23   Q.    Have you taken any steps to preserve this

24         information?

25   A.    To the extent I've -- I think I've kind of already

1   A.   That's my understanding.

2   Q.   And these Excel spreadsheets contain information

3        about people who have been involved in motor

4        vehicle collisions in North Carolina, true?

5   A.   To the best of my understanding, that's -- I mean

6        that's our anticipation, you know.  They could

7        send us people who were never involved in a motor

8        vehicle collision, and we wouldn't know

9        necessarily.

10  Q.   But what you believe you're getting and what you

11       have contracted to get from Digital Solutions is

12       information about people who have been involved in

13       motor vehicle collisions, true?

14  A.   We don't have a contract, but we just pay a fee

15       every month.

16  Q.   But your understanding is that's what they're

17       giving you?

18  A.   Yes.

19  Q.   And that's what they hold themselves out as giving

20       you?

21  A.   Yes.

22  Q.   And if they say that's what they're giving you,

23       you don't have any way to dispute that?

24  A.   Not really.

25  Q.   Okay.  Now the information that is in those

Case 1:16-cv-00542-LCB-LPA   Document 269-37   Filed 06/15/20   Page 8 of 14

1        spreadsheets is taken from -- as you understand

2        it -- taken from DMV-349 or crash report forms

3        that are completed by law enforcement agencies,

4        true?

5    A.  That would -- that would be kind of a leap I would

6        take to think that's where they come from, but I

7        don't know that to be a fact.

8    Q.  Well, you know that Digital Solutions also offers

9        access to the actual DMV-349s as well as to the

10       spreadsheets, do you not?

11   A.  I don't know that.

12   Q.  You don't know that.  Okay.  Your mailers do not

13       include -- your direct mail pieces do not include

14       copies of the accident report, correct?

15   A.  Correct.

16   Q.  I assume you're familiar that some of the other

17       lawyers who are involved in this lawsuit do send

18       copies of the actual crash report for the person's

19       crash?

20   A.  That's my understanding.

21   Q.  That's your understanding?

22   A.  Right.

23   Q.  All right.  So how long have you been practicing

24       law?

25   A.  Since November of 1993.

1    A.    That's my understanding, yes.

2    Q.    I looked back at some interrogatory responses that

3          you provided to us, and it appears that you've

4          been sending this direct mail since back in the

5          '90s maybe shortly after you got out of law

6          school?

7    A.    Correct.

8    Q.    Have you -- have you been using Digital Solutions

9          as the source of your data since at least 2012?

10   A.    Yes.

11   Q.    Understanding that there may have been a day here

12         or a day there when something wasn't working in

13         your office like the normal process works, have

14         you ever stopped sending direct mail pieces like

15         are at issue in this litigation since, say, May

16         2012 through the present?  At any point, have you

17         stopped sending mail?

18   A.    Yes.

19   Q.    When did you stop?

20   A.    When the lawsuit came in, we stopped shortly to

21         look at the lawsuit and re-research and look into

22         what we were doing, and then we began again, and I

23         don't know how long we stopped.

24   Q.    Can you estimate it for me?  Did you stop for as

25         long as a year?

Scott Court Reporting, Inc.
130 Angle Place
Stokesdale, North Carolina 27357
336/648-4371
JA4104
Case 1:16-cv-00542-LCB-LPA   Document 269-37   Filed 06/15/20   Page 10 of 14

1    other thing we want to let you know about," which

2    again goes to the informational part of this,

3    which is the idea that "You might be getting calls

4    from people now that you've been involved in an

5    accident, and you should be aware that people are

6    not supposed to call you about you being in an

7    accident, and to the extent you're receiving a

8    call, especially from a lawyer, here's the

9    information and telephone number for the Bar.  You

10   should call the Bar and report whoever called you

11   to the Bar."

12              MR. REICH:  No further questions.

13   **FURTHER EXAMINATION BY MR. STRADLEY (4:18 P.M.)**

14   Q.   So your -- in addition to your marketing

15        materials, you're trying to alert folks that there

16        may be people who are trying to compete with you

17        in ways that are not permitted by the State Bar

18        rules?

19   A.   No.  I think our original informational piece was

20        an advertising piece.  It does say "advertisement

21        for legal services" on the outside of it, for

22        goodness sakes.  So I mean I do think that was

23        informational for people, and it is something

24        that's helpful to them to know that hey, you don't

25        have to live next to a lawyer to know that you can

Scott Court Reporting, Inc.
130 Angle Place
Stokesdale, North Carolina 27357
336-548-4371
JA4105
Case 1:16-cv-00542-LCB-LPA   Document 269-37   Filed 06/15/20   Page 11 of 14

1    consult with a lawyer at no charge.

2         Because so many people will call our office

3    and actually say, even after they've gotten a

4    letter, "How much is it going to cost me to talk

5    to you?"  So I mean people -- in spite of all the

6    TV advertising you see every day, all the stuff

7    floating around, people still are unclear about

8    what they can and cannot do.  A big part of it is,

9    can you contact a lawyer and not have any money to

10   speak to a lawyer.

11        So we try to talk to them about that, but

12   the -- all of it is calculated to do two things or

13   a couple of things.  One is to give people

14   information.  The additional information we think

15   is critical because -- not so much from a

16   competition standpoint, but we want to alert

17   people to understand that when somebody calls you

18   on the phone, it's probably not a good idea.

19        Now we know that -- kind of know secondhand

20   that a lot of people get phone calls because they

21   say they get phone calls, and I just have to take

22   them at their word.  And if they get a phone call,

23   we just want to alert them to the idea that maybe

24   you should check with somebody else before you

25   start to just going off and doing whatever this

Scott Court Reporting, Inc.
130 Angle Place
Stokesdale, North Carolina 27357
(336)548-4371
JA4106
Case 1:16-cv-00542-LCB-LPA   Document 269-37   Filed 06/15/20   Page 12 of 14

1    person on the other end of the line is telling you

2    to do like, "Bring your car and have it fixed at

3    our body shop because we are the official body

4    shop of the insurance company and we can take care

5    of your car, and they want us to take care of your

6    car, and they have authorized us to send somebody

7    over to pick up your car."

8        Before you know it, somebody's there picking

9    up their car, bringing it back to the body shop,

10   and they're doing work on the car.  And then the

11   next thing you know is, the insurance company is

12   going like, "We're not paying for them because

13   they never do anything right, and they're going to

14   bill us for a big additional repair at the end,"

15   and then you get into a problem just on the

16   property damage with not even getting into the

17   bodily injury part of the claim.

18       So, you know, we spend a fair amount of time

19   trying to educate people just about property

20   damage, people who call our office and say, "I

21   wasn't even injured," and we're -- you know, we're

22   basically going through the process of giving them

23   the information as to what they should do on the

24   property damage.  And I do, every now and then,

25   take some property damage only cases just because

Scott Court Reporting, Inc.
130 Angle Place
Stokesdale, North Carolina 27357
(336) 548-4371
JA4107
Case 1:16-cv-00542-LCB-LPA   Document 269-37   Filed 06/15/20   Page 13 of 14

1    people are so upside down on what's going on that

2    it's just helpful to them.

3         But to the extent we put that piece of

4    information in there, it was because it was

5    starting to become so rampant that body shops, and

6    God knows who else, were intervening in people's

7    life in a very negative way.

8  Q.  And where do you think they get the information

9    from to intervene in people's lives in a very

10   negative way?  On the crash reports?

11 A.  I have no idea.

12 Q.  No idea?

13 A.  I don't -- I don't even know that -- and nobody

14   wants to fess up to even calling somebody, so how

15   would I know where they get the information from?

16   For all I know, they get it from a police officer

17   friend of theirs that's handed it to them.  So I

18   don't know.

19 Q.  You said there were two purposes.  The other

20   purpose being advertising?

21 A.  Correct.

22 Q.  Now you mentioned the mailers changed over time,

23   but from 2012 forward, you've been getting the

24   names and addresses for the purpose of sending out

25   these mailers, the content of which may have

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others
similarly situated*,

        Plaintiffs,

    v.

JAMES S. FARRIN, P.C., et al.,

        Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of
themselves and others similarly situated*,

        Plaintiffs,

    v.

MICHAEL A. DEMAYO, et al.,

        Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 38</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHNATHAN HATCH, et al., on behalf )
of themselves and others similarly )
situated,                          )
                                   )
            Plaintiffs,            )
                                   )
     vs.                           )  Civil Action Number:
                                   )  1:16-cv-00925-LCB-LPA
MICHAEL A. DEMAYO, individually,   )
THE LAW OFFICES OF MICHAEL A.      )
DEMAYO, P.C., et al.,              )
                                   )
            Defendants.            )
_____)
                                   )
JAMES WEAVER GAREY, et al., on     )
behalf of themselves and others    )
similarly situated,                )
                                   )
            Plaintiffs,            )
                                   )
     vs.                           )  Civil Action Number:
                                   )  1:16-cv-542-LCB-LPA
JAMES S. FARRIN, P.C., d/b/a LAW   )
OFFICES OF JAMES SCOTT FARRIN,     )
et al.,                            )
                                   )
            Defendants.            )

_____

**RULE 30(b)(6) DEPOSITION**

**OF**

**LAW OFFICES OF MICHAEL A. DEMAYO, LLP**

**(MICHAEL A. DeMAYO)**
_____

Charlotte, North Carolina
October 1, 2019
10:11 a.m.


Reporter:  Rebecca P. Scott

1        have you consistently used either reports or data

2        from reports from the Charlotte-Mecklenburg Police

3        Department since 2012?

4   A.   I'm sorry.  Are you saying accident reports?

5   Q.   Yes.  I'm sorry.

6   A.   Okay.  Yes.

7   Q.   Have you also used reports from the state highway

8        patrol from Mecklenburg County?

9   A.   I believe -- I believe so, yes.

10  Q.   Now can you take me through -- and this may be a

11       detail, and if it is, that's fine.  Let me know

12       when we're out of general and into specific, okay,

13       because you're the one that -- you know what

14       you've got general information for and I don't.

15            So take me through the process of how you

16       gather the information for an accident victim and

17       get a mail piece out the door?  Can you take me

18       through that process?

19  A.   I can take you through that process from

20       approximately 2015 forward.

21  Q.   Okay.  That's fine.

22  A.   Well, actually, let me rephrase that.  Because it

23       might have been different.  I can take you through

24       today, present day how we do it.

25  Q.   Okay.  All right.  Well, let's start with that.

1    A.    I'm going to assume that it was the same -- well,

2          it is -- to my knowledge -- I'm not going to

3          assume -- to my knowledge, it was the same in

4          2015.  So what we do is, we currently and in the

5          past, at least for the last four years, have

6          received Excel spreadsheets from DIY.  It's not

7          one spreadsheet.  It's multiple spreadsheets will

8          come throughout the day.

9    Q.    Excuse me.  From DI---

10   A.    DIY or---

11   Q.    DIY.

12   A.    ---Pinner, I think it is.

13   Q.    Digital Solutions, is that it?

14   A.    I'm sorry.  I might be calling them the wrong

15         thing.  Yes.

16   Q.    Digital Solutions of the Carolinas, does that ring

17         a bell?

18   A.    Yes.  Yes.  So that is sent in by email, and one

19         of three people in my office will grab that, print

20         it -- print the Excel spreadsheet -- actually,

21         they'll do two things.  With that Excel

22         spreadsheet, somehow there is an attachment for

23         each name noted of accident reports.

24              So they will print out every accident report,

25         and the reason why is, we are a fairly large firm

1    and -- so it doesn't matter if they're at fault,

2    not at fault.  If we're going to send them

3    marketing material, we like to have the accident

4    report, so if someone calls us, we can communicate

5    with them about what we're seeing because

6    oftentimes, as you probably know, clients are not

7    always the best historians about how an accident

8    may have occurred, both from a liability

9    standpoint or property damage or injuries or a

10   number different things.  So they'll take that

11   step.

12        One of the three individuals will immediately

13   identify if the person is at fault and it's not

14   someone we could help, it's not someone we could

15   assist because of our very stringent and unfair

16   contributory negligence laws.  Then that Excel

17   spreadsheet -- until recently, but I'll just say

18   for the most part -- will go to one of the

19   attorneys in the prelitigation part of the firm,

20   and the attorneys will review the individual

21   accident reports and determine whether or not they

22   think this is someone we could assist.

23        And I'll just tell you there is a general

24   criterion which is, obviously, we don't generally

25   think we can help people in parking lot cases or

Scott Court Reporting, Inc.
130 Angle Place
Stokesdale, North Carolina 27357
336-548-4371
JA4115
Case 1:16-cv-00542-LCB-LPA   Document 269-38   Filed 06/15/20   Page 5 of 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00542

WILLIAM PARKER GAREY, et al.,
*on behalf of themselves and others
similarly situated*,

          Plaintiffs,

     v.

JAMES S. FARRIN, P.C., et al.,

          Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:16-CV-00925

JOHNATHAN HATCH, et al., *on behalf of
themselves and others similarly situated*,

          Plaintiffs,

     v.

MICHAEL A. DEMAYO, et al.,

          Defendants.

# DEFENDANTS' <u>JOINT EXHIBIT 39</u>
# IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:16-cv-00925-LCB-LPA


JOHNATHAN HATCH, et al., on behalf )
of themselves and others similarly )
situated,                          )
                                   )
            Plaintiffs,            )
                                   )
      vs.                          )
                                   )
MICHAEL A. DEMAYO, individually,   )
THE LAW OFFICES OF MICHAEL A.      )
DEMAYO, P.C., et al.,              )
                                   )
            Defendants.            )

_____

DEPOSITION

OF

BENJAMIN TODD COCHRAN
_____


_____

Raleigh, North Carolina
July 10, 2019
10:16 a.m.
_____


Reporter:  Rebecca P. Scott

12

```
 1        knowledge, we were provided access to a web portal
 2        through Digital Solutions.
 3   Q.   Did you work with Digital Solutions the whole
 4        time?
 5   A.   Yes.  It's only been Digital Solutions that we
 6        obtained our access portal information from.
 7   Q.   I'm working up the knowledge base of how Digital
 8        Solutions works, and tell me how your firm
 9        interfaced with Digital Solutions to create direct
10        mail.
11   A.   To my knowledge, what we would do is access a web
12        portal, whether it be one or potentially two,
13        because we didn't originally always do statewide.
14        That came later.  We did a more regional market in
15        the beginning, but then statewide became later.
16        At the time of this lawsuit, we were performing
17        statewide, though.
18            And so the web portal gave you different
19        access to different regions, is my understanding.
20        I never actually interfaced with the web portal.
21        And then it's my understanding that the web portal
22        had a -- kind of an Excel spreadsheet that was
23        already created that had information that was
24        already provided in regards to individuals that
25        had been involved in motor vehicle collisions.
```

13

1  Q.  And once a member of your firm accessed that

2      web -- that Excel spreadsheet, what happened?

3  A.  Then they would sort it to parameters, and once

4      that was sorted, that generated a list of names.

5      We would take those names and input them into the

6      software that's supplied by the United States

7      government, and the software would then go through

8      the addresses of the names in order to apply the

9      current mailing address for those individuals.

10 Q.  So the software would -- what US government

11     software?

12 A.  It's in the discovery materials.  Yeah, that

13     was -- the information was provided in the

14     discovery materials.

15 Q.  And so what does -- what does the software do, as

16     you understand it?

17 A.  As I understand it, with any type of direct mail

18     campaign for anything, there is a considerable

19     amount of returned envelopes that never reach,

20     make it, whatever, to their destination, and they

21     come back.  This software uses these individuals

22     that is on the list -- their most current mailing

23     address that is registered with the United States

24     Post Office.  So it takes those names and puts the

25     addresses that they have on file so that you're

1        understanding.

2   Q.  Satori?

3   A.  Yes.

4   Q.  And just following up, let's say the name on the

5        accident report was John Smith.  Well, my

6        gracious, there's going to be a lot of John Smiths

7        in the US Postal Service database, I reckon.

8   A.  I would agree.

9   Q.  How would it know which one to send to?

10  A.  I'm not going to know the answer to that.  I think

11       those are different things.

12  Q.  Okay.  Okay.  So back to the process.  You get the

13       Excel spreadsheet, and I'm not trying to put words

14       in your mouth.  I'm trying to articulate what I

15       understand of how other lawyers have interfaced

16       with it and tell me whether this jives with your

17       understanding.

18            You get the Excel spreadsheet and it's got

19       everybody.  You're not going to want to send

20       letters to everybody.  You're not going to want to

21       send them to the at-fault drivers or no-jury

22       drivers or small-impact drivers -- small-impact

23       collisions.  Were those some of the criteria that

24       your firm used?

25  A.  Yeah.  The criteria that was used by us was,

17

```
 1        obviously, the no at-fault drivers.  They do not
 2        need any assistance from me in regards to their
 3        legal rights because they're at fault.  The other
 4        one would be injuries as well that would be
 5        sorted, and the final one would be property
 6        damage.  And so that variance would be 1500 to
 7        $2000.  That's the one that we used.
 8   Q.   Okay.  And was there a time for 1500 or a time for
 9        2000?
10   A.   Yes.  I mean there wasn't a specific time.  It
11        just depended on how many -- sometimes how many
12        numbers we needed to make the bulk rate.
13   Q.   Okay.  I get it.  Then you would go through --
14        it's my understanding, and my understanding may be
15        incorrect, but my understanding was that you could
16        go through that list and then click on and delete
17        the ones that didn't fit the criteria, and then
18        you would be left with the list that you wanted to
19        mail to.  Is that how yours worked?
20   A.   I don't know the answer to that.  Yeah, I never
21        ran the list myself.
22   Q.   All right.  And who in your firm was---
23   A.   Bethany Meeks.
24   Q.   Bethany Meeks?
25   A.   Yeah.  She's now Bethany Wade.  She's married now.
```

Case 1:16-cv-00542-LCB-LPA   Document 269-39   Filed 06/15/20   Page 6 of 7

19

1         summaries or Excel spreadsheets every day?

2    A.   Like I said, it was a web portal, so it would have

3         been available every day.

4    Q.   Okay.  And do you know whether they updated it

5         every day?

6    A.   I would assume that they did, yes.

7    Q.   Okay.  And it's your understanding that Digital

8         Solutions was somehow combing all the accident

9         reports that were available in the state and

10        somehow getting them in that Excel spreadsheet---

11   A.   Yes.

12   Q.   ---and providing that to you and your firm?

13   A.   Yes.

14   Q.   What is your insurance situation in terms of

15        liability coverage that might cover the claims in

16        this case?

17   A.   So the two policies that are involved would be

18        Lawyers Mutual, and then there would be a Liberty

19        Mutual business policy.

20   Q.   Lawyers Mutual would be the malpractice coverage?

21   A.   Correct.

22   Q.   What do they say about it?

23   A.   They have said that they are not providing

24        coverage.

25   Q.   Okay.  And what about Liberty Mutual?

Case 1:16-cv-00542-LCB-LPA   Document 269-39   Filed 06/15/20   Page 7 of 7